# Exhibit 1

Docket No. _CV11 - 60/8382_

| | |
|---|---|
| **NOVA GROUP, INC., as Trustee, Sponsor and** | : SUPERIOR COURT |
| **Named Fiduciary of the CHARTER OAK** | : |
| **TRUST WELFARE BENEFIT PLAN,** | : JUDICIAL DISTRICT OF HARTFORD: |
| | : AT HARTFORD |
| **vs.** | : |
| | : JANUARY 26, 2011 |
| **UNIVERSITAS EDUCATION LLC,** | : |

## ORDER FOR HEARING AND NOTICE

Upon the foregoing Application seeking to vacate the Arbitrator's Award referred to therein, it is hereby ordered that Respondent, **UNIVERSITAS·EDUCATION, LLC**, be summoned to appear before the Superior Court for the Judicial District of Hartford, at Hartford, 95 Washington Street, Hartford, Connecticut, on the 22nd day of February, 2011, at 9:30 A.M./P.M., then and there to show cause why the foregoing Application should not be granted.

It is further ordered that Movant shall cause a true and attested copy of the foregoing Application and this Order to be served upon the Respondent in the manner prescribed by law on or before February 15, 2011, and make due return to this Court.

Dated at Hartford, Connecticut this 26th day of January, 2011.

BY THE COURT

Adam Bulewich, AL
JUDGE/CLERK

Hearing in Courtroom 3.

101

**NOTICE REGARDING HEARING**
JD-CL-105  Rev. 11/09

STATE OF CONNECTICUT
**OFFICE OF THE CLERK**
**SUPERIOR COURT**
*www.jud.ct.gov*



## Notice Regarding Hearing

A hearing has been scheduled for this case on the date and time shown on the attached order, which has been signed by the judge or a clerk of the court. You must come to court, or your attorney must come to court, on the date and time shown in the order if you want to be heard in this matter.

On the first hearing date, the Court will conduct a status/settlement conference. **The Court will not take evidence at this first hearing date.** If the case is not resolved at the status/settlement conference, the Court will schedule the case for a hearing where it will take evidence, usually within two weeks of the status/settlement conference.

If you do not come to court, or your attorney does not come to court, on the date and time shown on the attached order, the Judge will make a decision based on the papers submitted by the applicant.

DOCKET NO. Cv11- 6018382

| | | |
|---|---|---|
| | : | **SUPERIOR COURT** |
| **NOVA GROUP, INC., as Trustee, Sponsor and** | : | |
| **Named Fiduciary of the CHARTER OAK** | : | **JUDICIAL DISTRICT OF** |
| **TRUST WELFARE BENEFIT PLAN,** | : | **HARTFORD** |
| Petitioner, | : | |
| | : | |
| **vs.** | : | **AT HARTFORD** |
| | : | |
| **UNIVERSITAS EDUCATION LLC,** | : | |
| Respondent. | : | |
| | : | **JANUARY 25, 2011** |

## APPLICATION TO VACATE ARBITRATION AWARD
## PURSUANT TO GEN. STAT. § 52-418

To the Superior Court within and for the Judicial District of Hartford, Petitioner **NOVA**

**GROUP, INC.** ("Nova"), as Trustee, Sponsor and Named Fiduciary of the **CHARTER OAK**

**TRUST WELFARE BENEFIT PLAN** ("Plan" or "Trust"), through its undersigned counsel,

hereby applies to this Court, pursuant to Gen. Stat. § 52-418, for an order vacating an arbitration

award issued by the American Arbitration Association dated January 24, 2011 ("Award")

through which respondent **UNIVERSITAS EDUCATION LLC** ("Universitas") was awarded

certain death benefits (including attorneys' fees, interest and costs) against Nova and the Plan. A

copy of the Award is attached hereto as **Exhibit A**.

As a threshold matter, Universitas failed to pay the required filing fees to initiate and

prosecute the arbitration. As a result, the Arbitrator lacked jurisdiction to issue the Award and

1

the Award is a nullity. The Arbitrator was informed of the issue and the governing law on multiple occasions, yet refused to address the deficiency.

With regard to the underlying merits, Universitas failed to file a timely claim for benefits, which is a legal prerequisite under both Federal (the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and Connecticut state law for receiving any benefits, and the Plan expressly states that a claim filed after the deadline must be denied. Thus, the Award manifests an egregious and patently irrational application of the law and violates clear public policy of Connecticut by granting death benefits to a claimant that failed to file a timely claim for death benefits or follow any of the required rules of the Plan.

Equally important, the Arbitrator also failed to apply ERISA appropriately as follows: (1) the Arbitrator failed to apply ERISA's preemption provision, providing that ERISA shall supersede any and all state laws insofar as they relate to an employee benefit plan, thereby permitting Universitas to assert untenable state law claims against Nova and the Plan; (2) the Arbitrator failed to review the denial of Universitas' claim for benefits, and subsequent appeal thereof, under the "arbitrary and capricious" standard of review; and (3) the Arbitrator failed to apply well-established contract principles that are fatal to Universitas' claim for benefits. In each instance, Nova had made these legal requirements abundantly and repeatedly clear to the Arbitrator, yet the Arbitrator disregarded these clear legal principles in rendering the Award.

At bottom this is a very simple case. Mr. Sash Spencer ("Mr. Spencer") and his insurance agent, Bruce Mactas ("Mactas") schemed to defraud the Charter Oak Trust – which is

2

a welfare benefit plan – and use its money to purchase insurance policies to secretly provide the proceeds from the prohibited sale of those life insurance policies held by the Trust (though fraudulently applied for and fraudulently obtained by Mr. Spencer and Mactas through the Trust) to fund a veritable "pleasure palace" out in the desert of Las Vegas to be run by Mr. Spencer's mistress, who is the head person of the dubious "charity" in this case – known as Universitas. It was represented to the fiduciary of the Charter Oak Trust that Universitas was a bona fide charity that provided scholarships to inner-city youth. The truth was that Universitas – really called Destination Universitas and not Universitas Education, LLC – was really not a charity at all, but rather a speculative venture to be created in the deserts of Las Vegas as a retreat for overworked and stressed-out business executives and world leaders.

Mr. Spencer and his agent Mactas planned to use the special "split-dollar" financing arrangement provided by the Charter Oak Trust to purchase two insurance policies on Mr. Spencer's life that Mr. Spencer and Mactas planned to sell to the financing source for the Charter Oak Trust, Grist Mill Capital, LLC, for a total of $1,800,000. The facts and the details of this transaction are not in dispute, nor is the cost of the purchase of the two policies from the Plan, which is $4,300,000 and is comprised of the premiums paid for the policies, plus the financing costs, plus 20% of the cost of the policies plus a percentage of the total death benefit as a

3

placement fee for arranging the transaction. All of this was **unknown** to Nova, which only knew that all of the Plan documents prohibit this type of Life Settlement or STOLI transaction.[1]

The only problem with Mr. Spencer's plans and the illicit Mactas STOLI transaction was that Mr. Spencer died before the policies could be purchased from the Plan, and now the bogus charity – Universitas – has asserted its claim to the proceeds as Mr. Spencer's designated beneficiary under the Plan, despite breaking or ignoring every rule in the proverbial ERISA book as well as the Plan documents.

The Arbitrator totally exceeded and abused his power and authority, manifestly disregarded and ignored the law, violated the public policy of ERISA, Connecticut and the law thereunder, and otherwise imperfectly performed his duties on what can only be described as a clear-cut case of "No Award" for at least a dozen reasons:

1.    According to Sash Spencer's insurance agent, Mactas, there was no meeting of the minds between the parties. If, as Mactas testified, Mr. Spencer would not have done the deal because of the 20% holdback provisions on any death benefit under Plan § 6.01, then there was and is no contract. No meeting of the minds means there was no agreement between the parties and the benefits would be rescinded just as would an insurance policy based on fraud and/or mistake.

2.    This supposition by Mactas, however, is not only rank speculation but total nonsense as well. Spencer and Mactas were defrauding the Plan by doing a Life Settlement transaction. Spencer negotiated the costs of the Life Settlement down to the penny; from 3% down to 2%, and from 2% down to 0%. Spencer wanted to minimize the cost of the Life Settlement transaction but did not care about death benefits because if he died, his beneficiary would not receive the death proceeds under the Life Settlement transaction anyway; the ultimate purchaser and new owner of the policies

---

[1] See, e.g., Mark Maremont & Leslie Scism, *Odds Skew Against Investors in Bets on Strangers' Lives*, Wall St. J. at A1 (Dec. 21, 2010).

4

would have been the beneficiary of all of the insurance proceeds of the policies. Therefore, Spencer never intended to make Universitas the beneficiary of "his" money in life or in death. There is no record of Mr. Spencer making any gifts to Universitas during his lifetime or as part of his will. More importantly to this case, there is voluminous evidence that he intended to make Universitas the beneficiary of his illicit and illegal Life Settlement agreement, but not the beneficiary of any insurance policy on his life. Mr. Spencer's "intent" was clear – he intended to live a long and prosperous life, so that any investment on any insurance policy on his life would ultimately be a bad investment for any purchaser of the policies. If he had truly intended to make Universitas the beneficiary of his insurance policies, why not disclose that to his wife and his business associates, or even his attorney? Obviously, he did not want to disclose either his illicit affair or his illicit STOLI transaction arranged surreptitiously by his insurance agent, Mactas.

3.     Mr. Spencer did not intend to die within two years. He wanted to use other people's money – *i.e.*, the $1.8MM he negotiated to receive from Grist Mill Capital, LLC ("GMC") – to fund his mistress' project in the desert outside of Las Vegas. This is fraud on the Plan because the Plan documents clearly prohibit any type of Life Settlement transaction and any death benefits under the Plan are therefore forfeited.

4.     Mr. Spencer's employer, Holding Capital, adopted into a welfare benefit plan by signing the Corporate Resolution and the Adoption Agreement. Holding Capital and Mr. Spencer agreed to follow the rules of the Plan and indemnify the Plan for all costs, including attorneys' fees.

5.     Mr. Spencer and/or his agent, Mactas, lied on the Enrollment Documents and insurance forms.

6.     Holding Capital, Spencer, Mactas, and Universitas all failed to follow the rules of the Plan, including compliance with the Plan's claims procedures.

7.     Universitas failed to prove that Holding Capital or Mr. Spencer paid the Plan's enrollment fee of $1,500 or the annual Admin Fees of $1,500 for 2007 and 2008.

8.     Universitas and Holding Capital and their attorneys, agents, and advisors threatened litigation against the Plan numerous times in clear contravention of the Plan Documents.

9.    Universitas never submitted a complete claim form on a timely basis and because of this fact alone is barred from any recovery under the Plan.

10.   Universitas did not submit a timely Appeal, and it was sent to the wrong person at the wrong address.

11.   When Jack Robinson, Nova's general counsel, told Universitas' attorney Ivan Schinderman that he needed to submit a claim form, Schinderman said he was too busy "fending off the widow," Mary Spencer. In fact, Universitas, in a written document, manifested an intent to disclaim its right to collect anything from the Plan in exchange for a $5,000,000 contribution from Mary Spencer.

12.   After Jack Robinson repeatedly informed Universitas and its agents, advisors, and attorneys that they needed to submit a claim form, Schinderman said he was too busy fending off Mary Spencer to worry about filing a claim form and Alex Sgoutas, representing Universitas, responded that instead of submitting the claim form, they needed more time to hire a new attorney to address the legal claims that Mr. Robinson had brought to their attention. Behind the scenes, Sgoutas had conversations with Jim Donaghy of Holding Capital Group (Mr. Spencer's employer) contemplating threatening and bringing more litigation against the Plan.

Despite Universitas' best efforts to obfuscate the undisputed facts of this case, defame uninvolved parties, and to expand these proceedings beyond the scope of ERISA and the examination of whether or not Universitas is entitled to benefits under the Plan, as detailed below there is no question that Universitas is not legally entitled to any benefits under the Plan, and the Arbitrator should have decided as such as a matter of law.

For these and other reasons set forth herein, the Award should be vacated in its entirety. Alternatively, the Court should remand the matter for rehearing before the Arbitrator pursuant to Gen. Stat. § 52-418(b).

6

**Parties**

1.      Petitioner Nova is a Delaware corporation having a principal place of business located in Hartford County at 100 Grist Mill Road, Simsbury, Connecticut 06070. Nova is the Trustee, Sponsor and Named Fiduciary of the Plan. The Plan is a Connecticut trust and welfare benefit plan having an address in Hartford County at 100 Grist Mill Road, Simsbury, Connecticut 06070.

2.      Respondent Universitas is a Delaware limited liability company having a principal place of business located at 404 East 55th Street, Apt. 13A, New York, New York 10022.

**Jurisdiction & Venue**

3.      This Court has subject matter jurisdiction pursuant to Gen. Stat. § 52-420 because this application to vacate has been brought within 30 days after notice of the Award.

