

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
UNIVERSITAS EDUCATION, LLC,                                            :
                                                                       : Case No.: 11 CV 1590-LTS-HBP
                              Petitioner,                              :
                                                                       :
              -v-                                                      :
                                                                       :
NOVA GROUP, INC., as Trustee, Sponsor                                  :
and Named Fiduciary of the CHARTER OAK                                 :
TRUST WELFARE BENEFIT PLAN,                                            :
                                                                       :
                              Respondent.                              :
-----------------------------------------------------------------------:
NOVA GROUP, INC., as Trustee, Sponsor                                  :
and Named Fiduciary of the CHARTER OAK                                 : Case No.: 11 CV 8726-LTS-RLE
TRUST WELFARE BENEFIT PLAN,                                            :
                                                                       :
                              Petitioner,                              :
                                                                       :
              -v-                                                      :
                                                                       :
UNIVERSITAS EDUCATION, LLC,                                            :
                                                                       :
                              Respondent.                              :
-----------------------------------------------------------------------X

**POST-HEARING MEMORANDUM OF RESPONDENTS MOONSTONE PARTNERS, LLC, DANIEL E. CARPENTER, AND MOLLY CARPENTER**

Respondents Moonstone Partners, LLC ("Moonstone"), Daniel E. Carpenter, and Molly Carpenter submit this post-hearing memorandum in opposition to the application of Universitas Education LLC ("Universitas") for a turnover order as to the as yet unpaid casualty loss compensation for the insurer of a property located at 329B Cards Pond Road, South Kingston, Rhode Island. Submitted along with this memorandum is Respondents' Propsed Findings of Fact, dated June 21, 2013.

1



## Statement of Facts

Respondent relies upon the "Statement of Proposed Findings of Fact", dated June 21, 2013, submitted with this memorandum. The recitations below repeat those proposed findings here.

As a participant in the Charter Oak Trust, Sash Spencer was the named insured on two life insurance policies owned by the Charter Oak Trust, which policies' face amounts totaled thirty million dollars. (Exhibit D at 1 and 8).

Mr. Spencer paid none of the premiums for the insurance agreements into which he entered. (Exhibit D, pg. 5 at ¶ 7; Exhibit N at 9 and 11).

The premiums for the Spencer policies were paid by Charter Oak Trust using funds borrowed from Grist Mill Capital. (Exhibit E, at 1-3).

The funding agreement between Grist Mill Capital and Charter Oak Trust with respect to the Spencer life insurance policies contained a provision whereby Grist Mill Capital (the "Funder") was given

> a first priority lien and a first priority security interest in and to all properties, assets, and rights of the Trust, wherever located, whether now owned or hereafter acquired or arising, including, without limitation the Policy (including all proceeds thereof, such proceeds to encompass, among other things, the premium refunds, cash value, death proceeds or other payments by the insurer with respect to such Policy or any proceeds from the sale thereof…  (Exhibit E at ¶ 7).

On December 27, 2006, Grist Mill Capital recorded a UCC 1 Financing Statement against all assets of the Charter Oak Trust and all proceeds thereof and including after acquired assets. (Exhibit C at # 2431931).



the Spencer policies was part of the insurance agreement entered into by Mr. Spencer, in December 2006 and March 2007. (Exhibit D).

When he enrolled in the Charter Oak Trust, Sash Spencer executed a Disclosure, Acknowledgment & Certification Agreement which contained the following provision:

> 9. The Insured and Agent both understand and agree that the following remittances, fees and expenses shall be due and payable to the Funder upon the maturation, disposition, termination, or change in beneficiary of the Policy:
> (a)  repayment of all premiums and related costs regarding the Policy;
> (b)  an Origination Fee of twenty percent (20%) of the total premiums funded and paid for the Policy in consideration of the funding Arrangement having been implemented;
> (c)  a Premium Funding Fee of three percent (3%) of the face amount of the Policy in consideration for the funding of such premiums;
> (d)  a Termination Fee of one percent (1%) of the face amount of the Policy in consideration of the termination of the Funding Arrangement.
> (Exhibit D at 5 ¶ 9).

