# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

UNIVERSITAS EDUCATION, LLC,

               Judgment Creditor,      :

      -against-                :      Case No. 11 CV 1590-LTS-HBP

NOVA GROUP, INC., as trustee, sponsor and    :
fiduciary of THE CHARTER OAK TRUST
WELFARE BENEFIT PLAN,           :     **RESTRAINING NOTICE**

              Judgment Debtor.     :
-------------------------------------------------------------X

To: Nova Group, Inc. and the Charter Oak Trust Welfare Benefit Plan

Address: 100 Grist Mill Road, Simsbury, CT 06070

**WHEREAS,** in an action in the United States District Court for the Southern District of New York (Swain, J.), between Universitas Education, LLC ("Universitas") as petitioner and Nova Group, Inc. ("Nova Group") as respondent, a judgment was entered on June 7, 2012 in favor of Universitas and against Nova Group in the amount of $30,181,880.30, which, along with post-judgment interest that has accrued thereon since June 7, 2012, remains due and unpaid;

**WHEREAS,** Nova Group and the Charter Oak Trust Welfare Benefit Plan are in possession of property or monies that must be used to pay the judgment;

**TAKE NOTICE** that pursuant to Federal Rule of Civil Procedure 69, and subdivision (b) of Section 5222 of the New York Civil Practice Law and Rules (which is set forth in full herein), **Nova Group, Inc. and the Charter Oak Trust Welfare Benefit Plan are hereby forbidden** to make, permit or suffer any sale, assignment or transfer of, or any interference with, any such property or monies, except as provided in Section 5222.

**TAKE FURTHER NOTICE** that this restraint also covers all property or monies in which Nova Group and/or the Charter Oak Trust Welfare Benefit Plan may have an interest in the future.

## CIVIL PRACTICE LAW AND RULES

(b) Effect of restraint; prohibition of transfer; duration. A judgment debtor or obligor served with a restraining notice is forbidden to make or suffer any sale, assignment, transfer or interference with any property in which he or she has an interest, except as set forth in subdivisions (h) and (i) of this section, and except upon direction of the sheriff or pursuant to an order of the court, until the judgment or order is satisfied or vacated. A restraining notice served upon a person other than the judgment debtor or obligor is effective only if, at the time of service, he or she owes a debt to the judgment debtor or obligor or he or she is in the possession

or custody of property in which he or she knows or has reason to believe the judgment debtor or obligor has an interest, or if the judgment creditor or support collection unit has stated in the notice that a specified debt is owed by the person served to the judgment debtor or obligor or that the judgment debtor or obligor has an interest in specified property in the possession or custody of the person served. All property in which the judgment debtor or obligor is known or believed to have an interest then in and thereafter coming into the possession or custody of such a person, including any specified in the notice, and all debts of such a person, including any specified in the notice, then due and thereafter coming due to the judgment debtor or obligor, shall be subject to the notice except as set forth in subdivisions (h) and (i) of this section. Such a person is forbidden to make or suffer any sale, assignment or transfer of, or any interference with, any such property, or pay over or otherwise dispose of any such debt, to any person other than the sheriff or the support collection unit, except as set forth in subdivisions (h) and (i) of this section, and except upon direction of the sheriff or pursuant to an order of the court, until the expiration of one year after the notice is served upon him or her, or until the judgment or order is satisfied or vacated, whichever event first occurs. A judgment creditor or support collection unit which has specified personal property or debt in a restraining notice shall be liable to the owner of the property or the person to whom the debt is owed, if other than the judgment debtor or obligor, for any damages sustained by reason of the restraint. If a garnishee served with a restraining notice withholds the payment of money belonging or owed to the judgment debtor or obligor in an amount equal to twice the amount due on the judgment or order, the restraining notice is not effective as to other property or money.

**TAKE FURTHER NOTICE** that disobedience of this Restraining Notice is punishable as contempt of court.

New York, NY

Dated: June 22, 2012

LOEB & LOEB LLP

By: _____

Paula K. Colbath (PC-9895)
Michael Barnett (MB-7686)
345 Park Avenue
New York, New York 10154-1895
(212) 407-4000

*Attorneys for Judgment Creditor*
*Universitas Education, LLC*

2

# AFFIDAVIT OF SERVICE

STATE OF NEW YORK    )
                          )     SS.

COUNTY OF NEW YORK  )

TIMOTHY B. CUMMINS, being duly sworn, deposes and says:

1.    I am not a party to this action and am over 18 years of age.

2.    On June 22, 2012, I served a true copy of the foregoing

Restraining Notice by Certified Mail, Return Receipt Requested, to the below listed

party:

> Nova Group, Inc. and
> The Charter Oak Trust Welfare
> Benefit Plan
> 100 Grist Mill Road
> Simsbury, CT 06070

Timothy B. Cummins

Sworn to before me this
22nd Day of June, 2012

Notary Public

ANTOINETTE PEPPER
Notary Public, State of New York
No. 01PE4973633
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires January 7, 2015

## SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Nova Group, Inc.
100 Grist Mill Road
Simsbury, CT 06070

## COMPLETE THIS SECTION ON DELIVERY

A. Signature

X _Jami E Moyon_   ☐ Agent  ☐ Addressee

B. Received by ( Printed Name )    C. Date of Delivery
Jamie E Moyon    7/12

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:    ☐ No

3. Service Type
☐ Certified Mail  ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)

7010 2780 0002 7515 6333

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

   Nova Group, Inc. and
   the Charter Oak Trust Welfare Benefit
   Plan
   100 Grist Mill Road
   Simsbury, CT 06070

2. Article Number
   *(Transfer from service label)*

   7010 2780 0002 7515 6098

PS Form 3811, February 2004          Domestic Return Receipt

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____    ☐ Agent
                             ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
   Shawn                         6-28

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☑ Certified Mail      ☐ Express Mail
   ☐ Registered          ☐ Return Receipt for Merchandise
   ☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

102595-02-M-1540

# AFFIDAVIT OF SERVICE

STATE OF NEW YORK    )
                              )    SS.
COUNTY OF NEW YORK  )

      TIMOTHY B. CUMMINS, being duly sworn, deposes and says:

1.    I am not a party to this action and am over 18 years of age.

2.    On June 22, 2012, I served a true copy of the foregoing

Restraining Notice by hand delivery to the below listed party:

        Joseph M. Pastore, III, Esq.
        Smith, Gambrell & Russell, LLP
        250 Park Avenue
        New York, New York 10177
        Attorneys for Respondents

                           Timothy B. Cummins

Sworn to before me this
22nd Day of June, 2012

Notary Public

ANTOINETTE PEPPER
Notary Public, State of New York
No. 01PE4973633
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires January 7, 2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNIVERSITAS EDUCATION, LLC,

        Judgement Creditor,

        -against-

NOVA GROUP, INC., et al.,

        Judgement Debtor.
-------------------------------------------------------X

Case No. 11 CV 1590-LTS-HBP

AFFIDAVIT OF SERVICE

STATE OF CONNECTICUT)
            S.S.:
COUNTY OF NEW CASTLE)

      **MICHAEL WALTON**, being duly sworn, deposes and says that he is over the age of

eighteen years, is an agent of the attorney service, D.L.S., Inc., and is not a party to this action.

      That on the 22nd day of June, 2012, at approximately the time of 2:20pm, deponent

served a true copy of the **RESTRAINING ORDER** upon **NOVA GROUP, INC.** at 100 Grist Mill

Road, Simsbury, CT by personally delivering and leaving the same with JASON CONCATELLI who

informed deponent that he holds the position of A. P. Clerk with that company and is authorized

by appointment to receive service at that address.

      Jason Concatelli is a white male, approximately 32 years of age, stands

approximately 6 feet 1 inch tall, and weighs approximately 200 pounds with brown hair.

**MICHAEL WALTON**

Sworn to before me this
2  day of June, 2012

NOTARY PUBLIC   8/31/2014

D.L.S., Inc.
01 Broadway
te. 510
lew York, NY 10013
12-925-1220
www.dlsnational.com

**DEMOVSKY LAWYER SERVICE**
Premier Nationwide Document Retrieval and Process Service Company
800-443-1058

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNIVERSITAS EDUCATION, LLC,

        Judgment Creditor,

    -against-

NOVA GROUP, INC., et al.,

        Judgment Debtor.

------------------------------------------------------------X

Case No. 11 CV 1590-LTS-HBP

AFFIDAVIT OF SERVICE

STATE OF CONNECTICUT)
         S.S.:
COUNTY OF NEW CASTLE)

    **MICHAEL WALTON**, being duly sworn, deposes and says that she is over the age of eighteen years, is an agent of the attorney service, D.L.S., Inc., and is not a party to this action.

    That on the 22nd day of June, 2012, at approximately the time of 2:20pm, deponent served a true copy of the **RESTRAINING ORDER** upon **CHARTER OAK TRUST** at 100 Grist Mill Road, Simsbury, CT by personally delivering and leaving the same with JASON CONCATELLI who informed deponent that he holds the position of A. P. Clerk with that company and is authorized by appointment to receive service at that address.

    Jason Concatelli is a white male, approximately 32 years of age, stands approximately 6 feet 1 inch tall, and weighs approximately 200 pounds with brown hair.



MICHAEL WALTON

Sworn to before me this
26 day of June, 2012

NOTARY PUBLIC  6/1/2014

D.L.S., Inc.
401 Broadway
Ste. 510
New York, NY 10013
212-925-1220
www.dlsnational.com

# Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNIVERSITAS EDUCATION, LLC,

                    Judgment Creditor,        :

         -against-                     :      Case No. 11 CV 1590-LTS-HBP

NOVA GROUP, INC., as trustee, sponsor and    :
fiduciary of THE CHARTER OAK TRUST
WELFARE BENEFIT PLAN,                 :     **RESTRAINING NOTICE**

                    Judgment Debtor.       :
------------------------------------------------------------X

     To: Grist Mill Capital, LLC
     100 Grist Mill Road
     Simsbury, CT 06070

     **WHEREAS,** in an action in the United States District Court for the Southern District of
New York (Swain, J.), between Universitas Education, LLC ("Universitas") as petitioner and
Nova Group, Inc. ("Nova Group") as respondent, a judgment was entered on June 7, 2012 in
favor of Universitas and against Nova Group in the amount of $30,181,880.30 (copy attached
hereto), which, along with post-judgment interest that has accrued thereon since June 7, 2012,
remains due and unpaid;

     **WHEREAS,** it appears that you owe a debt to Nova Group or the Charter Oak Trust
Welfare Benefit Plan, or are in possession of or have access to property in which Nova Group
and/or the Charter Oak Trust Welfare Benefit Plan has an interest;

     **TAKE NOTICE** that pursuant to Federal Rule of Civil Procedure 69 and subdivision (b)
of Section 5222 of the New York Civil Practice Law and Rules (which is set forth in full herein),
you are hereby forbidden to make, permit or suffer any sale, assignment or transfer of, or any
interference with, any such property or pay over or otherwise dispose of any such debt except as
provided in Section 5222.

