# Exhibit 11

SIMIONEMACCA02939



# Exhibit 12









# Exhibit 13

**CONNECTICUT SECRETARY OF THE STATE**
Document Review
30 Trinity Street
P.O. Box 150470
Hartford, CT 06115-0470

```
FILING #0004709160  PG 1 OF 2
      VOL  B-01715  PAGE  1810
   FILED  08/28/2012 05:50 PM
CONNECTICUT SECRETARY OF THE STATE
```

1. Name of Corporation:                  NOVA GROUP, INC.

2. Business ID:                          0886999

3. Report due in the month of:           January, 2008

4. This Corporation is:                  FOREIGN/STOCK

   Fee is:                               $435.00

   Corporate Name:                       NOVA GROUP, INC.

   Mailing Address:                      100 GRIST MILL ROAD
                                         SIMSBURY,CT 06070

   Changes:                              _____
                                         _____
                                         _____

5. Principal Office Address (In CT Only) : 100 GRIST MILL ROAD
                                         SIMSBURY,CT 06070

   Changes:                              _____
                                         _____
                                         _____

6. Executive Office Address (Foreign Corps Only):

   Changes:                              _____
                                         _____
                                         _____

7. Principal Office in State of Formation (Foreign Corps Only):

   Changes:                              _____
                                         _____
                                         _____

8. Attached hereto are the officers and directors of the corporation with their business and residence addresses.

9. Date:                                 08/28/2012

10. Email Address:                       mwestcott@usbgi.com

11. I hereby certify and state, under penalties of false statement, that all of the information set forth on this annual report is true. I hereby electronically sign this report.

   Print Capacity:                       WAYNE BURSEY

   Signature:                            WAYNE BURSEY

Report Officers/Directors
Business ID : 0866999

```
FILING # 0004709160  PG 2 OF 2
     VOL  B-01715  PAGE  1811
   FILED  08/29/2012 05:50 PM
CONNECTICUT SECRETARY OF THE STATE
```

1. Full Legal Name:
   Title(s):
   Residence Addr:

   Business Addr:

   Res Changes:

   Bus Changes:

WAYNE BURSEY
PRESIDENT
100 GRIST MILL RD
SIMSBURY,CT 06070

100 GRIST MILL RD
SIMSBURY,CT 06070

2. Full Legal Name:
   Title(s):
   Residence Addr:

   Business Addr:

   Res Changes:

   Bus Changes:

MOLLY CARPENTER
TREASURER
100 GRIST MILL RD
SIMSBURY,CT 06070

100 GRIST MILL RD
SIMSBURY,CT 06070

3. Full Legal Name:
   Title(s):
   Residence Addr:

   Business Addr:

   Res Changes:

   Bus Changes:

AMANDA ROSSI
SECRETARY
100 GRIST MILL RD
SIMSBURY,CT 06070

100 GRIST MILL RD
SIMSBURY,CT 06070

# Exhibit 14

# State of Delaware
# Annual Franchise Tax Report

| CORPORATION NAME | | | | | | | TAX YR. |
|---|---|---|---|---|---|---|---|
| NOVA GROUP, INC. | | | | | | | 2008 |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE | |
|---|---|---|---|
| 3563933 | 2002/08/30 | 2009/03/02 | |

PRINCIPAL PLACE OF BUSINESS
100 Grist Mill Road

PHONE NUMBER
860/408-7000 ext: 254

Simsbury CT 06070 United States

REGISTERED AGENT
THE CORPORATION TRUST COMPANY

AGENT NUMBER
9000010

CORPORATION TRUST CENTER
1209 ORANGE STREET

WILMINGTON          DE 19801

| AUTHORIZED STOCK | | DESIGNATION/ | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| BEGIN DATE | END DATE | STOCK CLASS | | |
| 2002/08/30 | | COMMON | 1,500 | |

| OFFICER          NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|
| Daniel E. Carpenter | | Chairman |
| 100 Grist Mill Road | | |
| Simsbury CT 06070 United States | | |

| DIRECTORS          NAME | STREET/CITY/STATE/ZIP |
|---|---|
| Corporation currently has no Directors | |

Total number of directors:0

NOTICE: Pursuant to 8 Del. C. 502(b), If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.

| AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR) | DATE | TITLE |
|---|---|---|
| Daniel E. Carpenter | | Chairman |
| 100 Grist Mill Road | 2010-02-25 | |
| Simsbury CT 06070 United States | | |

# *State of Delaware*
# *Annual Franchise Tax Report*

| CORPORATION NAME | | | TAX YR. |
|---|---|---|---|
| NOVA GROUP, INC. | | | 2010 |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE | |
|---|---|---|---|
| 3563933 | 2002/08/30 | | |

**PRINCIPAL PLACE OF BUSINESS**
100 Grist Mill Rd

**PHONE NUMBER**
860/408-7000

Simsbury CT 06070 United States

**REGISTERED AGENT**
THE CORPORATION TRUST COMPANY

**AGENT NUMBER**
9000010

CORPORATION TRUST CENTER
1209 ORANGE STREET

WILMINGTON                    DE 19801

| AUTHORIZED STOCK | | DESIGNATION/ STOCK CLASS | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| BEGIN DATE | END DATE | | | |
| 2002/08/30 | | COMMON | 1,500 | |

| OFFICER | NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|---|
| | Daniel E. Carpenter | | |
| | 100 Grist Mill Rd | | Chairman |
| | Simsbury CT 06070 United States | | |

| DIRECTORS | NAME | STREET/CITY/STATE/ZIP |
|---|---|---|
| Corporation currently has no Directors | | |

Total number of directors:0

*NOTICE: Pursuant to 8 Del. C. 502(b), If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.*

**AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR)**          **DATE**          **TITLE**
Daniel E. Carpenter

100 Grist Mill Rd                                              Chairman
                                        2011-02-28
Simsbury CT 06070 United States

# Exhibit 15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

UNIVERSITAS EDUCATION, LLC,                :

                    Petitioner,            :      11 Civ. 1590 (LTS)(HBP)

     -against-                             :

                                           :

NOVA GROUP, INC.,                          :

                    Respondent.            :
----------------------------------X

NOVA GROUP, INC.,                          :

                    Petitioner,            :      11 Civ. 8726 (LTS)(HBP)

     -against-                             :      CERTIFICATION OF FACTS,
                                                  CONCLUSIONS OF LAW AND
                                           :      PROPOSED REMEDY

UNIVERSITAS EDUCATION, LLC,                :

                    Respondent.            :
----------------------------------X

          PITMAN, United States Magistrate Judge:

          TO THE HONORABLE LAURA TAYLOR SWAIN, United States

District Judge,

I.  Introduction

    By notice of motion dated November 28, 2012 (Docket
Item 181 in 11 Civ. 1590 and Docket Item 122 in 11 Civ. 8726[1]),
Universitas Education, LLC ("Universitas") seeks an order holding
Nova Group, Inc. ("Nova Group"), and non-parties Daniel E.
Carpenter, Wayne H. Bursey, Jack E. Robinson, Molly Carpenter and
Amanda Rossi in civil contempt for failing to comply with my
Order dated August 17, 2012.

    In the absence of the parties' consent to a magistrate
judge's exercising complete jurisdiction pursuant to 28 U.S.C. §
636(c), a magistrate judge can neither grant nor deny a motion
for contempt.  As explained by the Honorable John G. Koeltl,
United States District Judge, a magistrate judge's role with
respect to such a motion is limited by 28 U.S.C. § 636(e)(6) to
certifying or declining to certify the facts constituting con-
tempt:

        [28 U.S.C. § 636(e)(6)] provides that a United States
        Magistrate Judge shall, in a case other than one over
        which the magistrate judge presides with the consent of
        the parties under 28 U.S.C. § 636(c) or a misdemeanor
        case proceeding under 18 U.S.C. § 3401, certify facts
        constituting civil contempt to the district judge.  See
        28 U.S.C. § 636(e)(6)(A), (e)(6)(B)(iii).  The magis-
        trate judge may also issue an order requiring the

_____

    [1]Unless otherwise stated, all subsequent references will be
to the docket in 11 Civ. 1590.

individual found to have committed the acts in question
to show cause before the district court why the indi-
vidual should not be adjudged in contempt of court.
See 28 U.S.C. § 636(e)(6).

Where the magistrate judge has certified facts
constituting contempt, the district court must make an
independent determination of the facts certified and
consider any additional evidence.  See 28 U.S.C. §
636(e)(6).  The determination of whether the conduct
constitutes contempt and, if so, what sanctions are
appropriate are left to discretion of the district
court.  28 U.S.C. § 636(e)(6)(B).

JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade

Servs., Inc., 03 Civ. 5562 (JGK)(AJP), 2006 WL 1148110 at *1

(S.D.N.Y. Apr. 28, 2006); see also Hunter TBA v. Triple V Sales,

250 F.R.D. 116, 118 (E.D.N.Y. 2008); Jones v. J.C. Penney's Dep't

Stores, Inc., 228 F.R.D. 190, 198 (W.D.N.Y. 2005).

Accordingly, I certify the following facts and recom-

mend that Nova Group and Messrs. Bursey, Carpenter and Robinson

be held in civil contempt.

## II.  Certified Facts

### A.  Background

#### 1.  Confirmation of
####    the Arbitration Award

These actions arise out of an arbitration concerning

the disposition of the proceeds of two life insurance policies.

The facts underlying the arbitration are set forth fully in the Memorandum Order of Honorable Laura Taylor Swain, United States District Judge, dated June 5, 2012.  Universitas Educ., LLC v. Nova Grp., Inc., 11 Civ. 1590 (LTS)(HBP), 2012 WL 2045942 (S.D.N.Y. June 5, 2012).  I assume familiarity with that decision.

Nova Group is the trustee, sponsor and fiduciary of Charter Oak Trust Welfare Benefit Plan ("Charter Oak Trust").  Two life insurance policies on Sash A. Spencer's life -- totaling approximately $30 million -- were placed in Charter Oak Trust.  Universitas is the sole, irrevocable beneficiary of the proceeds in Charter Oak Trust.  After Mr. Spencer's death in 2009, the life insurance carrier paid out the insurance proceeds to Charter Oak Trust.  Universitas then commenced an arbitration against Nova Group to determine its entitlement to the insurance proceeds.  On January 24, 2011, the arbitrator rendered an award in favor of Universitas.

On June 5, 2012, Judge Swain confirmed the arbitration award in favor of Universitas.  Universitas Educ., LLC v. Nova Grp., Inc., supra, 2012 WL 2045942.  Judgment against Nova Group was entered in the amount of $30,181,880.30 on June 7, 2012 (Docket Item 41).

4

2.  <u>August 17, 2012 Order</u>

In an effort to locate the insurance proceeds at issue here, Universitas served an information subpoena and request for documents on Nova Group and Charter Oak Trust (Declaration of Paula K. Colbath, Esq. in Support of Judgment Creditor Universitas Education, LLC's Motion in Support of Civil Contempt (Docket Item 183) ("Colbath Decl.") Exs. B, C).  Nova Group objected to Universitas' documents requests and filed a motion to quash the information subpoena (Docket Item 80).

After a discovery conference held on August 17, 2012, I overruled Nova Group's objections to Universitas' discovery requests and denied Nova Group's motion to quash the information subpoena (Docket Item 140).  I memorialized my rulings in an Order dated August 17, 2012, which directed, in pertinent part, that:

> 1.  Respondent's objections to petitioner's dis-covery requests (annexed to petitioner's August 10, 2012 letter) are overruled.  Respondent shall answer the discovery requests no later than August 31, 2012.

> .    .    .

> 2. . . . . With respect to petitioner's subpoena to Nova Group, Inc., the requested documents are to be produced no later than August 31, 2012.

(Colbath Decl. Ex. A ("August 17 Order")).

5

One day before Nova Group's compliance with my August 17 Order was due, Nova Group's counsel[2] wrote to Universitas' counsel that "it appears [that] our client will not be providing responses or documents on August 31, 2012" (Colbath Decl. Ex. E). This letter further explained:

> Despite our best effort, we have been advised that Wayne Bursey ("Mr. Bursey") has resigned his duties as Trustee for medical reasons. We have further been advised that Mr. Bursey was the only individual who had the capacity to search for responsive documentation or sign a verification on behalf of Nova or the Charter Oak Trust. Despite our efforts to press the client to provide another person who has the authority and capacity to effectuate a response, the client has taken the recalcitrant position that there is no one else.

(Colbath Decl. Ex. E).

At a second discovery conference held on September 19, 2012, I noted that "there has not been compliance with my August 17 order. And it's not clear to me why there is no one at the entity who can produce the documents" and that "I haven't heard any explanation under oath from someone at the defendant as to why the subpoena can't be complied with" (Colbath Decl. Ex. P at 21:8-10, 12-14). Accordingly, I granted Universitas' application for leave to file a motion for contempt. Universitas filed this

---

[2]This letter was authored by Joseph Pastore, Esq. Mr. Pastore has since withdrawn from this action and was replaced by Mr. Robinson (Docket Item 157). Mr. Robinson has also sought to withdraw as counsel of record (Docket Item 226). That motion remains pending.

motion on November 28, 2012 seeking an order finding Nova Group,
Daniel E. Carpenter, Wayne H. Bursey, Jack E. Robinson, Molly
Carpenter and Amanda Rossi in civil contempt.  Although the
individuals filed oppositions to this motion, Nova Group failed
to file an opposition or to otherwise respond.