4.      This Court has personal jurisdiction over Universitas pursuant to the Connecticut Long-Arm Statute, Gen. Stat. § 52-59b because Universitas claims to be a beneficiary under a welfare benefit plan domiciled in Connecticut and because Universitas and its representatives have had numerous telephone calls and meetings in Connecticut to discuss the Charter Oak Trust. Furthermore, Universitas filed a claim, although late, with Nova and the Plan in Connecticut and also filed an appeal of the denial of the claim in Connecticut.

5.      Venue is proper in this Court pursuant to Gen. Stat. § 52-418(a) because Nova and the Plan reside in this Judicial District, and the Plan is governed by Connecticut law.

7

ST1 24190v1 01/25/11

**Factual Background**

6.      The Plan is a welfare benefit plan that provides death benefits to the designated beneficiaries of employees whose employers participate in the Plan.  Normally, a participating employer makes cash contributions to the Plan each year and the Plan uses those contributions to purchase a life insurance policy on the life of the covered employee in an amount sufficient to pay the death benefit chosen by the employer at the time it enters the Plan.  However, the employer may, at any time, change the amount of the death benefit by executing a new adoption agreement and, similarly, increase or decrease the amount of the annual contributions the employer makes to the Plan.

7.      The Plan is at all times the owner and beneficiary of the life insurance policy issued on the life of the covered employee, meaning that neither the employer nor the employee has any privity with the life insurance company that issues the policy.  If a covered employee dies while his employer is participating in the Plan, the gross policy proceeds are paid from the life insurance company directly to the Plan (as the beneficiary of the policy).  After deducting various reimbursements, fees and costs agreed to by the employer and the employee at the time they enter the Plan, the Plan then pays out the net death benefit to the employee's designated beneficiary (normally a spouse, child, or a cared for and legitimate charity).

8.      Due to a special funding arrangement that the Plan was able to offer employers, a third-party funding source (Grist Mill Capital, LLC ("GMC")) agreed to fund the contributions by the employers, meaning that the employers did not have to make any cash contributions to the

8

Plan. All of the funds necessary to pay the premiums on the life insurance policies issued on the lives of the covered employees were paid by GMC on a "split-dollar" basis in return for the employer and the employee agreeing to reimburse the Plan and GMC for all premiums paid as well as pay other necessary funding fees, interest and other costs. This third-party funding arrangement allowed participating employers and covered employees to obtain valuable life insurance coverage through the Plan at no up-front cost to them.

9. As a result of this unique "split-dollar" funding arrangement, the employer in this particular case, Holding Capital Group, Inc. ("Holding Capital"), entered the Plan in December 2006 and chose to enroll its President and CEO Mr. Spencer in the Plan. When it enrolled in the Plan in December 2006, Holding Capital chose a $10 million death benefit for Mr. Spencer's beneficiary. Universitas was designated as Mr. Spencer's *revocable* beneficiary. A few months later, in March 2007, Holding Capital and Mr. Spencer executed a new Adoption Agreement and chose a $20 million death benefit for Mr. Spencer's *revocable* beneficiary — Universitas.

10. However, in May 2008, for some reason Mr. Spencer changed the beneficiary designation for Universitas from revocable to *irrevocable*.

11. Barely a month later, in June 2008, Mr. Spencer died unexpectedly. Soon thereafter, Nova and the Plan discovered that Universitas was a fake charity run by Mr. Spencer's former mistress.

12. Almost immediately after Mr. Spencer's untimely and unexpected death, Universitas retained an attorney, Ivan Schinderman, Esq. ("Schinderman"), to represent

9

Case 1:11-cv-01590-LTS-HBP    Document 4-1    Filed 03/11/11    Page 13 of 70

Universitas both with respect to its dealings with the Plan as well as its efforts to fend off competing claims to the death benefit by Mr. Spencer's widow. Once Mr. Spencer's widow discovered that her husband's mistress (whose existence and identity had been kept secret from the widow) was slated to receive a multi-million death benefit, the widow advised Nova and the Plan that she intended to protest any payment to Universitas and the mistress.

13.    In July 2008, the Plan's general counsel (Attorney Robinson) sent a letter to Schinderman, Holding Capital, and counsel for the widow stating that because Mr. Spencer had designated Universitas as his *sole irrevocable beneficiary*, the Plan was obligated to pay any death benefit to Universitas notwithstanding the competing interests and demands of the widow. In that letter, a mistaken reference was made to a $30 million death benefit because, at the time, the Plan's general counsel did not know that although the Plan owned $30 million of life insurance coverage on Mr. Spencer's life, in March 2007 Mr. Spencer and Holding Capital had executed a new adoption agreement by which a $20 million death benefit was chosen.

14.    Pursuant to Plan § 8.01, a claim for benefits under the Plan must be submitted to the Plan no later than 180 days after the end of the Plan Year in which the covered employee dies. The Plan Year ends on September 30th and Mr. Spencer died in June 2008. Thus, Universitas was required to file a claim for benefits with the Plan no later than 180 days after September 30, 2008 — or March 30, 2009.

15.    It is undisputed that although Universitas was represented by Schinderman from the time of Mr. Spencer's death in June 2008 until Schinderman's own untimely death in June

10

STI 24190v1 01/25/11

2009, neither Universitas nor Schinderman filed a claim for benefits by the March 30, 2009 claims deadline.

16.    The Plan allowed Universitas to file a *provisional* claim for benefits in July 2009 (several months after the claims deadline had already passed) due to Universitas needing to retain new counsel after Schinderman's death the prior month.  However, the Plan specifically and expressly reserved its right to deny any such claim on timeliness (and other) grounds.

17.    But when Universitas filed its provisional claim in July 2009, the Plan was shocked to discover that instead of Universitas claiming a right to the entire death benefit as Mr. Spencer's sole irrevocable beneficiary, Universitas and Holding Capital had entered into an illegal agreement whereby Universitas and Holding Capital were to split the death benefit evenly.  Both the terms of the Plan and governing law prevent an employer such as Holding Capital from receiving *any* benefits under a welfare benefit plan in general and under the Plan in particular.

18.    Even more shocking was that, as part of this illicit and illegal agreement, Mr. Spencer's insurance broker (Bruce Mactas) was slated to receive an illegal $200,000 kickback if the death benefit exceeded $23 million.

19.    Having received a copy of this illicit and illegal agreement attached to Universitas' claim form, Nova (on behalf of the Plan) denied the provisional Universitas claim for benefits in its entirety for these reasons as well as for the most basic reason that Universitas failed to file a timely claim for benefits.

20.    Universitas filed an appeal to Nova of the denial of its claim, which was also denied for the aforementioned reasons as well as for the additional reason that Universitas failed to file the appeal on time and failed to file the appeal at the correct address.

21.    Universitas commenced an arbitration proceeding as required by Plan § 8.02(d) regarding the denial of its claim for benefits.[2]  However, Universitas failed to pay the required filing fees with the American Arbitration Association ("AAA") to commence and prosecute the arbitration, such fees estimated to be approximately $23,000.  Nova objected to Universitas being able to initiate and prosecute an arbitration seeking in excess of $30 million in death benefits plus interest and attorneys' fees without paying the required $23,000 fee, and sought to have the arbitration proceeding dismissed on that basis.  Nova repeatedly informed the Arbitrator of the rules and law requiring Universitas to pay these fees.  However, the Arbitrator denied Nova's motion.

22.    After a three-day hearing held in December 2010, in which Universitas failed to present any evidence that it paid the required filing fees or filed a timely claim for benefits, the Arbitrator issued the Award.

---

[2]  The governing arbitration provision states, in pertinent part, as follows:

> Any controversy or claim arising out of or related to a denial of benefits hereunder or any and all other disputes, claims or controversies (whether or not related to benefits) arising under this Plan & Trust shall be settled by binding arbitration before a single arbitrator in New York, New York, under the commercial arbitration rules of the American Arbitration Association. . . . This Agreement and the Plan shall be construed, regulated, and administered by and under the laws of the State of Connecticut.

Plan § 8.02(d).

ST1 24190v1 01/25/11

23.    Consequently, Nova and the Plan request the Court to vacate the Award or, in the alternative, remand the matter to the Arbitrator for a full rehearing.[3]

## ARGUMENT

### Point I

### Universitas' Failure to Pay Filing Fees Renders Award a Nullity

Both parties agreed that the arbitration would be conducted "under the commercial arbitration rules of the American Arbitration Association," Plan § 8.02(d).  Accordingly, both parties agreed to abide by the AAA's Flexible Fee Schedule.  Universitas commenced an arbitration against Nova with the AAA in June 2010 (as amended in September 2010) seeking $30,677,276.75 in damages plus interest and attorneys' fees.

Based on Universitas' demand and applying the AAA Flexible Fee Schedule, Universitas should have paid $16,867.73 for the Initial Fee and Proceed Fee, plus a Final Fee of $6,000 when the first hearing was scheduled, for a total of $22,867.73.  Yet, shortly after commencement of the arbitration, and before the Hearing was to commence, Nova learned that Universitas failed to pay the necessary filing fee in accordance with the AAA's Flexible Fee Schedule, purportedly on the basis of a hardship waiver.  Nova objected to Universitas proceeding with this arbitration without fulfilling its obligations to pay all required fees, but the AAA refused to provide Nova with any papers filed by Universitas in support of its waiver request or any communication from

---

[3]  The arbitrator (Peter L. Altieri, Esq.) is an attorney admitted in Connecticut (Juris No. 306580), and is therefore subject to an order of this Court remanding the matter for rehearing on the merits.

13

the AAA to Universitas concerning the request. The AAA simply informed Nova that it had, on an *ex parte* basis, unilaterally permitted Universitas to proceed without paying the full fee. Nova moved to dismiss based, *inter alia*, on Universitas' failure to pay the requisite fees.

Subsequently, Nova learned from one of Universitas' submissions that the AAA had granted Universitas a "deferral" of its required filing fee. Nova has no idea what this "deferral" means—whether it means that Universitas will have to pay the full or partial fee at some later time or whether it will have to pay only if it wins an award. In either case, Nova still has not received the benefit of AAA Rule R-49 because that rule envisions up-front payment of filing fees as the norm with a very limited exception "in the event of extreme hardship," and, to Nova's knowledge, Universitas has not made any showing of hardship, let alone extreme hardship.[4]

It is fundamentally unfair for Universitas to enjoy all the benefits of arbitration without paying for them. Throughout, Universitas was represented by a prestigious and expensive 300-attorney national law firm, Loeb & Loeb. Obviously, there was no financial hardship in finding and hiring top-shelf counsel. In fact, the filing made by Universitas' counsel showed that under their retainer agreement, Universitas would be required to pay on a monthly basis an amount equal to the current fees being billed and defer the other half until the arbitration process was over. That same filing stated that the Loeb & Loeb billings to date were over $1,000,000, which

---

[4] AAA Rule R-49 states, in pertinent part, "The filing fee shall be advanced by the party or parties making a claim or counterclaim . . . The AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees." The AAA's Flexible Fee Schedule also states that "[i]f a Proceed Fee is not submitted within ninety (90) days of the filing of the Claimant's Demand for Arbitration, the [AAA] will administratively close the file and notify all parties."

ST1 24190v1 01/25/11

means Universitas had the financial wherewithal to pay Loeb & Loeb at least $500,000. So, clearly $23,000 to the AAA for the arbitration process should not have been a problem. Moreover, if Loeb's bills for Lexis-Nexis and outside counsel were far more than the mere $23,000 required by the AAA, it should have been obvious to both Universitas and Loeb that Loeb pay the AAA arbitration fees up front rather than risk the "No Award" mandate that comes from failure to pay their share of the arbitration costs.

Universitas materially breached the arbitration agreement and should not have been permitted to proceed further with the arbitration. The necessity to pay the requisite filing fees is a jurisdictional requirement in arbitration just as much as it is in state or federal court. See Gen. Stat. § 52-259(a) (requiring a civil filing fee in Superior Court of $300); 28 U.S.C. § 1914(a) (requiring $350 civil filing fee in federal district court). "Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants." Baldwin County Welcome Center v. Brown, 466 U.S. 147, 152 (1984); see also Jarrett v. US Sprint Communications Co., 22 F.3d 256, 261 (10th Cir. 1994) ("The filing fee requirement, by contrast, is established by Congress as a prerequisite to a civil action and must be complied with, absent the granting of IFP status.").

Moreover, the AAA had no authority to decide the issue of whether Universitas should be allowed to materially breach its obligation to arbitrate. The AAA usurped the Arbitrator's role by, essentially, granting Universitas IFP (*In Forma Pauperis*) status without the procedural

15

safeguards and requirements utilized by state and federal courts. Nova informed the Arbitrator

of this in its motion to dismiss and the Arbitrator denied the motion.

Under these circumstances, Universitas' failure to pay the required filing fees should be

deemed a material breach of the arbitration agreement by Universitas, rendering an award in

favor of Universitas a nullity.