When Universitas arbitrated its claim against Nova Group, Inc., the arbitrator determined that $4,020,453.23 was owed and was payable to Grist Mill Capital from the life insurance proceeds.

(Exhibit D, at 3, 9).

Mr. Spencer died on June 10, 2008. (Exhibit 11).

Charter Oak Trust received the proceeds of the Spencer policies from Lincoln Life Insurance Co. in two checks: one dated May 15, 2009, in the sum of $10,225,758.92 and a second, dated May 15, 2009, in the sum of $ 20,451,517.83. (Exhibit 1 at 1 and G at 1-2).

Charter Oak Trust disbursed sums of $ 8,677,276.75 on May 21, 2009, and $ 2,186,566.00 on May 26, 2009, to Grist Mill Capital Inc., a total sum of $10,863,842.75. (Exhibit 1 at 0348-0349 and Exhibit H, # 0357).



were disbursed, Grist Mill Capital was a secured creditor of Charter Oak Trust (Exhibit C, # 2431931).

Grist Mill Capital provided funding to Charter Oak Trust for the Spencer insurance policies and for many other policies owned by the Charter Oak Trust, approximately 85 policies in all. (Exhibit 22, at 74).

Under various funding agreements between Grist Mill Capital and the Charter Oak Trust, Charter Oak Trust became indebted to Grist Mill Capital in the amount of approximately sixty million dollars. (Exhibit 34, pp. 101,102).

Charter Oak Trust disbursed the total sum of $10,863,842.75, to Grist Mill Capital in partial repayment of Charter Oak Trustøs indebtedness to Grist Mill Capital. (Exhibit 34, pp. 90-104).

Before the disbursement of $10,863,842.75 to Grist Mill Capital, Charter Oak Trust had borrowed well in excess of that sum from Grist Mill Capital. (exhibit 34, pp. 90-104).

Grist Mill Capital had, in turn, a financing agreement with Ridgewood Finance, Inc. whereby Ridgewood advanced to Grist Mill Capital funds which Grist Mill Capital then used to make loans to Charter Oak Trust. (Exhibit 34, pp. 90-104).

Ridgewood Finance, Inc. was a secured creditor of Grist Mill Capital. (Exhibit C, # 2431927).

Among the insurance policies so funded were the Spencer policies. (Exhibit D).

Grist Mill Capital, after receiving on May 21, 2009 and May 26, 2009, the sums described, paid various of its creditors, including the Grist Mill Trust. (Exhibit H, # 0359).



rust the total sum of $3,798,882.81, by two wire transfers on June 9, 2009. (Exhibit H, # 0339).

At the time these sums were disbursed, Grist Mill Trust was a creditor of Grist Mill Capital. (Exhibit 34, at 102).

On June 12, 2009, Grist Mill Trust disbursed $2,700,000.00 to Phoenix Capital Management. (Exhibit J, # 0441) (Exhibit 1, # 0441).

Immediately prior to that disbursement, Grist Mill Trust had $5,058,712.18, in its JPMorgan Chase account. (Exhibit O, p. 4).

Of that sum, in excess of $1,259,829.37 was from sources unconnected in any way to the funds Grist Mill Trust received from Grist Mill Capital on June 9, 2009. (Exhibit R).

On July 13, 2009, Phoenix Capital Management disbursed $2,500,000.00 to Grist Mill Capital. Exibit J, # 0443) (Exhibit 1, # 0345, 0361).

On July 13, 2009, Grist Mill Capital then transferred $2,200,000.00 to Grist Mill Holdings. (Exhibit H, # 0361) (Exhibit 1, # 0523).

On July 15, 2009, Grist Mill Holdings then disbursed $1,200,000.00 to Hanover Trust Company. (Exhibit I, # 0492) (Exhibit 1, # 1365, 1366).