     **TAKE FURTHER NOTICE** that this notice also covers all property in which Nova
Group and/or the Charter Oak Trust Welfare Benefit Plan has an interest hereafter coming into
your possession or custody, and all debts hereafter coming due from you to Nova Group and/or
the Charter Oak Trust Welfare Benefit Plan.

### CIVIL PRACTICE LAW AND RULES

     Section 5222(b) Effect of restraint; prohibition of transfer; duration. A judgment debtor
or obligor served with a restraining notice is forbidden to make or suffer any sale, assignment,
transfer or interference with any property in which he or she has an interest, except as set forth in

subdivisions (h) and (i) of this section, and except upon direction of the sheriff or pursuant to an order of the court, until the judgment or order is satisfied or vacated. A restraining notice served upon a person other than the judgment debtor or obligor is effective only if, at the time of service, he or she owes a debt to the judgment debtor or obligor or he or she is in the possession or custody of property in which he or she knows or has reason to believe the judgment debtor or obligor has an interest, or if the judgment creditor or support collection unit has stated in the notice that a specified debt is owed by the person served to the judgment debtor or obligor or that the judgment debtor or obligor has an interest in specified property in the possession or custody of the person served. All property in which the judgment debtor or obligor is known or believed to have an interest then in and thereafter coming into possession or custody of such a person, including any specified in the notice, and all debts of such a person, including any specified in the notice, then due and thereafter coming due to the judgment debtor or obligor, shall be subject to the notice except as set forth in subdivisions (h) and (i) of this section. Such a person is forbidden to make or suffer any sale, assignment or transfer of, or any interference with, any such property, or pay over or otherwise dispose of any such debt, to any person other than the sheriff or the support collection unit, except as set forth in subdivisions (h) and (i) of this section, and except upon direction of the sheriff or pursuant to an order of the court, until the expiration of one year after the notice is served upon him or her, or until the judgment or order is satisfied or vacated, whichever event first occurs. A judgment creditor or support collection unit which has specified personal property or debt in a restraining notice shall be liable to the owner of the property or the person to whom the debt is owed, if other than the judgment debtor or obligor, for any damages sustained by reason of the restraint. If a garnishee served with a restraining notice withholds the payment of money belonging or owed to the judgment debtor or obligor in an amount equal to twice the amount due on the judgment or order, the restraining notice is not effective as to other property or money.

**TAKE FURTHER NOTICE** that disobedience of this Restraining Notice is punishable as contempt of court.


New York, NY

Dated: June 22, 2012


LOEB & LOEB LLP

By: _____

Paula K. Colbath (PC-9895)
Michael Barnett (MB-7686)
345 Park Avenue
New York, New York 10154-1895
(212) 407-4000

*Attorneys for Judgment Creditor*
*Universitas Education, LLC*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

UNIVERSITAS EDUCATION, LLC,

              Petitioner,

     -against-

NOVA GROUP, INC.,

              Respondent.

------------------------------------------------------X

11 **CIVIL** 1590 (LTS)(HBP)

## <u>JUDGMENT</u>

# 12, 1003

Petitioner Universitas Education, LLC having moved to confirm a January 24, 2011 Phase I arbitration award against Respondent Nova Group, Inc.; Respondent having cross-moved to vacate the award, and the matter having been brought before the Honorable Laura T. Swain, United States District Judge, and the Court, on June 5, 2012, having issued its Memorandum Order granting the petition for confirmation of the Award, denying Respondent's cross-motion for vacatur of the Award is denied, and directing the Clerk of Court to enter judgment confirming the January 24, 2011, Phase I Arbitration Award, awarding Petitioner $26,558,308.36, plus interest thereon from January 24, 2011, at the rate of 10% per annum ($3,623,571.94), for a total judgment of $30,181,880.30, and closing this case as well as the member case, No. 11 Civ. 8726, it is,

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Memorandum Order dated June 5, 2012, the petition for confirmation of the award is granted; Respondent's cross-motion for vacatur of the Award is denied; and judgment is entered confirming the January 24, 2011, Phase I Arbitration Award, awarding Petitioner $26,558,308.36, plus interest thereon from January 24, 2011, at the rate of 10% per annum ($3,623,571.94), for a total judgment of $30,181,880.30; accordingly, this case is closed as well as the member case, No. 11 Civ. 8726.

Dated: New York, New York
June 7, 2012

RUBY J. KRAJICK

_____
Clerk of Court

BY: _____
Deputy Clerk

THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON _____

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK    )

                             )      SS.

COUNTY OF NEW YORK   )

         TIMOTHY B. CUMMINS, being duly sworn, deposes and says:

1.      I am not a party to this action and am over 18 years of age.

2.      On June 22, 2012, I served a true copy of the foregoing

Restraining Notice by Certified Mail, Return Receipt Requested, to the below listed

party:

            Old Mill Capital, LLC
            100 Grist Mill Road
            Simsbury, CT 06070

                                    Timothy B. Cummins

Sworn to before me this
22nd Day of June, 2012

Notary Public

ANTOINETTE PEPPER
Notary Public, State of New York
No. 01PE4973633
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires January 7, 2015

NY1129038.1
214560-10001

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Grist Mill Capital, LLC
100 Grist Mill Road
Simsbury, CT 06070

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Shunix_  ☐ Agent  ☐ Addressee

B. Received by ( Printed Name)    C. Date of Delivery

D. Is delivery address different from Item 1?  ☐ Yes
   If YES, enter delivery address below:    ☐ No

3. Service Type
   ☐ Certified Mail   ☐ Express Mail
   ☐ Registered       ☐ Return Receipt for Merchandise
   ☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)

7010 2780 0002 7515 6173

PS Form 3811, February 2004         Domestic Return Receipt                    102595-02-M-1540

# Exhibit 3



**GROUP INC.**

GRIST MILL PLAZA
100 GRIST MILL ROAO
SIMSBURY, CT 06070

March 29, 2013

Policyholder Services
Sun Life Financial
One Sun Life Executive Park
Wellesley Hills, MA 02481

     Re:   Ownership & Beneficiary Change Request

To Whom It May Concern:

    Please find enclosed Change of Ownership and Beneficiary Change Forms for the following individual:

    Judith Amsterdam    Policy# 020158601

    I have also enclosed the new owner's Corporate Resolution. If you have any questions or require additional information, please feel free to contact me. Thank you.

            Kindest Regards,

            Incke Murphy
            Plan Administrator

# GRIST MILL CAPITAL, LLC

## RESOLUTIONS AUTHORIZING TRANSACTIONS
## WITH INSURANCE COMPANIES FOR POLICY CHANGE IN OWNERSHIPS

The undersigned, being the Secretary of the Managing Member of GRIST MILL CAPITAL, LLC (the "Company"), acting in accordance with the Delaware Limited Liability Company Act, as amended, hereby resolves as follows:

1.  RESOLVED, that the Company is hereby authorized to execute a change of ownership on certain insurance policies or contracts.

2.  RESOLVED, that Daniel E. Carpenter and/or Matthew Westcott (collectively, the "Company Signatories") are hereby authorized to execute on behalf of the Company in regard to the change in ownership on policies or contracts and all other documents incident thereto.

3.  RESOLVED, that the actions of the Company Signatories with respect to the change in ownership on insurance policies or contracts are hereby authorized, approved, ratified, adopted and confirmed in all respects.

4.  RESOLVED, that the Company Signatories are authorized and directed to perform any and all further acts and execute and deliver any and all additional documents necessary to effectuate the foregoing resolutions.

Signed this 4th day of January, 2013, by the Manager of the Company.

GRIST MILL CAPITAL, LLC


_____
Matthew Westcott
Assistant Secretary of the Managing Member

# Ownership Change Request



**Please note:**
- Use this form to change the owner(s) of the life insurance policy(ies) listed below.
- Use this form to designate (a) contingent owner(s), who will become the owner(s) of the policy(ies) in the event that the original owner(s) dies
- Changing the ownership DOES NOT affect the current beneficiary designation. To change the beneficiary designation, use the Beneficiary Change Request form
- For multiple owners unless you indicate differently, the surviving owner(s) assume ownership of any deceased owner's portion of the policy(ies)
- This ownership designation cancels all prior ownership designations

›For help with this form, call 800-862-6266.
›For policies issued in New York, please call 877-750-8683

## 1 Policy Information

| | |
|---|---|
| Policy number(s) | D2 01 58601 |
| Insured(s) name | Judith Amsterdam |
| Current owner name | Charter Oak Trust |
| Current co-owner (if applicable) | |
| Reason for change (transfer, death, gift etc) | Transfer per Collateral Assignment Agreement |

In case we need to contact you about this request  Daytime phone (860) 408-7000

## 2 Primary owner(s) designation

Please list the new owners  Include the details for any current owners you wish to remain on the policy(ies)  If you wish to designate a trust as an owner, complete the Designate a Trust as Owner section at the top of page 2  If you wish to designate an entity as an owner, complete the Designate an Entity as Owner section on page 2. If more space is needed, please attach an additional sheet with owner names, addresses, and signatures

### Designate a person as owner

| Owner name | | | SSN/TIN | |
|---|---|---|---|---|
| Relationship to the insured | | | Date of birth | |
| Address | | | | |
| City | | State | Zip code | |

---

Sun Life Assurance Company of Canada and Sun Life Assurance Company of Canada (U.S) issue policies in Puerto Rico, the District of Columbia, and all states except New York  Sun Life Insurance and Annuity Company of New York issues policies in New York. Each of these companies is responsible for its own financial condition and contractual obligations  The company that issued the policy referenced above is refferd to as 'Sun Life' throughout this form.