Despite Nova Group's complete failure to file any
response, I have independently reviewed the record to ascertain
the facts that are pertinent to the resolution of the instant
application with respect to Nova Group.  It now appears that Nova
Group has responded to Universitas' document requests and infor-
mation subpoena.  In support of its objections to my Report &
Recommendation dated May 21, 2013, Nova Group submitted a decla-
ration from its counsel, Ira Kleiman, dated June 4, 2013 (Decla-
ration of Ira Kleiman, Esq., in Support of Objections to Magis-
trate Judge's Report & Recommendation (Docket Item 258) ("Kleiman
Decl.")).[3]  In this declaration, Mr. Kleiman stated that his
firm, Brief Carman & Kleiman, was retained by Nova Group in
January 2013 "to assist Nova in complying with certain document
requests served by the Universitas Education, LLC" (Kleiman Decl.
¶ 3).  He further stated that Nova Group has since produced
documents responsive to Universitas' discovery requests and has

---

[3]Mr. Kleiman entered a notice of appearance on behalf of
Nova Group on January 25, 2013 (Docket Item 210).

responded to Universitas' information subpoena (Kleiman Decl. ¶¶ 3, 5, Ex. B). Nevertheless it is clear that these responses were submitted well after the August 31, 2012 deadline set forth in my August 17 Order. Mr. Kleiman offers no explanation for Nova Group's failure to comply with the deadline set in my August 17 Order.

### 3.  The Nova Group Individuals

In view of the fact that Universitas seeks to hold various individuals associated with Nova Group in contempt, a relatively detailed description of their roles at Nova Group is required. Nova Group is a small company (see Colbath Decl. Ex. P at 5:17-18), and Wayne H. Bursey, Daniel E. Carpenter, Jack E. Robinson, Molly Carpenter and Amanda Rossi (collectively, the "Nova Group Individuals") were each employed by Nova Group in varying roles and capacities.

Mr. Bursey was the president of Nova Group and the trustee and principal plan sponsor of Charter Oak Trust. During the underlying arbitration, in a sworn declaration dated November 12, 2010, Mr. Bursey stated that "As President of Nova [Group], I am familiar with [Charter Oak Trust's] assets and state that [Charter Oak Trust's] assets exceed $35 million" (Colbath Decl. Ex. X). In a TD Bank statement for an account maintained in the

name of Charter Oak Trust for the period January 21, 2010 to
February 20, 2010, Mr. Bursey is listed as "Trustee" (Colbath
Decl. Ex. T).  Mr. Bursey is also named as "Administrative
Trustee and "Principal Plan Sponsor" for Charter Oak Trust in a
PNC Custody Agreement dated January 9, 2007 (Colbath Decl. Ex. U
at COT_PNC000021).  However, in a letter dated August 30, 2012,
Nova Group's former counsel wrote that Mr. Bursey had resigned as
trustee for health reasons.  Despite this representation, Nova
Group's August 28, 2012 filing with the Connecticut Secretary of
State continued to list Mr. Bursey as "President" (Colbath Decl.
Ex. S).  During the September 19, 2012 conference at which my
August 17 Order was discussed, I directed that the deposition of
Mr. Bursey be conducted no later than October 19, 2012 (Docket
Item 156 ¶ 3).  At this deposition, Mr. Bursey testified that it
would "surprise" him to see documents filed with the Connecticut
Secretary of State identifying him as an officer and director of
a company (Declaration of Stephen v. Manning, Esq. in Support of
Wayne H. Bursey's Opposition to Motion for Civil Contempt (Docket
Item 202) ("Manning Decl.") Ex. A at 113:10-14).  Nonetheless,
during the September 19, 2012 discovery conference, Mr. Robinson,
who was appearing as Nova Group's counsel of record, stated that
Mr. Bursey was "still informally an advisor" to Nova Group and
that Mr. Bursey was one of the two people, in addition to Mr.

Carpenter, who made up Nova Group (Colbath Decl. Ex. P at 5:14-15, 17-19).  At his deposition, Mr. Bursey asserted his Fifth Amendment privilege against self-incrimination when questioned about his and Nova Group's actions to comply with my August 17 Order (Manning Decl. Ex. A at 35:15-36:15; 289:2-24).  Finally, Mr. Bursey is also a target of a pending grand jury investigation in the District of Connecticut (Colbath Decl. Ex. V; Manning Decl. Ex. A at 320:13-321:5).

In at least 2011, Daniel Carpenter was the chairman of Nova Group (Colbath Decl. Ex. N, State of Delaware Annual Franchise Tax Report for Nova Group, dated February 28, 2011, listing Daniel E. Carpenter as Chairman).  At the September 19, 2012 discovery conference, Mr. Robinson stated that Mr. Carpenter was "the founder" of Nova Group and had designed the Charter Oak Trust (Colbath Decl. Ex. P at 3:16-17).  He further stated that Mr. Carpenter "is still involved [with Nova Group] in terms of oversight, providing advice" and that "Mr. Carpenter has input as to what happens at Nova Group even though he may not be a formal officer or formal director" (Colbath Decl. Ex. P at 3:21-22, 5:2-4).  Mr. Robinson also stated that Mr. Carpenter, along with Mr. Bursey, was one of the two people who constituted Nova Group (Colbath Decl. Ex. P at 5:17-19).  Finally, Mr. Carpenter is also

a target of the grand jury investigation pending in the District
of Connecticut (Colbath Decl. Ex. V).

Mr. Robinson was formerly counsel of record for Nova
Group in this action, but has since sought to withdraw (Docket
Item 226). In addition to this present representation, Mr.
Robinson is also closely associated with Nova Group. For some
period of time, Mr. Robinson was General Counsel for Nova Group.
In filings Nova Group submitted in these actions, Nova Group
referred to Mr. Robinson as its general counsel (Docket Item 79
at 1, 3), but at the September 19, 2012 conference, Mr. Robinson
stated that he had not been Nova Group's general counsel for over
two years (Colbath Decl. Ex. O at 3:7-10). Mr. Robinson's
deposition is consistent with the foregoing recitation (Declara-
tion of Seth L. Marcus, Esq. in Support of Jack E. Robinson's
Opposition to Motion for Contempt, dated Dec. 20, 2012 (Docket
Item 195) ("Marcus Decl.") Ex. A at 252:13-23). In addition, Mr.
Robinson signed an appointment agreement dated February 12, 2007
on behalf of Nova Group as "Asst. Secretary" (Colbath Decl. Ex.
AA at COT_WSF000224). Mr. Robinson has also been identified as a
target in the same grand jury investigation that has targeted
Messrs. Bursey and Carpenter (Colbath Decl. Ex. V). Finally, in
a sworn declaration dated November 30, 2010 submitted during the
underlying arbitration, Mr. Robinson stated that "I am familiar

with [Charter Oak Trust's] operations, assets, liabilities and financial condition, and state that [Charter Oak Trust] has the current ability to satisfy a judgment of $30 million" (Colbath Decl. Ex. EE at ¶ 4).

Molly Carpenter, the wife of Daniel Carpenter, was listed as Nova Group's treasurer in its August 28, 2012 filing with the Connecticut Secretary of State (Colbath Ex. S). Mrs. Carpenter is also listed as a "Plan Sponsor Signatory Designee" for Charter Oak Trust in a PNC Custody Agreement dated January 9, 2007 (Colbath Decl. Ex. U at COT_PNC000021). Finally, Mrs. Carpenter serves as Chairwoman for Benistar Admin Services, Inc., which contracts with Nova Group to provide administrative ser-vices (Colbath Decl. Ex. FF at 469:13-471:17). For example, Nova Group's 2009 tax return reflects that it paid $672,000 to Benistar Admin Services, Inc. (Colbath Decl. Ex. GG).

Amanda Rossi is listed as a "Trustee" of Charter Oak Trust in a TD Bank account statement from December 2009 (Colbath Decl. Ex. HH). Christiana Bank & Trust, the insurance trustee of Charter Oak Trust, sent account statements to Ms. Rossi's attention (Colbath Decl. Ex. II). Ms. Rossi signed Nova Group's 2004 corporate income tax return as "President" (Colbath Decl. Ex. JJ). Ms. Rossi is also listed as a signatory to a TD Bank account opened in Nova Group's name in 2009 (Colbath Decl. Ex.

12

KK), as well as on several bank accounts to which Universitas alleges that Nova Group improperly transferred the insurance proceeds at issue here (Reply Declaration of Paula K. Colbath (Docket Item 207) ("Colbath Reply Decl.") Exs. 3-6). It appears, however, that Mr. Bursey -- not Ms. Rossi -- authorized the deposits to these accounts (Colbath Reply Decl. Exs. 7-11). At her deposition, Ms. Rossi testified that she was employed only by Benistar Admin Services, Carpenter Financial Group and USB Group, Inc. (Rossi Deposition Transcript, dated November 20, 2012, attached as Ex. B to Molly Carpenter's and Amanda Rossi's Memo-randum of Law in Opposition to Civil Contempt Motion (Docket Item 192) ("Rossi Dep. Tr.") at 11:2-5, 12:16-17, 14:21-22, 16:13-18). She further testified that she performed office-manager work for these three entities (Rossi Dep. Tr. at 17:3-7), and that she worked as an executive assistant to Mr. and Mrs. Carpenter (Rossi Dep. Tr. at 29:19-30:5).

B.  Conclusions of Law

As the late Honorable Constance Baker Motley, United States District Judge, explained in D'Orange v. Feely, 959 F. Supp. 631, 634-35 (S.D.N.Y. 1997):

> It is a firmly established principal that federal
> courts possess the inherent power to punish for con-
> tempt.  See, Chambers v. NASCO, Inc., 501 U.S. 32, 43,

13

111 S. Ct. 2123, 2132, 115 L. Ed. 2d 27 (1991) ("Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." (quotation omitted); Young v. United States ex rel. Vuitton et Fils, S.A., 481 U.S. 787, 795, 107 S. Ct. 2124, 2131, 95 L. Ed. 2d 740 (1987); Abrams v. Terry, 45 F.3d 17 (2d Cir. 1995). These powers reach conduct before the court and beyond the court's confines, Young, 481 U.S. at 798, 107 S. Ct. at 2132-33, and are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." Chambers, 501 U.S. at 43, 111 S. Ct. at 2132 (quoting Link v. Wabash R.R. Co., 370 U.S. 626, 630-31, 82 S. Ct. 1386, 1388-89, 8 L. Ed. 2d 734 (1962)).

See also Mitchell v. Lyons Prof'l Servs., Inc., 708 F.3d 463, 467 (2d Cir. 2013); S. New England Tel. Co. v. Global NAPs Inc., 624 F.3d 123, 144 (2d Cir. 2010); Israel v. Carpenter, 95 Civ. 2703 (JCF), 2003 WL 21518830 at *2 (S.D.N.Y. July 7, 2003) (Francis, M.J.); Merriweather v. Sherwood, 250 F. Supp. 2d 391, 393 (S.D.N.Y. 2003) (McMahon, D.J.).

The standards applicable to a motion for civil contempt are well settled and require only brief review.  As the Court of Appeals for the Second Circuit explained in Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Tech., Inc., 369 F.3d 645, 655 (2d Cir. 2004):

> A party may be held in civil contempt for failure to comply with a court order if "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and unambiguous, and (3) the contemnor has not diligently

attempted to comply in a reasonable manner." <u>King v. Allied Vision, Ltd.</u>, 65 F.3d 1051, 1058 (2d Cir. 1995). It need not be established that the violation was willful. <u>Donovan v. Sovereign Sec. Ltd.</u>, 726 F.2d 55, 59 (2d Cir. 1984).

<u>See also</u> <u>Perez v. Danbury Hosp.</u>, 347 F.3d 419, 423-24 (2d Cir. 2003); <u>E.E.O.C. v. Local 638</u>, 81 F.3d 1162, 1171 (2d Cir. 1996); <u>Huber v. Midland Marine Bank</u>, 51 F.3d 5, 10 (2d Cir. 1995). The movant bears the burden of showing contempt with clear and convincing evidence. <u>Latino Officers Ass'n City of New York, Inc. v. City of New York</u>, 558 F.3d 159, 164 (2d Cir. 2009); <u>E.E.O.C. v. Local 638</u>, <u>supra</u>, 753 F.2d at 1178. "In the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate a 'reasonable certainty' that a violation occurred." <u>Levin v. Tiber Holding Corp.</u>, 277 F.3d 243, 250 (2d Cir. 2002) (internal citation omitted).

"The only defenses to civil contempt are that (1) the order allegedly violated is unclear; (2) the party charged with contempt had no knowledge of the order or (3) proof of noncompliance fails to meet the clear and convincing standard of proof." <u>JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.</u>, <u>supra</u>, 2006 WL 1206372 at *6.

The burden is on the alleged contemnor to prove his inability to comply with the order "clearly, plainly, and unmistakably." <u>Huber v. Marine Midland Bank</u>, <u>supra</u>, 51 F.3d at 10;

accord <u>Close-Up Int'l, Inc. v. Berov</u>, 474 F. App'x 790, 795 (2d Cir. 2012). Further, a "court is not required to credit the alleged contemnor's denials if it finds them to be 'incredible in context;'" in addition, "[c]onclusory statements are inadequate to carry [the putative contemnor's] burden." <u>Huber v. Marine Midland Bank</u>, <u>supra</u>, 51 F.3d at 10.