<u>**Point II**</u>

**The Arbitrator Ignored the Multiple Legal Arguments for**
<u>**Denying the Claim**</u>

Pursuant to Gen. Stat. § 52-418(a)(4), a court may vacate an arbitration award "if the

arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and

definite award upon the subject matter submitted was not made." <u>Id.</u> "[A]n award that manifests

an egregious or patently irrational application of the law is an award that should be set aside

pursuant to § 52-418(a)(4) because the arbitrator has exceeded [his] powers or so imperfectly

executed them that a mutual, final and definite award upon the subject matter submitted was not

made." <u>Industrial Risk Insurers v. Hartford Steam Boiler Insp. & Ins. Co.</u>, 273 Conn. 86, 95

(Conn. 2005) (internal quotations and citations omitted).

To demonstrate an "egregious or patently irrational application of the law," the following

elements must be satisfied: (1) the error was obvious and capable of being readily and instantly

perceived by the average person qualified to serve as an arbitrator; (2) the arbitrator appreciated

the existence of a clearly governing legal principle but decided to ignore it; and (3) the governing

16

law alleged to have been ignored by the arbitrator is well-defined, explicit, and clearly applicable. See, e.g., id. As detailed below, the Arbitrator's Award in favor of Universitas manifests an "egregious or patently irrational application of the law," and the Award in favor of Universitas must be vacated.

## A. Universitas' Failure to Timely File a Claim Mandates Denial of any Death Benefit Under the Plan

The primary reason for denying Universitas a death benefit under the Plan was that it failed to submit a claim before the deadline of March 30, 2009. **Ex. 431; Tr. 986:8-12**.[5] Because it is undisputed that Universitas failed to file a claim by the deadline, Nova, as the Plan Trustee, Sponsor, and Fiduciary, was legally required to strictly follow the provisions of the Plan and deny the claim. The Arbitrator was made aware of the law mandating this result yet clearly ignored it in rendering the Award.

Guiding this issue is the Connecticut Supreme Court's decision in Voris v. Middlesex Mut. Assur. Co., 297 Conn. 589 (2010).[6] There, the Court held that an insurance company properly denied a claim on the grounds that the claim was submitted after the deadline imposed in the policy and it was of no consequence *whether the late submission prejudiced the insurer*:

---

[5] "Ex." refers to exhibits admitted into evidence during the arbitration hearing and "Tr." refers to the arbitration hearing transcript page and line(s).

[6] Reference to Connecticut law is required because the Plan provides that it "shall be construed, regulated and administered by and under the laws of the State of Connecticut, where the Trust is created." Plan § 13.06.

17

A failure to abide by the limitation of action condition in a policy stands on a much different footing than a non-compliance with the notice provisions… [T]he main purpose underlying the notice stipulations is to safeguard the insurer from prejudice in processing a claim. Therefore, where an insurer's interests have not been harmed by a late notice, the reason for the notice condition is lacking. By contrast, limitation periods of suits are designed to promote justice by preventing surprises through revival of stale claims, to protect defendants and courts from handling matters in which the search for truth may be impaired by loss of evidence, to encourage plaintiffs to use reasonable and proper diligence in enforcing their rights, and to prevent fraud… **The presence or absence of prejudice is not, nor should it be, a factor in deciding whether an insurer may effectively assert this defense under the policy**.

297 Conn. at 599-600 (emphasis added).

"Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms." Allstate Life Insurance Co. v. BFA Ltd. Partnership, 287 Conn. 307, 313 (2008). When a document "operates in the nature of a contract, in that it establishes the parties' rights and obligations [courts] apply the rules of contract construction to the interpretation [of the document]." Cantonbury Heights Condominium Association, Inc. v. Local Land Development, LLC, 273 Conn. 724, 734 (2005).

Thus, courts may enforce claims limitations provisions in policies despite the fact that most insurance policies are contracts of adhesion. Arpin v. Aetna Cas. & Sur. Co., No. CV-91-0388584, 1994 WL 411309, at *2 (Conn. Super. Ct. Jul. 27, 1994). "Limitations on time within which a claim may be brought set forth in a policy raise different concerns that are analogous to those raised by statutorily imposed limitations on actions." Bilodeau v. Aetna Cas. & Sur. Co., No. CV-94-0534733S, 1996 WL 107030, at *4 (Conn. Super. Ct. Feb. 29, 1996). "There is no

18

requirement that an insurance company prove it was prejudiced due to lack of notice under a

claims made policy… [P]rejudice for an untimely report in [the case of a claims made policy] is

not an appropriate inquiry ….” Cabrera v. United Coastal Ins. Co., No. CV-04-0833416S, 2005

WL 1971216, at *6 (Conn. Super. Ct. Jul. 18, 2005).

Moreover, the filing of a timely written notice of claim is not a mere promise, or

condition precedent to the *accrual of a claim* for benefits under Plan § 8.01 but is a *condition*

*precedent to entitlement to any benefits* thereunder because that section specifically provides for

denial of the claim and a loss of all benefits if the beneficiary fails to comply with its

requirements.  See Gianetti v. Health Net of CT, Inc., 116 Conn. App. 459, 468 (2009) (“If the

condition is not fulfilled, the right to enforce the contract does not come into existence.”).

Indeed, this is the very reasoning espoused in McCarthy v. Travelers Indem. Co., No.

CV-970345443-S, 2000 WL 372801 (Conn. Super. Mar. 29, 2000):

> [T]here is an established body of case law in this jurisdiction as well as others
> specifically dealing with the issue of compliance with proof of loss policy
> provisions, with the leading case in Connecticut being *Elberton Cotton Mills, Inc.
> v. Indemnity Ins. Co., 108 Conn. 707, 145 A. 33 (1929)*. The insured in that case
> submitted a proof of loss nine months after notice of loss, and the insurer claimed
> forfeiture on the ground that the policy required proof of loss within ninety days
> after notice. The court, relying on the great preponderance of authority as
> disclosed in the exhaustive discussions contained in *Hirsch-Fauth Furniture Co.
> v. Continental Ins. Co., 24 F.2d 216 (S.D. Fla. 1928)*, and *Clark v. London
> Assurance Corp., 44 Nev. 359, 195 P. 809 (1921)*, held that "if the furnishing of
> proof of loss within a stipulated time is made a condition precedent to liability on
> the part of the insurer, or if a forfeiture is provided for failure to file within that
> time, those provisions will ordinarily be given effect, but where the rendering of
> such proof within the specified time is not expressly made a condition precedent
> to liability, and no forfeiture is provided for on account of delay . . . *such delay*

19

*merely postpones the time of payment and for bringing suit, and if proof of loss is subsequently given the insured may recover on his policy notwithstanding his delay, provided the time otherwise limited for bringing suit has not expired.*" (Emphasis added.) *108 Conn. at 712-13* . . . . The above principles continue to be expressed in the great weight of authority as indicated recently in a leading insurance treatise: "Where a policy requires proofs of loss to be furnished within a certain time after loss has occurred, but does not specify forfeiture for failure to furnish them within the prescribed time . . . the insured may maintain an action even though he or she does not furnish proofs within the designated time, *provided he or she does furnish them.*" (Emphasis added.) 13 G. Couch, Insurance (3rd Ed. 1999) 193:20, p. 193-31.

What the above authority makes clear is that, although a delay in submitting the required proof of loss, absent an express contractual provision to the contrary, does not automatically result in forfeiture, the obligation of the insured to furnish such proof is not dispensed with--**the insured ultimately must provide a sworn proof of loss in order to recover, and do so within the time limitation designated in the policy for bringing suit.**

2000 WL 372801 at * 3-4 (emphasis added).

This is entirely consistent with the fundamental tenets of insurance law where, absent a

waiver or excuse, untimely notice discharges the duty to pay benefits:

Under Connecticut law, "absent waiver, an unexcused, unreasonable delay [by an insured] in notification [of a covered occurrence] constitutes a failure of condition that entirely discharges an insurance carrier from any further liability on its insurance contract."

Arrowood Indemnity Co. v. King, 605 F.3d 62, 77 (2d Cir. 2010) (quoting Aetna Cas. & Sur. Co.

v. Murphy, 206 Conn. 409, 412, 538 A.2d 219 (1988)).

There is no dispute that Universitas never filed a written (let alone sworn) notice of claim

with the Plan Administrator (*i.e.*, Nova) within 180 days after the end of the Plan Year, despite

the clear and unambiguous language governing the claims process and denial of benefits.

20

Universitas has not established any waiver by Nova of the contractual requirements.  Nor has it

otherwise provided an excuse for its untimely filing.  <u>National Publishing Co. v. Hartford Fire</u>

<u>Ins. Co.</u>, 287 Conn. 664, 673 (2008) ("When an insured brings an action against an insurer for

breach of the insurance contract, the insured bears the burden of proving that it complied with

the terms of the contract, including the conditions.").  Nevertheless, the Arbitrator, who was fully

aware of these legal requirements, disregarded them and issued an award that flies in the face of

the above cited well-established legal principles.

      **1.**     **<u>Plan § 8.01</u>**

Article VIII of the Plan is entitled, "Claims by Members or Beneficiaries," and the very

first section, § 8.01, states that a claim must be filed on a form supplied by the Plan Sponsor

(Nova) and provides a simple road map for determining the deadline.  As Jack E. Robinson,

Esq., General Counsel of Nova, testified, Plan § 8.01 required claims for benefits to be filed with

the Administrator (Nova) on forms supplied by the Plan Sponsor (Nova) "within one hundred

eighty (180) days from the end of the Plan Year in which the death of incident of claim

occurred."  Plan § 2.21 defined "Plan Year" to mean "the 12-month period ending on September

30th of each year."  **Tr. 1100:10-16**.  As Robinson explained, since Spencer died on June 10,

2008, the pertinent Plan Year ended on September 30, 2008 and the deadline of 180 days later

was March 30, 2009.  **Tr. 1100:20-25**.  Plan § 8.01 further provides that any claim application

not filed by the deadline "will be considered untimely filed and **<u>denied for that reason</u>**."

(Emphasis added.)

21

**2.    Ivan Schinderman, Esq.**

Robinson testified that on several occasions he repeatedly told Ivan Schinderman,

Universitas' attorney from at least the end of June 2008 until his death the following June, to

read the Plan and make sure to file a claim by the deadline. **Tr. 687:5-688:2; 691:24-692:11**.

He asked Schinderman when he would be filing a claim for the death benefit. Schinderman

replied that he was "too busy fending off the widow Mary Spencer" who was threatening to

contest Universitas' right to the death benefit under Florida law protecting surviving spouses.

**Tr. 693:17-696:6.** Furthermore, Schinderman certainly had a copy of the Plan because he and

Robinson discussed the issue regarding the 20% withhold of death benefit in Plan § 6.01, an

issue raised as early as Robinson's letter of July 23, 2008 (**Ex. 83**), and Schinderman pulled the

Plan out of his briefcase during a lunch with Robinson at the Harvard Club in New York City.

**Tr. 1093:22-1094:19**.

**3.    Insurance Agent Bruce Mactas**

Mactas testified that as part of the services he renders to his life insurance clients, he

assists their beneficiaries in making claims after the clients die. **Tr. 36:7-18; 415:18-23.** In

testifying about **Ex. 92**, an email chain about Robinson's July 23, 2008 letter, he referred to

"client issues" and under cross-examination clarified that he viewed Universitas as his client.

**Tr. 187:4-19; 326:5-327:24.** As early as January 19, 2007, Mactas had a copy of the Plan. **Ex.

19**. He sent it to Spencer in May or June 2007. **Tr. 375:24-376:20.**

22

In performing his services for his clients, on June 13, 2008, three days after Spencer died, Mactas had his staff complete a claim form for the proceeds of the life insurance policies issued by Lincoln National Life Insurance Company ("Lincoln") and sent it to Nova's president (Wayne H. Bursey) to execute on behalf of the beneficiary of the policies (*i.e.*, the Plan). **Ex. 63; Tr. 414:14-416:18**. Mactas testified he obtained the form from Lincoln, and the form required the beneficiary to swear to the accuracy of the statements under penalty of perjury. **Tr. 415:15-17; 416:7-9**. Bursey signed the form before a notary public and sent it back to Mactas on June 16, 2008. **Ex. 413; Tr. 416:13-19; 419:3-7**. Mactas filed the form with Lincoln's brokerage general agent on July 10, 2008, a month after Spencer died. **Ex. 70; Tr. 418:22-421:13**. Thus, Mactas knew very well how to request a claim form, fill it out, have the beneficiary sign it under oath, and file it with the insurer or payor.

Despite performing these tasks for the Plan to make sure that Lincoln paid under the policies, Mactas admitted that he never once asked the Plan for its claim form for a death benefit under the Plan to be completed by Plan beneficiaries and that he never filed a claim form with the Plan before the March 30, 2009 deadline. **Tr. 446:18; 447:12**. He also acknowledged that the claim form he submitted to Lincoln did not constitute filing of a claim for a death benefit under the Plan. **Tr. 446:6-9.** On April 4, 2008, two months before Spencer died, Mactas asked whether he should fill out a new beneficiary form to make irrevocable Spencer's designation of beneficiary and "file it with COT" [Charter Oak Trust]. **Ex. 55**. Thus, Mactas recognized there were Charter Oak Trust forms that he must file with the Plan.