On July 15, 2009, Hanover Trust Company then disbursed $1,100,000.00 to Moonstone Partners LLC. (Exhibit K, #. 1372) (Exhibit 1, # 1008).

On July 15, 2009, Moonstone Partners LLC used $1,040,000.00 to acquire the property located at 392B Cards Pond Road, South Kingstown, Rhode Island. (Exhibit 4 and Exhibit L at 1008).



...rtners, LLC entered in to a mortgage with Hanover Trust Company, memorializing its indebtedness to Hanover for the funds used by Moonstone to acquire the Rhode Island property. (Exhibit 39).

6



## Statement of Applicable Law

This turnover application was brought as a motion rather than a special proceeding and is governed by Federal Rule of Civil Procedure ("FRCP") 69(a), which states in part that

> [t]he procedure on execution-and in proceedings supplementary to and in aid of judgment or execution-must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies.

A turnover proceeding may be brought by motion in federal court under FRCP 69(a), rather than instituting a special proceeding under the New York state law. See Northern Marianas v. Millard, 845 F.Supp. 579 (S.D.N.Y. 2012), S.E.C. v. Colonial Inv. Management LLC, No. 07 Civ. 8849, 2010, WL 4159276, at *2 (S.D.N.Y. Oct. 6, 2011); Mitchell v. Lyons *582 Professional Services, Inc., 727 F.Supp.2d 120, 122-23 (E.D.N.Y. 2010).

The relevant state law procedure to be applied by the District Court is found in N.Y. C.P.L.R. § 5225(b). That statute provides that:

> Upon a special proceeding commenced by the judgment creditor, against a person in possession or custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee, the court shall require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to satisfy the judgment to a designated sheriff… The Court may permit the judgment debtor to intervene in the proceeding.

On the merits, the Second Circuit has set forth a two-step process for cases in which a judgment creditor alleges that property belongs to a judgment debtor but is in the hands of a third party. See Beauvais v. Allegiance Sec., Inc., 942 F.2d 838, 841 (2d Cir.1991).



Your complimentary use period has ended. Thank you for using PDF Complete.

Click Here to upgrade to Unlimited Pages and Expanded Features

First, it must be shown that the judgment debtor "has an interest" in the property the creditor seeks to reach. Where this first step is satisfied, the trial court must, second, then make one of two findings: it must find either that the judgment debtor is "entitled to the possession of such property," or it must find that "the judgment creditor's rights to the property are superior" to those of the party in whose possession it is.

Id. at 840-41. See also Baker v. Power Securities Corp., 948 F.Supp. 255 (W.D.N.Y. 1996).

Only after both parts of the analysis are proved by the judgment-creditor may a trial court order the transferee to turn over the property to the judgment creditor, here Universitas. *See* Key Lease Corp. v. Manufacturers Hanover Trust Co., 117 A.D.2d 560, 561-62, 499 N.Y.S.2d 66, 68 (1st Dep't 1986).



**Argument**

**I**

**Universitas has not proven that Moonstone Partners LLC was ever in possession or custody of money or other personal property in which the judgment debtor had an interest in 2009.**

Under the first part of CPLR 5225(b), Universitas must show that the USAA casualty loss payment is in some fashion "property in which the judgment debtor has an interest." The proof in this matter does not establish this.

Universitas has identified a series of banking transactions which occurred after Charter Oak Trust received the Sash Spencer insurance proceeds. Universitas asserts in the turnover proceeding that Charter Oak Trust and Grist Mill Capital were entitled to the beneficial ownership of <u>none</u> of that money. The actual contract documents which governed the relationship of Sash Spencer with Charter Oak Trust--and which were executed by the insured--contradict this position.

As a participant in the Charter Oak Trust, Sash Spencer was the named insured on two life insurance policies owned by the Charter Oak Trust, which policies' face amounts totaled thirty million dollars. Mr. Spencer paid none of the premiums for the insurance agreements into which he entered. (Exhibit D, p. 1, 8). The premiums for the Spencer policies were paid by Charter Oak Trust using funds borrowed from Grist Mill Capital. (Exhibit E, Exhibit N at 9).