© 2010 Sun Life Assurance Company of Canada (U.S)  All rights reserved
Sun Life Financial and the globe symbol are registered trademarks of Sun Life Assurance Company of Canada

## 2  Primary owner(s) designation (continued)

| Co-owner name (if applicable) | | SSN/TIN | |
|---|---|---|---|
| Relationship to the insured | | Date of birth | |
| Address | | | |
| City | State | Zip code | |

### Designate a trust as owner

You will also need to complete a Trust Certification/Affidavit form.

| Trust name | |
|---|---|
| Date of trust | TIN |
| Trustee(s) name | |

### Designate an entity as owner

| Entity name  Grist Mill Capital, LLC - Delaware | | TIN  81-0607868 | |
|---|---|---|---|
| Address  100 Grist Mill Road | | | |
| City  Simsbury | State  CT | Zip code  06070 | |

## 3  Contingent owner(s) designation

We strongly recommend that you designate a contingent owner if the insured and owner are different  If a contingent owner(s) is not named and there is no surviving primary owner, then the owner(s) estate automatically assumes ownership of all or the portion of the policy belonging to that owner upon that owner's death

| Contingent owner name | | SSN/TIN | |
|---|---|---|---|
| Relationship to the insured | | Date of birth | |
| Address | | | |
| City | State | Zip code | |

| Contingent owner name | | SSN/TIN | |
|---|---|---|---|
| Relationship to the insured | | Date of birth | |
| Address | | | |
| City | State | Zip code | |

# Exhibit 4

 **Lincoln**
Financial Group

**Jeffrey L. Smith**
*Vice President and Chief Counsel - Life Insurance*

Lincoln National Life Insurance Co.
100 N. Greene Street
PO Box 21008
Greensboro, NC 27420-1008
direct 336 691-3305
fax 336 335-2408
jeff.smith@LFG.com

July 30, 2013

<u>**Via Facsimile (860.408.7022) Only**</u>

Mr. Wayne H. Bursey
Charter Oak Trust
Grist Mill Plaza
100 Grist Mill Road
Simsbury, CT 06070

    Re:    JJ7098098, JJ7075457, JJ7105688 and JJ7121879 (the "Policies")

Dear Mr. Bursey:

    This is in response to your May 16 letter.

    The Restraining Notice Lincoln received relates to Nova Group as Trustee, Sponsor and Fiduciary of the Charter Oak Trust Welfare Benefit Plan. The fact that one or more of the Policies may be owned by a specific Charter Oak Trust with at different TIN than the policy underlying the litigation is not relevant. Unless and until the Restraining Notice is lifted or set aside by the Court, Lincoln will not process any changes to the Policies.

    Very truly yours,

Jeffrey L. Smith

Cc:    Ms. Paula K. Colbath (w/ copy of May 16 letter)

Registered Representative of Lincoln Financial Distributors, Inc., distributor of securities and broker/dealer. Principal office located at 130 N. Radnor-Chester Rd., Radnor, PA 19087-5221. Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.



CHARTER OAK TRUST

rec'd
5/17/13

May 16, 2013

Mr. Jeffrey L. Smith
Vice President and Chief Counsel – Life Insurance
100 N. Greene Street
Greensboro, NC 27401

**Re:    JJ7098098, JJ7075457, JJ7105688 and JJ7121879**

Dear Mr. Smith:

We are in receipt of your fax with the attached Restraining Notice (Exhibit 1). I would like to bring to your attention that this is not a court order. Further to that, the Notice clearly names Nova Group, Inc. as the "Judgment Debtor" and talks about property or debts owed to Nova Group, Inc. or the Charter Oak Trust. The above listed policies are not affiliated with either.

I would like to draw your attention to the attached documentation demonstrating clear evidence of the lack of connection between the Sash Spencer policies which is what the Universitas lawsuit refers to and the above listed policies. As you should know by now, the Sash Spencer policies were owned by a Charter Oak Trust with a TIN of 20-6225830, which would be the only policies that pertain to this Restraining Notice. But Lincoln has already been sued once by that Charter Oak Trust over the very same Sash Spencer policies that are the subject of the Universitas lawsuit.

On the other hand, the policies that we are talking about and that are not subject to any restraining order issued by Universitas' attorneys were owned by the 2009 Charter Oak Trust established October 1, 2009 with the TIN 27-6108478. The ownership of the policies by a separate and distinct Trust with a different tax id number is clearly stated on the attached application and policy issue pages. For example, please refer to Exhibit 2, detailing Barbara L. Wisda's policy's ownership. Do you see Nova Group, Inc. mentioned anywhere? Please refer to Exhibits 3 through 5 for the remaining three applications and policy pages that clearly state Charter Oak Trust 2009. Moreover, the ownership rights of Grist Mill Capital, LLC are clearly outlined in the attached Disclosure, Acknowledgement & Certification Agreements shown in Exhibits 6 through 9. I would ask again that you re-read the Restraining Notice and see for yourself that neither the 2009 Charter Oak Trust, nor Grist Mill Capital, LLC are listed in the Notice, which, as stated above, is merely written by attorneys and not court ordered.



CHARTER OAK TRUST

Grist Mill Capital also has a collateral assignment interest in all of the policies. Please refer to Exhibits 10 through 13 to see the applications as well as the notifications of the acceptance by Lincoln of the assignments.

Based on these facts, please follow through with the changes of ownership and beneficiary as were previously requested. If you have further questions, please contact me at (860) 408-7000 ext. 257. Thank you.

Sincerely,

Wayne H. Bursey

# Exhibit 5

Suite 1900
250 Park Avenue
New York, New York 10177
Main: 212 907-9700
Fax: 212 907-9800
www.sgrlaw.com

# SMITH, GAMBRELL & RUSSELL, LLP

*Attorneys at Law*

Joseph M. Pastore III
NY Tel:  212-907-9730
NY Fax:  212-907-9830
CT Tel:  203-564-1485
CT Fax:  203-564-1402
jpastore@sgrlaw.com

August 30, 2012

**Via Email & Regular Mail**

Michael Barnett, Esq.
Loeb & Loeb LLP
345 Park Avenue
New York, New York 10154

> **Re:**    **Universitas Education, LLC v. Nova Group, Inc.;**
> **Case No. 11-Civ-1590 (LTS) (HBP) and 11-Civ.-8726 (LTS)(RLE)**

Dear Mr. Barnett:

I write in response to your August 28, 2012 email regarding the Discovery Responses that are due to be answered by Friday, August 31, 2012.

Since the Court entered the Order requiring answers to Universitas' requests, we have been in frequent communications with our client to obtain responsive information. Despite our best efforts, we have been advised that Wayne Bursey ("Mr. Bursey") has resigned his duties as Trustee for medical reasons. We have further been advised that Mr. Bursey was the only individual who had the capacity to search for responsive documentation or sign a verification on behalf of Nova or the Charter Oak Trust. Despite our efforts to press the client to provide another person who has the authority and capacity to effectuate a response, the client has taken the recalcitrant position that there is no one else.

As a result of this turn of events, it appears our client will not be providing responses or documents on August 31, 2012. We have advised the client that it is under a court Order to respond, and we will continue to press the client to come to a workable way to respond. As we have made clear, the position is that there is no one to sign the relevant verification and thus, compliance is not an option. We have pushed as hard as we can and will continue to do so. This recalcitrance by the client is symptomatic of other issues, and this latest situation will



*Atlanta, Georgia | Frankfurt, Germany | Jacksonville, Florida | New York, New York | Stamford, Connecticut | Washington, D.C.*

likely cause me to seek to withdraw as counsel based on irreconcilable differences between attorney and client.

Please contact me with any questions.

Very truly yours,

Joseph M. Pastore III

cc:     Paula K. Colbath, Esq.

**Exhibit 6**

# O'BRIEN, TANSKI & YOUNG, LLP
### COUNSELLORS AT LAW

JAMES M. TANSKI
ROBERT D. SILVA
DONNA R. ZITO
ALBERT G. DANKER, JR.
STEPHEN V. MANNING□
NANCY P. TYLER○
MICHAEL G. RIGG
AMY F. GOODUSKY
ADAM J. TARR□
CLAIRE V. MORGAN

CITYPLACE II
185 ASYLUM STREET, 16TH FLOOR
HARTFORD, CONNECTICUT 06103-3402

(860) 525-2700
TELEFAX (860) 247-7861
www.otylaw.com

RETIRED
DONALD W. O'BRIEN

COUNSEL
ROLAND F. YOUNG, III

□ ALSO MEMBER OF MASSACHUSETTS BAR
○ ALSO MEMBER OF FLORIDA BAR

May 8, 2013

Hon. Laura Taylor Swain
United States District Judge
Southern District of New York
500 Pearl St.
New York, NY 10007-1312

(Fax) (212) 805-0426

Re:  Universitas Education, LLC v. Nova Group, Inc.
     Case No. 1:11-cv-01590-LTS-HBP

I write as counsel for Wayne H. Bursey, on whose behalf I accepted service of a subpoena issued by Michael S. Barnett of Loeb & Loeb LLP, representing Universitas Education, LLC. ("Universitas"). Universitas' subpoena calls for the testimony of Mr. Bursey at a hearing in this matter scheduled before Your Honor this Thursday, May 9, 2013 at 9:30 a.m.

It is a matter of record in this proceeding, see Doc. 183-22, that Mr. Bursey is on a list of persons/entities designated as targets of a federal criminal investigation being conducted in the District of Connecticut. I have no information that Mr. Bursey's status in that regard has changed. By his signature below, Mr. Bursey confirms that he would assert his Fifth Amendment rights against self-incrimination in response to all questions regarding the following subjects:

- Formation and operation of the Charter Oak Trust Welfare Benefit Plan ("Charter Oak Trust") and the basis for and validity of any liens in favor of Grist Mill Capital LLC encumbering the assets of Charter Oak Trust and/or Nova Group, Inc.

- Disposition of the $30,677,276.85 paid by Lincoln National Life Insurance Company to the Charter Oak Trust in May 2009, including all transfers made to entities operated or controlled by Daniel E. Carpenter.

- Mr. Bursey's role in the Charter Oak Trust, Grist Mill Trust, Nova Group, Inc., Grist Mill Capital, LLC and related entities.

- Daniel E. Carpenter's role in the Charter Oak Trust, Grist Mill Trust, Nova Group, Inc., Grist Mill Capital and related entities.

- Transactions between and among Ridgewood Finance II (and related entities), Grist Mill Capital LLC, Charter Oak Trust and/or Nova Group, Inc.

- The bank accounts and banking relationships of entities operated or controlled by Daniel E. Carpenter and/or Wayne Bursey.

- The purchase of properties in South Kingston, Rhode Island by Moonstone Partners, LLC, and the sources of the funds used to make such purchase.

Mr. Bursey recognizes that the Court may have discretion to draw adverse inferences against Respondents Moonstone Properties, LLC, Daniel E. Carpenter, and Molly Carpenter, and/or Defendant Nova Group, Inc. as Trustee of the Charter Oak Trust, as a result of his assertion of his Fifth Amendment rights against self-incrimination.