### 1. <u>Nova Group</u>

The evidence clearly establishes that Nova Group is in contempt of my August 17 Order. First, my August 17 Order was clear and unambiguous; it overruled Nova Group's objections to Universitas' discovery requests and directed that Nova Group respond to Universitas' request for documents and information subpoena by August 31, 2012. Next, there is no dispute that Nova Group failed to comply with my August 17 Order by August 31, 2012. Indeed, Nova Group's counsel wrote on August 30, 2012 -- one day before Nova Group's compliance was due -- that Nova Group would not be providing responses or documents on August 31, 2012 (Colbath Decl. Ex. E). Further, I noted at the September 19, 2012 conference that "there has not been compliance with my August 17 order. And it's not clear to me why there is no one at the entity who can produce the documents" (Colbath Decl. Ex. P at 21:8-10). Thus, it is also plain that Nova Group did not comply

16

with my August 17 Order by August 31, 2012.  Finally, even though it now appears that Nova Group has responded to Universitas' discovery requests (see Kleiman Decl.), this much-delayed response is the antithesis of a diligent attempt to comply with my Order in a reasonable manner.  The fact that Nova Group failed to submit any response or opposition to Universitas' motion for contempt further underscores its lack of effort.  Accordingly, I conclude that Nova Group should be found in contempt of my August 17 Order.

### 2.  The Nova Group Individuals

The principal issue presented by the pending motion is whether any of the Nova Group Individuals, as non-parties, may be held in contempt for Nova Group's failure to comply with my August 17 Order.  According to Universitas, the Nova Group Individuals should be held in contempt because each, as principals of Nova Group, could have effected compliance with my August 17 Order.  As a general matter, the Nova Group Individuals argue that they should not be held in contempt because they claim that they are no longer current employees of Nova Group and, therefore, cannot be held responsible for Nova Group's failure to comply with my August 17 Order.  I conclude that, with the

17

exception of Mrs. Carpenter and Ms. Rossi, the Nova Group Indi-
viduals are in contempt of my August 17 Order.

"'It is well settled that a court's contempt power
extends to non-parties who have notice of the court's order and
the responsibility to comply with it.'" Bridgeport Guardians v.
Delmonte, 371 F. Supp. 2d 115, 121 n.5 (D. Conn. 2005), quoting
Chicago Truck Drivers v. Bhd. Labor Leasing, 207 F.3d 500, 507
(8th Cir. 2000).  In Wilson v. United States, 221 U.S. 361, 376
(1911), the Supreme Court held that:

> A command to the corporation is in effect a command to
> those who are officially responsible for the conduct of
> its affairs.  If they, apprised of the writ directed to
> the corporation, prevent compliance or fail to take
> appropriate action within their power for the perfor-
> mance of the corporate duty, they no less than the
> corporation itself, are guilty of disobedience, and may
> be punished for contempt.

See also United States v. Voss, 82 F.3d 1521, 1526 (10th Cir.
1996) ("[W]hen a subpoena or order unequivocally directs an
organization to produce records, the persons who have knowledge
of the court's action and who 'fail to take appropriate action
within their power' to comply with the subpoena or order may be
held in contempt." (internal citation omitted)); Electrical
Workers Pension Trust Fund of Local Union 58, IBEW v. Gary's
Elec. Serv. Co., 340 F.3d 373, 383 (6th Cir. 2003) ("[B]ecause a
civil contempt ruling either attempts to coerce compliance or

compensate the complainant for losses, it is fully appropriate to impose judicial sanctions on the nonparty corporate officer."); Nat'l Labor Relations Bd. v. Hopwood Retinning Co., 104 F.2d 302, 305 (2d Cir. 1939) ("As an important officer and agent of the Hopwood Company, Hopwood should be held in contempt for his company's non-compliance with the court's order.").

Accordingly, to the extent that a non-party is responsible for the conduct of a contemptuous corporation, courts have either sanctioned or held in contempt such a non-party individual for the actions or non-actions of that corporation. See, e.g., Ferrara v. Nordeve, LLC, 10 Civ. 5844 (JFB)(WDW), 2012 WL 1999643 at *4 (E.D.N.Y. Apr. 10, 2012) (Report & Recommendation), adopted, 2012 WL 2017501 (E.D.N.Y. May 30, 2012) (recommending that non-party be held in contempt for failure of corporation to comply with court order where "she clearly had control over Nordev and access to the information and documents sought"); Jones v. Regent Asset Mgmt. Solutions, Inc., 10 Civ. 262 (CSH), 2011 WL 2037626 at *3 (D. Conn. May 24, 2011) (noting that it was proper to hold non-party individual in contempt where "there was a strong degree of identity between Defendant Regent Asset Management Solutions, Inc. and its President, CEO, and sole stockholder, Michael Scata"); Amerisource Corp. v. Rx USA Int'l Inc., 02 Civ. 2514, 2010 WL 2730748 at *5 (E.D.N.Y. July 6, 2010)

19

(concluding that the court had the inherent power to sanction a non-party where the non-party was the majority shareholder and chief executive and managed the litigation on behalf of the defendant); Diamant v. GMS Diamonds Corp., 04 Civ. 2636 (RCC), 2004 WL 2710028 at *1 (S.D.N.Y. 2004) (Casey, D.J.) (concluding that principal and sole shareholder of a corporation could be held in contempt for corporation's failure to comply with a subpoena); Spectacular Venture, L.P. v. World Star Int'l, Inc., 927 F. Supp. 683, 685 (S.D.N.Y. 1996) (holding in contempt individual non-party who was the president and principal of defendant that failed to comply with court order); In re Snider Farms, Inc., 125 B.R. 993, 999 (Bankr. N.D. Ind. 1991) ("[T]he Respondent, as responsible executive officer of the Debtor, and legally identified with it, can be held in contempt, because the Debtor failed to comply with the Court's orders.").

Furthermore, such a non-party may not avoid contempt or other sanctions through self-serving statements that artificially claim that the individual is no longer associated with the contemptuous party.  See People of the State of N.Y. by Vacco v. Operation Rescue Nat'l, 80 F.3d 64, 70 (2d Cir. 1996) (in the context of an injunction, "an organization and its agents may not circumvent a valid court order merely by making superficial changes in the organization's name or form" ); Jones v. Regent

20

Asset Mgmt. Solutions, Inc., supra, 2011 WL 2037626 at *4 (sanctions appropriate for failure to comply with post-judgment discovery notwithstanding non-party's claim that he had resigned from corporation; claimed resignation occurred after default judgement was entered, and non-party remained listed as agent for service and officer in states' corporate records); Colonial Williamsburg Found. v. Kittinger Co., 792 F. Supp. 1397, 1406 (E.D. Va. 1992), aff'd, 38 F.3d 133 (4th Cir. 1994) ("[T]he case law establishes that an individual who is responsible for ensuring that a corporation complies with a court order cannot escape liability merely by removing himself from the day-to-day operations of the corporation and washing his hands of responsibility.").

Because each of the Nova Group Individuals present similar, but non-identical, arguments, I shall address each below separately.

a.   Wayne Bursey

Mr. Bursey should be held in contempt.   Notwithstanding his ipse dixit assertions that he is not a current officer of Nova Group, the evidence strongly suggests otherwise. Universitas has presented a number of documents that demonstrate that Mr. Bursey was the trustee of Charter Oak Trust, an entity

closely affiliated with Nova Group and central to these actions.
Indeed, during the arbitration, Mr. Bursey submitted a declara-
tion, as President of Nova Group, confirming his familiarity with
Charter Oak Trust's assets.  Particularly compelling is Nova
Group's August 28, 2012 filing with the Secretary of State that
lists Mr. Bursey as President.  The fact that this document was
filed only three days before Nova Group's compliance with my
August 17 Order was due discredits Mr. Bursey's conclusory
statements that he is not a corporate officer of Nova Group.
Furthermore, the alleged transfers of the insurance proceeds at
issue here were authorized by Mr. Bursey (Colbath Reply Decl. Ex.
7-11).  This evidence, when taken in conjunction with Mr. Robin-
son's representation at the September 19, 2012 conference that
Mr. Bursey was one of the individuals constituting Nova Group and
was in a position to respond to Universitas' discovery requests
and the August 30, 2012 letter identifying Mr. Bursey as the
individual at Nova Group who could search for documents, leads
overwhelmingly to the conclusion that Mr. Bursey, for all practi-
cal purposes, is responsible for the conduct of Nova Group.  Even
though Mr. Busey testified at his deposition that he was unaware
of my August 17 Order, this statement establishes, at most,
wilful blindness in view of the evidence demonstrating Mr.
Bursey's significant role at Nova Group.

22

Moreover, this assertion is particularly suspect because Mr. Bursey's deposition was ordered as a result of the September 19, 2012 conference that discussed, in part, my August 17 Order. Finally, aside from this deposition testimony, Mr. Bursey has provided no other evidence to corroborate his claim that he is no longer an officer or principal of Nova Group.

Accordingly, I conclude that Mr. Bursey should be found in contempt of my August 17 Order.

### b. Daniel Carpenter

I also conclude that Daniel Carpenter should be held in contempt. Although Mr. Carpenter claims that, in August 2012, he was not an officer or custodian of Nova Group, he, like Mr. Bursey, has failed to support this assertion with any form of evidence other than his own statements. In contrast, the evidence presented by Universitas demonstrates that Mr. Carpenter, at a minimum, functions as a de facto officer of Nova Group. Mr. Carpenter does not dispute that he was the founder and chairman of Nova Group. He has provided no evidence, other than his own statements, to suggest that he no longer serves in those roles. As I concluded above with respect to Mr. Bursey, the inference is particularly compelling that Mr. Carpenter is responsible for the actions of Nova Group because Mr. Robinson represented at the

September 19, 2012 discovery conference that Mr. Carpenter was an individual who could respond to Universitas' discovery requests (Colbath Decl. Ex. P at 5:17-19). Lastly, Mr. Carpenter's argument that a protective order issued in a civil case pending in the District of Massachusetts shields him from contempt liability here (Memorandum of Daniel Carpenter in Opposition to Motion for Civil Contempt Filed by Universitas Education, LLC (Docket Item 132) at 3-4 n.1) is unavailing. First, I note that Mr. Carpenter failed to provide a copy of the protective order. Next, this order was not issued from this court and there is no indication that it was meant to apply beyond the action pending in the District of Massachusetts. Finally, the discovery that was the subject of my August 17 Order was sought not from Mr. Carpenter himself, but rather from Nova Group as an entity and, therefore, even assuming that the Massachusetts protective order would have shielded him from discovery, its protections would be inapplicable here.

I conclude, therefore, that Mr. Carpenter is responsible for the conduct of Nova Group and should be held in contempt.

### c.  Jack E. Robinson

Mr. Robinson should also be held in contempt. The evidence demonstrates that Mr. Robinson also functioned as a

corporate officer of Nova Group such that he can be held respon-
sible for its conduct.  He previously served as general counsel,
and was listed as assistant secretary for Nova Group.  Further,
during the underlying arbitration, Mr. Robinson stated that he
was familiar with the operations, assets, liabilities and finan-
cial condition of Charter Oak Trust.  Given the small size of
Nova Group and its close relationship with Charter Oak Trust,
this evidence strongly suggests that Mr. Robinson's role at Nova
Group is significant.  Moreover, Mr. Robinson has provided no
evidence to corroborate his ipse dixit statements that he is no
longer an officer of Nova Group.  It is difficult to credit these
uncorroborated assertions in view of both the evidence that does
link him to Nova Group and his continued representation of Nova
Group in these actions.

Accordingly, I conclude that Mr. Robinson, practically
speaking, is responsible for Nova Group and, thus, should be held
in contempt.[4]

---

[4]Finally, Mr. Robinson also requests that the court sua
sponte strike those portions of Universitas' motion for contempt
that relate to him because they allegedly contain "impertinent
and scandalous" statements (Opposition of Jack E. Robinson to
Motion for Civil Contempt Filed by Universitas Educatiion, LLC
(Docket Item 194) at 7-11).  However, Mr. Robinson has failed to
identify any authority that justifies such relief.  Accordingly,
I recommend that this application be denied.

d. <u>Molly Carpenter</u>

I conclude that Mrs. Carpenter should not be held in contempt for Nova Group's failure to comply with my August 17 Order. As with the other Nova Group Individuals, Mrs. Carpenter claims, but provides no evidence, that she is no longer an employee of Nova Group. Although there is documentary evidence that lists Mrs. Carpenter as treasurer for Nova Group as of August 28, 2012 and as a signatory on accounts held in Charter Oak Trust's name, I conclude that the record does not clearly establish that Mrs. Carpenter's role at Nova Group was as extensive or central as those of the Nova Group Individuals discussed above. Nor does her role as Chairwoman of Benistar Admin Services Inc. establish that she was a controlling officer of Nova Group. Although it appears that these entities are closely related, this close relationship does not necessarily demonstrate that Mrs. Carpenter is or was responsible for Nova Group's management. Universitas' argument that Mrs. Carpenter, as treasurer, would have been in a position to comply with my August 17 Order on behalf of Nova Group does not mean that she was a corporate officer chargeable with such responsibility. In the absence of evidence that Mrs. Carpenter actually functioned as a controlling officer of Nova Group, it is not appropriate to hold

26

her responsible for the conduct of Nova Group. Accordingly, I conclude that Mrs. Carpenter should not be held in contempt.