23

Mactas remained actively involved with Universitas by communicating with the Plan, Universitas and its representatives, Holding Capital and its representatives, and Spencer's widow and her representatives after Spencer's death and past the March 30, 2009 deadline for filing a claim and, thus, could have and should have asked the Plan for a claim form and filed it before the March 30, 2009 deadline, which he should have calendared based on Plan § 8.01. **Ex. 65, 414, 72, 439, 84, 106, 425, 165; Tr. 441:18-442:2**.

Thus, both of Universitas' representatives had the Plan document no later than July 2008 and could have and should have obtained the claim form from Nova, helped Universitas complete it, and filed it before the March 30, 2009 deadline. Obviously, with all these insurance agents, advisors and attorneys involved representing Holding Capital, Universitas, and the widow and threatening litigation regarding Plan § 6.01, someone should have at least requested a claim form. Mactas asked Nova's Barbara Korfel to send the Plan document to Lincoln, but never once asked her to send him a claim form so Universitas could file a claim with the Plan.

### 4.    Lack of Equivalent Substitutes for a Claim Form

Universitas cannot seriously contend that it filed any claim whatsoever before March 30, 2009. In light of its examination of Robinson, Universitas argued that Schinderman's February 25, 2009 letter to Robinson (**Ex. 418**) constituted a "claim" for death benefits under the Plan. However, that letter cannot conceivably be considered a claim for benefits. The letter is not signed by Universitas as the beneficiary, nor is it signed under oath. The word "claim" does not appear in the "Re" line. In fact, the letter is nothing more than a continuation of the debate over

24

the 20% withhold, to which Robinson responds in the second paragraph of his letter dated March 2, 2009 (**Ex. 419**).

There is no other document that Universitas argued constitutes a written claim before March 30, 2009. Rather, it suggests in its examination of Robinson that the filing of a written claim on a form supplied by Nova was unnecessary because the Plan already had all of the information required by the form. **Tr. 829:4-839:16; Ex. 148, 424**. Robinson testified, however, that the Plan needed a claim to be signed by the beneficiary and that trust law required the claim to be signed under oath. **Tr. 827:15-828:6; 1101:15-19**.

Additionally, Robinson explained that clearly the Plan did not possess knowledge of all the information called for in the claim form because when Universitas eventually filed the belated provisional claim form on July 15, 2009, it wrote on the line for "Designated Beneficiary" the phrase, "PLEASE SEE ATTACHED AGREEMENT." **Tr. 927:7-24.** The attached Agreement was a Settlement Agreement and Releases dated November 11, 2008 in which Universitas and Holding Capital agreed to pay Mactas $200,000 if the net death benefit exceeded $23 million and then to split evenly the net death benefit between Universitas and Holding Capital. **Ex. 425**. Since Robinson was learning for the first time that Universitas was directing the Plan to pay portions of the death benefit to Mactas and Holding Capital based on a Settlement Agreement from November 2008, the Plan obviously did not know all the information called for in the claim form before the March 30, 2009 deadline. **Tr. 916:7-917:22.** Robinson testified that he was unaware of the November 2008 Settlement Agreement before

25

seeing it as an attachment to the provisional claim form after it was filed on July 15, 2009. **Tr. 915:8-16; 1086:21-1087:7**.

Robinson also testified that it is important for the Plan to have all the necessary information about the death benefit claim in a single document to protect the Plan from later conflicting claims. **Tr. 1102:19-1103:9**. Furthermore, it is important to have the beneficiary sign under the penalty of perjury to prevent fraud. **Tr. 1108:17-1109:4**.

Consequently, the requirement of a written, sworn claim form submitted by the deadline is not a mere ministerial event that can be complied with in substance or through alternative means. Following the letter of the Plan required the denial of the claim under these circumstances.

     **5.**     <u>**Allowance of a "Provisional" Claim**</u>

Robinson testified that after Lincoln paid the policy proceeds to the Plan in mid-May 2009 (but only after the Plan had sued Lincoln), Nova searched its records but could not find any claim form filed by Universitas. **Tr. 889:6-23; 893:3-895:4**. Likewise, Robinson could not find any claim form in his files. <u>Id.</u>

Because Plan § 8.01 provides that any claim application not filed by the deadline "will be considered untimely filed and denied for that reason," Robinson was obliged to inform Universitas in a letter dated July 8, 2009 (**Ex. 424**) that it had failed to file a claim by the March 30, 2009 deadline and that failure to file a timely claim was sufficient grounds for denying Universitas any death benefit. Nevertheless, because the Plan was not in business for the

purpose of denying claims (in which case it would have eventually gone out of business), the Plan allowed Universitas to file a "provisional" claim by July 15, 2009 but reserved the right ultimately to deny the claim for untimeliness. **Tr. 901:5-14; 976:21-977:9; Ex. 424**. Robinson testified that this was not an exercise in futility because the Plan might have allowed the claim if Universitas demonstrated that it had completed a claim form and given it to Mactas or Schinderman but that it had not been forwarded to the Plan. **Tr. 901:5-902:12**.

Robinson testified that it was not his job to calendar or keep track of the March 30, 2009 deadline. **Tr. 878:15-879:22**. He had reminded Schinderman several times to file a claim form. **Tr. 687:5-688:2**. Mactas testified he had decades of experience in filing claim forms after a client's death and had sold insurance in connection with so-called "419 plans." **Tr. 66:15-17; 334:15-19**. Thus, Universitas had two representatives who should have calendared the deadline and filed the claim form before the deadline. Universitas should sue them for failing to do so, especially since they both read the Plan document where all of the required procedures for filing a claim for benefits are clearly spelled out. Universitas argued incessantly over the 80% provision in Plan § 6.01 but now wants the Arbitrator to believe that it completely overlooked the claims procedure outlined in Plan § 8.01. That does not make any sense, and Nova should not be held responsible for the professional negligence of Mactas and Schinderman in this regard.

27

6.    **The Late Appeal**

Universitas acknowledged that it sent its appeal of the denial of its death benefit claim to Robinson in care of Benistar at Benistar's Stamford, Connecticut office and has not presented any evidence that it sent its appeal to Nova in Simsbury, Connecticut. **Ex. 223**. Plan § 8.02(a) provides that if a claim for death benefits is denied, the claimant "may file a written appeal to the Administrator" within 60 days after denial of the claim. There is no dispute that the Plan Administrator was Nova, Plan § 2.01, and Nova's only location is in Simsbury, Connecticut.

Plan § 8.01 provides that "[c]laims for benefits under the Plan shall be filed with the Administrator . . . ." In accordance with that provision, Universitas sent its provisional claim form to Wayne H. Bursey, Nova Group, Inc., 100 Grist Mill Road, Simsbury, CT. **Ex. 425**. Additionally, at the end of Robinson's July 8, 2009 letter, he directed Universitas to file its claim with Bursey at Nova in Simsbury and the claim form he enclosed had a similar directive on its first page. **Ex. 424** (NOVA 981). On page 3 of Bursey's letter dated October 2, 2009 denying the claim, he set a deadline of December 1, 2009 for Universitas "to file a written appeal of this decision to Nova." **Ex. 431**. That letter was written on Nova letterhead showing an address in Simsbury. Id.

Because Universitas and its lawyers ignored these instructions to file the appeal with Nova in Simsbury and rather sent it to Robinson in Stamford, the appeal sat on his desk through the first ten days or so of December 2009 while he was in Massachusetts campaigning for the Republican nomination for Ted Kennedy's Senate seat against the ultimate general election

28

ST1 24190v1 01/25/11

winner – Scott Brown. **Tr. 1127:16-1128:16.** Furthermore, Robinson did not have access to his email during this period because he did not yet have a Blackberry. **Tr. 1202:3-22.** Consequently, Nova did not receive Universitas' appeal until mid-December 2009, after Robinson returned to his office in Stamford, found the appeal on his desk, and forwarded it to Bursey in Simsbury. **Tr. 1128:12-1129:10.**

Universitas cannot blame its failure to file its appeal with Nova in Simsbury on Robinson's earlier letter of September 11, 2009 (**Ex. 427**). Robinson wrote that letter to stop Loeb & Loeb and Alex Sgoutas, Universitas' representatives, from threatening the Plan with litigation and/or conducting settlement negotiations directly with Bursey and others to the exclusion of Robinson, the attorney representing the Plan. Thus, he insisted that all such "communications" and "questions" be directed solely to him, as the Plan's counsel. He did not state that any appeal of a denial of death benefit should be directed to him. In fact, at that time, the claim was still pending, and no denial was issued until three weeks later. **Tr. 1126:7-1127:1.**

Accordingly, yet another ground for denial of the appeal was that it was not filed with Nova in Simsbury by the December 1, 2009 deadline. **Ex. 433**.

### 7.    Additional Pertinent Legal Authority

Denial of a death benefit to Universitas may seem harsh, but ERISA and Plan § 8.01 require that result. Nova, as Plan Sponsor, Trustee, and Fiduciary, was required to follow the rules of the Plan.

29

A.    **ERISA Considerations.**

In Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan, 129 S. Ct. 865, 875 (2009), the

Supreme Court held that the plan administrator rightfully followed the plan documents and

ignored the informal attempts to change the designation of the beneficiary.  In the present case,

the legal issues surrounding delivery, or lack of delivery, of a claim form, and the Plan

documents were presented to the Arbitrator and they were ignored.  The Arbitrator was also told

that under ERISA, Universitas was not free to ignore informal attempts by Universitas to vary

the Plan's requirements.

Nova relies on two principles of law enunciated in Kennedy that apply to all claims

brought against any welfare benefit plan:

> 1.    Universitas' claim for benefits "stands or falls by 'the terms of the plan,'
> [ERISA] § 1132(a)(1)(B), a straightforward rule of hewing to the directives of the
> plan documents that lets employers establish a uniform administrative scheme,
> [with] a set of standard procedures to guide processing of claims and
> disbursement of benefits."
>
> 2.    " . . . ERISA forecloses any justification for enquiries into nice
> expressions of intent . . . ."

Kennedy, 129 S. Ct. at 875 (2009) (quotation marks omitted).

Again, these legal issues were explained to the Arbitrator in detail.  Nova explained to the

Arbitrator that it denied Universitas' claim because Nova was obliged to follow the letter of the

Plan documents.  For instance, Nova was required to enforce the requirement that a claim be

submitted on its form and under oath by March 30, 2009.  The fact that Universitas may have

30

contacted Nova soon after Mr. Spencer had been laid to rest is immaterial to the timeliness of its claim and whether it was submitted in proper form. Indeed, Universitas was being counseled by its representatives, Mactas and Schinderman, both of whom had the Plan and were aware of the necessity that claims had to be properly and timely filed in order to obtain a death benefit. The deadline for claims and the form for the claims are bright line tests from which Nova could not deviate. The Arbitrator was repeatedly told this clear and well settled point of law, and he elected to ignore it.

Thus, Universitas' claim was properly denied on the grounds that it was submitted after the deadline imposed by Plan § 8.01, and its appeal was properly denied on the grounds that it was submitted after the deadline imposed by Plan § 8.02(a). In fact, under the Supreme Court's ruling in Kennedy, supra, Nova, as the Plan's Fiduciary, was obligated to "hew[] to the directives of the plan documents" and avoid "enquiries into nice expressions of intent" and, as a result, was compelled to deny Universitas' claim and appeal because they both were submitted too late under these clear deadlines established by the Plan.

To the extent Universitas attempted to argue that it had provided the Plan with the equivalent of a claim form before the March 30, 2009 deadline, there is no dispute that it never filed a written and sworn proof of claim with the Plan Administrator before March 30, 2009, as required by Plan § 8.01. The claim form itself requires that the proof of claim be made in writing and sworn to under penalty of perjury **by the beneficiary** and **in two places**. Ex. **424** (UNIV 983, 985). No such document existed or was filed before mid-July 2009.

31

Simply put, because Universitas failed to file a sworn proof of claim, no benefits are payable under the Plan. This was the very situation addressed in <u>McCarthy</u>, <u>supra</u>, where the plaintiff never submitted a sworn proof of loss. The court held "that at the very least the plaintiff's failure to submit a sworn proof of loss has prevented the loss from becoming payable." 2000 WL 372801 at * 4. All these points of law were provided to the Arbitrator in both pre- and post-hearing submissions, and he ignored them.

**B.**    **The Arbitrator Ignored the Plan Requirements of ERISA**

**1.**    **The Award manifests an egregious or patently irrational application of the law because the Arbitrator failed to apply ERISA's preemption provision**

The Award also manifests an egregious and patently irrational application of the law in the following respects: (1) the Arbitrator ruled in Universitas' favor on exclusively state law claims, despite it being well-established that ERISA bans consideration of such claims; and (2) the Arbitrator failed to apply the most deferential standard of review to Nova's decision to deny Universitas' claim—the arbitrary and capricious standard of review.