The funding agreement between Grist Mill Capital and Charter Oak Trust with respect to the Spencer life insurance policies contained a provision whereby Grist Mill Capital (the "Funder") was given:

> a first priority lien and a first priority security interest in and to all properties, assets, and rights of the Trust, wherever located, whether now owned or hereafter acquired or arising, including, without limitation the Policy (including all proceeds thereof, such proceeds to encompass, among other things, the premium



...eeds or other payments by the insurer with respect ...rom the sale thereof" (Exhibit E at 2, ¶ 7).

On December 27, 2006, Grist Mill Capital recorded a UCC 1 Financing Statement against all assets of the Charter Oak Trust and all proceeds thereof and including after acquired assets. (Exhibit C at # 2431931).

The funding arrangement for the Spencer policies was part of the insurance agreement entered into by Mr. Spencer, in December 2006 and March 2007. (Exhibit D).

When he enrolled in the Charter Oak Trust, Sash Spencer executed a Disclosure, Acknowledgment & Certification Agreement which contained the following provision:

> "9. The Insured and Agent both understand and agree that the following remittances, fees and expenses shall be due and payable to the Funder upon the maturation, disposition, termination, or change in beneficiary of the Policy:
> (a) repayment of all premiums and related costs regarding the Policy;
> (b) an Origination Fee of twenty percent (20%) of the total premiums funded and paid for the Policy in consideration of the funding Arrangement having been implemented;
> (c) a Premium Funding Fee of three percent (3%) of the face amount of the Policy in consideration for the funding of such premiums;
> (d) a Termination Fee of one percent (1%) of the face amount of the Policy in consideration of the termination of the Funding Arrangement." (Exhibit D at 5, 9).

Under the terms of the trust documents and Spencer enrollment documents, payment to Grist Mill Capital had priority over any other disbursement of the death benefits paid by Lincoln. Payment to Grist Mill Capital was due within 90 days of receipt of the insurance proceeds from Lincoln. Thus, the in excess of four million dollars that was owed to Grist Mill Capital from the insurance proceeds is a) far in excess of the amount that found its way from Grist Mill Capital to Grist Mill Trust, b) far in excess of the amount that went to Phoenix Capital c) far in excess of the amount that later went to Hanover Trust, d) far in excess of the amount

10



far in excess of the purchase price for the Cards Pond Road property.

The arbitrator confirmed the validity of the contractual provisions described above. When Universitas arbitrated its claim against Nova Group, Inc., the arbitrator determined that $4,020,453.23 was owed and was payable to Grist Mill Capital from the life insurance proceeds. (Exhibit N, at 9 (see line items for "Premiums Paid" "Originator Fee" "Premium Funding/Placement Fee" and "Reasonable Costs of Funding")).

At the hearing, this Court specifically asked counsel for respondents if the arbitrator's reduction of the award to give Charter Oak Trust "credit" for the contracted fees, removes that four million dollar sum the Court's consideration on the turnover motion.

The answer then and now is that it does not.

One aspect of the issues before this Court is whether— in May 2009 — the money Charter Oak Trust transferred to Grist Mill Capital was Charter Oak Trust's to disburse. A second aspect of the issues is whether the funds transferred were due beneficially to Grist Mill Capital. Both questions impact on whether Charter Oak Trust had an "interest" in the funds transferred after they were paid to Grist Mill Capital.

The arbitrator's findings, albeit made well after the events, confirm that in excess of four million dollars was due to Charter Oak Trust and then to Grist Mill Capital in 2009. That finding does not render the transfers in any way irrelevant now. To the contrary, the arbitrator's finding confirms that over four million dollars of the Spencer insurance proceeds were due to Grist Mill Capital and that these funds were due to Grist Mill Capital within 90 days. This is relevant on the CPLR 5225 issues because the arbitrator's finding support the conclusion that Charter Oak



contemplated by CPLR 5225) in the fees due to Grist Mill Capital and actually paid in May 2009.