Universitas is willing to accept this letter to the Court in lieu of Mr. Bursey's appearance at the hearing, and has released Mr. Bursey from his obligation to appear before the Court in response to the subpoena.

Very truly yours,
O'BRIEN, TANSKI & YOUNG, LLP

Stephen V. Manning

SVM/bms
cc:    Bryan I. Reyhani (via email)
       Paula K. Colbath (via email)
       Michael S. Barnett (via email)
       Dan E. LaBelle (via email)
       Anthony J. Siano (via email)

Acknowledged and Agreed to:

_____
Wayne H. Bursey

# Exhibit 7

No. HHDCV-05-4013820
**STATEWIDE GRIEVANCE COMMITTEE**

**SUPERIOR COURT**

VS.

**HARTFORD J.D.**

**DANIEL CARPENTER**

**ORDER**

This matter having come to this Court with an agreement as to disposition in accordance with Practice Book 2-82, it is hereby ORDERED;

Attorney Daniel Carpenter, Juris #300541 is hereby suspended from the practice of law until further order of this court.

By the Court,

_____
Aurigemma          ,Judge

1-6-09
_____
Date

III
S2

# Exhibit 8

11-92 M-01 (JGM)

# UNITED STATES DISTRICT COURT

for the
District of Connecticut

| In the Matter of the Search of | ) |
| (Briefly describe the property to be searched | ) |
| or identify the person by name and address) | ) Case No. |
| | ) |
| The entirety of the premises located at 100 Grist Mill | ) |
| Road in Simsbury, Connecticut, and more particularly | ) |
| described in Attachment B | ) |

COPY

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____Connecticut_____
*(identify the person or describe the property to be searched and give its location):*
The entirety of the premises located at 100 Grist Mill Road in Simsbury, Connecticut, and more particularly described in Attachment B

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):*
See Attachment D

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before       6/4/11
                                                                                    *(not to exceed 14 days)*

☒ in the daytime  6:00 a.m. to 10 p.m.       ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
Joan G. Margolis
                    *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*  ☐ for _____ days *(not to exceed 30).*
                                                                ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:  5/25/11, 12:45 p

_____
*Judge's signature*

City and state:  New Haven, CT

Joan G. Margolis
*Printed name and title*

**CONFIDENTIAL**                                             SGR 000027

# ATTACHMENT D

## DESCRIPTION OF ITEMS TO BE SEIZED

For the period of 2006 through the present, all of the following items or records, whether in paper, electronic or other form, relating to Daniel Carpenter, Jack E. Robinson, Donald Trudeau, J. Edward Waesche, Wayne Bursey, Charles Induddi Westcott, Robert Pacini, Andrew Varner, Paul E. Martin, Grist Mill Capital, LLC, Grist Mill Holdings, LLC, Benefit Plan Advisors, LLC, TPG Group, Inc., Caroline Financial Group, Nova Group, Avon Capital, LLC, the Charter Oak Trust Welfare Benefit Plan, the Charter Oak Trust, and the Charter Oak Trust 2009:

a.   All books and records, including all general ledgers, cash receipts journals, cash disbursement journals, petty cash journals, bank statements, passbooks, cancelled checks, check stubs or registers, deposit tickets, deposit receipts, cashier's checks, money orders, wire transfer documents, invoices, written estimates, receipts, billing statements, contracts, agreements, customer ledger cards, purchases journals, advance payment ledgers, accounts payable ledgers, accounts receivable ledgers, correspondence, memoranda and documents;

b.   any and all IRS forms and/or U.S. Treasury forms to include Annual Return/Report of Employee Benefit Plan Form 5500, Federal income tax returns, partnership returns, payroll tax returns, Forms W-2, and Forms 1099;

c.   copies of federal and state income tax returns, including amended federal and state tax returns, as well as any and all records used in, or resulting from, the preparation of federal and state income tax returns;

d.   records of income and expenses, such as profit and loss statements, financial statements, balance sheets and income and expense journals;

e.   records involving payments from employers, or from any source, into the Charter Oak Trust or Charter Oak Trust 2009;

f.   records associated with all insurance policies that were owned at any time by the Charter Oak Trust, whether or not they were subsequently transferred;

g.   records involving loans, lines of credit, payments, settlement agreements or any financial transactions from Ridgewood Finance, Inc. and/or Ridgewood Finance II, LLC to any of the above entities or related businesses;

**CONFIDENTIAL**

SGR 000028

h.   correspondence between Waesche, Robinson, Carpenter, Bursey, Westcott, Pacini, and/or Trudeau and/or any other business entities or individuals regarding all payments, debts, withdrawals, loans, new policies, transfers of policies, or other activity involving the Charter Oak Trust or Charter Oak Trust 2009 (whether in paper or electronic format and stored on any computers or computer networks or servers), such as letters, memoranda, emails, mailings, and envelopes.;

i.   all records in whatever form of transfers of ownership of insurance policies;

j.   bank records, including but not limited to cancelled checks, cashier's checks, money orders, statements, deposit tickets, and withdrawal;

k.   bank loan records, including but not limited to loan applications and loan agreements, notes, certificates of deposit, payment records, mortgage statements, mortgage applications, broker accounts, notes receivable, notes payable, stock certificates, account statements, interest and dividend reports, and account activity reports;

l.   documents regarding debts owed and monies due from any of the above-mentioned entities or persons, including bills, foreclosure notices, and past due statements;

m.   documents and records relating to Charter Oak Trust's relationship with any of the above-mentioned entities or persons, including Trust Agreements, Plan Documents, Adoption Agreements, Insurance Policies, Invoices, Payments, Commission Reports, Loan requests, Contracts, and Complaints;

n.   documents and records relating to Charter Oak Trust 2009's relationship with any of the above-mentioned entities or persons, including Trust Agreements, Plan Documents, Adoption Agreements, Insurance Policies, Invoices, Payments, Commission Reports, Loan requests, Contracts, and Complaints;

o.   records, in whatever form, of personal and business activities relating to the operation and ownership of the computer systems, such as telephone records, notes, books, diaries and reference materials;

p.   records, in whatever form, pertaining to accounts held with Internet Service Providers or of Internet use;

q.   In order to search for the items described above that may be maintained in electronic media, law enforcement personnel are authorized to search, copy, image and seize the following items for off site review:

i.   Any computer equipment and storage device capable of being used to commit further, or store evidence of the offenses listed above;

ii.   Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices and optical scanners;

iii.  Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

iv.   Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

v.    Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

vi.   Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data;

vii.  Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data; and

viii. Files, records, programs, logs, electronic communications, scanning programs, financial records, hacking software and router configuration software.

NOTE: As used above, the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form, including electronic media;

CONFIDENTIAL

SGR 000030

## ATTACHMENT B

## PLACE TO BE SEARCHED

### 100 Grist Mill Road
### Simsbury, Connecticut

The entire premises of the office property located at 100 Grist Mill Road, Stamford, Connecticut. 100 Grist Mill Road is a large, single story office building. The lower portion of the building consists of red brick and window, while the upper portion consists of horizontal gray siding. The property is accessed by a short driveway off of Grist Mill Road. At the bottom of the driveway is a red brick structure with a sign attached to it that says, "100 GRIST MILL ROAD." At the top of the driveway, as you approach the parking lot, is a wooden sign that reads, "DIRECTORY, ENTRANCE 1, BENISTAR." There is no signage on the exterior of the building itself. A photograph of the office building is attached as Exhibit 2

**SGR 000031**

**EXHIBIT 2**

**PHOTOGRAPH OF SUBJECT OFFICE B,
100 GRIST MILL ROAD, SIMSBURY, CONNECTICUT**



SGR 000032

**Exhibit 9**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 04-10029-GAO |
| ) | |
| DANIEL E. CARPENTER, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States submits this memorandum in advance of the December 19, 2005

sentencing hearing in this case.

### Introduction

On July 27, 2005, following a thirteen-day trial, a jury convicted Daniel E. Carpenter

("Carpenter") of nineteen counts of wire and mail fraud, stemming from his misappropriation of

client funds that had been entrusted to his company, Benistar Property Exchange Trust

Company, Inc. ("BPE").  Contrary to representations that the funds would be held in fixed

interest escrow accounts, Carpenter transferred the money to trading accounts, gambled it in

speculative stock options, and lost approximately $9 million.

In anticipation of Carpenter's sentencing, the government submits this memorandum

presenting: (i) a summary of relevant facts; (ii) the government's guidelines computations;

(iii) the government's sentencing recommendation; and (iv) a response to certain departure and

sentencing arguments that the defendant has made to the Probation Office.

I.    **Relevant Facts**

The Probation Office's Presentence Report ("PSR") summarizes the principal evidence

that the government introduced at trial. (PSR ¶¶ 8 - 57). Rather than repeat that summary here, the government highlights five principal factual points that it believes are material to the Court's sentencing determination:[1]

A.   Carpenter Is Fully Culpable for His Criminal Conduct.

Carpenter is fully culpable for his criminal conduct, which he undertook in an attempt to enrich himself.

Carpenter knew that clients were entrusting their funds to BPE based on representations that the money would be held in short term, fixed interest escrow accounts and returned to them to complete their 1031 property exchanges. Carpenter personally participated in BPE's first exchange, was advised in writing by Attorney David Patterson during that exchange of the importance of maintaining the funds' security, and signed an Exchange Agreement and an Escrow Agreement containing such assurances. (Gov. Exs. 138, 140, 142).

Contrary to these representations, Carpenter misappropriated the client escrow funds by using them to trade in the options market. He knew full well the associated risks. Merrill Lynch and PaineWebber warned him of those risks when he opened the trading accounts (Gov. Exs. 145-46, 166-67); he experienced the risks firsthand in the form of millions of dollars in trading losses that he suffered beginning in April, 2000 (Gov. Exs. 196, 206); and yet from August through December of the same year, he took millions more that the victims in this case entrusted to BPE, and proceeded to trade and lose that money as well. (Id.). He did so despite the repeated warnings of Merrill Lynch and PaineWebber and the enormous losses he had already sustained. (Gov. Exs. 152-53, 161-63, 172).

---

[1] The government refers the Court to the PSR for a broader discussion of the evidence.