### e. Amanda Rossi

I also conclude that Amanda Rossi should not be held in contempt. Notwithstanding the appearance of Ms. Rossi's name in an official capacity on Nova Group and Charter Oak Trust documents, there is not sufficient evidence that she was officially responsible for the affairs of Nova Group. At her deposition, Ms. Rossi testified that was not even, in fact, employed by Nova Group and that her duties were largely administrative in function. In light of this testimony, it would be unreasonable to draw the inference from the evidence that Universitas offers that Ms. Rossi was in a position to authorize Nova Group's compliance with my August 17 Order. Finally, although Ms. Rossi is a signatory on the bank accounts into which Universitas claims that Nova Group improperly deposited the insurance proceeds, Mr. Bursey signed the deposit slips and endorsed the checks. This attenuates any inference that Ms. Rossi was a controlling officer of Nova Group if she did not actually participate in one of the central transactions at issue.

Accordingly, I conclude that Ms. Rossi should not be held in contempt.

f.   The Fifth Amendment

Finally, Messrs. Bursey and Carpenter argue that they should not be held in contempt because their compliance with my August 17 Order on behalf of Nova Group would have infringed upon their Fifth Amendment privilege against self-incrimination particularly because of the pending grand jury investigation that has named them as targets.  This argument is misplaced and is no defense to contempt here.  First, it is well established -- and undisputed by any of the Nova Group Individuals -- that a corporation such as Nova Group has no Fifth Amendment privilege against self-incrimination.  Braswell v. United States, 487 U.S. 99, 102 (1988); In re Two Grand Jury Subpoenae Duces Tecum, 769 F.2d 52, 57 (2d Cir. 1985); see also Louis Vuitton Malletier S.A. v. LY USA, Inc., 676 F.3d 83, 92 n.5 (2d Cir. 2012) ("[A] corporation may not refuse to submit to a Rule 30(b)(6) deposition, or to turn over corporate records, on the grounds that such acts may tend to incriminate it.").  Here, compliance with my August 17 Order required responses only in a representative capacity, i.e., on behalf of Nova Group as a corporation, and not in an individual capacity.  Accordingly, the personal Fifth Amendment privilege of Messrs. Bursey and Carpenter would not have been implicated because any responses would have been submitted only in a

28

representative, not an individual, capacity.  <u>See</u> <u>In re Grand</u>
<u>Jury Subpoeanas Issued June 18, 2009</u>, 593 F.3d 155, 158 (2d Cir.
2010) (<u>per</u> <u>curiam</u>) ("[T]he custodian of corporate records, who
acts as a representative of the corporation, cannot refuse to
produce corporate records on Fifth Amendment grounds.  This is
true (1) whether the subpoena is directed to the corporation
itself or to the custodian in his representative capacity, <u>see</u>
[<u>Bellis v. United States</u>, 417 U.S. 85, 90 (1974)], and (2)
'regardless of how small the corporation may be,' [<u>Bellis v.</u>
<u>United States</u>, <u>supra</u>, 417 U.S. at 100].").  Moreover, given that
it appears that Nova Group has responded to Universitas' document
requests and information subpoena -- albeit many months past the
deadline -- any concerns about the Fifth Amendment implications
of their compliance with my August 17 Order on behalf of Nova
Group are effectively moot.

C.  <u>Proposed Remedy</u>

As relief, Universitas requests that an order be
entered directing that (1) Nova Group and the Nova Group Individ-
uals each pay monetary sanctions in the amount of $2500 per day
for each day that they have failed to comply with my August 17
Order beginning from September 1, 2012 to the date of compliance;
(2) the Nova Group Individuals appear before the Court on a date

certain to show cause why each should not be arrested and held in prison until such time as they comply with my August 17 Order; (3) Nova Group deposit the amount of $30,450,690.31[5] with the court until the final resolution of Nova Group's appeal to the Court of Appeals for the Second Circuit[6] and (4) the payment of Universitas' attorneys' fees and costs associated with this motion for contempt.

"The imposition of civil contempt sanctions may serve dual purposes:  to secure future compliance with court orders and to compensate the party that has been wronged." Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Tech., Inc., supra, 367 F.3d at 657; see also Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 829 (1994) ("A contempt fine accordingly is considered civil and remedial if it either 'coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained.'"

---

[5]This sum is comprised on $30,181,880.30 representing the judgment entered against Nova Group (Docket Item 41) and $268,810.01 in attorneys' fees and costs ordered by Judge Swain on October 5, 2012 (Docket Item 162).

[6]Nova Group had sought to dismiss this action for lack of subject matter jurisdiction, and Judge Swain denied that motion (Docket Item 161).  Nova Group appealed from that order.  The Court of Appeals has affirmed Judge Swain's denial of Nova Group's motion to dismiss for subject matter jurisdiction. Universitas Educ., LLC v. Nova Grp., Inc., No. 12-3504. 2013 WL 781100 (2d Cir. Mar. 4, 2013) (Summary Order).

(quoting United States v. United Mine Workers, 330 U.S. 258, 303-04 (1947)); accord F.T.C. v. Verity Int'l, Ltd., 443 F.3d 48, 70 (2d Cir. 2007); Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd., 885 F.2d 1, 5 (2d Cir. 1989); Perfect Fit Indus., Inc. v. Acme Quilting Co., 673 F.2d 53, 56-57 (2d Cir. 1982).

In view of Nova Group's recent responses to Universitas' document requests and information subpoena, coercive sanctions are not warranted.  However, even where a coercive award is no longer necessary, a compensatory award is still appropriate "because the purpose of the award -- 'to compensate [the contempt movant] for the costs it incurred in attempting to [enforce] the Court's order]' -- is not terminated" by the contemnor's ultimate compliance."  Shady Records, Inc. v. Source Enters., Inc., 371 F. Supp. 2d 394, 398 (S.D.N.Y. 2005) (Lynch, then D.J., now Cir. J.) (alterations in original), quoting Petroleos Mexicanos v. Crawford Enter., Inc., 826 F.2d 392, 400 (5th Cir. 1987); see also Jaeger v. Massis, No. 00-7390, 2000 WL 1678778 at *2 (2d Cir. Nov. 3, 2000) (table), citing Backo v. Local 281, United Bhd. of Carpenters & Joiners of Am., 438 F.2d 176, 182 (2d Cir. 1970) ("Insofar as a civil contempt sanction is meant to compensate a complainant, it cannot be mooted by volun-tary cessation of the suit.  The harm flowing from contumacy is not terminated because the underlying order is terminated;

31

because the harm persists, so too do the sanctions" (internal

footnote omitted)).

     The Court of Appeals for the Second Circuit has coun-

seled that when "the fine is compensatory in purpose . . . . 'the

sanction should correspond at least to some degree with the

amount of damages.'" Paramedics Electromedicina Comercial, Ltda

v. GE Med. Sys. Info. Techs., Inc., supra, 369 F.3d at 658,

quoting King v. Allied Vision, Ltd., 65 F.3d 1051, 1062 (2d Cir.

1995); see also Lesser v. U.S. Bank Nat'l Ass'n, 09 Civ. 2362

(KAM)(ALC), 2011 WL 1004708 at *13 (E.D.N.Y. 2011).  "'[S]ome

proof of loss must be present to justify [a sanction's] compensa-

tory aspects.'" Paramedics Electromedicina Comercial, Ltda v. GE

Med. Sys. Info. Techs., Inc., supra, 369 F.3d at 658, quoting

N.Y. State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1353 (2d

Cir. 1989); accord Weitzman v. Stein, 98 F.3d 717, 719 (2d Cir.

1996) ("The compensatory goal . . . can only be met by awarding

to the plaintiff any proven damages.").

     With the exception of Universitas' request for attor-

neys' fees and costs associated with this motion for contempt,

its requests for sanctions are coercive in nature.  Accordingly,

because it appears that Nova Group has now complied with my

August 17 Order, such coercive sanctions are not justified.

However, Universitas' request for attorneys' fees and costs stands on different footing, and I conclude that Universitas is entitled to recover the attorneys' fees and costs it incurred in bringing this motion for contempt.  This sanction is properly considered compensatory in nature because it will compensate Universitas for the damages it suffered, i.e., its efforts to secure Nova Group's compliance with my August 17 Order.  See Jacobs v. Citibank, N.A., 318 F. App'x 3, 4 (2d Cir. 2008) ("Although Jacobs contends that the award of attorneys' fees was punitive because he had already complied with the terms of the at-issue order by the time the sanction was imposed, the district court's grant of attorneys' fees was to compensate Citibank for part of the expenses they incurred due to Jacobs' contemptuous conduct.").  As noted by the Honorable Gerard E. Lynch, then District Judge, now Circuit Judge, "whether willful contempt is a prerequisite for an attorneys' fee award remains an open question in this Circuit."  Shady Records, Inc. v. Source Enters., Inc., 351 F. Supp. 2d 64, 67 (S.D.N.Y. 2004) (Lynch, then D.J., now Cir. J.); see also Mattina v. Saigon Grill Gourmet Rest., Inc., 08 Civ. 3332 (DC), 2009 WL 323507 at *8 (S.D.N.Y. Feb. 4, 2009) (Chin, then D.J., now Cir. J).  Nonetheless, "[w]hen deciding whether to award fees, courts have focused on the willfulness of the contemnor's misconduct" and "a finding of

willfulness strongly supports granting them." <u>Weitzman v. Stein</u>,
98 F.3d 717, 719 (2d Cir. 1996); <u>accord</u> <u>Manhattan Indus., Inc. v.
Sweater Bee by Banff, Ltd.</u>, <u>supra</u>, 885 F.2d at 8.

Nova Group willfully flouted my August 17 Order.  As
noted above, prior to the recent declaration submitted by Nova
Group's counsel, it appears that Nova Group made no effort to
comply with my August 17 Order.  Indeed, in a letter from its
former counsel, it affirmatively represented to Universitas that
it would not be complying with my Order.  In addition, Nova Group
failed to file an opposition or a response of any kind to
Universitas' motion for contempt.  Nova Group's extremely belated
responses to Universitas' discovery requests do not un-do its
many months of non-compliance, and a contrary conclusion would
effectively eviscerate court-ordered deadlines.  Accordingly, I
conclude that Nova Group's contempt was willful and that
Universitas is entitled to its reasonable attorneys' fees and
costs incurred in attempting to secure Nova Group's compliance
with my August 17 Order.  <u>See</u>, <u>e.g.</u>, <u>Akman v. Pep Boys Manny Moe
& Jack of Delaware, Inc.</u>, 11 Civ. 3252 (MKB), 2013 WL 2237542 at
*8 (E.D.N.Y. May 21, 2013); <u>Software Freedom Conservancy, Inc. v.
Westinghouse Digital Electronics, LLC</u>, 812 F. Supp. 2d 483, 491
(S.D.N.Y. 2011) (Scheindlin, D.J.); <u>Leser v. U.S. Bank Nat'l</u>

34

Ass'n, supra, 2011 WL 1004708 at *13; Shady Records, Inc. v.
Source Enters., Inc., supra, 351 F. Supp. 2d at 67.

     I further recommend that Messrs. Bursey, Carpenter and
Robinson be held jointly and severally liable with Nova Group for
the attorneys' fees and costs Universitas incurred in attempting
to secure Nova Group's compliance with my August 17 Order.  In
view of my conclusions above that these three individuals were
responsible for Nova Group's conduct when I issued my August 17
Order, their failures to ensure that Nova Group complied with my
Order were also willful.  There is no indication that they made
any attempts to comply with my August 17 Order on behalf of Nova
Group.  Rather, as noted above, it appears that each simply
sought to avoid any responsibility through uncorroborated asser-
tions that they were no longer affiliated with Nova Group.  Such
tactics lend support to a finding that Messrs. Bursey, Carpenter
and Robinson acted willfully in failing to comply with my August
17 Order on behalf of Nova Group.

     Accordingly, I conclude that Messrs. Bursey, Carpenter
and Robinson should be held jointly and severally liable with
Nova Group for the reasonable attorneys' fees and costs
Universitas incurred in bringing this motion for contempt.  I
recommend that Universitas be directed to submit affidavits and
contemporaneous time and billing records sufficient to document

the fees and costs it incurred in bringing this motion for
contempt.

III.  Conclusion

        Accordingly, I certify the facts set forth above and
that Nova Group, Wayne H. Bursey, Daniel E. Carpenter and Jack E.
Robinson have failed to comply with my August 17 Order in any
respect.  I further recommend that Nova Group, Wayne H. Bursey,
Daniel E. Carpenter and Jack E. Robinson be ordered to reimburse
Universitas for the reasonable attorneys' fees and costs it
incurred in bringing this motion for contempt and that
Universitas be directed to submit affidavits and contemporaneous
time records sufficient to prove the fees and costs it incurred
in bringing this motion.

IV.  Objections

        Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72(b) of
the Federal Rules of Civil Procedure, the parties shall have
fourteen (14) days from receipt of this Report to file written
objections.  See also Fed.R.Civ.P. 6(a).  Such objections (and
responses thereto) shall be filed with the Clerk of the Court,
with courtesy copies delivered to the Chambers of the Honorable
Laura Taylor Swain, United States District Judge, 500 Pearl

Street, Room 755, New York, New York 10007, and to the Chambers

of the undersigned, 500 Pearl Street, Room 750, New York, New

York 10007.  Any requests for an extension of time for filing

objections must be directed to Judge Swain.  FAILURE TO OBJECT

WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS

AND **WILL** PRECLUDE APPELLATE REVIEW.  Thomas v. Arn, 474 U.S. 140,

155 (1985); United States v. Male Juvenile, 121 F.3d 34, 38 (2d

Cir. 1997); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049,

1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.

1992); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir.

1988); McCarthy v. Manson, 714 F.2d 234, 237-238 (2d Cir. 1983).