As an employee welfare benefit plan, the Plan is governed in part, as are all welfare benefit plans in the United States, by ERISA.[7] The Plan is subject to certain provisions of ERISA even though it is not strictly speaking an "ERISA benefit plan" because it was not created, established, or maintained by an employer (*i.e.*, Holding Capital).

---

[7] All welfare benefit plans are covered by Part 5 of ERISA –the Administration and Enforcement Section of ERISA—and thus, as to the Plan, ERISA controls.

**a. The Arbitrator manifestly disregarded the law by failing to apply ERISA and allowing Universitas to assert state law claims**

It is clear under the standard set forth in <u>Industrial Risk Insurers</u>, that the Arbitrator's Award in favor of Universitas manifests an egregious or patently irrational application of the law, and an award in favor of Universitas must be vacated. <u>Id.</u>, 273 Conn. at 95.

That Universitas' state law claims have no basis is obvious and certainly capable of being readily and instantly perceived by one qualified to serve as an arbitrator. Moreover, the Arbitrator appreciated the existence of ERISA's preemption provision — a clearly governing legal principle, as is demonstrated by the extensive briefing by the parties on this very issue. In spite of the briefing on the issue, and Universitas ultimately conceding that ERISA does apply, the Arbitrator failed to rule on it. Finally, the ERISA preemption provision, which was ignored by the Arbitrator, is well-defined, explicit, and clearly applicable to this case.

ERISA's preemption provision is sweeping, providing that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title." 29 U.S.C. § 1144(a); <u>see also</u> <u>Paneccasio v. Unisource Worldwide, Inc.</u>, 32 F.3d 101, 114 (2d Cir. 2008) (<u>quoting</u> <u>Aetna Health Inc. v. Davila</u>, 542 U.S. 200, 214 (2004) ("As to state common law claims, ERISA preempts those that seek 'to rectify a wrongful denial of benefits promised under ERISA-regulated plans, and do not attempt to remedy any violation of a legal duty independent

33

of ERISA.")); <u>Pilot Life Ins. Co. v. Dedeaux</u>, 481 U.S. 41, 45 (1987) (common law causes of action based on alleged improper processing of a claim for benefits are preempted by ERISA).

ERISA limits Universitas to a single claim for benefits, and fully preempts all of Universitas' common law claims. ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B); <u>Bd. of Trustees of Local 295/Local 851-IBT Employer Group Pension Fund & The Local 295/Local 851-IBT Employer Group Welfare Fund v. Callan Assoc., Inc.</u>, 175 F.3d 1007 (2d Cir. 1999) (claims for breach of contract and breach of fiduciary duty are preempted by ERISA); <u>LoPresti v. Terwilliger</u>, 126 F.3d 34, 41 (2d Cir. 1997) (conversion claim is preempted by ERISA); <u>Saks v. Franklin Covey Co.</u>, 117 F. Supp. 2d 318 (S.D.N.Y. 2000) (stating "it has long been held that a plaintiff has no claim of breach of contract against a plan administrator for failing to award benefits, because such claims are squarely preempted by ERISA"); <u>Nealy v. U.S. Healthcare HMO</u>, 844 F. Supp. 966, 970, 971 (S.D.N.Y. 1994) ("as part of ERISA's enforcement scheme, most state laws relating to employee benefit plans are preempted").

To the extent that Universitas relies upon common law to support its breach of fiduciary duty claims, such reliance is also improper as ERISA's express preemption provisions clearly reach state law claims for breach of fiduciary duty. <u>See</u> <u>Gabel v. Richards Spears Kibbe & Orre</u>, 615 F. Supp. 2d 241 (S.D.N.Y. 2009) (ERISA preempts claim for breach of fiduciary duty); <u>Watson v. Consol. Edison of N.Y.</u>, 594 F. Supp. 2d 399, 408-09 (S.D.N.Y. 2009) (ERISA preempts fraud and breach of fiduciary duty claims premised on fiduciaries' misconduct in administering ERISA plan).

Thus, Universitas' common law claims for declaratory judgment, breach of contract, breach of fiduciary duty and duty of loyalty, conversion, unjust enrichment, and accounting are preempted and must fail as a matter of law. <u>Pilot Life Ins. Co. v. Dedeaux</u>, 481 U.S. 41 (1987). Accordingly, the Award must be vacated.

**b. The Arbitrator manifestly disregarded the law by failing to apply the most deferential standard of review to Nova's decisions and decision making process—the arbitrary and capricious standard of review**

The Arbitrator's failure to apply ERISA, improperly and impermissibly allowing Universitas to bring state law claims, is further compounded by the Arbitrator's failure to apply the most deferential standard of review to Nova's decisions and decision making process—the arbitrary and capricious standard of review.

Under the arbitrary and capricious standard of review, a decision to deny benefits may be overturned only if it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." <u>Pagan v. NYNEX Pension Plan</u>, 52 F.2d 438, 442 (2d Cir. 1995). Had the Arbitrator reviewed Nova's decision to deny Universitas' claim under the "arbitrary and capricious" standard, the only decision he could have rendered is one of no award to Universitas.

ERISA does not set forth a standard of review for actions challenging the denial of benefits. However, in <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 109 (1989), the Supreme Court established the deferential standard of review for plan sponsors and administrators is the "arbitrary and capricious" standard: "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the

administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Id. at 115 (emphasis added). Moreover, as explained in Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243 (2d Cir. 1999), a fiduciary may have discretion to interpret plan rules even if the plan does not specifically use language expressly stating this discretion because "magic words such as discretion and deference may not be absolutely necessary to avoid [de novo] standard of review." Id. at 251 (quoting Jordan v. Retirement Committee of Rensselaer Polytechnic Institute, 46 F.3d 1264, 1271 (2d Cir. 1995)). The use of language that is the "functional equivalent" will result in review of claim denials under the arbitrary and capricious standard." Kinstler, 181 F.3d at 252.

Plan § 8.01 gives subjective decision-making power to Nova to deny a claim for benefits, and thus provides Nova with the functional equivalent to "discretion." This Section provides in pertinent part that "[i]n the event the claim is denied, the reasons or the provisions of the Plan shall be cited." Id. Because no objective criteria are listed that control its determination of a claim, it follows that Nova may deny a claim for any reason, so long as that reason is explained. In addition, under the Plan, Nova is the Plan Sponsor, Named Fiduciary, Trustee, Named Trustee, and Administrator. Plan §§ 2.01, 2.16, 2.17, 2.20 and 2.24. Plan § 3.03 provides: "The Plan Sponsor shall be deemed to be the Administrator… and the Named Fiduciary of the Plan shall direct the administration of the Plan in all respects …." The Plan Sponsor may amend or terminate the Plan. Plan §§ 3.04, 3.06. Payment of benefits to beneficiaries is "upon the advice

36

of the Plan Sponsor," Plan § 7.01, and payment of benefits upon termination of the Plan is "at the direction and discretion of the Plan Sponsor." Plan § 7.02.

Furthermore, there are no limitations on Nova's discretion in processing and deciding claims for benefits. For example, approval of the Plan's Insurance Trustee (a financial institution separate from Nova) is not required for any function that Nova may exercise with respect to granting or denying a claim. Under these circumstances, the Arbitrator was required to apply an "arbitrary and capricious" standard of review to Nova's decision to deny Universitas' claim for benefits and its appeal under Article VIII of the Plan. See Peck v. Aetna Life Ins. Co., 406 F. Supp. 2d 271, 277 (D. Conn. 2007) (Because Aetna exercised discretion in denying claim, "[t]he court will therefore evaluate Aetna's denial under the arbitrary and capricious standard").

In Glenn, the Supreme Court elucidated its earlier decision in Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989):

> We do not believe that Firestone's statement implies a change in the standard of review, say, from deferential to *de novo* review. Trust law continues to apply a deferential standard of review to the discretionary decisionmaking of a conflicted trustee, while at the same time requiring the reviewing judge to take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion.
> *       *       *
> Nor would we overturn Firestone by adopting a rule that in practice could bring about near universal review by judges de novo – i.e., without deference – of the lion's share of ERISA plan claims denials, any ERISA plans grant discretionary authority to administrators that combine evaluation and payment functions.

Glenn, 554 U.S. at 115-16 (emphasis added).

ST1 24190v1 01/25/11

But perhaps the most significant controlling case of the Supreme Court's analysis of the standard of review of a plan sponsor's or an administrator's decision to deny benefits was decided this year in Conkright v. Frommert, 130 S. Ct. 1640 (2010), which is doubly significant in that the case originated from the Second Circuit. Firestone established the deferential standard of review for plan sponsors and administrators in the "arbitrary and capricious" standard:

> It is undisputed that, under *Firestone* and the terms of the Plan, the Plan Administrator here would normally be entitled to deference when interpreting the Plan.

Conkright, 130 S. Ct. at 1646.

Glenn made it clear that despite a systemic conflict that arose when the plan administrator and claims payer roles were both played by the insurance carrier who was ultimately responsible for paying the claims and suffering the loss, the Supreme Court reaffirmed the "arbitrary and capricious" standard and deferential review of such an administrator's review of the denial of claims:

> We held that, when the terms of a plan grant discretionary authority to the plan administrator, a deferential standard of review remains appropriate even in the face of a conflict.

Id.

Now the Supreme Court has spoken in Conkright, which stands for the premise that even if the plan administrator makes a **mistake** in the denial or the calculation of a claim, the administrator's decision is to still be given the utmost deference, and the Supreme Court rejected the "one strike and you're out" approach utilized by the district court and the Second Circuit.

<u>Conkright</u> involved a deferred compensation or pension type of plan (*i.e.*, similar to a

"Top-Hat Plan" which Robinson confirmed the Charter Oak Trust is not, **Tr. 1035:9-1036:17**).

There are certain "non-forfeiture" provisions in ERISA to protect participants in pension plans.

Those anti-forfeiture provisions do not apply to welfare benefit plans like the Charter Oak Trust,

<u>see</u> <u>In re: Lucent Death Benefits ERISA Litigation</u>, 541 F.3d 250 (3d Cir. 2008), or in "Top-Hat"

plans, <u>see</u> <u>Bryan v. Pep Boys</u>, No. 00-1525, 2001 WL 752645 (E.D. Pa. Jun. 29, 2001).  In

<u>Bryan</u>, the district court refused to apply federal common law to declare the non-compete void:

> The failure of ERISA to provide nonforfeitability coverage to Top Hat plans is
> not an "interstice" because it is the result of a deliberate decision to let executives
> use their positions of power to negotiate such protection for their plans on their
> own.  Since ERISA intentionally omits Top Hat plans from its nonforfeitability
> protection, federal common law must not be used to create nonforfeitability
> protection under ERISA.

<u>Id.</u> at *4.

Thus, if there is no ERISA "non-forfeiture" provision or vesting provision in a welfare

benefit plan, the plan can change or eliminate the benefit at any time (<u>see</u> <u>Lucent</u>, <u>supra</u>), or if

the plan provisions are not followed, the claim can be easily denied when the beneficiary does

not follow the rules (<u>see, e.g.</u>, <u>Bryan</u>, <u>supra</u>, as well as <u>Kennedy v. DuPont</u>, 129 S. Ct. 865

(2009)).

In <u>Lucent</u>, even though the death benefit was attached to a pension plan, the district court

and the Court of Appeals ruled that there was no vesting of the death benefit and it could be

cancelled at any time:

39

The pensioners contend that the pensioner death benefit is an accrued and vested pension benefit that is protected by ERISA from unilateral termination. Lucent, on the other hand, argues that the pensioner death benefit is an unvested welfare benefit that it may terminate unilaterally.

Lucent, 541 F.3d at 254.

If the death benefit was considered part of the pension, it would be subject to vesting and

be nonforfeitable. However, the Court of Appeals found otherwise:

Instead, the pensioner death benefit provides "benefits in the event of . . . death." *See* 29 U.S.C. § 1002(1) (defining a welfare plan). This fits readily within the definition of a welfare benefit. As the Second Circuit Court of Appeals has explained, the fact that a welfare benefit appears in a larger plan that also provides pension benefits does not change the character of that welfare benefit. *See Rombach v. Nestle USA, Inc.*, 211 F.3d 190, 193-94 (2d Cir. 2000).

Id. at 255.

The Court of Appeals found in Lucent the same as with this case, that the death benefits

at issue constituted a welfare benefit plan rather than a "pension" plan and that there was no

ambiguity in the documents on this crucial point:

The Lucent plan thus is a welfare plan to the extent that it provides for the pensioner death benefit at issue in this case. No ambiguity in the plan prohibits us from reaching this legal conclusion since the plan language is not "subject to reasonable alternative interpretations."