These contractual relationships were in effect when Charter Oak Trust disbursed a portion of the Spencer insurance proceeds to Grist Mill Capital in the two transfers on May 21, 2009, and May 26, 2009 (Exhibit 1, at 6). Also, at the time the first sums were paid from Charter Oak Trust to Grist Mill Capital, Grist Mill Capital was a secured creditor of Charter Oak Trust (Exhibit C #2431931) with respect to the total sums used by Charter Oak Trust to pay all the insurance premiums for all the policies in the Trust. (Exhibit 22, at 74).

For both these reasons, Charter Oak Trust was properly paying its creditor— Grist Mill Capital— with the May 21, 2009, and May 26, 2009, transfers. Once Grist Mill Capital was paid those sums, the judgment debtor no longer had an "interest" in them as required by CPLR 5225(b).

If the money Grist Mill Capital received in May 2009 was not money in which Charter Oak Trust retained an interest, none of the further dispositions of those funds by Grist Mill Capital to any of the other Grist Mill entities or by those entities is relevant to the claim under CPLR 5225(b).



## II

**Universitas has not proven that its rights to the USAA casualty loss payment are superior to those of Moonstone Partners, LLC.**

Under the second part of CPLR 5225(b), Universitas must show that its rights to the USAA casualty loss payment are superior to Moonstone Partners, LLC. The case law applying CPLR 5225(b) holds that (a) the funds in question must be, in essence, funds upon which the judgment creditor has a valid claim, or (b) the transfers were undertaken without a proper purpose. Beauvais v. Allegiance Sec., Inc., 942 F.2d 838, 841 (2d Cir. 1991).

Universitas has not met its burden of proof on either of these points. To the contrary, Universitas has based its application for a turnover order on a completely false premise and an erroneous recitation of facts.

a) <u>The change of banks was undertaken for a valid reason.</u>

Universitas' false premise was and is that the bank accounts opened by Charter Oak Trust, Grist Mill Capital and other entities in mid-2009 at TD Bank were a scheme to hide the movement of money. In essence, Universitas had argued to this Court that because the banking relationships were changed in the same time period when Lincoln paid the insurance proceeds to Charter Oak Trust, the change in banks must have been undertaken for the purpose of hiding the Spencer insurance proceeds.

In Universitas' motion papers, it argued to this Court that the respondents and the various entities associated with the judgment debtor had undertaken a course of bank transactions at a new bank— TD Bank— for the express purpose of concealing the life insurance proceeds paid to Charter Oak Trust in May 2009. No proof adduced at the hearing supports this claim.


Your complimentary use period has ended. Thank you for using PDF Complete.

Click Here to upgrade to Unlimited Pages and Expanded Features

and what the documents from 2009 actually disclose is that Charter Oak Trust and Grist Mill Capital had pre-existing banking relationships— primarily, but not exclusively, with The Bank of America— for many years prior to the payment of the Sash Spencer insurance proceeds.

The proof at the hearing was that those relationships ended because The Bank of America changed its practices as to wire transfers for the companies having Grist Mill accounts at the Bank.

The only documentary evidence relating to the change of banks which Universitas offers to this Court— Exhibit 12— is a single e-mail discussion between bank personnel and Mr. Carpenter relative to the wire transfer practices of The Bank of America.

Universitas has conducted wide ranging post-judgment discovery in this matter. Despite casting its net as widely as it has, there is no document from The Bank of America, and no document from Charter Oak Trust or Nova Group, that supports Universitas' claim that the change in banks was motivated by an intent to conceal the disbursement of the Sash Spencer insurance proceeds or that the change was made to hide funds.