Carpenter's conduct cannot be justified as "good faith" investments authorized by BPE's clients. The clients received documents and signed agreements stating that their funds would be held in escrow in fixed interest accounts. (Gov. Exs. 1-3, 10-13, 18). They were never told, nor did they authorize, the funds to be traded in high risk options. No reason existed for them ever to suspect that would happen. Sufficient yields were available from U.S. Treasury instruments, money market accounts, and similar vehicles to enable Carpenter to satisfy the rates of interest owed to clients consistent with the escrow representations that BPE had made to them, particularly since the majority of the funds were to be held at 3%. (Gov. Exs. 148D, 168, 208). However, as Carpenter stated in a memorandum dated October 30, 2000, putting BPE's client funds in such prudent holdings would not have yielded profits "worthy of [his] time." (Gov. Ex. 184). So, instead, Carpenter gambled the funds in speculative options trading. He did so for the purpose of enriching himself, by using the escrow money to finance aggressive trading that he hoped would generate substantial profits – profits which, after paying the 3% or 6% interest that BPE owed to clients, Carpenter could then pocket. Id.

That BPE did not collapse until January, 2001 is not a testament to either Carpenter's "good faith" or the "prudence" of his investments, as he now asserts. BPE's ability to continue to close replacement property transactions in the latter part of 2000 was attributable solely to the fact that enough new client money was coming in to pay off existing clients whose funds had (unbeknownst to them) been traded and lost in the market. In essence, Carpenter's conduct was analogous to a Ponzi scheme. As early as April, 2000, Carpenter's trading losses caused BPE to have far less escrow money in its accounts than what it owed to clients. (Gov. Ex. 207). However, Carpenter was able to cover up the sizeable shortfall, and hide what was in fact

3

happening to the money, because enough new clients were being lured in to cover the redemptions owed to earlier clients who had requested their money back.

      B.    <u>Carpenter's Conduct Caused Substantial Harm.</u>

When Carpenter's scheme finally imploded, his criminal conduct had caused seven victims, collectively, to lose approximately $9 million – money that they (falsely) had been told would be held in escrow but that, in truth, Carpenter misappropriated and traded. (PSR ¶ 172; Gov. Ex. 209). The victim impact statements submitted to Probation describe the resulting harm to these individuals. In addition to the obvious financial impact, Carpenter's conduct has caused substantial additional consequences. Two of the victims are in their eighties; one is in his mid-seventies. These three have been forced to spend some of the final years of their lives dealing with the worry and stress of having lost substantial amounts of their life savings. The remaining victims have experienced considerable harm as well, including one who had to struggle to find financing to replace the lost funds at the same time that he was being treated for cancer and dealing with the birth of a premature daughter. All have suffered collateral financial consequences, in the form of adverse tax penalties, increased financing costs, legal and accounting expenses, and the like – consequences that were foreseeable to Carpenter and that will not be covered by any order of restitution.

      C.    <u>Carpenter Has Displayed No Remorse or Acceptance of Responsibility.</u>

Through it all, Carpenter had displayed no remorse. He has hired teams of lawyers to mount a bitter defense against parallel civil litigation that the victims filed against him, to wage an equally vigorous defense in this criminal case, and to blame anyone and everyone else for what has happened – from his brokers, who should have saved him from himself, to Martin

Paley, whom Carpenter characterizes as the "real" criminal, to government counsel, whose every

action (according to Carpenter) has been tainted by misconduct. Carpenter's transparent

purpose, in every motion he has filed, every continuance he has sought, and every appeal he has

pursued, has been to delay the ultimate day of reckoning for as long as possible, in the hope that

he will outlive and/or outlast his victims.

      D.    <u>Carpenter Has Withheld Financial Information from Probation.</u>

      Consistent with the foregoing strategy, Carpenter has not been forthcoming in providing

financial information to Probation. Based on the information contained in the PSR, Carpenter

apparently claims liquid assets of less than $10,000, real estate assets of only $13,000 (held by

his wife), no business assets of any kind, no personal income (although his wife apparently

draws a salary from Benistar), three life insurance policies (characterized as assets of his wife),

and an outstanding civil judgment against him, all of which yields an alleged net worth of

*negative* $129,000. (PSR ¶¶ 148, 150-55).

      The PSR reflects no disclosures by Carpenter concerning relevant tax returns (individual

or corporate), no disclosures concerning assets held in the name of his child (or other family

member) or in trust for his child (or other family member), no disclosures concerning the value

or the division of ownership interests in the numerous companies that he has established or with

which he has been associated (a list of those entities is attached at Exhibit 1), virtually no

disclosures concerning assets held in the name of his wife or for her present or future benefit,

and no disclosures concerning the assets on which he and his family have been living, continue

to live, or the sources of the money that he has been using to fund his civil and criminal defense.

      According to letters that he has submitted to Probation, Carpenter distributes substantial

gifts to Benistar employees (many of whom have written letters on his behalf), makes sizeable contributions to the prep school that he attended as a boy (and certain other causes) (PSR ¶146A), drives a Cadillac Escalade (with lesser SUV's leased for his wife and daughter) (PSR ¶ 152), presumably has paid and continues to pay hundreds of thousands of dollars to his many lawyers, and yet purportedly has not a single dollar with which to pay restitution.

E.    Carpenter's Past History Reveals that His Conduct Here Is Not an Anomaly.

In his submissions to Probation, Carpenter has urged full consideration of his life history. Towards that end, he has submitted approximately 40 supporting letters, which he characterizes as reflecting, inter alia, a life of "hard work," "charity," and "ethical and law-abiding behavior." (PSR at 73). It is difficult to evaluate such submissions. Over half are from employees of Carpenter's business(es), with most of the remainder from family and friends. They plainly are written to put the defendant in the best possible light. And yet they paint a picture materially at odds with the conduct that gave rise to the defendant's conviction.

In an effort to probe beyond the letters, the government has conducted some rudimentary public database searches. Those searches have revealed prior instances of sharp-elbowed conduct that are tellingly consistent with the behavior displayed by Carpenter in this case, and that offer insight into an aspect of his character not reflected in the letters he has submitted.

The longest running saga involves the case of Israel v. Carpenter, litigated primarily in the United States District Court for the Southern District of New York from 1995 to 2004, which arose out of an acrimonious parting of the ways between Carpenter and two former business partners. The partners accused Carpenter of reneging on an agreement to pay them the value of their ownership interests, and filed suit. See Israel v. Carpenter, 2000 WL 1376255 (S.D.N.Y.

(September 25, 2000).  The court described a "long and rather tortured history" of litigation that, in the court's words, included conduct by Carpenter "toward the plaintiffs and others [that] has often been characterized by threats of retribution whenever someone takes a position that he perceives to be contrary to his interests."  2000 WL 1376255 at *7.  The court then listed a series of examples of such "bullying" conduct by Carpenter, including threats of "Thermonuclear War" and "one last chance to get out before you and your family spend the next 7 years on the wrong side of a lawsuit."  Id.  Carpenter lost the case and, according to the factual summaries of various judicial decisions, apparently fought the nearly half-million dollar judgment (more, with interest) for years, through appeals, "frivolous" motions (see 2001 WL 1159631 (S.D.N.Y. October 1, 2001)), and questionable assertions concerning the nature and value of his assets.  See 2002 WL 1424594 (S.D.N.Y. June 28, 2002).  When in April, 2004, the plaintiffs finally located and obtained a writ of execution against property held by Carpenter in Florida, Carpenter promptly conveyed the land to his sister for $0, following which she proceeded to encumber it with mortgages held by various Carpenter-controlled businesses, presumably in an effort to so dissipate the value that the plaintiffs would effectively recover nothing.  (See Property Transfer Records at Exhibit 2; PSR at 40).

Carpenter has employed similarly aggressive tactics in other disputes.  E.g., Daniels v. Wayne Bursey, Daniel Carpenter, et al., 2004 WL 1144046, *1 (N.D. Ill. 2004) (deploring the parties' "level of invective," which the court described as having "far exceeded" virtually anything the judge had seen during years of practice or on the bench); Amresco v. John Olson, Daniel Carpenter, et al., 147 F.3d 179 (2d Cir. 1997) (detailing aggressive maneuvers employed by Carpenter in an attempt to evade claims (and dissolve an associated lien) filed against him).

Carpenter has exhibited similar behavior here, both in the greed and arrogance that motivated the conduct giving rise to his convictions, and the manner in which he has responded to the civil and criminal actions filed against him.  If past is prologue, the dearth of financial information provided by Carpenter to Probation likely presages the next phase of this case, which will consist of Carpenter's fierce resistance to paying restitution.

All of the foregoing is equally relevant to assessing Carpenter's "history and characteristics."  It indicates, unfortunately, that the conduct at issue in this case does not represent an anomalous occurrence.

## II.   **Application of the Sentencing Guidelines**

### A.   Statutory Maximums

The applicable statutory maximums on each of counts one through nineteen of the indictment are:

1. No more than five years imprisonment;
2. A fine of up to $250,000;
3. Special assessment of $100;
4. Three years supervised release; and
5. Mandatory restitution to the victims.

(PSR ¶¶ 156-173).

### B.   Guidelines Computation

The applicable Guidelines Manual, which was the Manual in effect at the time of the offense, is the November, 2000 edition.  Application of this Manual yields the following Guidelines computations:

8

| | | |
|---|---|---|
| Base Offense Level | 6 | U.S.S.G. §2F1.1(a) |
| Increase for Loss of More than $5 million and less than $10 million | 14 | U.S.S.G. §2F1.1(b)(1)(O) |
| More than minimal planning | 2 | U.S.S.G. §2F1.1(b)(2) |
| Abuse of position of trust | 2 | U.S.S.G. §3B1.3 |
| **FINAL OFFENSE LEVEL** | **24** | |
| *Guidelines Sentencing Range* | *51-63 months* | |
| *Restitution* | $9,040,686.00 | U.S.S.G. §5E1.1 |
| *Applicable Fine* | $10,000 - $100,000 | U.S.S.G. §5E1.2 |

Probation concurs with the foregoing computations.  (PSR ¶¶ 101-113).

Carpenter disputes each of the enhancements as well as the restitution amount.  For the reasons discussed below, his arguments are without merit.

1.    Loss/Restitution

Application Note 8 to U.S.S.G. §2F1.1 states that "loss is the value of the money, property, or services unlawfully taken."  Here, the indictment charged and the jury convicted Carpenter of having engaged in a fraudulent scheme pursuant to which victims were induced to entrust money to BPE based, inter alia, on false representations that the money would be held in short term, fixed interest escrow accounts and returned to them so that they could complete their 1031 exchanges.  The "value of the money . . . unlawfully taken" consists of the amount of the funds that the victims fraudulently were induced to entrust to Carpenter's company – funds that were never returned to them and that they never would have given BPE had they been told the money would be traded in options.  That sum, collectively, for the seven victims referenced in the indictment, totals $9,040,686.00.  (PSR ¶ 172; Gov. Ex. 209).