Dated:  New York, New York
        July 11, 2013

                              SO ORDERED

                              HENRY PITMAN
                              United States Magistrate Judge

Copies transmitted to:

All Counsel

37

# Exhibit 16



**GRIST MILL PLAZA
100 GRIST MILL ROAD
SIMSBURY, CT 06070**

October 22, 2008

Melissa Leppink
Claims Examiner
Lincoln Financial Group
100 North Green Street
Dept 5310
Greensboro, N. C. 27401

RECEIVED

OCT 2 3 2008

CLAIMS - 5310

Re:    Sash Spencer Death Claim 587487

Dear Ms. Leppink:

The Charter Oak Trust has been the Owner and Beneficiary of the Sash Spencer Lincoln Financial Group policies 7305475 and 7320809 since the inception of the policies. We have a fiduciary responsibility and legal obligation to carry out Mr. Spencer's wishes as he intended in a timely fashion to pay those death proceeds to a charity that he established prior to his death. As you are aware, Mr. Spencer passed away on June 10, 2008 and to date we have not been able to move forward with the settlement of this claim. I am enclosing the obituaries previously provided to you and Proof of Death from the New York Presbyterian Hospital.

As you can see from the obituaries, Mr. Spencer was a famous businessman, the youngest partner ever at McKinsey & Company and the president of several Fortune 500 Companies before starting one of the most successful hedge funds in history. I only mention this so you can understand my concerns over the delay. There is no doubt that Mr. Spencer is dead. He did not commit suicide. He did not die from nondisclosed hang-gliding in the French Alps. He did not die from lung cancer from too much smoking. In fact, he picked up an infection from a stay in the hospital that killed a totally healthy man that expected to live at least another 20 years.

Let me also point out that this is no "Butcher of Brooklyn" case where Lincoln did eventually pay out a $10,000,000 death claim after an investigation of about a year into some strange and suspicious, if not totally morbid, circumstances surrounding a Stranger Owned Life Insurance case. Here we have a person easily worth a Half Billion Dollars that could afford to have insurance made payable to his Charitable Foundation to provide scholarships to poor inner city youth. I do not understand why you need to bother the widow in this case, Mary Spencer, his wife of 47 years. Hasn't she suffered enough?? My point being, Charter Oak has been the Owner and Beneficiary of the policies from the beginning. We have a duty to pay the Charity, Universitas, LLC. Why do you need to bother the poor widow in this case?? As you can see, I am more than a little frustrated with the investigator's lack of progress. Please see what you can do to expedite this unnecessary investigation. I have been in the insurance business for 30 years, and I see no reason to hold up this death claim any longer.

EXHIBIT 104

AAA Case No. 13195 Y 1558 10

TEL: (860) 408-7000    •    FAX: (860) 408-7015
CONFIDENTIAL

LFG-00328

According to Barbara Korfel of our office, there are a number of items in which you recommended that would be needed to proceed with the claim processing:

- A currently dated and signed authorization to release medical, pharmacy and dental records. (We can provide those to you as Owner of the policies).

- A recently dated and signed authorization from New York Presbyterian Hospital to provide you with Mr. Spencer's medical records while he was hospitalized prior to his death (I suggest we can provide that as well).

- An interview scheduled with the next of kin and 10 years of medical, dental and pharmaceutical records to compare against medical records your underwriters reviewed at the time of the application. (As Owners of the polices we are authorized to obtain these records).

RECEIVED
OCT 2 3 2008
CLAIMS - 5310

Mr. Spencer was a very successful businessman and decided to pass on a charitable legacy to his foundation Universitas Education, LLC as the beneficiary of his life insurance and he elected to entrust that responsibility to our Charter Oak Trust in order to make that happen. It is shameful that we cannot proceed with his desires as expeditiously as he would have expected if he were alive today.

The ultimate beneficiary, Universitas Education, LLC continues to be patient with us for the moment, but I fear that in due time they will become suspicious of your lack of performance.

We have been making weekly contact with Lincoln Financial Group to check on the progress of the claim, but so far we haven't gotten anywhere. I know as time goes by, we will be accruing interest on these death claim proceeds from the date of death, but our intent is to settle this claim as quickly and professionally as possible. You can certainly appreciate our frustration because over four months have gone by and your investigator hasn't even started to collect the medical records! Your urgency in this matter would be greatly appreciated.

Finally, I would like you to provide me in writing an expected timeline of settlement events and the necessary documents you need in order to expedite our claim.

Best regards,

Wayne H. Bursey, Trustee
Charter Oak Trust

cc:    Lydia Tart

CONFIDENTIAL



**NOVA**
GROUP INC.

GRIST MILL PLAZA
100 GRIST MILL ROAD
SIMSBURY, CT 06070

December 11, 2008

Mr. Dennis R. Glass
Lincoln Financial Group
150 N. Radnor Chester Rd
Radnor, PA  19087

> Re:   Sash Spencer Death Benefit
>         Claim Number 587487 on Policy Numbers 7305475 & 7320809

Dear Mr. Glass:

   I am the Trustee of the Charter Oak Trust, which is the Owner and Beneficiary of $30,000,000 of Death Benefit on the life of Mr. Sash Spencer. For your benefit, I have enclosed both the McKinsey & Co. and New York Times obituary notices.  Mr. Spencer was one of the youngest principals ever at McKinsey & Co and went on to become the CEO of several Fortune 500 Companies before starting one of America's earliest private equity funds, Holding Capital Group.  At the time of his death, Mr. Spencer's wealth was easily over a billion dollars.

   I am writing to you at the suggestion of two colleagues of mine, Charlie Induddi Westcott and Dan Carpenter who have told me that you are one of the brightest and best insurance company CEO's in the business.  Though I have been in the insurance business for over 30 years, I am sorry that I have not had the pleasure of meeting you in person.  I am also sorry to have to bother you to ask for your help in cutting through the normal insurance industry "red-tape."  I know there is standard insurance industry protocol for deaths within two years of contracting, but this is no ordinary case, and Mr. Spencer is no ordinary client.

   The Charter Oak Trust prides itself on being the biggest and best nondeductible welfare benefit trust designed to help wealthy clients avoid estate and gift taxes through third-party ownership of the policy on their lives payable to a charity or to a family trust of some sort.  In Mr. Spencer's case, he established a Private Foundation and a charitable entity that is the beneficiary of the policies on his life held by the Trust.  His charity was designed to provide scholarships to poor, deserving inner city youths as a way of giving back something for his own "rags to riches" success story.

   Mr. Spencer died in June, and Barbara Korfel from our office has worked diligently and closely with Melissa Leppink of Lincoln in processing this death claim.  Unfortunately, it took the Private Investigator six months just to schedule a meeting with the widow, Mr. Spencer's wife of 47 years, Mary Spencer.



**NOVA**
BENEFIT PLANS, LLC

Mr. Dennis R. Glass
December 11, 2008
Page 2 of 2

I repeatedly told the people at Lincoln that we had any and all medical information that they could possibly desire. They said it was all just standard operating procedure. Now that it has been three weeks from the meeting, I had Barbara Korfel follow up with Melissa on what time frame she expected now that the Investigator had met with Mary Spencer. Her response is that it would take 3-6 months just to obtain the medical records for the last 10 years. Obviously, I was flabbergasted and chagrinned by her response.

Now I can fully understand that if someone said they were <u>not</u> a private pilot and died in a plane crash while helicopter-skiing in the Andes, that kind of death would and should lead to some sort of exhaustive investigation. Perhaps a "nonsmoker" dying of lung cancer warrants an investigation of "10 years of medical records," but I just can't see a perfectly healthy person who dies after contracting an infection during a routine hospital stay warrants the kind of investigation contemplated here. Assume for the sake of argument, that some discrepancy or minor indiscretion turns up in the medical records, is Lincoln really going to risk going to court over some immaterial item that pops up in the medical record? This is a well known and well respected person who never did a fraudulent thing in his life. And who is the ultimate beneficiary of his charitable largesse? Inner city children. Bottom line, I am at a loss to explain to Mrs. Spencer's attorney or the Charity's attorneys why this death benefit claim process is taking so long. I have lost all credibility with them. I need your help to cut through the insurance company bureaucracy and "red tape" to get this claim paid. I would appreciate all efforts on your part to help us through this frustrating process.

Lastly, let me just say what big fans we are of Lincoln, and that we will be on track to do over $200,000,000 of new death benefit with Lincoln in 2009. Because a charity is involved, we plan to give favorable plugs for everyone involved, including Lincoln. Charlie is particularly excited about our favorable press and making in roads into the charitable and not-for-profit institutions. Paying this death claim will be a good shot in the arm for all of us.

Thank you for your attention to these matters.

Very best regards,

Wayne H. Bursey



**NOVA**
BENEFIT PLANS, LLC

GRIST MILL PLAZA
100 GRIST MILL ROAD
SIMSBURY, CT 06070

March 6, 2009

Ms. Valerie Loftin
Vice President – Claims
Lincoln Financial Group
100 North Greene Street
Greensboro, NC  27401

      Re:    **Sash Spencer Death Claim # 587487**

Dear Ms. Loftin:

    I feel that I must once again advise you of the unnecessary delays on the processing of the Sash Spencer death claim.

    Melissa Leppink of your office has done an excellent job keeping us up to date with the receipt of all the doctor, hospital, and medical records. Due to her diligent record keeping, we know that it is over a month that we were waiting for the last few doctor reports. The absolutely last doctor report outstanding is a doctor who was mentioned in passing in one of the latest medical reports mentioned by a doctor who was not even one of Mr. Spencer's primary care physicians. That doctor now needs to search his archives to find any and all files that he might have on someone he does not remember as a patient.

    I mention this only because we will, of course, be demanding interest from the date of death. On a Death Benefit of $30,000,000 the interest alone comes to $150,000 a month. In these harsh economic times where all insurance carriers finances are being questioned I am trying to save you a substantial amount of money. The practice of waiting until all medical files are in before reviewing any of the files does not make any sense at all, but especially not in these present trying times.

    Lastly, we are in Connecticut and we read terrible stories about the Hartford, as well as other insurance carriers everyday. The Phoenix stock is now valued in pennies rather than dollars. It would be good to know that we do not need to worry about Lincoln's ability to pay this claim.

    Thank you for your attention to these matters.

Best regards,

Wayne H. Bursey
Trustee

cc: Mr. Dennis Glass

            EXHIBIT 126

AAA Case No. 13195 Y 1558 10

TEL: (860) 408-7000  •  WWW.NOVAPLANS.COM  •  FAX: (860) 408-7015

**CONFIDENTIAL**

LFG-00128



GROUP INC.

GRIST MILL PLAZA
100 GRIST MILL ROAD
SIMSBURY, CT 06070

April 22, 2009

Mr. Dennis R. Glass
Lincoln Financial Group
150 N. Radnor Chester Rd
Radnor, PA  19087

     Re:    Sash Spencer Death Claim #587487

Dear Mr. Glass:

     It is with great interest that we notice that Melissa Leppink of Lincoln has gone from Claims Examiner to the Contestable Claims Compliance Unit.  We are very concerned that what should be a rather routine review of medical records is turning into an overly long deliberative process.

     For the ease of your perusal I have attached our previous correspondence, plus I have added several of the many emails between Barbara Korfel of our office and Ms. Leppink of your office.  Please note that we first contacted you about the unnecessary delays in this case on October 22, 2008.  Please see letter attached.  Please also note that Mr. Spencer was a distinguished American and prominent investor and established and ran one of America's first and foremost hedge funds.  We were concerned about delays then, and we are even more concerned now.

     Mr. Spencer died of natural causes in a hospital in June of last year.  We have diligently supplied Lincoln with every thing they need to pay this death claim.

     In the emails between Barbara Korfel and Ms. Leppink of Lincoln, please note the email dated March 12, 2009 from Melissa stating: "The review generally takes two to four weeks; however we are trying to move this along as quickly as possible."  Therefore, our expectation was far less than two weeks, and certainly not more than a month. Additionally, please note Melissa's email of February 24, 2009 indicating that Lincoln had in fact received all but one or two records for the Sash Spencer file.  Significantly it took two weeks just to track down the medical records for a Doctor who did not even remember treating Mr. Spencer but whose name was mentioned in passing in one of Mr. Spencer's other medical records.

     Thus, from the time that Lincoln had the overwhelming majority of the records (see February 4th email) to the time Melissa contacted us saying they had almost everything (February 24th) to the time that everything was sent to be reviewed (see March 12th email) there has been no progress in the adjudication of this claim whatsoever.  Moreover, as you can clearly see, there was an unnecessary month delay from the receipt of the overwhelming majority of the material to when the final materials were received and another delay in sending the final package for review and now on

TEL: (860) 408-7000     •     FAX: (860) 408-7015



Mr. Dennis Glass
April 22, 2009
Page 2 of 2

April 22nd – almost 6 weeks from the beginning of the medical review process (see March 12th email) there has been no change in the status of the Sash Spencer death claim except for Ms. Leppink being moved to the Contestable Claims Compliance Unit.

    This is not the first time I have brought this situation to your attention. Please see my letters of December 11, 2008, January 13, 2009 and March 6, 2009 as well as the response by Valerie Loftin of January 7, 2009. Therefore, all things considered, I believe that I have a fiduciary duty to bring a claim against Lincoln for the unpaid death benefit on the life of Sash Spencer if in fact we are not in receipt of the death claim proceeds by the close of business April 30, 2009. That gives Lincoln a full week to complete the review they should have started three months ago, and which they clearly started six weeks ago, and which certainly should have been completed by now.