Id. at 256 (citation omitted).

The significance of Conkright is that even in making a **mistake** in the administration of a

**pension**-type benefit, the Supreme Court still held the most deferential standard of review to be

the correct standard:

40

We reject this "one-strike-and-you're-out" approach. Brief for Petitioners 51. As an initial matter, it has no basis in the Court's holding in *Firestone,* which set out a broad standard of deference without any suggestion that the standard was susceptible to ad hoc exceptions like the one adopted by the Court of Appeals. See 489 U.S., at 111, 115, 109 S.Ct. 948. Indeed, we refused to create such an exception to *Firestone* deference in *Glenn,* recognizing that ERISA law was already complicated enough without adding "special procedural or evidentiary rules" to the mix. 554 U.S., at ___, 128 S.Ct., at 2351. If, as we held in *Glenn,* a systemic conflict of interest does not strip a plan administrator of deference, see *id.,* at ___, 128 S.Ct., at 2350-51, it is difficult to see why a single honest mistake would require a different result.

Conkright, 130 S. Ct. at 1646-47.

Nova did not make a mistake in denying the Universitas claim for death benefits. Nova had not just one good reason, it had several good reasons for denying Universitas' claim and appeal, including late filings, an illegal attempt to share the death benefit with Holding Capital and Mactas, and fraud committed on the Plan by Mactas and Spencer in attempting to perform a prohibited Life Settlement transaction in a welfare benefit plan. Nova is not the insurer. Nova will not benefit at all from the payment or denial of this claim, as would Metlife in Glenn. Nova has no conflicts and Nova made no mistakes in denying the Universitas claim. But even if it did have a conflict or even if it did make a mistake, Conkright entitles Nova to the most deferential standard of review – the "arbitrary and capricious" standard. Even the dissent in Conkright agreed that the correct standard of review was the "arbitrary and capricious" standard:

> In essence, the Administrator read the 1989 Plan to include the language that had been omitted--an interpretation that, as described below, see Part I-B, *infra,* the Court of Appeals found to be **arbitrary and capricious** and in violation of ERISA.

41

> The Court of Appeals concluded that, because the 1989 Plan said nothing about how the Administrator would adjust the previous benefits distributions, it was "**arbitrary and capricious**" for the Administrator to interpret the 1989 Plan as if it still incorporated the "phantom account."

Conkright, 130 S. Ct. at 1654 (emphasis added) (Breyer, J., dissenting).

Since Nova did not have a conflict, did not make a mistake, and had several meritorious reasons for denying the payment of an untimely-filed claim, the Arbitrator should have concluded that Universitas was not entitled to any death benefit and entered an award that Universitas was to take nothing, and would have to pay Nova's legal fees totaling approximately $425,000. Each of these legal points were explained to the Arbitrator in detail, repeatedly, and were obviously (and blatantly) ignored by the Arbitrator, thus requiring this application to vacate the Award.

The Arbitrator was required to apply the most deferential standard of review to Nova's decisions and decision-making process—the arbitrary and capricious standard of review. Nova denied Universitas' claim for benefits under the Plan and appeal for several reasonable, clearly delineated reasons, including late filings, an illegal attempt to share the death benefit with Holding Capital and Mactas, and fraud committed on the Plan by Mactas and Spencer in attempting to perform a prohibited Life Settlement transaction in a welfare benefit plan. Had the Arbitrator reviewed Nova's decision to deny Universitas' claim under the "arbitrary and capricious" standard of review, the only possible conclusion he could have come to is that Universitas is not entitled to an award as a matter of law. However, even assuming the Court or

42

the Arbitrator used a *de novo* standard of review, the failure to file a complete or timely claim

form is fatal to any and all of Universitas' claims to benefits under a strict reading of the Plan

documents, which is the essence of the *de novo* standard of review. Accordingly, the Award

must be vacated.

2. **The Award manifests an egregious or patently irrational application of the law because the Arbitrator failed to apply well established contract principles fatal to Universitas' claim**

Nova denied Universtas' claim because Nova was obliged to follow the letter of the Plan

documents, specifically the requirement that a claim be submitted on its form and under oath by

March 30, 2009. The deadline for claims and the form of the claims are bright line tests from

which Nova could not deviate and Nova rightfully ignored informal attempts by Universitas to

vary the Plan's requirements. Furthermore, the Plan contains prohibitions against litigation and

threats of litigation. Plan §§ 8.02(d), 13.07. Thus, Universitas' repeated threats of litigation

provided additional valid grounds for denying its late-filed and improperly-executed claim.

Where the language of the contract is "clear and unambiguous, the contract is to be given

effect according to its terms." Allstate Life Ins. Co. v. BFA Ltd. Partnership, 287 Conn. 307,

313 (2008). The operative language of Plan § 8.01 is clear and unambiguous as to the rights of

the parties. Indeed, "[i]t is axiomatic that a party is entitled to rely upon its written contract as

the final integration of its rights and duties." Levine v. Massey, 232 Conn. 272, 279 (1995).

Plan § 8.01 is clear that "[a]ny claim application or claim not filed within one hundred eighty

(180) days from the end of the Plan Year in which the death or incident of claim occurred will be

considered untimely filed and denied for that reason." The "Plan Year" is defined in Plan § 2.21 as meaning "the 12-month period ending on September 30th of each year."

Spencer died on June 10, 2008. Thus, the end of that Plan Year was September 30, 2008 and the deadline to file a claim was March 30, 2009. Universitas did not submit a claim on forms supplied by the Plan Sponsor pursuant to Plan § 8.01 until July 15, 2009, three and a half months late. Moreover, the Plan requires the claim form to be sworn to by the beneficiary, and in two places, before any claim will be paid. No such document existed or was filed until mid-July 2009. Universitas has not established any waiver of the requirement of Plan § 8.01 by Nova. Nor has it otherwise provided an excuse for its untimely filing. See National Publishing Co. v. Hartford Fire Ins. Co., 287 Conn. 664, 673 (2008) ("When an insured brings an action against an insurer for breach of the insurance contract, the insured bears the burden of proving that it complied with the terms of the contract, including the conditions."). Thus, despite the clear and unambiguous language governing the claims process and denial of benefits, Universitas failed to file a claim by the deadline. As a result, Universitas is not entitled to any benefits. These points were expressly and repeatedly made to the Arbitrator, but he ignored them, therefore being totally derelict in his duties in making an award clearly in manifest disregard of all ERISA rules and Connecticut State law.

In addition, Universitas was instructed by Plan documents to submit any appeal of the denial of its claim to Nova in Simsbury, Connecticut by December 1, 2009 in accordance with Plan § 8.02(a), which permits the claimant to "file a written appeal to the Administrator" within

44

60 days of the claimant's receipt of denial of its claim. Nova did not receive the appeal until the week of December 15—two weeks after the deadline. Universitas' late submission of its claim and appeal constituted valid grounds for the denial thereof. See <u>Voris v. Middlesex Mut. Assur.</u> <u>Co.</u>, 297 Conn. 589 (2010) (insurance company properly denied a claim on the grounds it was submitted after the deadline in the policy, regardless of whether the late submission prejudiced the insurer). Accordingly, the Award must be vacated.

### C.    **Illegal Sharing of Death Benefit.**

Another reason for denying Universitas a death benefit under the Plan was that in its provisional (and belated) claim form, Universitas disclosed its intention to split the death benefit evenly with Spencer's employer, Holding Capital, after making an illegal $200,000 payment to the insurance broker, Mactas, from the death benefit. **Ex. 431; Tr. 986:8-22**.

### 1.    **Draft July 2008 Settlement Agreement**

By early July 2008, several weeks after Spencer died, Robinson was receiving communications from Schinderman, an attorney representing Universitas, and from Arthur Michaelson, an attorney representing Spencer's widow (Mary Spencer) and, at times, also Holding Capital, presenting conflicting demands for the death benefit and threats of litigation. **Tr. 689:7-14; 815:23-817:11**. Robinson received a copy of a draft Settlement Agreement dated July 10, 2008 in which Mary Spencer would receive the entire death benefit, less expenses, and then would make a charitable contribution of $5 million to Universitas. **Ex. 414; Tr. 1085:24-1086:25**. Mactas testified that Universitas was negotiating with Mary Spencer because Lincoln

45

was conducting an investigation into Spencer's death since he died within the contestability period of the first two years after issuance of the policies and Mary was refusing to cooperate with Lincoln regarding a next-of-kin interview.  **Tr. 423:3-25**.

By letter dated July 23, 2008, Robinson sought to end the barrage of conflicting interests, make it clear that Universitas was the sole beneficiary of the death benefit, warn that continued threats of litigation would result in a forfeiture of the death benefit, and state that the Plan would be willing to pay the death benefit to an escrow account but would not sign the draft Settlement Agreement.  **Ex. 83; Tr. 815:9-819:18**.  Nevertheless, for another year, Robinson continued to receive communications from the conflicting interests even into September 2009 (**Ex. 429**), and the draft Settlement Agreement was never executed.

### 2.    Illegal November 2008 Settlement Agreement

Unbeknownst to Robinson and Nova, negotiations among Universitas, Mary Spencer, and Holding Capital continued and culminated in an executed Settlement Agreement and Releases dated November 11, 2008.  **Ex. 106**.  The Settlement Agreement was between Holding Capital and Universitas, and Mary Spencer and Mactas signed to indicate their consent.  In the Settlement Agreement, Holding Capital and Universitas agreed to split the net Plan death benefit equally, after expenses and an illegal payment of $200,000 to Mactas if the net death benefit exceeded $23 million.  Holding Capital, Universitas, Universitas' principals, and Mary Spencer exchanged releases in connection with the Settlement Agreement.

46

The first time Robinson and Nova learned of the Settlement Agreement was eight months later when Universitas attached it (without the releases) to its provisional claim form submitted on July 15, 2009. **Ex. 425; Tr. 1109:17-1112:14**. Robinson and Nova were shocked to see this Settlement Agreement because it was the first time they learned that Universitas intended to illegally share the death benefit with Holding Capital and Mactas. **Tr. 1109:17-1112:14**.

In response, Robinson wrote for Bursey's signature a letter dated July 30, 2009 to Universitas in which he explained that the Plan could not and would not pay any death benefit to be shared with the Employer and Mactas. **Ex. 426**. He explained that payment of any portion of the death benefit to Holding Capital, which was the Participating Employer in the Plan, was prohibited by law and by Plan §§ 5.05, 5.07, and 7.01. He also explained that a $200,000 payment from the death benefit to Mactas may violate the law and constitute a conflict of interest. Robinson also testified that the payment to Mactas would violate the prohibition in paragraph 7 of the Disclosure, Acknowledgment & Certification Agreement (**Ex. 410**) against any "remuneration to the Agent of any kind" apart from the standard insurance commission. **Tr. 1111:6-1113:15**. The July 30, 2009 letter asked Universitas to provide further information about the Settlement Agreement and Releases and an irrevocable waiver by Mactas of any payment from the death benefit and stated that the Plan could not proceed to process the claim without the requested information and documentation.

Once Nova learned that Universitas intended to split the death benefit with Holding Capital and pay $200,000 from the death benefit to Mactas through an illegal settlement

47

agreement, it could not turn a blind eye, pay the death benefit to Universitas, and thereby knowingly facilitate a direct or indirect transfer of assets of the Plan to Holding Capital and Mactas. **Tr. 738:19-739:10; 985:7-22.**

When the requested information and documentation had not been received a month and a half later, Robinson wrote on September 11, 2009 to Lanny Oppenheim, Esq. of Loeb & Loeb, who had been retained by Universitas, and set a deadline of September 22, 2009 for submission of the requested information and documentation. **Ex. 427.** On September 21, 2009, Oppenheim sent a letter responding in conclusory, single sentences to the nine enumerated points in Bursey's July 30, 2009 letter. With respect to the Settlement Agreement and Releases, he simply stated they "are not in effect." **Ex. 428.** Robinson replied the next day and asked for documentary proof that the Settlement Agreement and Releases were not in effect, particularly in light of communications he received as recently as September 8, 2009 from the law firm of Levett Rockwood, which was representing Holding Capital and asking to be copied on correspondence, that led him to believe the Settlement Agreement and Releases **were** still in effect. **Ex. 429.** Robinson asked for the documentary proof by October 2, 2009.

At 5:34 p.m. on Friday evening, October 2, 2009, Lloyd Rothenberg of Loeb & Loeb emailed to Robinson a Termination Agreement purporting to terminate the Settlement Agreement and Releases. **Ex. 165.** The Termination Agreement did not alleviate Robinson's serious concerns about whether Universitas intended to share the death benefit with Holding Capital and Mactas but rather raised further questions. First, Oppenheim's letter dated

48

September 21, 2009 (**Ex. 428**), written a day before the deadline set in Robinson's letter dated September 11, 2009 (**Ex. 427**), stated, "The Settlement Agreement and Releases are not in effect." Second, the Termination Agreement later sent was "made and entered into effective as of the 20th day of September, 2009," a day before Oppenheim's letter. **Ex. 165**. Third, the signatures were affixed to the Termination Agreement on October 1 and 2, 2009, as indicated in the notary blocks.