To the contrary, the bank account for Grist Mill Trust— which is material to a resolution of the issues now before this Court— remained at JP Morgan Chase before, during and after the various banking transactions cited in the hearing (Exhibit O). Grist Mill Trust did not change banks. It did not do so because the problem that necessitated the change in banks arose with The Bank of America only.

In fact, there is no proof that supports the claim that the change to TD Bank was provoked by the arrival of the Sash Spencer insurance proceeds.



shes the insurance proceeds to be the cause of the change" because that would support their claim that the change was made for the purpose of hiding the insurance proceeds. Universitas has no proof to support in that assertion, however melodramatic that argument might appear.

Finally, Universitas' argument begs the more fundamental question— is it possible to hide banking transactions that are all on paper? The answer is that it was not possible to do so in the United States banking system in 2009. Indeed, all the proof regarding transfers of funds relevant to the Court's determination of the turnover application are from <u>documented</u> banking transactions undertaken by the respondent Daniel Carpenter or other employees of the various companies involved.

b) <u>Universitas' various recitation of the banking transaction do not prove that either a superior claim or the insurance proceeds.</u>

The erroneous sworn factual statements upon which Universitas' application was based is the explicit recitation of banking transactions that was set out in the affidavits of Mr. Reyhani and in Plaintiff's Exhibit 20.

In Universitas' description of the disbursement of the Spencer insurance proceeds by Charter Oak Trust in May 2009, the chain of events set forth under oath by Bryan Reyhani, in his February 28, 2013, affirmation is simply wrong.

Respondents ask the Court to compare paragraphs 23 through 46 of the Reyhani Declaration of February 28, 2013, to Petitioner's Exhibit 25; and then compare Petitioner's Exhibit 20 to Petitioner's Exhibit 25, Those comparisons reveal several factual contradictions in the proof submitted by Universitas.



ibit 25, did Universitas finally correct its description of the flow of funds that ultimately funded the Moonstone Partners LLC acquisition of the Cards Road property. Universitas' descriptions before May 9, 2013 to this Court of the flow of funds, are factually incorrect. Those sums were present in –but not addressed- in the accounts identified by Universitas in Exhibit 20 or in the Reyhani declarations.

But the money flow which is accurately set out in Exhibit 25 and, in Universitas' arguments to this Court, omit completely any effort to address the sums <u>other than</u> the Spencer insurance proceeds that were available to the respondents and which were actually used to purchase the property.

Respondents submit that the actual transactions which occurred prove that the money to buy the Cards Pond Road property was already in the possession of Grist Mill Trust before, and without reference to, any of the Spencer insurance proceeds. That money was more than sufficient to purchase the Cards Pond Road property.

Respondents' Exhibit R sets out an analysis of the Grist Mill Trust account at JP Morgan Chase for the only month relevant to this application– June 2009. Exhibit R's analysis of available balances for that account demonstrate the fact that Grist Mill Trust had in excess of the contract price for the Cards Road property ($1,200,000.00) available at all times before the transfer of funds was made from Grist Mill Trust to Phoenix Capital Management.

The total sum of funds Grist Mill Trust received (which sum Universitas identifies as the Spencer insurance proceeds) is $3,798,882.81, specifically the two June 9, 2009 transfers from



Immediately after those transfers, Grist Mill Trust had $5,058,712.18, in its JPMorgan Chase account. See Exhibit O.[1]

As of April 2009, the contract price for the Cards Road property was only $1,200,000.00. See Exhibit 18.

On June 12, 2009, Grist Mill Trust disbursed $2,700,000.00 to Phoenix Capital Management (Exhibit J, #0441). Before that transfer was made, the Grist Mill Trust account at JP Morgan Chase still had on deposit in excess of $1,259,829.37 from sources unconnected in any way to the funds Grist Mill Trust received from Grist Mill Capital on June 9, 2009. See Exhibit R.

After Phoenix Capital received funds from Grist Mill Trust on June 9, 2009, Phoenix Capital Management transferred funds to Grist Mill Capital on July 13, 2009 (Exhibit J, # 0443), which in turn disbursed funds to Grist Mill Holdings that same day. (Exhibit H, # 0361).