9

Carpenter strives to characterize the victims' $9 million loss as consequential damages flowing from extrinsic events for which he is not criminally culpable. (PSR at 78-81, 84-86). This argument is unavailing. There is nothing "consequential" or "extrinsic" about the $9 million amount. That figure represents the <u>direct</u> sum that the victims were fraudulently induced to give Carpenter's company and that he knowingly took, gambled, and lost in high risk options trading, contrary to the representations that had been made to the victims. Probation concurs in this assessment. (PSR at 81-82, 87).

There are substantial additional damages that the victims suffered over and above their $9 million in direct losses, including tax penalties, replacement financing costs, foregone interest, and attorney's fees. These additional damages, which are detailed in the victim impact statements, are not included in the government's loss or restitution computations.

Pursuant to 18 U.S.C. §§ 3663A and 3664(f)(1)(A), restitution is mandatory and shall be ordered in the full amount of each victim's loss. The PSR sets forth those loss amounts in paragraph 172.[2]

2.    <u>More than Minimal Planning</u>

Application Note 1(f) to U.S.S.G. § 1B1.1 states, in relevant part, that "'More than minimal planning' is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune. Consequently, this adjustment will

_____

[2] The government notes that civil litigation and arbitration proceedings remain pending between, <u>inter alia</u>, certain of the victims and Merrill Lynch and PaineWebber. Pursuant to 18 U.S.C. § 3664(j)(1), if any of the victims ultimately receives compensation from any third party source, the court "shall order that restitution be paid to the person who provided . . . the compensation . . . provided that all restitution of victims . . . be paid . . . before any restitution is paid to such a provider of compensation." The government requests that the Court incorporate by reference into its restitution order the requirements of § 3664(j)(1).

apply especially frequently in property offenses."

Here, Carpenter's fraudulent conduct commenced no later than October, 1998, when he directly participated in inducing BPE's first client to entrust her funds to Carpenter's company based on false representations that the money would be held in a short term, fixed interest escrow account. In fact, Carpenter simultaneously, and without disclosure to that client or any other client, was opening up a speculative options trading account at Merrill Lynch into which he transferred and traded client funds. (Gov. Ex. 144).

Thereafter, Carpenter's conduct continued through the end of 2000, including, most notably, the period from April through December, 2000, when Carpenter, on virtually a daily basis, made aggressive, speculative bets on high risk options trades and lost millions of dollars in client funds, despite the repeated warnings of Merrill Lynch and, later, PaineWebber. (Gov. Exs. 148, 168). Such repeated acts, over an extended period of time, pursuant to a long running scheme in which clients were fraudulently induced to entrust their funds to Carpenter's company, constitute the essence of "more than minimal planning." See PSR ¶ 107. E.g., United States v. Colon-Munoz, 318 F.3d 348, 362-363 (1st Cir. 2003); United States v. Chapman, 241 F.3d 57, 61-62 (1st Cir. 2001).

3.    Abuse of Position of Trust

Carpenter's conduct also falls squarely within the Guidelines enhancement applicable to offenses involving the abuse of a position of trust. The escrow relationship supposedly formed between BPE and its clients was, by definition, one of trust. Indeed, Benistar's web site included among its "Frequently Asked Questions" the following query: "Can I trust Benistar Property Exchange with my money?" (Gov. Ex. 185). The company's answer to that question was an

unequivocal "yes," backed by representations, assurances, and written commitments that client funds would be held in escrow in fixed interest accounts and then returned. Carpenter utilized his position as BPE Chairman, and the unfettered control that he exercised over BPE's accounts, to abuse that trust by misappropriating the money. His conduct was closely analogous to the example given in Application Note 1 to U.S.S.G. § 3B1.1, which states that the abuse of trust enhancement applies to situations such as the embezzlement of a client's funds by an attorney serving as a guardian.

Here, Carpenter, through his company, was serving as an escrow agent rather than as a guardian, but his conduct was the functional equivalent. He occupied a position of trust characterized by considerable unchecked authority over BPE's client funds, and he used that authority to facilitate his misappropriation of the monies that BPE had pledged to hold in escrow. The enhancement properly applies. See PSR ¶ 108.

## III.   The Government's Sentencing Recommendation

Pursuant to the foregoing guidelines computations, Carpenter's GSR is 51-63 months. The government recommends a sentence of 60 months, which falls in the upper quadrant of the applicable range, together with three years supervised release, a special assessment of $1,900, restitution in the amount of $9,040,686.00, and a fine of $75,000.

Without repeating the discussion set forth above, Carpenter's conduct was egregious; the harm inflicted was severe; and the defendant remains unrepentant, indeed, defiant in resisting all efforts to hold him accountable for his conduct and secure restitution for the victims.

**IV.**   **Other Sentencing Matters**

    A.   Oral Statements by Victims

The government is informed that at least three and perhaps five of the victims in this case

wish to make an oral statement at the sentencing hearing either personally or through a

representative, pursuant to their rights under the Justice for All Act of 2004. See 18 U.S.C.

§§ 3771(a)(4) and 3771(d)(1). The government expects the statements to be brief.

    B.   Downward Departures

Carpenter has not (yet) filed a motion for downward departure. Based on defendant's

submissions to Probation, however (see PSR at 54-75), the government anticipates that

Carpenter will raise the following arguments. In the event that Carpenter supplements the

arguments that he made to Probation with a formal departure motion, the government requests

the opportunity to file an opposition.

    1.   Carpenter's Offenses Do Not Fall Outside the "Heartland" (PSR at 54)

The Sentencing Commission has approved of "heartland" departures under limited

circumstances, stating that it "does not foreclose the possibility of an extraordinary case that,

because of a combination of . . . characteristics or circumstances [not ordinarily relevant to a

departure], differs significantly from the 'heartland' cases covered by the guidelines in a way

that is important to the statutory purposes of sentencing, even though none of the characteristics

or circumstances individually distinguishes the case." U.S.S.G. § 5K2.0, commentary. The

Sentencing Commission has emphasized, however, that cases where this kind of departure is

appropriate "will be extremely rare." U.S.S.G. § 5K2.0, commentary.

This is not such a case. The conduct for which Carpenter was charged and convicted – a

fraudulent scheme, which induced victims to entrust their funds to the defendant's control, followed by the defendant's misappropriation of those funds to engage in high risk, speculative trading – is not unique. That Carpenter failed in his attempts to enrich himself by speculating with other people's funds, and that he lost all the money, is all too common as well. No support exists for Carpenter's assertion that this case falls outside the "heartland."

      2.    The Loss Amount Does Not Overstate the Seriousness of the Offense (PSR at 56)

Carpenter advances two "loss overstates" arguments. Neither fits within the type of fact pattern that the Sentencing Commission or the First Circuit has recognized as potentially justifying a "loss overstates seriousness" departure.

First, the sentencing guidelines provide that, "*in a few instances*, the loss determined under subsection (b)(1) [the loss table] may overstate the seriousness of the offense." U.S.S.G. §2F1.1, app. note 11 (emphasis supplied). By way of example, the Sentencing Commission points to a situation such as an attempted scheme to defraud that was "so obviously fraudulent" that it never could have worked. In such circumstances, a Court may consider whether the loss overstates the seriousness of the offense. Id.

Here, of course, the loss numbers are not based on a mere attempt but rather on actual losses. Moreover, the losses resulted from Carpenter's intentional conduct in using client escrow funds to engage in speculative options trading whose substantial risks were repeatedly disclosed to him in warnings issued by Merrill Lynch and PaineWebber. Notwithstanding those warnings, notwithstanding the millions of dollars in trading losses that he suffered beginning in April, 2000, notwithstanding Merrill Lynch's termination of his trading privileges, and notwithstanding the enormous losses he thereafter continued to suffer at PaineWebber, Carpenter knowingly and

willfully persisted in gambling and losing client escrow monies in high risk options trades. By the fall of 2000, when virtually all of the victim funds at issue in this case were transmitted, misappropriated, traded, and lost, Carpenter cannot credibly claim ignorance, and he cannot credibly claim good faith – a defense on which the jury was instructed and which, through its verdict, it plainly rejected. Rather, the evidence established that Carpenter chose to increase the magnitude of his bets in the options market because, as he stated in his October 30, 2000 memorandum to Martin Paley (Gov. Ex. 184), handling the money prudently would not have yielded profits "worthy of [his] time." In no way do the losses overstate Carpenter's culpability in this case. His actions were knowing, they spanned a lengthy period of time, they were egregious, and they caused enormous harm.

Second, Carpenter's "multiple causation" argument is similarly without merit.[3] Carpenter cannot evade culpability for the victims' losses in this case by striving to blame them on "economic and political forces beyond [his] control." (PSR at 58). It was within Carpenter's control not to breach the representations made to BPE's clients that their funds would be held in escrow in fixed interest accounts; it was within his control not to misappropriate the monies, in an attempt to enrich himself, by gambling them in high risk stock options; and it was within his control to wake up to the enormous losses he suffered beginning in April, 2000, heed his brokers' repeated warnings, and put the remaining money (and all new money that subsequently came in) into the escrow accounts in which it should have been maintained from the outset. In

---

[3] The First Circuit has recognized that a downward departure may be warranted under U.S.S.G. § 2F1.1 where a fraudulent misrepresentation is "not the sole cause of the loss." United States v. Rostoff, 53 F.3d 398, 405 (1st Cir. 1995); see also United States v. Bennett, 60 F.3d 902, 905 (1st Cir. 1995).

sum, as the Probation Office observes, "the overwhelming contributing factor for the loss in this

case was not the significant decline in the stock market, but rather the placement of BPE client

funds in the speculative options market, a market in which the placement of client funds was

neither intended nor authorized by BPE clients." (PSR at 60).  Put succinctly, it is Carpenter's

criminal conduct that caused the losses, and he bears full culpability for the entire amount.[4]

 3. Carpenter's Civic Contributions Do Not Warrant a Departure (PSR at 60)

 Charitable work and community service are discouraged factors under the Sentencing

Guidelines.  U.S.S.G. § 5H1.11; United States v. DeMasi, 40 F.3d 1306, 1324 (1st Cir. 1994).