    It is often said in situations like this, "Nothing personal, just business." In this case I truly mean that. You must understand that we have a charity to pay and no one can understand Lincoln's delay at this point. We must assume that with the passage of time, that delay has become negligence, and negligence has become bad faith. I hope I am wrong about this but the emails and letters exchanged between our two firms speak volumes, and I can no longer look the other way. I am sure that if our roles were reversed you would feel the same way I do and would be sending the same demand letter. So, in the spirit of cooperation and good faith dealings and abiding by the terms of your contract with us, please pay the full death claim plus interest at 6% by April 30, 2009.

    Thank you for your prompt attention to these matters.

Best regards,

Wayne H. Bursey
For the Sponsor and Trustee
Charter Oak Trust

cc:    William J. McGrath, Esq.
       Jack E. Robinson, Esq.



**GROUP INC.**

GRIST MILL PLAZA
100 GRIST MILL ROAD
SIMSBURY, CT 06070

April 27, 2009

Ms. Valerie W. Loftin
Chief Claims Officer
Lincoln Financial Group
100 North Greene St.
Greensboro, NC 27401

RE: Sash Spencer – Claim # 587487

Dear Ms. Loftin:

Please find enclosed the documents you requested in your letter dated April 24, 2009. Coincidentally, we were on a conference call last Thursday (April 23) with Lincoln Financial Attorneys including Erik Lanning and Compliance Officer Ken Elder concerning the efficacy of the Charter Oak Trust, and we discussed many of these same issues.

It is disappointing to learn that nearly a year after Mr. Spencer's death you are just now reviewing the Charter Oak Trust as the Owner and Beneficiary of the policy and its relationship to Sash Spencer, and the fiduciary duty we have to pay death benefits to the Participant's designated beneficiary, Universitas Education, LLC., Mr. Spencer's private foundation.

Since we have provided this information to Lincoln several times before, I believe it is fair to keep our deadline of Thursday April 30th for the receipt of the full death claim proceeds plus the 6% interest from the date of death. The answers to your questions are attached following this letter in the same order as you asked them in your letter, which I also attached for the ease of your perusal.

Best regards,

Wayne H. Bursey

cc: Mr. Dennis Glass

TEL: (860) 408-7000    •    FAX: (860) 408-7015

CONFIDENTIAL
EXHIBIT 131

AAA Case No. 13195 Y 1558 10

**LFG-00138**

# Exhibit 17

(Page 1 of 1)

**TD Banknorth**

**NEW PERSONAL ACCOUNT**

PERSON: TDBN MM-AM CT

ACCOUNT #: 424774648                    TYPE OF ACCOUNT: IM   Convenience Checking

TYPE CODE: 530         BRANCH #: 807     CATEGORY: Personal Checking

OFFICER CODE: 40L07     DATE OPENED: 05/13/2009        BANK REPRESENTATIVE: Dawn Foster

ACCOUNT TITLING / ADDRESS:                    ACCOUNT RELATIONSHIP:

THE CHARTER OAK TRUST                         Trust - Legal, 1 Trustee

WAYNE H BURSEY TRUSTEE

100 GRIST MILL ROAD

SALISBURY, CT          USA          06070

| CUSTOMER #1 INFORMATION | CUSTOMER #2 INFORMATION |
|---|---|
| Primary | |
| ID Type #1: | ID Type #1: State Issued Driver License w/Photo |
| State/County of Issuance: | State/County of Issuance: CT |
| Number: | Number: |
| Expiration Date: | Expiration Date: 05/13/2014 |
| 20E225630 | |
| (800) 409-7000 | |
| LEGAL ADDRESS: | LEGAL ADDRESS: |
| 100 GRIST MILL RD | 22 HIGH HILL RD |
| SALISBURY, CT 06404 | BLOOMFIELD, CT 06002 |
| MAILING ADDRESS: | MAILING ADDRESS: |
| 100 GRIST MILL ROAD | 22 HIGH HILL ROAD |
| SALISBURY, CT 06069 | BLOOMFIELD, CT 06002 |
| | ACCEPT |

| CUSTOMER #3 INFORMATION | CUSTOMER #4 INFORMATION |
|---|---|
| ID Type #1: | ID Type #1: |
| State/County of Issuance: | State/County of Issuance: |
| Number: | Number: |
| Expiration Date: | Expiration Date: |
| LEGAL ADDRESS: | LEGAL ADDRESS: |
| MAILING ADDRESS: | MAILING ADDRESS: |

ADDITIONAL CUSTOMER VERIFICATION:

☐ Employment   ☐ Address/Phone   ☐ Reference: _____   ☐ Previous Bank: _____

**IMPORTANT INFORMATION**

Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account.

The undersigned acknowledge(s) receipt of the Deposit Account Agreement, Account Maintenance Information grid, Fee Schedule and rates, which govern my/our account with the Bank. My/our use of the account shall evidence my/our acceptance of the terms and conditions set forth in the Deposit Account Agreement, Account Maintenance Information grid and Fee Schedule as the same may be amended from time to time.

Your signature constitutes authorization for each and issuance for any signatory on this account.

The undersigned, both individually and on behalf of the account owner, if different, hereby authorize(s) the Bank to, from time to time, request consumer reports containing information about me/us from third parties, such as a consumer reporting agency, in connection with opening and maintaining this account. If you (the Bank) are unable to open a deposit account, you will provide me/us with an additional notice regarding the consumer reporting agency.

I/We acknowledge and understand that TD Banknorth and TD Bank are trade names of TD Bank, N.A. I/We further acknowledge and understand that for FDIC insurance purposes, my/our deposits may not be separately insured from any other deposits that may have at TD Banknorth and/or TD Bank.

By signing this signature card, I acknowledge that the deposit account to which I am being added as a co-owner may have an existing line/expire account attached. I understand that a line/expire account is a line of credit for overdraft protection. I acknowledge receipt of the line/expire Agreement and agree to that terms and conditions. I understand and agree that, as a co-owner of the deposit account, I will be fully responsible for payments on the line/expire account (including any outstanding balance on this line) and that payment history and other credit information may be reported to consumer reporting agencies. By signing below, I authorize the Bank to automatically deduct the Minimum Payment Due for my line/expire Account from the corresponding checking account if the Minimum Payment Due is not received by the Payment Due Date listed on the statement. Further, I agree to maintain sufficient funds in your checking account to cover this automatic payment.

This section does not apply to U.S. non-resident aliens. Under penalty of perjury, I certify(ies) that:
1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. person (including a U.S. resident alien).

Certification Instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return or for other reasons. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA) and, generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN.

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

(1) X _Wayne H Bursey_      5/12/09      THE CHARTER OAK TRUST

(2) X _____                          WAYNE H BURSEY

(3) X _____

(4) X _____

Rev. 1/2008

TD-Universitas 0008



TD-Universitas 0003

CORRECTION

NO IMAGE AVAILABLE



TD-Universitas 0002

Account: 424277454B
Amount: 30,677,276.85
PostDate: 20000518
Tran_ID: 402017972
CheckNum: 0
DIN: 402017972
ReturnReasonDescription:
ECEItemSeqNum:

Account: 424277454B
Amount: 30,677,276.85
PostDate: 20000518
Tran_ID: 402017972
CheckNum: 0
DIN: 402017972
ReturnReasonDescription:
ECEItemSeqNum:

Account: 85911803
Amount: 30,461,517.83
PostDate: 20000518
Tran_ID: 402017972
CheckNum: 14579296
DIN: 402017973
ReturnReasonDescription:
ECEItemSeqNum:

Account: 85911803
Amount: 30,461,517.83
PostDate: 20000518
Tran_ID: 402017972
CheckNum: 14579296
DIN: 402017973
ReturnReasonDescription:
ECEItemSeqNum:

# Exhibit 18

From: DCarpenter US Benefits <"/O=BENISTAR/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=DCUS">
To: "'Roman, Jeffrey D'" <jeffrey.d.roman@ustrust.com>
Subject: RE: Follow-up
Date: 2009-05-14 10:08:08

Jeff:

No problem.  Let me know how things work out with your KYC group.  Just so you know, since we had our meeting with US Trust we have already opened new accounts for the Charter Oak Trust with two other major banks.  We already have starter checks with one of them.  Please get back to Wayne Bursey with any questions on the Trust once your people have reviewed it.

As for Mark, I have asked him to find out who the person was at BOFA that told Rob Boyan that I was not allowed to do wires any more at BOFA on Avon Capital which is a Company that I created and which has control over millions of dollars of assets in several trust accounts.  I estimate I have done over TWENTY MILLION DOLLARS in wires at that branch alone in the various accounts that I am a signatory on.  So imagine my surprise when an associate of mine was told by Rob Boyan that I could not do wires at BOFA, but we would have to get someone else on the account to do wires.  I have asked Mark to get back to me today with the name of that person.  Rob Boyan has not returned my call.....so maybe when he gets this email he will let me know.

Let me know what you know.

Dan

---

From: Roman, Jeffrey D [mailto:jeffrey.d.roman@ustrust.com]
Sent: Thursday, May 14, 2009 8:33 AM
To: DCarpenter US Benefits
Cc: Milligan, Mark P; Boyan, Robert; Soyster, Filomena
Subject: RE: Follow-up

Dan,

I apologize for the delay in my response.  The reason for the delay is that I passed your response on to Filomena.  She was going to reach out to the head of our KYC (Know Your Customer) group for thoughts and discussion.  I was off yesterday, and will follow-up with Filomena this morning.

Secondly, I just received a call from Mark Milligan.  He shared with me a discussion you had with him last night.  I would like to set a couple of things straight:

- The branch has it's own protocol and policies they adhere to regarding wire transfers.
- They operate separate and independently from Business Banking and US Trust.
- I have no influence or jurisdiction over them.
- Lastly, we shared with you that we needed time and information to complete our due diligence.

I will ask Filomena to contact you today.

*Jeffrey D. Roman*

Senior Vice President
Private Client Manager
U.S. Trust, Bank of America Private Wealth Management

29 South Main Street
West Hartford, CT 06107
CT2-110-01-02
Phone:(860) 313-7021
Toll free: 1-800-535-2808
Fax: (860) 313-7042

E-Mail: jeffrey.d.roman@ustrust.com

**CONFIDENTIAL & PRIVILEGED**

*This communication is confidential and intended only for the addressee. If you are not the intended recipient, you may not copy, disclose, or distribute this message to anyone else; any such actions may be unlawful. If you have received this communication in error, please contact the sender of the message to inform him or her of the error. Regular internet e-mail is not secure. We

ask that you do not send personal or company information of a sensitive or confidential nature through unsecured e-mail. For questions concerning your account relationship with Bank of America, you may contact us by phone or US mail."

**From:** DCarpenter US Benefits [mailto:dcarpenter@usbenefitsnetwork.com]
**Sent:** Monday, May 11, 2009 4:37 PM
**To:** Roman, Jeffrey D; Kevin US; Wayne NOVA
**Cc:** Soyster, Filomena; Iacovazzi, Cathy N; Dan Carpenter US Benefits
**Subject:** RE: Follow-up

Jeff:

Total nonstarter.....

We are already working with the largest banks in the Country including B of A.
All of the Companies that work out of 100 Grist Mill are private companies.....and we do not provide the info you are looking for to anyone. We are trying to bring you business......not vice versa. We know all about "know your client" rules. There are no terrorists allowed in the building.

The only entity that we will set up with you is Charter Oak Trust......Dan does not own or control the Charter Oak Trust and Wayne will be the only signatory.
NOVA Group Inc is the Sponsor.....and NOVA Benefits LLC is the Sponsor of a number of welfare benefit plans......both are owned by NOVA Partners LLC.
The NOVA "Partners" are Wayne Bursey, Don Trudeau, and Molly Carpenter.

What else do you need for opening the account for Charter Oak Trust????

Dan

**From:** Roman, Jeffrey D [mailto:jeffrey.d.roman@ustrust.com]
**Sent:** Monday, May 11, 2009 4:04 PM
**To:** DCarpenter US Benefits; Kevin US; Wayne NOVA
**Cc:** Soyster, Filomena; Iacovazzi, Cathy N
**Subject:** Follow-up

Gentlemen,

Thank you again for your time on Friday. As we discussed, I will need to gather some information as we complete our due diligence prior to continuing our discussion regarding a trust relationship. Please provide me the following information:

- The name of all the companies run out of 100 Grist Mill Road, Simsbury
- The name of all the companies that Dan owns, operates, directs, etc.
- The ownership make-up of each company (Names of individuals, businesses, LLC's and percentages owned)
- How any of the companies are related; affiliated; have business transaction between each other, etc.
- The sources and uses of funds for each company. Important to complete our Know Your Customer forms.
- Any other information that you would deem helpful.

This would be a great start.

Thanks,

*Jeffrey D. Roman*

Senior Vice President
Private Client Manager
U.S. Trust, Bank of America Private Wealth Management

29 South Main Street
West Hartford, CT 06107
CT2-110-01-02
Phone:(860) 313-7021
Toll free: 1-800-535-2808
Fax: (860) 313-7042

E-Mail: jeffrey.d.roman@ustrust.com

# Exhibit 19

[Page 1]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------X

UNIVERSITAS EDUCATION, LLC,

            Plaintiff,

        vs.           Case No.

                      11-1590-LTS-HBP

NOVA GROUP, INC., as trustee,

sponsor, and fiduciary of

The CHARTER OAK TRUST WELFARE

BENEFIT PLAN,

            Defendant.