The Termination Agreement was not addressed in the October 2, 2009 denial of the claim (**Ex. 431**) because the denial was sent out by Federal Express at the end of the day and before arrival of Rothenberg's email after the close of business. **Tr. 962:23-963:6; 969:23-972:8**. For the following reasons, though, the Termination Agreement did not rescue the claim from denial.

Under these circumstances, it appeared to Robinson that there had been no basis for Oppenheim to state on September 21, 2009 that the Settlement Agreement and Releases were not in effect but rather that he drafted the Termination Agreement to be effective "as of September 20, 2009" to cover up his misstatement. If the Settlement Agreement and Releases had truly not been in effect as of September 20, 2009, there should have been documentation of their termination on or before that date, particularly since Bursey's July 30, 2009 letter (**Ex. 426**) had raised serious concerns about them and Robinson's September 11, 2009 letter (**Ex. 427**) had reminded Oppenheim of this issue. So, Universitas had almost two months from Bursey's letter and had nine days from Robinson's letter to prepare and execute the half-page Termination

49

Agreement by September 20, 2009.  Instead, the Termination Agreement was executed almost two weeks later in October and its effective date backdated.  **Tr. 929:18-930:9**.

To this day, Robinson and Nova continue to doubt that the illegal Settlement Agreement and Releases were, in fact, terminated.  In fact, as recently as one month before the arbitration hearing, Holding Capital, purportedly now known as Key Biscayne Investments, Inc., sent a letter dated November 12, 2010 to Nova designating Universitas' counsel, Loeb & Loeb, as its representative to inspect and audit the books and records of the Plan.  **Ex. 435**.  If the Settlement Agreement and Releases had actually been terminated and Holding Capital were not expecting a share of the death benefit, Holding Capital would have had no interest in inspecting and auditing the Plan's books and records or in assisting Universitas, whose right to the death benefit Holding Capital formerly contested.  **Tr. 1124:18-1125:21**.  Again, the legal issues were all presented to the Arbitrator, and were ignored.

### 3. Pertinent Legal Authority

Nova properly denied benefits to Universitas because of Universitas' stated intent to illegally share the death benefit with Holding Capital and Mactas.

Universitas' intended splitting of half the death benefit with Holding Capital violates established principles of law as well as the Plan documents.  On page 7 of its prehearing brief, Universitas relies on 29 U.S.C. §§ 1104(a)(1)(A), which appears in Part 4 of Title I of ERISA.  ERISA § 406(a)(1)(D), which also appears in Part 4, provides that a fiduciary of an employee welfare benefit plan such as Nova "**shall not cause the plan to engage in a transaction, if he**

50

**knows or should know that such transaction constitutes a direct or indirect . . . transfer to,**

**or use by or for the benefit of a party in interest, of any assets of the plan**." 29 U.S.C.

§ 1106(a)(1)(D) (emphasis added). Holding Capital fits the definition of a "party in interest,"

which includes "an employer any of whose employees are covered by such plan." 29 U.S.C.

§ 1002(14).

Moreover, the Internal Revenue Code forbids welfare benefit plans from sending any

funds to the employer. IRC § 4976 specifically forbids any type of a reversion from a welfare

benefit plan to the employer and penalizes it with a 100% excise tax. IRC § 4976(a) provides

that the IRS imposes on an employer in a welfare benefit plan "a tax equal to 100 percent" of a

"disqualified benefit." A "disqualified benefit" is defined to include "any portion of a welfare

benefit fund reverting to the benefit of the employer." 26 U.S.C. § 4976(b)(1)(C). Thus, the

Code effectively prohibits reversions to the employer because the excise tax equals the amount

of the funds that are transferred from the plan to the employer.

The Plan would have no way of knowing if Universitas later split the benefits with

Holding Capital. As a result, the transfer of Plan assets would go unreported to the IRS, and

Holding Capital would have succeeded in skirting the prohibition and excise tax in 26 U.S.C. §

4976(b)(1)(C). The Plan simply could not aid and abet such tax evasion by turning a blind eye

and paying Universitas the death benefit in reliance on the suspect Termination Agreement.

Again, all of these points were made to the Arbitrator, and he ignored them.

51

## CONCLUSION

For the foregoing reasons, the Court should vacate the Award in its entirety or, in the

alternative, remand to the Arbitrator for rehearing.

RESPONDENT,
NOVA GROUP, INC.


Joseph M. Pastore III, Esq.
FOX ROTHSCHILD LLP
One Landmark Square, 21st Floor
Stamford, CT 06901
(203) 425-9500
Juris No. 429762

William J. McGrath, Esq.
Daniel P. Scapellati, Esq.
Scott S. McKessy, Esq.
HALLORAN & SAGE LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06103
(860) 522-6103
Juris No. 026105


Richard S. Order, Esq.
Kevin J. McEleney, Esq.
UPDIKE, KELLY & SPELLACY, P.C.
100 Pearl Street, P.O. Box 231277
Hartford, CT 06123-1277
(860) 548-2600
Juris No. 065040

# Exhibit A

AMERICAN ARBITRATION ASSOCIATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Universitas Education, LLC,               :

                          Claimant,    :      AAA No.: 13-195-Y-001558-10

              - against -       :

                                :      INTERIM AWARD

Nova Group, Inc., Wayne Bursey Benistar Admin :
Services, Inc., Donald Trudeau Grist Mill Capital, :
LLC, and Daniel E. Carpenter,            :

                      Respondents.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

         I, Peter Louis Altieri, the undersigned Arbitrator, was designated in accordance with the arbitration agreement contained in the Charter Oak Trust and having been duly sworn, and having heard the proofs and allegations of the Parties, hereby render the following Interim Award.

         Consistent with the "Report of Preliminary Hearing and Scheduling Order" dated September 17, 2010, it was determined that the parties would receive a reasoned Award, and not findings of fact and conclusions of law. Subsequently, by Order dated November 3, 2010, consistent with Commercial Arbitration Rule 30(b), it was determined that the arbitration proceedings were to be bifurcated. Hearings for the initial phase were held on December 6 through 8, 2010 ("PHASE I") with extensive briefings before and after the hearings. The parties for the PHASE I hearings were Claimant Universitas Education, LLC, against Respondents Nova Group, Inc. ("Nova"), Wayne Bursey ("Bursey") in his capacity as Trustee of the Charter Oak Trust and Charter Oak Trust Welfare Benefit Plan (hereinafter the Trust and Plan are collectively

"COT") and Benistar Admin Services, Inc. ("BASI") in its capacity as an administrator of the COT, (collectively "Respondents"). The issues to be determined in PHASE I included whether Respondents appropriately denied Claimant's claim for benefits and, if not, what damages should be awarded to Claimant.

This proceeding arises out of a claim by Universitas, a designated beneficiary of the COT, following the COT's denial of Universitas' claim for $30,000,000 in death benefits received by the COT in connection with life insurance on the life of Sash Spencer provided by The Lincoln National Life Insurance Company ("Lincoln National") at the request of Mr. Spencer's employer, Holdings Capital Group, Inc. ("Holdings Capital").

By their very nature, trusts are established for the benefit of their participants and beneficiaries, not for the benefit of the Sponsor, Trustee, or Plan Administrator. As a matter of law, the Sponsor, Trustee and Plan Administrator owe a fiduciary duty to the participants and their beneficiaries. Nova admits that it is a fiduciary of an employee welfare benefit plan. (See Respondents' Post Hearing Brief, p. 38). On behalf of Nova, the named trustee and Plan Sponsor of the COT, Mr. Bursey acknowledged Nova's fiduciary responsibilities when he wrote on October 22, 2008, "The Charter Oak Trust has been the Owner and Beneficiary of the Sash Spencer Lincoln Financial Group policies 7305475 and 7320809 since the inception of the policies. We have a fiduciary responsibility and legal obligation to carry out Mr. Spencer's wishes as he intended in a timely fashion to pay those death proceeds to a charity that he established prior to his death." (Exhibit 104).

Whether analyzed under the common law or under ERISA principles, based on the evidence presented, I determine that the PHASE I Respondents violated their fiduciary duties

- 2 -

by denying the claim for benefits under the COT. While I would be inclined to adopt certain adverse inferences requested by Claimant, as Claimant acknowledges, "adverse inferences are not necessary for Claimant to prevail on the merits in this proceeding" and therefore this Award is rendered based on the record evidence actually presented and not on any inferences. (Claimant's letter of January 4, 2011, fn. 4). I do not need to reach Claimant's other substantive legal claims given this determination of breach of fiduciary duty.

Following Mr. Spencer's untimely death on June 10, 2008, Universitas' representatives regularly communicated with Respondents in connection with assisting the COT in recovering the death benefits payable to it by Lincoln National and then by asserting Universitas' claim for those benefits to be paid by the COT to Universitas as the named beneficiary. Emails, phone calls, letters and meetings were frequent and continuous leading up to the formal submission of a written claim on the prescribed claim form on July 14, 2009 and corrected claim on September 21, 2009. The original claim as amended was denied October 2, 2009 and the subsequent appeal was denied February 9, 2010. (Exhibit 433).

Essentially, the claim and the appeal were denied for five reasons: (1) the existence of an illegal agreement to allow reversion to the employer and an illegal payment to an insurance broker; (2) the parties were engaged in a life settlement transaction; (3) the failure to file a timely claim; (4) the Claimant threatened litigation; and (5) any interest in the COT was transferred to Grist Mill Capital.

In connection with this proceeding, in addition to those reasons, Respondents asserted other defenses including alleged misrepresentation in connection with the insurance

claim and failure to pay the $1,500 enrollment and administration fees, all of which defenses I determine are similarly insufficient to warrant the denial of the benefits to Universitas.

(1)     Any illegal agreement to allow reversion to the Employer or make payment to the insurance broker was terminated and should not be a proper basis for denial of the benefit and/or appeal of the denial. (Exhibit 430). The termination of the settlement agreement and Mr. Mactas' testimony that he is not to receive any further payment resolves these issues.

(2)     The life settlement transaction proposition espoused by Respondents is based upon an inference made from the fact of a series of evaluation reports run by Mr. Mactas and that inference was directly contradicted by Mr. Mactas. Mr. Mactas' testimony on the intended purposes of the valuation reports was credible and the fact remains a life settlement transaction was never effectuated. To use an unrealized intention to cause a forfeiture of the benefits would be an unjustifiable consequence under the circumstances.

(3)     Respondents' contend there was a failure to file a timely claim. There can be no question that there were extensive dealings on behalf of Claimant with the Trust by its representatives to obtain payment of the life benefits in a timely matter. While the Trust provides for submitting the claim on a claim form to be supplied by the Trustee, initially, no such form was ever supplied by the Trustee. When the form was provided it was completed and submitted within the time requested and in the manner requested by Mr. Robinson. (Exhibit 425). There can be no question that the COT was on notice that Universitas was asserting a claim for benefits under the two policies shortly after Mr. Spencer died and well within the deadlines required by the Trust.

- 4 -

There is also no question that the COT or its representatives never supplied a claim "form" during the time period required and when they finally did provide one it was thereafter timely submitted. There is no general legal requirement or requirement under the COT itself that any claim form for trust benefits must be "signed" under oath. While the form eventually supplied by COT did provide for verification, the Trust itself made no separate requirement other than to direct use of the form. To determine that a timely claim was not made by Universitas would truly be putting "form" over substance given the overwhelming evidence of interaction between the COT representatives and Universitas' representatives following the untimely death of Mr. Spencer as well as the numerous statements by the COT representatives themselves to Lincoln National and to the Claimant's representatives concerning the fiduciary responsibilities of Nova and the entitlement of Universitas to the benefits. Respondents' technical arguments purportedly justifying the rejection of the claim are based in substantial part on Connecticut insurance law contract cases. It is inappropriate to consider insurance contract cases and principles which may require stricter adherence to the terms of the contract rather than trust/fiduciary principles where the very existence of the trust is for the benefit of the participants and the beneficiaries.

(4)  <u>Threatened litigation</u>.  The letters submitted on behalf of Attorney Schinderman, Alex Sgoutas and Bruce Mactas do not constitute threats of litigation sufficient to warrant a denial of benefits by the fiduciaries.

(5)  <u>Conflicting claim of Grist Mill Capital</u>.  There is no credible evidence that any agreement was ever consummated arising out of the discussions Mr. Spencer had before he died with Grist Mill Capital regarding the possible assignment of the beneficial interest under the policies to Grist Mill Capital in return for a $1.8 million payment to Universitas. Even Mr.

Robinson acknowledged that there was no written evidence of such an agreement. (Tr. 762-3). According to Respondents' position, such agreement, if entered into, may have constituted a life settlement transaction which would not have been permitted in any event. Finally, there was no evidence that in accordance with that agreement the Trust intended to pay such benefits to Grist Mill Capital.