Grist Mill Holdings then transferred only $1,200,000.00--the contract price--to Hanover Trust Company on the day of closing (Exhibit J, # 0441) and Hanover Trust Company funded the closing by transferring $1,100,000.00 through the Moonstone Partners, LLC account, all these transactions occurring on July 15, 2009. (Exhibit K, # 1372).

On June 12, 2009, Grist Mill Trust had in excess of the sum of $1,200,000.00 available to transfer to Phoenix Capital Management without any sums from Grist Mill Capital and Grist Mill Trust had in excess of that sum on deposit at JP Morgan Chase before any funds were deposited into that account from Grist Mill Capital. See Exhibit R.

---

[1] The Grist Mill Trust Bank statement (Exhibit O) has daily ending balances. The daily ending balance for June 11, 2009, the figure is $5,058,712.18. The two deposits from Grist Mill Capital on June 9 total $3,798,882.81. Other than the $2,700,000 transfer to Phoenix, there were no other transactions in the account on June 12, 2009. When one subtracts $3,798,882.81 (the total amount of the GMC transfers) from $5,058,712.18 (the day ending account balance on June 11), the result is $1,259,829.37. That figure matches with the bottom line figure on Exhibit R.



demonstrated that the Spencer insurance proceeds were actually used to purchase the Cards Pond Road property. If the Spencer insurance proceeds were not used to purchase the property, Universitas cannot establish that it has a putative interest in any aspect of the property or that its claimed interest in the USAA casualty loss payment is "superior" to the interest of anyone— including, of course, the judgment debtor itself.

Finally, it has been conclusively established that Grist Mill Capital was entitled to immediate payment from the Charter Oak Trust of more than four million dollars of the proceeds paid on the Spencer life policies. That amount is far in excess of anything transferred by Grist Mill Capital to the Grist Mill Trust and far in excess of the $1.1 million ultimately transferred to Moonstone Partners to fund the purchase of the Cards Pond Road property. As described in Point I, above, Charter Oak Trust retained no "interest" in those sums once paid to Grist Mill Capital. That alone ends consideration of the issue of whether Universitas has superior rights to anything. <u>Northern Marianas v. Canadian Imperial Bank of Commerce</u>, __ F.3d __ (2nd Cir. 2013), 2013 WL 1982816.

PDF Complete
Your complimentary use period has ended. Thank you for using PDF Complete.
Click Here to upgrade to Unlimited Pages and Expanded Features

**CONCLUSION**

Based on the foregoing, the application of Universitas for a turnover order as to the USAA insurance payment should be denied.

Dated: June 21, 2013
       White Plains, New York

                            Respectfully submitted,

                            __s/Anthony J. Siano_____
                            Anthony J. Siano, Esq. (AS8842)
                            Anthony J. Siano Esq. PLLC
                            *Attorney for Daniel E. Carpenter and.*
                            *on this application, for Moonstone Partners LLC*
                            300 Westchester Avenue, Suite 302
                            White Plains, New York 10604


                            __s/Daniel E. LaBelle_____
                            Dan E. LaBelle, Esq. (DL2779)
                            Halloran & Sage LLP
                            *Attorneys for Molly Carpenter*
                            315 Post Road West
                            Westport, CT 06880



Brian Reyhani, Esq.
200 Park Avenue, FL 17
New York, New York 10166

Paula K. Colbath, Esq
Michael Barnett, Esq.
345 Park Avenue
New York, New York 10154

Matthew Brief, Esq.
Brief, Carmen, Kleiman, LLP
805 Third Avenue - 11th Floor
New York New York
United States of America 10022

Carole Bernstein, Esq.
41 Maple Avenue North
Westport, Connecticut 06880

Michael Evan Gorelick, Esq.
Abrams, Gorelick, Friedman & Jacobson, P.C.
One Battery Park Plaza, 4th Floor
New York, New York 10004