Accordingly, such activities can serve as the basis for a downward departure only where the

defendant's charitable deeds are truly extraordinary in nature.  E.g., Koon v. United States, 518

U.S. 81, 92 (1996); United States v. Rivera, 994 F.2d 942, 948 (1st Cir. 1993).  Carpenter fails to

clear this threshold.  The community contributions that he lists, which consist principally of

various soccer and sports programs and donations to the prep school that he attended as a boy

(see PSR ¶ 146A), are not "exceptional" for local businessmen, particularly one of Carpenter's

wealth.  As such, they do not justify a downward departure.  E.g., United States v. Thurston, 358

F.3d 51, 79-81 (1st Cir. 2004) ("Those who donate large sums because they can should not gain

an advantage over those who do not make such donations because they cannot."), remanded for

further consideration in light of U.S. v. Booker, 125 S. Ct. 984 (2005); United States v. Morken,

133 F.3d 628, 630 (8th Cir. 1998) (defendant's community activities, which included service on

---

 [4] The government also notes that the $9 million loss amount is close to the upper end of
the applicable guidelines range.  The Court would need to find the loss to be "overstated" by
approximately 44%, from $9 million down to below $5 million, to drop to the next lower offense
level.  The facts do not support such a finding.

his church council and raising money for charity, although laudable, were neither exceptional nor out of the ordinary for someone of the defendant's income and preeminence in his town); United States v. Crouse, 145 F.3d 786, 792 (6th Cir. 1998) (similar); United States v. Kohlbach, 38 F.3d 832, 838 (6th Cir. 1994) (deeming it "usual and ordinary" in white-collar crimes involving executives to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts); United States v. Haversat, 22 F.3d 790, 796 (8th Cir. 1994) (similar).

> 4.    No Departure Is Warranted Based on Harm to Third Parties (PSR at 61)

In United States v. Olbres, 99 F.3d 28 (1st Cir. 1996), the First Circuit held that a sentencing court is permitted to consider "whether a case is so unusual as to warrant a downward departure based on the loss of jobs to innocent employees occasioned by the imprisonment of the defendant owner of a small business." Id. at 29; see also United States v. Milikowsky, 65 F.3d 4, 9 (2d Cir. 1995) ("departure may be warranted where . . . imprisonment would impose extraordinary hardship on employees"). Although acknowledging the possibility of such a departure, the First Circuit observed that:

> It is a rare case which does fall outside. As courts have
> recognized, incarceration of a defendant inevitably means that the
> defendant will no longer be employed in his previous position and
> that fact inevitably will have consequences . . . The mere fact that
> innocent others will themselves be disadvantaged by the
> defendants' imprisonment is not alone enough to take a case out of
> the heartland. These issues are matters of degree, involving
> qualitative and quantitative judgments.

Id. at 36. Other courts have similarly observed that such "business failure" departures should rarely be granted. See United States v. Sharapan, 13 F.3d 781, 785 (3d Cir. 1994) (there is "nothing extraordinary" about the claim that defendant's imprisonment "may cause harm to the

business and its employees; the same is presumably true in a great many cases in which the

principal of a small business is jailed"); United States v. Rutana, 932 F.2d 1155, 1158 (6th Cir.

1991) (there is "nothing special" about an industrial polluter who happens to be an employer

because the "very nature of the crime dictates that many defendants will likely be employers,

whose imprisonment may potentially impose hardship upon their employees"). In short,

ownership of a small business does not entitle one to an automatic get out of jail free card. A

defendant must demonstrate the existence of facts that take his case outside the heartland of

typical white collar defendants.

Carpenter has failed to do so here. The situation that he faces is the same as that posed in

any other case where the principal of a small business is facing incarceration.

The government also notes the material inconsistency that exists between the assertions

that Carpenter makes in support of his departure argument – that he is indispensable to

Benistar's continued existence – and the representations that he has made in other contexts for

other purposes. Carpenter has stated to Probation that he has removed himself from Benistar's

daily operations (PSR ¶¶ 147-48). He states that his wife has had to convince clients that he is

no longer affiliated with the company in order to secure the clients' business. (PSR ¶ 132). He

lists no controlling or ownership interest in the business among his assets. (PSR ¶¶ 150-53).

Having made these representations, Carpenter cannot now assert that he is so integrally

involved in the running of Benistar that the company will fail lest he receive a departure.

5.      The Purposes of Sentencing Have Not Been Satisfied. (PSR at 64)

Carpenter has not served a day in prison. He has not paid a dime towards the $9 million

in restitution that he owes. He exhibits no remorse, no repentance, and has accepted no

18

responsibility for the offenses for which he has been convicted.   There seems little doubt that should he receive a departure of any kind, he will trumpet that as vindication for his insistence that he did nothing wrong.   The purposes of sentencing have emphatically not been satisfied – not punishment, not deterrence, and not respect for the law.

      6.     <u>Carpenter Cannot Use Paley To Justify a Downward Departure</u> (PSR at 66)

Carpenter's attempt to invoke Martin Paley as justification for a downward departure is factually and legally deficient.

As a factual matter, Carpenter and Paley are not similarly situated.   Carpenter, not Paley, was responsible for handling the client escrow funds.   Carpenter is the one who set up the undisclosed Merrill Lynch and PaineWebber trading accounts to engage in speculative/aggressive options trading.   (Gov. Exs. 144-46, 164-66).   He is the one who transferred client funds into those accounts and thereafter conducted the trading.   (Gov. Exs. 150, 171).   He received the warnings concerning the risks.   (Gov. Exs. 145-46, 165-66).   He received the account statements showing the magnitude of the losses.   (Gov. Exs. 148, 168).   He is the one who continued to trade notwithstanding the warnings and the losses.

Paley, by contrast, had no authority over the accounts and no involvement in the trading. His responsibilities involved the property exchange side of BPE's business, not the financial side.   For the most part, clients wired their escrow monies directly into the Carpenter-controlled accounts.   Paley left that money entirely in the hands of Carpenter and his company – precisely the same arrangement that Paley had used, without incident, with Nationwide Property

Exchange, the company with which he had been affiliated prior to Benistar. (Tr. 7:108).[5]

Consistent with the foregoing, Carpenter acknowledged in early January, 2001, during the throes of BPE's demise, that "It's definitely not Marty Paley's fault." (Gov. Ex. 114 and 114A). Upon the commencement of this case, however, Carpenter reversed course. Suddenly, Paley became the sole culpable party, and the focus of Carpenter's defense became breaking Paley down on cross-examination.

Many witnesses would not hold up well under such circumstances, and Paley did not. That Paley crumpled under a relentless cross-examination, however, does not render him the criminal conspirator that Carpenter seeks to portray. The two men's demeanor in the courtroom made plain who has the commanding personality and was in charge, and who was not. The evidence introduced at trial – which established that Carpenter's approval was required on all material matters and that he had final authority – corroborated that fact. (Gov. Ex. 179; Tr. 2:134, 3:52, 7:115-19, 7:126-28). Paley may have been – to use the vernacular – a dupe and perhaps even a dope, too quick to defer to an overbearing figure such as Carpenter and without the backbone to ask the questions he should have asked. That is not reason to charge him, however, much less treat him and Carpenter as similarly situated. They are not.

Carpenter's arguments also suffer from multiple legal deficiencies. As a matter of Guidelines law, the First Circuit has made clear that even if Carpenter and Paley were similarly

---

[5] Paley subsequently stated that he thought the clients' principal was safe – that he believed any trading in which Carpenter was engaged involved only the "spread" – i.e., the surplus interest resulting from the difference between the rate that Merrill Lynch and Paine Webber paid on the accounts, and the 3% or 6% that BPE was obligated to pay its clients. (Tr. 8:22-23.

situated co-defendants – which they are not – a departure is not warranted to equalize their two outcomes. E.g., United States v. Wogan, 938 F.2d 1446, 1448-49 (1st Cir. 1991); see also Thurston, 358 F.3d at 78. Whatever the law might be elsewhere, including in the Sixth and Ninth Circuits (to which Carpenter heavily cites), the First Circuit has held that Congress' objective in enacting the Sentencing Guidelines was to eliminate "*nationwide* disparity among equivalent offenders." Id. at 1449 (emphasis in original). Contrary to this objective, reducing a defendant's sentence below the GSR to equalize it with that of a co-defendant "promotes, rather than reduces nationwide disparities" by creating a new disparity between the defendant's sentence and "'that of all similarly situated defendants throughout the country.'" Id. (quoting United States v. Joyner, 924 F.2d 454, 459-61 (2d Cir. 1991)). Congress' "chief concern," the First Circuit concluded, "was to safeguard the macrocosm of the sentencing universe from differential treatment, even if, occasionally, that valued prophylaxis might be attained at the expense of some disparity within a particular microcosm of the sentencing universe." Id.

Post-Booker, the same reasoning applies with equal strength to 18 U.S.C. § 3553(a)(6), which instructs courts to consider, in imposing sentence, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." The government submits that section 3553(a)(6) is most properly viewed as safeguarding against disparities, per Wogan's language, across the "macrocosm of the sentencing universe."

Finally, the government notes certain separation of powers concerns that are implicated by Carpenter's arguments. Carpenter's contentions, as applied to this case, go beyond the issue addressed in Wogan, which is whether one convicted defendant should receive a below-

21

Guidelines sentence because another convicted defendant benefitted from one. Rather, Carpenter effectively asks the Court to second-guess the government's charging decision and deem it an injustice – to be rectified by a departure – that Paley was not charged at all. Carpenter's request, which asks the Court to alter its sentence based on an assessment of a charging decision to which it was not privy, is unwarranted. Carpenter should be sentenced, as he was tried and convicted, on the basis of the conduct for which he is individually culpable.

7.    No Support Exists for a Family Circumstances Departure (PSR at 67)

Carpenter also seeks a departure for "extraordinary family responsibilities," asserting that he has both a college-aged daughter and elderly parents to whom he provides assistance. This argument also is unavailing.

In United States v. Pereira, 272 F.3d 76 (1st Cir. 2001), the First Circuit made clear that family hardship is neither atypical nor unusual when a family member is incarcerated. For this reason, such hardships – without more – cannot justify a departure under U.S.S.G. § 5H1.6. Pereira, 272 F.3d at 80-83.

By way of illustration, the First Circuit cited in Pereira to a series of appellate cases in which considerable family hardships – both financial and emotional – had been deemed insufficient to take defendants out of the "heartland." The cases included situations such as: (1) the imprisonment of both the mother and father of a four-year old child, United States v. Carr, 932 F.2d 67 (1st Cir. 1991) (not extraordinary; vacating departure); (2) a defendant with a neurologically impaired nine-year old son and a wife with fragile mental health, United States v. Rybicki, 96 F.3d 754 (4th Cir. 1996) (not extraordinary; vacating departure); (3) a defendant who was a single mother and the sole provider for five children, one of whom had a substantial

neurological impairment, <u>United States v. Sweeting</u>, 213 F.3d 95 (3d Cir. 2000) (not

extraordinary; no departure); (4) a defendant who supported three children and had a wife with

depressive disorder and panic attacks, <u>United States v. Goff</u>, 20 F.3d 918, 921 (8th Cir. 1994)

(no departure warranted); and (5) a defendant who was a single mother with three children under

the age of four, where incarceration would require placing the children in foster care, <u>United</u>

<u>States v. Dyce</u>, 91 F.3d 1462 (D.C. Cir. 1996) (not extraordinary; vacating departure).