---------------------------------------X

VIDEOTAPED 30(B)(6) DEPOSITION

OF GRIST MILL CAPITAL

BY PETER A. GOLDMAN

Armonk, New York

Tuesday, April 30, 2013

Reported by:

JOAN WARNOCK

[Page 2]

1

2

3                          April 30, 2013

4                          10:00 a.m.

5

6          Videotaped 30(B)(6) deposition of

7     GRIST MILL CAPITAL, by Peter A. Goldman,

8     held at the offices of Boies, Schiller &

9     Flexner, LLP, 333 Main Street, Armonk,

10    New York, pursuant to Subpoena, before

11    Joan Warnock, a Notary Public of the

12    State of New York.

13

14

15

16

17

18

19

20

21

22

23

24

25

[Page 3]

1

2    A P P E A R A N C E S:

3

4        LOEB & LOEB, LLP

5        Attorneys for Plaintiff

6            345 Park Avenue

7            New York, New York  10154

8    BY:   PAULA K. COLBATH, ESQ.

9          MICHAEL BARNETT, ESQ.

10

11       LAW OFFICES OF CAROLE R. BERNSTEIN

12       Attorneys for Defendants

13           41 Maple Avenue North

14           Westport, Connecticut  06880

15    BY:   CAROLE R. BERNSTEIN, ESQ.

16

17   ALSO PRESENT:

18       HENRY MARTE, VIDEOGRAPHER

19

20

21

22

23

24

25

[Page 4]

1           P. Goldman

2           VIDEOGRAPHER: This marks the

3    beginning of videotape number one in the

4    videotaped deposition of Mr. Peter A.

5    Goldman in the matter of Universitas

6    Education versus Nova Group, Inc., filed

7    in the United States District Court,

8    Southern District of New York.

9           This deposition is being held at

10   333 Main Street, Armonk, New York, on

11   April 30th, 2013, at approximately

12   ten a.m.  The court reporter and video

13   operator are both here on behalf of U.S.

14   Legal Support.

15          Counsel will please introduce

16   themselves for the record.

17          MS. COLBATH: Yes.  Paula Colbath

18   from the firm of Loeb & Loeb, LLP, 345

19   Park Avenue, New York, New York  10154

20   representing Universitas.  And with me

21   today is my colleague, Michael Barnett.

22          MS. BERNSTEIN: Carole Bernstein,

23   Law Offices of Carole Bernstein, 41

24   Maple Avenue North, Westport,

25   Connecticut  06880.  I'm here on behalf

1                P. Goldman

2       Q.   -- there's a portion of the

3   document that shows a checking deposit

4   ticket; correct?

5       A.   Yes.  Yes.

6       Q.   So let's focus on that checking

7   deposit ticket.  Can you tell me the amount

8   of the deposit?

9       A.   That was the one you just read,

10  wasn't it, the 8,677,276.75.

11      Q.   Right.  And in whose account is

12  that 8.677 million being deposited?

13      A.   Well, it looks like Grist Mill

14  Capital Delaware.

15      Q.   And the money, at least based on

16  this document, appears to be coming from the

17  Charter Oak Trust; right?

18      A.   Yes.

19      Q.   And do you have any reason to

20  believe that the 8.677 did not originate in

21  the Charter Oak Trust?

22      A.   I have no reason to believe that --

23      Q.   Okay.

24           MS. BERNSTEIN: Can he just finish,

25      please.

[Page 102]

```
 1                    P. Goldman

 2        A.    I have no reason to believe that it

 3   did not originate from the Charter Oak Trust.

 4        Q.    And do you have any understanding

 5   as to why Grist Mill Capital Delaware was

 6   receiving on May 21st, 2009, 8.677 million

 7   from the Charter Oak Trust?

 8        A.    No.

 9        Q.    You have no understanding as to why

10   that transfer was being made to Grist Mill

11   Capital Delaware?

12             MS. BERNSTEIN: Objection.  Asked

13        and answered.  Don't answer.

14             MS. COLBATH: Can I have the

15        question read back, please.

16             (Record read.)

17             MS. BERNSTEIN: And you have my

18        objection not to answer.  It was asked

19        and answered.

20             MS. COLBATH: What's the basis of

21        --

22             MS. BERNSTEIN: The question read

23        before.

24             MS. COLBATH: You're directing him

25        not to answer based on?
```

[Page 103]

1          P. Goldman

2          MS. BERNSTEIN: Because you're

3    wasting time.  He gives you an answer,

4    and then you say, you have no idea why?

5    You asked the same question but in a

6    different tone.

7          MS. COLBATH: So I just want the

8    record to be clear.

9          MS. BERNSTEIN: The record is

10   clear.

11         MS. COLBATH: The direction not to

12   answer is based on what?

13         MS. BERNSTEIN: That it was asked

14   and answered.  Move on.

15         MS. COLBATH: Okay.

16    Q.    Do you have any understanding as to

17   how the amount of 8.677276.75 was arrived at?

18    A.    No.

19    Q.    Did you ask anyone in preparation

20   for today's deposition how that amount was

21   arrived at?

22    A.    No.

23    Q.    Did you ask anyone prior to today's

24   deposition why this amount was being

25   transferred to Grist Mill Capital?

[Page 104]

```
 1                   P. Goldman
 2        A.    No.
 3        Q.    Have you seen any documents to
 4   support the transfer of 8.677276.75 into
 5   Grist Mill Capital's account?
 6              MS. BERNSTEIN: Object to the form.
 7        You can answer.
 8        A.    I don't know what you mean by have
 9   I seen any documents.
10        Q.    Have you seen any documents that
11   indicate why this very specific amount that
12   we've been talking about, the 8,677,276.75,
13   was transferred in May 2009?
14        A.    No, I didn't see any documents
15   regarding this.
16        Q.    Did you speak to anyone about why
17   this transfer was being made?
18              MS. BERNSTEIN: Objection.
19        A.    No.
20              MS. BERNSTEIN: Asked and answered.
21        Q.    Now, you made mention earlier today
22   about an eight million or eight million and
23   change transfer to Grist Mill Capital.  Do
24   you recall that?
25        A.    Yes, I do.
```

[Page 118]

1              P. Goldman

2       that I can confirm myself that I have

3       all the documents that have been

4       furnished to him.

5           MS. BERNSTEIN: I'll take it under

6       advisement.

7       Q.   Now, am I correct that the

8   documents that appear on GMC-4 are similar to

9   the documents that we saw on GMC-3, but the

10  transfer is in a different amount?

11      A.   That's correct.

12      Q.   And am I correct that GMC-4

13  reflects a transfer of $2,186,566 from a TD

14  Bank account -- from a Charter Oak Trust bank

15  account at TD Bank, and that amount is being

16  transferred to a Grist Mill Capital account

17  at TD Bank?

18      A.   That's what the document indicates.

19      Q.   And do you have any understanding

20  why this transfer was made?

21      A.   No.

22      Q.   Do you have any understanding as to

23  how the amount $2,186,566 was arrived at?

24      A.   No.

25      Q.   Other than the checks that you have

[Page 119]

```
 1              P. Goldman
 2   testified to that you've seen reflecting the
 3   payment from Lincoln Life Insurance Company
 4   to the Charter Oak Trust, are you aware of
 5   any other documents that exist to support
 6   this transfer that's reflected in GMC-4?
 7          MS. BERNSTEIN: Object to the form.
 8      You can answer.
 9      A.   I don't know if this relates to
10   Lincoln at all.  I have no idea.
11      Q.   So you don't know whether this is
12   part of the $30 million?  Is that your
13   testimony?
14      A.   I have no idea.  Yes.  That's my
15   testimony, yes.
16      Q.   But prior to today you saw a copy
17   of the checking debit memo and the checking
18   deposit tickets set forth on GMC-4; right?
19      A.   I'm not positive I saw these
20   documents.  I know I saw the amount going
21   into the account.  And that's what I think I
22   recall more clearly -- more clear.  I clearly
23   remember seeing this deposit going into the
24   account.  I don't recall if I actually saw
25   the deposit tickets.
```

[Page 120]

1          P. Goldman

2          Q.    Have you discussed with anyone why

3    this $2.186 million transfer was being made

4    to Grist Mill Capital?

5          A.    No.

6          Q.    Do you have any understanding as to

7    who authorized this transfer into the Grist

8    Mill Capital account?

9          A.    No.

10         Q.    Do you have any understanding as to

11   how this 2.186 million was used by Grist Mill

12   Capital?

13         A.    No.

14              MS. BERNSTEIN: Are you done with

15         4?

16              MS. COLBATH: Yes.

17              MS. BERNSTEIN: The witness needs a

18         little break.

19              MS. COLBATH: Yes.  Before we do

20         this, we'll take a little break.

21              THE WITNESS: Okay.  Thank you.

22              MS. COLBATH: No problem.

23              VIDEOGRAPHER: The time is

24         12:15 p.m.  Off the record.

25              (Recess taken from 12:15 p.m. to

[Page 121]

1                    P. Goldman

2         12:25 p.m.)

3              VIDEOGRAPHER:  The time is

4         12:25 p.m.  We're back on the record.

5              (Plaintiff's GMC Exhibit 5,

6         Document Bates stamped TD-Universitas

7         0107, marked for identification, as of

8         this date.)

9              MS. COLBATH: We have marked as the

10        next GMC-5.  I'm handing it to the

11        witness.  Here you go.  It's a

12        single-page document bearing Bates stamp

13        number TD-Universitas 0107.

14        Q.    And, Mr. Goldman, my question to

15   you is, prior to today, have you seen a copy

16   of any portion of GMC-5?

17        A.    No.

18        Q.    Do you agree with me that GMC-5

19   shows a transfer on October 27th, 2009, from

20   the Charter Oak Trust in the amount of

21   $19,000,800 to an account at TD Bank in the

22   name of Grist Mill Capital LLC Delaware?

23        A.    Yes.

24        Q.    And do you have any understanding

25   as to why Grist Mill Capital was receiving

[Page 122]

                    P. Goldman

1

2    $19.8 million on October 27, 2009, from the

3    Charter Oak Trust?

4         A.   No.

5         Q.   Do you know how Grist Mill Capital

6    used this $19,000,800?

7         A.   Other than what I've testified to,

8    no.

9         Q.   Do you know whether Grist Mill

10   Capital currently has any of this money

11   remaining?

12        A.   Not to my knowledge.

13        Q.   Were you aware prior to seeing

14   Grist Mill Capital 5 that a transfer had been

15   made in October 2009 in the amount of

16   $19,800,000 from the Charter Oak Trust to

17   Grist Mill Capital?

18        A.   Yes.

19             THE WITNESS: Sorry.

20             MS. BERNSTEIN: I was going to

21        object to the form only because are you

22        aware before seeing this exhibit here

23        today or before having seen a copy of

24        this on his own?

25        Q.   Before having seen a copy back in

# Exhibit 20

[Page 1]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CASE NO. 11-1590-LTS-HBP


UNIVERSITAS EDUCATION, LLC

        Plaintiff,


        VS.


NOVA GROUP, INC., as trustee,

sponsor and fiduciary of the

CHARTER OAK TRUST WELFARE

BENEFIT PLAN,

        Defendant.


        JULY 26, 2013

        9:30 a.m.

        DEPOSITION OF PETER A. GOLDMAN


REPORTED BY:

MARY G. VAN DINA, Certified Court Reporter,

Certified LiveNote Reporter

[Page 2]

1

2     July 26, 2013

3     10:00 a.m.

4

5          Deposition of PETER A. GOLDMAN, taken by

6     Plaintiffs, pursuant to subpoena, at the offices

7     of LOEB & LOEB, LLP, 345 Park Avenue, New York,

8     New York, before MARY G. VAN DINA, a Certified

9     Shorthand Reporter and Notary Public within and

10    for the State of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

[Page 3]

1

2    A P P E A R A N C E S:

3

4    LOEB & LOEB, LLP

5    345 Park Avenue

6    4 New York, New York 10154

7    BY:  PAULA K. COLBATH, ESQUIRE

8    Attorneys for the Plaintiff

9

10   BRIEF CARMEN & KLEIMAN, LLP

11   805 Third Avnue

12   New York, New York 10601

13   BY: IRA KLEIMAN, ESQ.

14   Attorneys for the Defendants

15

16   A L S O   P R E S E N T:

17

18   NICHOLAS TAYLOR, Summer Associate at Brief Carmen

19    & Kleiman

20

21

22

23

24

25

[Page 4]

```
 1
 2                        INDEX
 3
 4   WITNESS                              PAGE
 5
 6   PETER A. GOLDMAN
 7      BY MS. COLBATH              6, 245
 8      BY MR. KLEIMAN:            244
 9
10                E X H I B I T S
11
12   NUMBER        DESCRIPTION          PAGE
13   Goldman 1     Subpoena to Testify at    39
14                 Deposition in a Civil
15                 Action
16   Goldman 2     State of Delaware Annual  53
17                 Franchise Tax Report For
18                 Tax Year 2008 and 2010
19   Goldman 3     2009 U.S. corporation     57
20                 income tax return Form
21                 1120
22   Goldman 4     Settlement Agreement,     61
23                 Bates numbers
24                 Caldwell-000515 through
25                 539
```

[Page 5]

1

2    Goldman 5    Affidavit of Wayne        64

3                 Bursey, November 12, 2010

4    Goldman 6    Response to Information    69

5                 Subpoena

6    Goldman 7    Declaration of Jack        87

7                 Robinson dated November

8                 30, 2010

9    Goldman 8    Memorandum of Law in      143

10                Support of Motion to

11                Dismiss

12   Goldman 9    A Stipulation of          143

13                Dismissal With Prejudice

14   Goldman 10   Deposit Ticket and the    144

15                Check From Penn Mutual to

16                Grist Mill Capital Dated

17                June 13, 2011

18   Goldman 11   Group of Documents        161

19   Goldman 12   Group of Documents        169

20   Goldman 13   Collection of Letters     220

21

22

23

24

25

[Page 6]

1                    Goldman 7/26/13

2           IT IS HEREBY STIPULATED AND

3      AGREED by and between the attorneys for

4      the respective parties herein, that

5      filing and sealing be and the same are

6      hereby waived.