While Respondents' present a myriad of defenses to justify their denial of the claim, they are not, however, individually or collectively sufficient to overcome the fact that all Respondents are acting in a fiduciary capacity in connection with the Trust that is designed for "the exclusive benefit of the Participants, their dependents and, in the case of life benefits, their beneficiaries...." (Exhibit 436). To adopt Respondents' defenses to Claimants' assertion of a wrongful denial of the claim would defeat the underlying stated purpose of the COT, would result in an unwarranted forfeiture of the benefits clearly designed and obtained by Mr. Spencer and Holding Capital through their participation in the Plan, and would result in an undeserved windfall to either the other COT participants or the Plan's Sponsor, Administrator or Trustee, that is not justifiable under the circumstances presented in this proceeding.

Having established Claimants' entitlement to benefits, the question remains as to what amount of benefits are warranted. Specifically, the following issues are presented: (1) whether the death benefits under both policies should be considered part of the Plan adopted by Holding Capital and Mr. Spencer or just the second $20 million policy; (2) does the 20% withhold inserted in the Trust in January 2009 apply to either policy or both; (3) which funding costs if any are properly included as a deduction under the terms of the Plan; (4) is the benefit limited to the face value of the policies or should the additional interest payments be included in what the beneficiary under the Plan is entitled to recover; (5) should prejudgment interest be

Awarded and, if so, from when and at what amount; and (6) what reasonable amount of attorneys' fees and costs should be granted to the prevailing party.

(1)    The first issue is whether by subsequently executing an Adoption Agreement in the amount of $20 million did Holding Capital and Mr. Spencer limit any right to have included within the COT the initial $10 million death benefit policy they obtained from Lincoln National for the benefit of the COT. To find, as Respondents urge, that Mr. Spencer "clearly manifested his intent to change the death benefit from $10 million to $20 million" when he executed the second Adoption Agreement in March 2007 (Respondents' Post Hearing Brief, p. 42; Exhibit 411) is contrary to the evidence submitted at the hearing and would require application of contorted logic and law to sustain a finding that the second Adoption Agreement succeeded and pre-empted the first (Exhibit 406) particularly where all the objective evidence indicates otherwise and in the absence of any integration or merger clause in the second Adoption Agreement.

The fact that Mr. Spencer, with the assistance of Mr. Mactas, designated the change in beneficiary form for the two separate policies (Exhibits 56 and 57) a year later, is the best evidence of their intent to adopt and participate in the Plan for both policies and $30 million. Similarly, Mr. Bursey's understanding that Holding Capital was in for $30 million is borne out by his correspondence with Lincoln National acknowledging once again his fiduciary duty and legal obligation to pay out the proceeds of both policies to Universitas. (Exhibit 104). There is no independent evidence other than the Adoption Agreement itself submitted in connection with the second insurance policy for $20,000,000 at the time that the first $10 million policy and the corresponding Adoption Agreement were in place, that Holding Capital and Mr. Spencer had any intention to reduce their participation in the COT from $30 million to $20 million and to leave

$10 million in coverage obtained earlier for the benefit of other unknown and unrelated "participants" in the COT. (See also Exhibit 83). Had Nova believed that Holding Capital and Mr. Spencer only intended to participate for $20 million, they should have objected or not accepted the irrevocable beneficiary designation for the $10 million policy when that was submitted on May 14, 2008 (Exhibit 58) and they are now estopped from asserting otherwise. (See Tr. 671-72).

        (2)    The next issue to determine is whether the payment due to Claimant for benefits received by COT in connection with the $10 million or $20 million policy are subject to the provision appearing in Section 6.01 of the Plan entitling the beneficiary to a death benefit equal to only 80% of the original face amount of any of the policies held by the Plan. Respondents admit that "Spencer was enrolled in the Plan using the draft documents on or about December 17, 2006." (Exhibit 406; Respondents' Post Hearing brief, p. 46). Those documents, including the COT itself (Exhibit 19) have no mention of the 20% retention of the death benefit found in a later version of the COT that was adopted no earlier than January 19, 2007.

        Accordingly, I determine that at the time Holdings Capital and Mr. Spencer committed to participate in the Plan and that the first policy was acquired, there was no 20% withhold in effect and it would be inequitable to apply that deduction to the benefit payable under the $10 million policy. The right to receive the death benefits without the withhold became analogous to a vested benefit as of that time that should not be forfeitable by a subsequent "amendment" of the Plan. On the other hand, I do credit Mr. Robinson's testimony that the Plan in place as of the time the second policy was obtained did contain the provision allowing for the 20% withhold. (See Tr. 522-24). Accordingly, I determine that the COT is

allowed to retain the 20% withhold as to the 7320809 $20,000,000 policy obtained in March 2007, but not as to the 7305475 $10,000,000 policy obtained in December 2006.

        (3)   Deductions for funding costs. Both versions of the Plan provide for the deduction for "the cost of any premiums or placement or origination fees listed in the Plan documents." Claimant acknowledges the appropriateness of deducting the total premiums paid by Grist Mill Capital (Exhibit 437) $2,322,305.79, an origination fee of 20% of the premiums paid (Exhibit 406 at 750; Exhibit 411 at 826) totaling $464,461.58, and the premium funding fee/placement fee of 2% of the total death benefit (Id.) of $600,000. (See Affirmation of Paula K. Colbath regarding amount of arbitration Award at Exhibit 1). In addition to these amounts, Respondents are claiming entitlement to deduct funding costs of $835,394.83 (on both policies) and then taking an origination fee of 20% of the total amount funded pursuant to Section 10b of $631,540.12 and they assert that those two amounts should be proper additional deductions beyond the amount acknowledged by Claimant. (See Exhibit 441, at ¶ 14). Based on the evidence before me, in addition to the amounts above acknowledged as proper by Claimant, I determine that funding costs of $633,686.28, representing the interest due and paid to Ridgewood in connection with the two policies is appropriately charged against the benefits payable pursuant to the COT, but not the other amounts claimed by Respondents. (See Exhibit 437).

        (4)   Beyond the face values of the two policies, on May 15, 2009, Lincoln made payment to the COT of interest in the amount of $451,517.83 on the $20 million policy and $225,752.92 on the $10 million policy. Finally, on November 3, 2009, Lincoln made payment of $250,000 in connection with the two policies to the COT (Exhibits 168, 173) representing additional interest. Section 2.07 of the Plan defines "Death Benefit" as meaning "the net amount

of death benefit, after payment of any amounts owed with respect to any such death benefit and/or with respect to any insurance policy related thereto, as selected by the Employer in the Adoption Agreement, payable under the terms of the Plan on the death of the participant to the participant's designated beneficiary." (Exhibit 436). I determine that the interest constitutes proceeds of the insurance policy that pursuant to the terms of the Plan should be paid to the beneficiaries and not be retained by the Trust itself except with respect to that portion of interest attributable to the allowable 20% withhold on the 0809 policy which amount the COT was entitled to retain pursuant to the Trust language in effect at the time that particular policy was acquired.

(5)    The COT itself is silent on the issue of my power to Award prejudgment interest.   Section 8.02(d) however provides that the COT shall be construed, regulated and administered by and under the laws of the State of Connecticut.  Under Connecticut law, pre-judgment interest is governed by Connecticut General Statue Section 37-3a.  Cases interpreting that section provide that the trier of fact may Award prejudgment interest as an element of damages for the wrongful detention of money after it becomes payable if equitable considerations deem that such interest is warranted.  In this instance, given the fiduciary duty of the Trust to pay the benefit, I determine that the detention of the money was wrongful under the circumstances.  The trier of fact must also determine the date upon which the wrongful detention began in order to assess the time from which interest should be calculated.  Prejudgment interest shall run from the denial of the claim on October 2, 2009, except as to that portion of the interest proceeds received from Lincoln National on November 3, 2009, which should be assessed as of that date.

Given these determinations, the Award is calculated as follows:

## AWARD CALCULATION

| | | | |
|---|---|---|---|
| Death Benefit | | $10,000,000.00 | $20,000,000.00 |
| Interest on Death Benefit | 5/15/09 | $225,752.92 | $451,517.82 |
| | 11/3/09 | $83,333.34 | $166,666.66 |
| Less 20% Death Benefit and Proportional Interest | | N/A | $4,123,636.90 |
| Less Premiums Paid | | $779,200.00 | $1,543,105.79 |
| Less Origination Fee of 20% of Premiums Paid | | $155,840.00 | $308,621.16 |
| Less Premium Funding Fee/ Placement Fee of 2% of Death Benefit | | $200,000.00 | $400,000.00 |
| Less Reasonable Costs of Funding | | $217,010.54 | $416,675.74 |
| **Subtotals** | | **$8,957,035.72** | **$13,826,144.89** |
| Prejudgment Interest at 10% through January 21, 2011 on Amounts withheld from denial of claim on October 2, 2009, except as to amounts received on November 3, 2009 | | 8,873,702.38 for 474 days = $1,152,365.57 <br> 83,333.34 for 434 days = $9,908.65 | 13,659,478.23 for 474 days = $1,773,861.10 <br> 166,666.66 for 434 days = $19,817.30 |
| PREJUDGMENT INTEREST TOTALS | | $1,162,274.22 | $1,793,678.40 |
| TOTALS BY POLICY | | $10,119,309.94 | $15,619,823.30 |
| TOTAL BENEFIT PAYABLE WITH INTEREST THROUGH JANUARY 21, 2011 | | $25,739,133.24 | |

(6)    Attorneys' fees and costs.  The COT provides "all costs of the prevailing party (including attorneys' fees and costs), as well as the costs of arbitration, shall be borne exclusively by the non-prevailing party."  Article 8, Section 8.02(d).  Claimant is the prevailing party and is entitled to its attorneys' fees and costs.  However, inherent in any award of attorneys' fees and costs is that they must be reasonable.  Respondents contest that the fees outlined and sought by Claimant in the total amount of $1,075,918.14 by Loeb and Loeb for services rendered, a 5% contingency fee of arbitration Award to the Schinderman estate of $1,786,620.78 and a 3% success fee for Loeb and Loeb of $1,071,972.47 are in fact reasonable. A fair reading of the agreement provides that only those fees incurred in connection with a denial of the benefits and claims are appropriate.  For that reason alone, Mr. Schinderman's fees should not be Awarded as clearly his services were rendered prior to the commencement of any arbitration and prior to the formal submission of the claim and the appeal from the denial thereof. By providing merely the dates and total hours by timekeeper without any description of services, it is more difficult to determine with precision a reasonable amount of attorneys' fees and costs incurred by Loeb in connection with the denial of benefits.  However, based on the bills that were submitted, the time spent by Respondents' counsel, and my review of much of the work product of Claimant's counsel,  I hereby determine that $750,000 is reasonable in fees and $36,402.64 in costs to be recovered in connection with the adjudication of the PHASE I issues. Any and all fees of the American Arbitration Association and the Arbitrator are to be paid by Respondents as the non-prevailing party.

Claimant has asserted this claim not only against Nova Group, Inc. as Administrator of the COT, but against Mr. Bursey, as Trustee, and BASI as Plan Administrator.  At this stage I do not believe that it is warranted to enter any Award against Mr. Bursey or BASI.  In the first instance,

- 12 -

claims for wrongfully denied benefits are typically only liabilities of the Plan or Trust itself and not of the Plan Administrator or Trustee. Should the COT fail to make timely payment of the Award, during the PHASE II proceeding and/or any court proceedings, upon a full record, the trier of fact should properly determine liability of Mr. Bursey or BASI, if any. I make no determination of those issues at this time.

Accordingly, I award Universitas Education, LLC, the sum of $26,525,535.88 against Respondent Nova as Sponsor, Trustee and Administrator of the COT as of the date of this Award.

The administrative fees of the American Arbitration Association totaling $20,800.00, and the compensation of the arbitrator totaling $47,889.50 shall be borne by Respondent, Nova Group. Therefore, Nova Group shall reimburse Universitas Education, LLC the sum of $32,772.38, shall reimburse Donald Trudeau the sum of $11,972.38 and shall reimburse Daniel E. Carpenter the sum of $11,972.36, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Universitas Education, LLC, Donald Trudeau and Daniel E. Carpenter.

PHASE I Respondents are directed to deposit $26,525,535.98 in escrow with the law firm of Updike Kelly and Spellacy on or before the later of 30 days following the date of this Award or 30 days after determination of any motion for reconsideration under Rule 46, the grounds for which are extremely limited. Should Respondents not do so, PHASE II discovery and hearings will be promptly scheduled or Claimant may proceed judicially to obtain further

relief without violating Article VII, Section 8.02(d) of the COT, as such action to enforce the terms of the Award would be appropriate and warranted under the circumstances.


_1/24/2011_

Date

_Peter J. Altieri_

Peter Louis Altieri


I, Peter Louis Altieri, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_Peter J. Altieri_

Peter Louis Altieri

- 14 -