As the First Circuit held in <u>Pereira</u>, in view of the significant hardships that courts have

deemed to lie within the "heartland," Carpenter cannot supportably contend that his situation

should for some reason be found extraordinary.  It is not.  He has one child, who is in college.

And he has two siblings in the United States, including a sister in New York, who can assist in

taking care of his elderly parents.  (PSR at 68).

8.     <u>No Basis Exists for Carpenter's Claim of Government Misconduct</u> (PSR at 68)

The United States previously has addressed, at length, Carpenter's unsupported claims of

government misconduct.  There were no discovery violations, no <u>Napue</u> violation, and no

shifting of prosecution theories mid-trial, to the purported detriment of Carpenter's theory of

defense.  <u>See</u> Government's Opposition to Defendant's Motion to Set Aside the Verdict and

Grant a New Trial, at 5-10.

9.     <u>No Departure is Warranted Based on the Totality of Circumstances</u> (PSR at 69)

Carpenter's request for a "combination" departure based on the "totality of the

circumstances" is equally unsupported.

The sentencing commission has approved of "combination" departures under limited

circumstances, stating that it "does not foreclose the possibility of an extraordinary case that,

because of a combination of . . . characteristics or circumstances [not ordinarily relevant to a departure], differs significantly from the 'heartland' cases covered by the guidelines in a way that is important to the statutory purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case." U.S.S.G. § 5K2.0, commentary. The sentencing commission has emphasized, however, that cases where this kind of departure is appropriate "will be extremely rare." U.S.S.G. § 5K2.0, commentary.

This is not such a case. Carpenter was convicted in connection with a fraudulent scheme pursuant to which he misappropriated and traded client escrow funds in the options market in an effort to enrich himself. By all accounts, at the time of the offense, he ran a profitable business with ties to the local community. His apparent motive was to add to his wealth. Such facts are not unique, whether viewed in isolation or in combination. No downward departure is warranted. E.g., United States v. Rushby, 936 F.2d 41, 43 (1st Cir. 1991) (defendant's solid employment history and family responsibilities, "whether taken separately or together", did not justify a departure); see also United States v. DeBeir, 186 F.3d 561, 573-74 (4th Cir. 1999) (departure based on variety of factors, including defendant's education, strong employment history, efforts at rehabilitation and remorse, was abuse of discretion); United States v. Winters, 174 F.3d 478, 485 (5th Cir. 1999) (sentencing judge abused discretion by departing based on combination of factors, including defendant's 15-year employment history and family ties); United States v. Weise, 128 F.3d 672, 674-75 (8th Cir. 1997) (departure based on defendant's four and one half year employment record and fact that he supported four children was abuse of discretion).

C.     Section 3553(a) Factors

Carpenter's final sentencing arguments invoke the factors set forth in 18 U.S.C. §

3553(a) to contend that the Court should impose a sentence of probation, rather than the 51-63

months of imprisonment called for by the applicable Guidelines Sentencing Range.  (PSR at 70-

74).

In support of this contention, Carpenter harkens back to virtually every theory of defense

that he advanced at trial and virtually every departure argument that he made to Probation.  All

of it can be distilled into three basic assertions: (1) he committed no crime; (2) it's all Paley's

fault; and (3) he has suffered enough.

To these assertions, the government offers three responses: (1) Carpenter defrauded

seven individuals of $9 million in a scheme whose sole purpose was to enrich himself by putting

other people's money at risk; (2) the jury rejected every one of his defenses and convicted him

on all counts after a full trial; and (3) Carpenter has served no jail time, returned none of the $9

million, and given every indication that he will exhaust every civil and criminal avenue available

to him, hide every asset, and remain defiant and unrepentant to the end.

Carpenter has advanced no justification, either under a departure analysis or under

section 3553(a), for imposing a sentence below the applicable GSR.  To the contrary,

Carpenter's conduct warrants a sentence in the upper quadrant of the range.

## Conclusion

For the foregoing reasons, the United States requests that the Court impose a sentence of

60 months imprisonment, three years supervised release, a special assessment of $1,900,

restitution in the amount of $9,040,686.00, and a fine of $75,000.

25

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:

 /s/ **Michael J. Pineault**
Michael J. Pineault
Jonathan Mitchell
Assistant U.S. Attorneys
U.S. Courthouse, Suite 9200
1 Courthouse Way
Boston, MA 02210

Date: December 14, 2005

Government's Sentencing Memorandum

## EXHIBIT 1

## LIST OF COMPANIES[1]

Abigail Partners, LLC
Alaska Pacific Acquisition Group, Inc.
Alaska Pacific Corporation
Avon Capital LLC
Benefit Concepts, Inc.
Benefit Concepts New York, Inc.
Benefits Concepts Systems Inc.
BCNY, Inc.
BCNY Systems, Inc.
Benistar, Ltd.
Benistar Group, Ltd.
Benistar Corporation
Benistar Employer Services Trust Co., Inc.
Benistar Admin Services, Inc.
Benistar Insurance Group, Inc.
Benistar Capital, LLC
Benistar 419 Plan Services, Inc.
Benistar Step Plan Services, Inc.
Caroline Financial Group, Inc.
Cohen Family Charitable Foundation, Inc.
Florida Air, Inc.
Frace Carpenter & Co., Inc.
GIC Asset Management Corp.
Health Resource Organization, Inc.
National Telcom PCS, Inc.
National Telecom, Inc.
Nova Group Business Trust
The ESOP Group, Inc.
T.P.G. Group, Inc.
United Health Care Organization, Inc.
Voluntary Benefit Systems, Inc.

---

[1] Based on database searches conducted by the government to date, each of the above-listed entities appears to have been associated with Carpenter. It is unclear, at present, which of the entities remains active and what his current relationship with such entities might be.

# Exhibit 10

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10029-GAO |
| | ) | |
| DANIEL E. CARPENTER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## GOVERNMENT'S OPPOSITION
## TO THE DEFENDANT'S REQUEST TO TRAVEL INTERNATIONALLY

The government hereby opposes the "Defendant's Emergency Motion to Modify Conditions of Release to Allow International Travel and For Return of Passport" (Docket Number 361), in which Carpenter seeks the return of his passport and permission to travel internationally without limitation.  Carpenter's motion is materially identical to the one the Court denied before the second trial in this case, and it is the third time he has made the request. *See* Docket Numbers 203 and 238.  He offers little reason to believe that circumstances now are so different as to warrant the extraordinary step of allowing an indicted, and now twice convicted, defendant to leave the United States during the pendency of his case.  The Court should reject Carpenter's motion for the same reasons it did last time.

First, possession of a passport and the freedom to travel internationally inherently elevate the risk of flight, particularly given the difficulty of tracking an individual's movements outside the United States and the number of countries who will not extradite for non-violent offenses.  It is thus rare for federal defendants to be permitted any international travel, and virtually unheard of for them to have, as Carpenter now seeks, unfettered access to their passport and an unrestricted right to travel whenever and wherever they wish.  The risk of international flight is

perhaps highest among white collar offenders like Carpenter, who have the means and the wherewithal to remain outside the United States for the long run. Indeed, just in the last year, two white collar offenders prosecuted in this courthouse fled the District after their convictions. *See United States v. Albania Deleon*, 07-CR-10277-NMG (arrest warrant issued on March 23, 2009); *United States v. Chuong Van Duong*, 03-CR-10363-RGS (arrest warrant issued on May 29, 2009).

Second, even if Carpenter's request were limited to the trips he wishes to take in the next few months, Carpenter offers little to substantiate their purported necessity. He does not explain in any detail why attending business conferences in England, or taking soccer trip to South Africa, are essential to his earning a living. Unlike other defendants who wish to have the court loosen their conditions of release so that they may work, Carpenter does not appear unable to foot his living expenses. His recent admission that he has spent over $10,000,000 on legal fees in connection with this case and related litigation suggests that money is not a problem for him in the way that it is for other defendants. *See* Docket Number 355, Exhibit 3 at 6. Moreover, Carpenter's travel is not restricted within the United States; he may travel anywhere in the country for either business or pleasure. He offers the Court no reason to conclude that suitable business opportunities are not available to him here.

Third, nothing has changed that would warrant revisiting his travel restrictions. If anything, Carpenter has a greater incentive to flee now, having been convicted on all counts by two different juries and facing a significant Guidelines sentencing range. To the extent that his motion argues that matters are now different on account of the evidence that Merrill Lynch recently produced to Carpenter, for the reasons set forth in the government's response to

2

Carpenter's new evidence motion (Docket Number 357), the new evidence does not alter the equation.

Fourth, as stated on other occasions, the government has serious concerns about the completeness and the truthfulness of Carpenter's representations to Probation and the Court about his assets and his business dealings. According to the PSR prepared after the first trial, Carpenter disclosed no personal income, no business holdings, no real estate assets, virtually no liquid assets, and a negative net worth. He also disclosed no significant assets held in the name of or for the benefit of his wife. Yet, as noted above, Carpenter now admits to spending over $10,000,00 in legal fees in recent years, and evidently has the means to travel extensively overseas.

These inconsistencies raise doubts about the veracity of Carpenter's assertions and his motivations in making them. Carpenter's faces a sizeable mandatory restitution obligation in this case, notwithstanding the third party payments to the exchangors. It is particularly telling that in his motion, he does not propose to post any collateral as a means of ensuring his return from his desired travel. As the government has stated before, there is thus ample reason to question whether Carpenter has hidden money, and whether the purpose of his seeking permission to travel internationally is to hide it overseas.

3

For all the foregoing reasons, the United States requests that the Court deny Carpenter's motion seeking the return of his passport and permission to travel internationally.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
JACK PIROZZOLO
Assistant U.S. Attorneys

### Certificate of Service

I hereby certify that on this 14th day of April, 2010, I served on counsel of record in the foregoing matter the Government's Opposition to Defendant's Request to Travel Internationally, by means of the ECF system.

/s/ Jonathan F. Mitchell
Jonathan F. Mitchell

4