7           IT IS FURTHER STIPULATED

8      AND AGREED that all objections, except

9      as to the form of the question, shall be

10     reserved to the time of the trial.

11          IT IS FURTHER STIPULATED

12     AND AGREED that the within deposition

13     may be sworn to and signed before any

14     officer authorized to administer an

15     oath, with the same force and effect as

16     if signed and sworn to before the Court.

17

18     P E T E R  A.  G O L D M A N, 12 Fairlawn Parkway,

19     Rye Brook, New York 10573, having been duly sworn

20     by the Notary Public, testified as follows:

21     EXAMINATION BY MS. COLBATH:

22          Q.   Good morning,  Mr. Goldman.

23          A.   Good morning.

24          Q.   My name is Paula Colbath, and as you

25     know, I represent the Charter Oak Trust, Nova

[Page 19]

1          Goldman 7/26/13

2    didn't need to file them.

3          Q.   Well, which years didn't they file tax

4    returns?

5          A.   I don't know the answer to that.

6          Q.   Do you know whether they had any

7    income in 2009?

8          A.   I never saw income on any of the

9    returns that I did get to see.

10          Q.   What is the Charter Oak Trust?

11          A.   Charter Oak Trust is a benefit, a

12    death benefit plan for employees for different

13    entities.  So if an organization had a key man or

14    person and they wanted to have a life insurance

15    policy on that person, giving that person's

16    beneficiary a death benefit and Charter Oak would

17    be the holder of the policy in the trust, of

18    course.

19          Q.   Did any employee ever benefit from the

20    Charter Oak Trust?

21          A.   Employee for whom?

22          Q.   Well, you testified that the Charter

23    Oak Trust was a plan to benefit employees.

24    Correct?

25          A.   Right.

1                           Goldman 7/26/13

2          Q.   And are you aware of any employee that

3    ever benefited from the Charter Oak Trust?

4          A.   No, I don't know the answer to that.

5    I didn't see any.  I didn't make an inquiry into

6    that, no.

7          Q.   Well, in your review of all of the

8    lengthy list of documents, was there anything

9    that you reviewed or in any conversations you've

10   ever had prior to today that's indicated to you

11   that any employee ever benefited from the Charter

12   Oak Trust?

13         A.   I didn't see any.

14         Q.   You're not aware of any benefit that

15   any employee ever received from the Charter Oak

16   Trust.  Correct?

17         A.   I'm not aware, no.

18         Q.   Who did benefit from the Charter Oak

19   Trust?

20         A.   You mean in terms of death benefit?

21         Q.   Yes.

22         A.   I have no idea.

23         Q.   Well, you're aware that an insured by

24   the name of Sash Spencer died.  Correct?

25         A.   Yes.

[Page 21]

1                        Goldman 7/26/13

2        Q.    And that two policies insured his life

3   that were held by the trust.

4              Correct?

5        A.    Yes.

6        Q.    And that the death benefit on those

7   two life insurance policies totalled $30 million.

8              Correct?

9        A.    Yes.

10       Q.    And that Lincoln Life Insurance

11  Company, the carrier who issued those policies,

12  paid the $30 million to the Charter Oak Trust.

13             Correct?

14       A.    Yes.

15       Q.    Now, where -- where is the $30 million

16  today?

17       A.    The only response I had to that is in

18  the documents subpoena, we prepared a complete

19  analysis and traced the $30 million from Charter

20  Oak into Grist Mill Capital and then from Grist

21  Mill Capital into different entities.

22       Q.    So Grist Mill Capital benefited from

23  the Charter Oak Trust.

24             Correct?

25       A.    Well, they received the proceeds from

[Page 22]

1                    Goldman 7/26/13

2    the policy.

3         Q.    Okay.  Back to the 2009 tax returns

4    filed on behalf of the Charter Oak Trust.

5                Who was indicated as the trustee?

6         A.    Nova Group.

7         Q.    And who signed the return on behalf of

8    Nova Group, Inc.?

9         A.    Wayne Bursey.

10        Q.    And what position did Mr. Bursey hold

11   at Nova Group, Inc. in 2009?

12        A.    President.

13        Q.    Now, did the Charter Oak Trust file

14   any tax returns for 2010?

15        A.    I don't recall.

16        Q.    Who was the trustee of the Charter Oak

17   Trust in 2010?

18        A.    Nova Group, Inc. was still the

19   trustee, I believe.

20        Q.    And who were the officers of Nova

21   Group, Inc. in 2010?

22        A.    I don't believe there were any

23   officers at that point.  I think they all

24   resigned.

25        Q.    Well, in 2010, who was running the

1                          Goldman 7/26/13

2    continued to update whenever it needed updating

3    and it was started -- it was created initially --

4    when I say "created," they started it when

5    Ridgewood was still financing.

6                    So I think in an effort to be

7    complete, they did not eliminate the column that

8    was Ridgewood's column.  So even though Ridgewood

9    was out of the picture, this document would have

10   had to have been amended significantly in terms

11   of deleting that column showing Ridgewood.  So

12   this is a complete document in terms of what was

13   going on while Ridgewood was still funding and

14   going forward from there.

15        Q.    Okay.  Well, if you look at page 10,

16   there's a grand total of $60 million plus that's

17   indicated owed to Grist Mill Capital from Charter

18   Oak Trust.

19              Right?

20        A.    Yes.

21        Q.    Now, that 60 million-dollar number

22   includes the $33 million that's already been

23   satisfied to Ridgewood.

24              Correct?

25        A.    Yes.

1                    Goldman 7/26/13

2          Q.   So the 60 million-dollar number is

3     inaccurate.  Right?

4          A.   Well, it's not accurate as of the date

5     of this -- as of the date that this document was

6     generated, that's correct.

7          Q.   And still focusing on page 10 of this

8     document, there's an entry Avon Insurance Trust

9     and opposite that is a number $3,647,964.01.

10              Do you see that?

11         A.   Yes.

12         Q.   What does that number represent?

13         A.   Apparently, monies that were advanced

14    for -- paid on Avon Insurance Trust policies.

15         Q.   Monies advanced by who to the Avon

16    Insurance Trust?

17         A.   Well, it would have been Grist Mill

18    Capital.

19         Q.   Okay.  And why do you say monies

20    advanced by Grist Mill Capital.  Where is that

21    shown on the document?

22         A.   It's not.

23         Q.   So 3.647 million dollar amount, as I

24    understand your testimony, that's an amount that

25    the Avon Insurance Trust, may owe to Grist Mill

[Page 139]

1                    Goldman 7/26/13

2    Capital.

3              Correct?

4        A.    Yes.

5        Q.    So why is it listed here on this

6    document that relates to the Charter Oak Trust?

7        A.    I think this document -- that part of

8    this document is a summary of the total amount of

9    monies that is owed Grist Mill Capital, not just

10   Charter Oak Trust, even though it's titled that.

11       Q.    Okay.

12       A.    I think this is just a summary that

13   they did, because the first line, the subtotal

14   shows the total amount between Grist Mill and --

15   I'm sorry -- Grist Mill and Ridgewood, and then

16   the next line clearly is not part of this.

17              So I think that -- and the collateral

18   that Grist Mill put up for I don't know what,

19   interest and whatever else.  So I think this

20   lower section is just a summary as to show the

21   total amount that is owed Grist Mill from not

22   only Ridgewood and Grist Mill Capital, but

23   Avon -- I mean, from Charter Oak, but just Avon,

24   too, and whatever other kind of obligations

25   arose.

                        Goldman 7/26/13

1

2        Q.    But that the lower summary that we're

3   looking at that starts with subtotal and ends

4   with grand total --

5        A.    Yes.

6        Q.    -- those amounts are all outdated.

7              Correct?

8              Because you've testified that

9   Ridgewood was paid off and 33 million of the

10  subtotal amount reflected here as 47 million has

11  already been paid.

12             Correct?

13       A.    Yes.

14       Q.    So the 60 million grand total number,

15  that's not an amount that's currently owed to

16  Grist Mill Capital.

17             Correct?

18       A.    Yes, unless there was some other

19  change, that's correct.

20       Q.    And would it be fair to say that that

21  number -- well, strike it.

22             What is -- tell me, the entry right

23  above grand total, interest, CAPLTD, I think

24  that's short for "capitalized."

25             Am I correct?

[Page 141]

1                         Goldman 7/26/13

2         A.   Yes.

3         Q.   And the amount opposite that entry is

4    7,939,519.74.

5              What does that number represent?

6         A.   I believe that's interest that has not

7    been -- not been paid, obviously, because of the

8    grand total but it -- I don't know what they mean

9    by "capitalized."

10             I think that they might not -- it

11   might be a bookkeeping entry for them, in terms

12   of the way they keep their books.  So I'm not

13   certain why it's capitalized interest.

14        Q.   Well, do you know where the number

15   came from --

16        A.   No.

17        Q.   -- how it was calculated?

18        A.   No.

19        Q.   Do you know whether it relates to the

20   Avon Insurance Trust?

21        A.   I do not know.

22        Q.   Do you know if it relates to the

23   Ridgewood financing that was done?

24        A.   I do not know.

25        Q.   The entry "collateral, 1.1 million,"

[Page 142]

1                          Goldman 7/26/13

2      do you see that?

3           A.   Yes.

4           Q.   Do you know what that relates to?

5           A.   No.  That number looks familiar to me,

6      but I just can't -- I don't remember.

7           Q.   Interest paid of 610,000, do you see

8      that?

9           A.   Yes.

10          Q.   I've rounded the number.  Do you know

11     what that relates to?

12          A.   No.

13          Q.   Does that relate to Ridgewood?

14          A.   I don't know.

15          Q.   Does it relate to the Avon Insurance

16     Trust?

17          A.   I don't know.

18          Q.   Do you know who the current owner of

19     the Amsterdam policy is?

20          A.   No.

21          Q.   Do you know why the Amsterdam policy

22     is shown on this chart?

23          A.   I think because this is a chart in

24     progress where they continue to maintain an

25     accounting, and I don't mean a debit and credit

[Page 143]

1                    Goldman 7/26/13

2    accounting, but an accounting of what policies

3    are in existence and the payment of the premiums.

4         Q.    What is the relationship of the

5    Amsterdam Life Insurance policy to the Charter

6    Oak Trust?

7         A.    I don't know.

8         Q.    So you don't know whether the Charter

9    Oak Trust currently is the owner of the Amsterdam

10   policy?

11        A.    I do not.

12        Q.    On page 2 of the exhibit, there's an

13   entry, Bolton.

14             Do you know if that policy is

15   currently owned by the Charter Oak Trust?

16        A.    I don't.

17        Q.    And, again, you'll notice that all of

18   the payments on the Bolton policy have taken

19   place after December 17, 2009.

20        A.    Yes.

21        Q.    Do you know where Grist Mill Capital,

22   this out of business entity is getting the money

23   to make those premium payments?

24        A.    No.

25        Q.    Who owns the Clinard policy?

[Page 144]

Goldman 7/26/13

1

2      A.    I don't know.

3      Q.    Are any of the policies set forth on

4   Exhibit 2 owned by the Charter Oak Trust today?

5      A.    I'm not certain.

6      Q.    Who would know?

7      A.    Matt Westcott might know or Amanda

8   might know.  I don't know.  I didn't ask them.

9      Q.    Do you know if they know what policies

10  are owned by the Charter Oak Trust?

11     A.    No.

12     Q.    Does Exhibit 2 reflect any payments

13  that were received by Grist Mill Capital upon

14  surrender of any policies?

15     A.    I'm not sure I understand.

16     Q.    Okay.  Let me ask that a little

17  differently.

18         MS. COLBATH:  Let me mark an exhibit.

19         I'm going to mark three exhibits, so

20     the first exhibit we'll mark as Goldman

21     Exhibit 8.  It is a document headed

22     "Memorandum of Law in Support of Motion to

23     Dismiss" in an action brought by the Penn

24     Mutual Life Insurance Company against Wayne

25     Bursey as trustee of the Charter Oak Trust,

[Page 244]

Goldman 7/26/13

1

2      A.   I have no idea.  I don't know.  You

3  told me where you got it, but I don't know who

4  worked on it.

5      Q.   Okay.  If you look in the chart next

6  to the -- opposite Spencer --

7      A.   On Exhibit 14?

8      Q.   Well, we can look at the one --

9      A.   I have Spencer open now.

10     Q.   I'd rather have you look at it on your

11  information subpoena response.

12     A.   Okay.

13     Q.   Do you have that?

14     A.   Yes.

15     Q.   Am I correct that Grist Mill Capital

16  didn't advance even a penny on the Spencer

17  policies?

18     A.   According to this, they did not.

19          MS. COLBATH:  That's all I have.

20  Thank you.

21          MR. KLEIMAN:  Thank you.

22          Just one question just to clarify

23  something which he had mentioned before.

24          MS. COLBATH:  Sure.

25  EXAMINATION BY MR. KLEIMAN: