# EXHIBIT 41

 **Banknorth**

# LIMITED LIABILITY COMPANY BANKING RESOLUTION
## (For Deposit Accounts)

| Account Holder: | Financial Institution: |
|---|---|
| PHOENIX CAPITAL MANAGEMENT LLC<br>100 GRIST MILL ROAD<br>SIMSBURY , CT 06070 | TD Bank, N.A.<br>Drake Mill Mall, 714 Hopmeadow St<br><br>Simsbury, CT 06070 |
| **Account No.** 4242774671 | **State / Commonwealth:** CT |

In consideration of the existing or proposed banking relationship between  PHOENIX CAPITAL MANAGEMENT LLC
a Limited Liability Company (the "Company") and TD Bank, N.A., the persons signing below jointly and severally and on behalf of the Company do hereby certify that and agree as follows:

PHOENIX CAPITAL MANAGEMENT LLC                is the complete and correct name of the Account Holder.

Managers, Members and Authorized Signers:  We further certify that the following is a complete list of the names of all managers, members and authorized signers of the Company.  We agree to notify the Financial Institution of any change in the Company, including the adding of new members and leaving of current members from the Company, before the change takes effect.

| Title | Name | Signature |
|---|---|---|
| Chairman Managing Member | DANIEL E CARPENTER | Daniel E Carpenter |
| Secretary | AMANDA ROSSI | Anda R |
| | | |
| | | |

Assumed Business Names:  Excluding the name of the Company, the following is a complete list of all assumed business names under which the Company does business:

Assumed Business Name #1: _____

Assumed Business Name #2: _____

We further certify that at a meeting of the members of the Company (or by other duly authorized Company action in lieu of a meeting, duly called and held on ___5/21/09___ , at which a quorum was present and voting, the following resolutions were adopted:

**Be It Resolved,** that TD Bank, N.A., at any one or more of its branches, be and it hereby is designated as the Financial Institution of and depository for the funds of this Company, which may be withdrawn on checks, drafts, advices of debit, notes or other orders for the payment of money;

**Be It Further Resolved,** that any one (1) of the Authorized signers ("Agents") listed above may enter into any such agreements and perform such other acts as they deem reasonably necessary in furtherance of the Company's Banking Relationship with the Financial Institution, and those agreements will bind the Company, and acting for an on behalf of the Company and as its act and deed be, and they hereby are, authorized and empowered;

Page 1 of 2

**Execute Documents:** To execute and deliver to Financial Institution the form of Limited Liability Company Banking Resolution and other account opening documents submitted by Financial Institution, confirming the nature and existence of Account Holder and evidencing the terms of the agreement between Financial Institution and Account Holder.

**Agent's Authority:** Any one of such Agents is authorized to endorse all checks, drafts, notes and other items payable to or owned by this Company for deposit with the Financial Institution, or for collection or discount by the Financial Institution; and to accept draft and other items payable at the Financial Institution. The Financial Institution is hereby directed to accept and pay without further inquiry any item drawn against any of the Company's accounts with the Financial Institution bearing the signature of any one of the Agents, as authorized above or otherwise, even though drawn or endorsed to the order of Any Agent signing or tendered by such Agent for cashing or in payment of the individual obligation of such Agent or for deposit to the Agent's personal account, and the Financial Institution shall not be required or be under any obligation to inquire as to the circumstances of the issue or use of any item signed in accordance with the resolutions contained herein, or the application or disposition of such item or the proceeds of the item.

**Further Acts:** The above-named Agents are authorized and empowered to execute such other agreements, including, but not limited to, special depository agreements and arrangements regarding the manner, conditions or purposes for which funds, checks or items of Account Holder may be deposited, collected or withdrawn and to perform such other acts as they deem reasonably necessary to carry out the provisions of this resolutions.

**Be It Further Resolved,** that the authority hereby conferred upon the above-named Agents shall be and remain in full force and effect until written notice of any amendment or revocation thereof shall have been delivered and received by the Financial Institution at each location where an account is maintained. Financial Institution shall be indemnified and held harmless by the Company from any loss suffered or any liability incurred by it in continuing to act in accordance with this resolution. Any such notice shall not affect any items in process at the time notice given.

**We Further Certify** that the authorized signers name above are duly elected, appointed or employed by or for the Company, as the case may be, and occupy the positions set opposite their respective names; that the foregoing resolutions now stand of record on the books of the Company; and that the resolutions are in full force and effect and have not been modified or revoked in any manner whatsoever.

We have each read all of the provisions of this Limited Liability Company Resolution, and we each jointly and severally and on behalf of the Company certify and agree to its terms.

This Agreement is dated: 05/20/2009

Account Holder: PHOENIX CAPITAL MANAGEMENT LLC

By: _____     By: _____

By: _____     By: _____

TD- UNIVERSITAS   0468

# Delaware

**PAGE 1**

### The First State

    I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF FORMATION OF "PHOENIX CAPITAL MANAGEMENT GROUP, LLC", FILED IN THIS OFFICE ON THE THIRTIETH DAY OF DECEMBER, A.D. 2005, AT 1 O'CLOCK P.M.

*Harriet Smith Windsor*

Harriet Smith Windsor, Secretary of State

**AUTHENTICATION:** *4417328*

**DATE:** *01-03-06*

4086984  8100

051076651

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 02:01 PM 12/30/2005*
*FILED 01:00 PM 12/30/2005*
*SRV 051076651 - 4086984 FILE*

# CERTIFICATE OF FORMATION
## OF
## LIMITED LIABILITY COMPANY

FIRST.   The name of the limited liability company is PHOENIX CAPITAL MANAGEMENT GROUP, LLC.

SECOND.   The address of its registered office in the State of Delaware is 2711 Centerville Road, Suite 400, Wilmington, Delaware, 19808. The name of its registered agent at such address is The Company Corporation.

IN WITNESS WHEREOF, the undersigned have executed this Certificate of Formation of PHOENIX CAPITAL MANAGEMENT GROUP, LLC this 30th day of December, 2005.

NAME:

Keith R. Jones
Authorized Person

# EXHIBIT 42

| | |
|---|---|
| Direction | I |
| FAX | |
| Fee | 10.00 |
| Intermd Bank | |
| IMAD | 20090917B1QGC04C005135 |
| MID | 090917143301F200 |
| Paymt Method | FED |
| Msg Status | COMPLETE |
| Msg Type | 10 |
| Msg Subtype | 00 |
| OBI | PAYMENT FROM TRANEN CAPITAL ALT.INVESTMENT FUND RE - ALLEN TUCKERPOLICY NUMBER 157 200 848 |
| Office | 004 |
| OMAD | 20090917A1B7001S00090809171433FT01 |
| Originator | CALEDON TRUST COMPANY |
| ORG ADDR1 | SUITE 3402 |
| ORG ADDR2 | 130 ADELAIDE ST W |
| ORG ADDR3 | TORONTO ONM5H3P5 |
| ORG ID | 000024082640 |
| ORG ID Code | AC |
| Recv ABA | 011103093 |
| Recv Name | TD BANKNORTH CT |
| REF IMAD | |
| Reference | 7095600260JS |
| Sender ABA | 021000021 |
| Sender Name | JPMORGAN CHASE |
| Paymt Source | FLS |
| Time | 14:33:01 |
| UserID | |
| Value Date | 9/17/2009  12:00:00AM |

| | |
|---|---|
| MIF_AMOUNT | 510,000.00 |
| Account No | 4242774712 |
| Amount | 510,000.00 |
| BBI | |
| Bene Bank | |
| Beneficiary | Grist Mill Trust |
| BNF ADDR1 | 100 Grist Mill Road |
| BNF ADDR2 | |
| BNF ADDR3 | SimsburyCT |
| BNF ID | 904028488 |
| Branch ID | 004BR001 |
| Country Code | US |
| Currency | USD |
| Wire Date | 12/3/2009  12:00:00AM |
| Direction | O |
| FAX | |
| Fee | 15.00 |
| Intermd Bank | |
| IMAD | 20091203C1B76E1C002387 |
| MID | 091203142312XI03 |
| Paymt Method | FED |
| Msg Status | COMPLETE |
| Msg Type | 10 |
| Msg Subtype | 00 |
| OBI | |
| Office | 004 |
| OMAD | 20091203B1QGC01R04116812031442FT01 |
| Originator | GRIST MILL CAPITAL LLC |

| | |
|---|---|
| **ORG ADDR1** | 100 GRIST MILL ROAD |
| **ORG ADDR2** | SIMSBURY, CT 06070- |
| **ORG ADDR3** | |
| **ORG ID** | 4242774712 |
| **ORG ID Code** | AC |
| **Recv ABA** | 021000021 |
| **Recv Name** | JPMORGAN CHASE BAN |
| **REF IMAD** | |
| **Reference** | 091203142312XI03 |
| **Sender ABA** | 011103093 |
| **Sender Name** | TD BANK |
| **Paymt Source** | MAX |
| **Time** | 14:40:06 |
| **UserID** | MARKM |
| **Value Date** | 12/3/2009  12:00:00AM |

| | |
|---|---|
| **MIF_AMOUNT** | 29,359.90 |
| **Account No** | 4242774712 |
| **Amount** | 29,359.90 |
| **BBI** | |
| **Bene Bank** | |
| **Beneficiary** | Abbott And Abbott Atty Trust Acct |
| **BNF ADDR1** | 1905 Diamond ST. Ste B |
| **BNF ADDR2** | |
| **BNF ADDR3** | San MarcusCA |
| **BNF ID** | 687052712 |
| **Branch ID** | 001 |
| **Country Code** | US |
| **Currency** | USD |
| **Wire Date** | 2/10/2010  12:00:00AM |
| **Direction** | O |
| **FAX** | |
| **Fee** | 15.00 |
| **Intermd Bank** | |
| **IMAD** | 20100210C1B76E1C001790 |
| **MID** | 100210135639XI02 |
| **Paymt Method** | FED |
| **Msg Status** | COMPLETE |
| **Msg Type** | 10 |
| **Msg Subtype** | 00 |
| **OBI** | Anico Policy   U0581409 |
| **Office** | 004 |
| **OMAD** | 20100210L2B7721C00122202101402FT01 |
| **Originator** | GRIST MILL CAPITAL LLC |
| **ORG ADDR1** | 100 GRIST MILL ROAD |
| **ORG ADDR2** | SIMSBURY, CT 06070- |
| **ORG ADDR3** | |
| **ORG ID** | 4242774712 |
| **ORG ID Code** | AC |
| **Recv ABA** | 121100782 |
| **Recv Name** | BANK OF THE WEST |
| **REF IMAD** | |
| **Reference** | 100210135639XI02 |
| **Sender ABA** | |
| **Sender Name** | TD BANK |
| **Paymt Source** | MAX |
| **Time** | 14:02:35 |
| **UserID** | RUTH |
| | 2/10/2010  12:00:00AM |

TD- UNIVERSITAS  0420

# EXHIBIT 43

| | |
|---|---|
| **MIF_AMOUNT** | 42,373.30 |
| **Account No** | 4242774712 |
| **Amount** | 42,373.30 |
| **BBI** | |
| **Bene Bank** | |
| **Beneficiary** | North American Life And Health |
| **BNF ADDR1** | 420 Montgomery Street |
| **BNF ADDR2** | |
| **BNF ADDR3** | San FranciscoCA |
| **BNF ID** | 0194944013 |
| **Branch ID** | 004BR001 |
| **Country Code** | US |
| **Currency** | USD |
| **Wire Date** | 12/16/2009  12:00:00AM |
| **Direction** | O |
| **FAX** | |
| **Fee** | 15.00 |
| **Intermd Bank** | |
| **IMAD** | 20091216C1B76E1C003381 |
| **MID** | 091216162642XI06 |
| **Paymt Method** | FED |
| **Msg Status** | COMPLETE |
| **Msg Type** | 10 |
| **Msg Subtype** | 00 |
| **OBI** | Paul D. Carter  Policy #LB00969380 SS# 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 |
| **Office** | 004 |
| **OMAD** | 20091216I1B7031R02753412161634FT01 |
| **Originator** | GRIST MILL CAPITAL LLC |
| **ORG ADDR1** | 100 GRIST MILL ROAD |
| **ORG ADDR2** | SIMSBURY, CT 06070- |
| **ORG ADDR3** | |
| **ORG ID** | 4242774712 |
| **ORG ID Code** | AC |
| **Recv ABA** | 121000248 |
| **Recv Name** | WELLS FARGO NA |
| **REF IMAD** | |
| **Reference** | 091216162642XI06 |
| **Sender ABA** | |
| **Sender Name** | TD BANK |
| **Paymt Source** | MAX |
| **Time** | 16:34:12 |
| **UserID** | LAURAYIP |
| | 12/16/2009  12:00:00AM |

| | |
|---|---|
| **MIF_AMOUNT** | 178,125.00 |
| **Account No** | 4242774712 |
| **Amount** | 178,125.00 |
| **BBI** | |
| **Bene Bank** | |
| **Beneficiary** | Grist Mill Trust |
| **BNF ADDR1** | 100 Grist Mill Road |
| **BNF ADDR2** | |
| **BNF ADDR3** | SimsburyCT |
| **BNF ID** | 904952088 |
| **Branch ID** | 004BR001 |
| **Country Code** | US |
| **Currency** | USD |
| **Wire Date** | 12/3/2009  12:00:00AM |

| | |
|---|---|
| Direction | O |
| FAX | |
| Fee | 15.00 |
| Intermd Bank | |
| IMAD | 20091203C1B76E1C001531 |
| MID | 091203122908XI01 |
| Paymt Method | FED |
| Msg Status | COMPLETE |
| Msg Type | 10 |
| Msg Subtype | 00 |
| OBI | |
| Office | 004 |
| OMAD | 20091203B1QGC01R02819612031229FT01 |
| Originator | GRIST MILL CAPITAL LLC |
| ORG ADDR1 | 100 GRIST MILL ROAD |
| ORG ADDR2 | SIMSBURY, CT 06070- |
| ORG ADDR3 | |
| ORG ID | 4242774712 |
| ORG ID Code | AC |
| Recv ABA | 021000021 |
| Recv Name | JPMORGAN CHASE BAN |
| REF IMAD | |
| Reference | 091203122908XI01 |
| Sender ABA | 011103093 |
| Sender Name | TD BANK |
| Paymt Source | MAX |
| Time | 12:29:08 |
| UserID | |
| Value Date | 12/3/2009  12:00:00AM |

| | |
|---|---|
| MIF_AMOUNT | 44,150.00 |
| Account No | 4242774712 |
| Amount | 44,150.00 |
| BBI | |
| Bene Bank | |
| Beneficiary | Financial Processing Unit |
| BNF ADDR1 | 620 Liberty Avenue |
| BNF ADDR2 | |
| BNF ADDR3 | PittsburghPA |
| BNF ID | 1005255672 |
| Branch ID | 001 |
| Country Code | US |
| Currency | USD |
| Wire Date | 1/6/2010  12:00:00AM |
| Direction | O |
| FAX | |
| Fee | 15.00 |
| Intermd Bank | |
| IMAD | 20100106C1B76E1C000841 |
| MID | 100106113006XI02 |
| Paymt Method | FED |
| Msg Status | COMPLETE |
| Msg Type | 10 |
| Msg Subtype | 00 |
| OBI | Avon Ins Trust Acct. 20420023416042Rella Waldman Anico Policy #U0583990 |
| Office | 004 |
| OMAD | 20100106D3B74V9C00206201061130FT01 |
| Originator | GRIST MILL CAPITAL LLC |
| ORG ADDR1 | 100 GRIST MILL ROAD |

# EXHIBIT 44

Suite 1900
250 Park Avenue
New York, New York 10177
Main: 212 907-9700
Fax: 212 907-9800
www.sgrlaw.com

# SMITH, GAMBRELL & RUSSELL, LLP
*Attorneys at Law*

Joseph M. Pastore III
Direct Tel:  212-907-9730
Direct Fax: 212-907-9830
CT Tel:    203-564-1485
CT Fax:    203-564-1402
jpastore@sgrlaw.com

September 21, 2012

## VIA EMAIL, FAX & FEDERAL EXPRESS

bmorgan@yesbank.com
Fax: (856) 489-7016

Barbara J. Morgan
Custodian of Records
Legal Department
TD Bank, N.A.
1701 Route 70 East
Cherry Hill, NJ 08034

Re:  **Universitas Education, LLC v. Nova Group, Inc., as Sponsor and Named Fiduciary
of the Charter Oak Trust Welfare Benefit Plan
Case No.: 12-mc-00102-AWT**

Dear Ms. Morgan:

We represent Nova Group, Inc. and The Charter Oak Trust Welfare Benefit Plan,
(collectively, the "Customer") in the above-entitled Connecticut Action. We write to you to
articulate the Customer's position on Connecticut Law. We understand that a subpoena was
served upon TD Bank, N.A. ("TD Bank") by Bryan Reyhani, Esq. of the law firm of Reyhani
Nemirovsky LLP on behalf of Universitas Education, LLC ("Universitas") in a related New
York Action. We understand that the subpoena seeks various Customer's "financial records" (as
that term is defined in Conn. Gen. Stat. § 36a-41(2)), many of whom are not involved in this
case.

Please be advised that because the Customer is located in Connecticut and TD Bank has
numerous Bank branches in Connecticut, TD Bank is required to comply with Connecticut law
regarding the disclosure of the Customer's financial records. Thus, we write to tell you that
under Connecticut Law, **the Customer objects to TD Bank's further compliance with the
subpoena or the disclosure of any of its financial records to Mr. Reyhani, his law firm, or**



SGR/10027418.1
Atlanta, Georgia | Frankfurt, Germany | Jacksonville, Florida | New York, New York | Stamford, Connecticut | Washington, D.C.

**any other person or entity.**

Disclosure of the Customer's financial records to anyone other than the Customer or the Customer's duly authorized agent is strictly prohibited by Conn. Gen. Stat. § 36a-42 because the subpoena is not a "lawful subpoena" as required by the statute. Mr. Reyhani failed to serve a certified copy of the subpoena on the Customer at least ten (10) days prior to the date on which the records are to be disclosed. See Conn. Gen. Stat. § 36a-43(a). Thus, it is not lawful under Connecticut Law.

You would also be well advised to take notice of Conn. Gen. Stat. § 36a-45(a), which provides that: "**Any officer or employee** of a financial institution who knowingly and willfully furnishes financial records in violation of sections 36a-41 to 36a-44, inclusive, **shall be guilty of a class C misdemeanor.**" Id. (emphasis added). For your information, a class C misdemeanor in Connecticut carries with it a fine of up to $500 and imprisonment of up to three months. Furthermore, because Mr. Reyhani knowingly and willfully induced or attempted to induce TD Bank to disclose the Customer's financial records in violation of Connecticut law, he also faces potential criminal liability under Conn. Gen. Stat. § 36a-45(b).

Aside from potential criminal penalties, TD Bank faces substantial civil liability if it discloses the Customer's financial records in violation of Connecticut law. This letter shall serve notice that, absent a final order by a Connecticut court authorizing disclosure, if TD Bank discloses the Customer's financial records to anyone other than the Customer, the customer will seek to hold TD Bank legally responsible. Because the subpoena is facially invalid, TD Bank cannot rely on the "safe harbor" provided by Conn. Gen. Stat. § 36a-43(d).

In light of the foregoing, you and TD Bank would be well advised to govern yourselves accordingly. If you have any questions about this matter, please do not hesitate to contact me

Very truly yours,

Joseph M. Pastore III

JMP/kj

cc:    Bryan Reyhani, Esq. (via email only)
       Jack E. Robinson, Esq. (via email only)



GRIST MILL CAPITAL LLC

**VIA FAX**

Fax (856) 489-7016

Barbara J. Morgan
Custodian of Records
Legal Department
TD Bank, N.A.
1701 Route 70 East
Cherry Hill, NJ 08034

Re:   **Subpoena for Customer Records in re Universitas, LLC v. Nova Group, Inc.**

Dear Ms. Morgan:

     This letter is to inform you that you are not to release any of my personal information, or that of Grist Mill Capital, LLC ("GMT"). Neither I nor GMC are parties to this litigation and it is outrageous that Universitas is asking for personal information for bank accounts not dealing with the Charter Oak Trust or Nova Group, Inc. in the supplemental subpoena served upon TD Bank, N.A. **GMC and I object to TD Bank's further compliance with the subpoena or the disclosure of any of our bank records to any other person or entity.**

     You would be well advised to take notice of Conn. Gen. Stat. § 36a-45(a), which provides that "**Any officer or employee** of a financial institution who knowingly and willfully furnishes financial records in violation of sections 36a-41 to 36a-44, inclusive, **shall be guilty of a class C misdemeanor.**" Id. (emphasis added). For your information, a class C misdemeanor in Connecticut carries with it fines and imprisonment of up to three months. Aside from potential criminal penalties, TD Bank faces substantial civil liability if it discloses our financial records in violation of Connecticut law. This letter shall serve notice that, absent a final order by a Connecticut court authorizing disclosure, if TD bank discloses our financial records to anyone other than us, TD Bank shall be held legally responsible under applicable federal and state law and we will sue TD Bank for upwards of $50 million in actual damages plus treble punitive damages. Because the subpoena is facially invalid, TD Bank cannot rely on the "safe harbor" provided by Conn. Gen. Stat. § 36a-43(d).

     In light of the forgoing, you and TD Bank would be well advised to govern yourselves accordingly.

With best regards,

*[signature]*

Daniel E. Carpenter

# EXHIBIT 45

## LOAN AGREEMENT AND PROMISSORY NOTE

THIS LOAN AGREEMENT AND PROMISSORY NOTE, is made this 11th day of August, 2006, by and among Grist Mill Capital, LLC of 100 Grist Mill Road (hereinafter, known as "BORROWER") and The Grist Mill Trust, a Trust organized under the laws of the State of Connecticut (hereinafter known as "LENDER"). BORROWER and LENDER shall collectively be known herein as "the Parties". In determining the rights and duties of the Parties under this Loan Agreement, the entire document must be read as a whole.

### PROMISSORY NOTE

FOR A LOAN OF PREMIUMS RECEIVED, for the policy on the life of REDACTED (Phoenix Policy # REDA ) BORROWER promises to pay to the order of LENDER, the sum of the total dollars borrowed to pay premiums on the policy as listed in Schedule "A" on demand, but no later than August 14, 2009 (hereinafter known as "LOAN"). Any amounts unpaid shall accrue at 1% interest per month or 12% per annum.

### ADDITIONAL LOAN TERMS

The BORROWER and LENDER, hereby further set forth their rights and obligations to one another under this Loan Agreement and Promissory Note and agree to be legally bound as follows:

A. LOAN REPAYMENT TERMS. BORROWER shall pay back the entire amount of the LOAN to LENDER no later than August 14, 2009 with interest computed at 1% per month or 12% per annum.

B. DEMAND BY LENDER. This is a total premium dollars invested on "demand" Loan Agreement and Promissory Note under which BORROWER in the event of default is required to repay in full the entire outstanding Loan Amount within 15 days of receiving a written demand from LENDER for full repayment of the Loan Amount. Delivery of written notice by LENDER to BORROWER via U.S. Postal Service Certified Mail shall constitute prima facie evidence of delivery. For mailing of said notice, LENDER shall use BORROWER'S address as stated below.

C. METHOD OF LOAN PAYMENT. The BORROWER shall make all payments called for under this Loan Agreement by hand delivery or by sending a check, wire, or other negotiable instrument made payable to LENDER at the following address:

Grist Mill Trust

C/O Benefit Plan Advisors, LLC

Grist Mill Plaza

100 Grist Mill Road

Simsbury, CT 06070

860-408-7000

If LENDER gives written notice to BORROWER that a different address shall be used for making payments under this Loan Agreement, BORROWER shall use the new address so given by LENDER.

D. DEFAULT. The occurrence of any of the following events shall constitute a Default by the BORROWER of the terms of this Loan Agreement and Promissory Note:

    1. BORROWER's failure to pay any amount due as principal or interest on the date required under this Loan Agreement.

    2. BORROWER seeks an order of relief under the Federal Bankruptcy laws.

    3. A federal or state tax lien is filed against the assets of BORROWER.

    4. A money judgment is entered by any court against BORROWER.

E. ADDITIONAL PROVISIONS REGARDING DEFAULT:

    1. Commercial Loan. BORROWER fully recognizes that this is a Commercial Loan given in the course of a business venture and therefore BORROWER waives any and all rights to demand, presentment for payment, notice of non-payment, notice of dishonor, protest, and notice of non-payment of this Promissory Note.

    2. Acceleration. If the BORROWER fails to cure any default on or before the expiration of the fifteen (15) day cure period that starts on the date BORROWER receives written notice from LENDER that an event of default has occurred under this Loan Agreement, the entire unpaid principal, accrued interest, and penalties under this Loan Agreement shall accelerate and become due and payable immediately.

    3. Indemnification of Attorneys Fees and out-of-pocket costs. A default by BORROWER which is not cured within 15 days after receiving a written notice of default from LENDER constitutes a material breach of this Agreement by BORROWER, and will entitle the Lender to be indemnified by the BORROWER for any Attorneys' Fees, court costs, and out-of-pocket costs in the collection of the dept owed to the LENDER.

F. PLEDGE AND COLLATERAL. As security for the repayment in full of this loan, and in addition to any and all other rights and remedies under the law, BORROWER pledges to LENDER all shares of any business interest owned by the BORROWER as well as the assets of any real estate owned by BORROWER. BORROWER further agrees to protect such assets as collateral and help LENDER collect on those assets and shares in the event of BORROWER's default as listed above.

G. INTEGRATION. This Agreement, including any attachments mentioned in the body as incorporated by reference, sets forth the entire agreement between the Parties with regard to the subject matter hereof. All prior agreements, representations and warranties, express or implied, oral or written, with respect to the subject matter hereof, are hereby superseded by this agreement. This is an integrated Agreement.

GMT-000146

H.  SEVERABILITY. In the event any provision of this Agreement is deemed to be void, invalid, or unenforceable, that provision shall be severed from the remainder of this Agreement so as not to cause the invalidity or unenforceability of the remainder of this Agreement. All remaining provisions of this Agreement shall then continue in full force and effect. If any provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope and breadth permitted by law.

I.  MODIFICATION. Except as otherwise provided in this document, this Agreement may be modified, superseded, or voided only upon the written and signed agreement of the Parties. Further, the physical destruction or loss of this document shall not be construed as a modification or termination of the Agreement contained herein.

J.  EXCLUSIVE JURISDICTION FOR SUIT IN CASE OF BREACH. The Parties, by entering into this Agreement, submit to jurisdiction in Hartford, Connecticut for adjudication of any disputes and/or claims between the parties under this Agreement. Furthermore, the parties hereby agree that the courts of Hartford, Connecticut shall have exclusive jurisdiction over any disputes between the parties relative to this Agreement, whether said disputes sound in contract, tort, or other areas of the law.

K.  STATE LAW. This Agreement shall be interpreted under, and governed by, the laws of the State of Connecticut.

IN WITNESS WHEREOF and acknowledging acceptance and agreement of the foregoing, BORROWER and LENDER affix their signatures hereto.

BORROWER:

Grist Mill Capital, LLC

_Daniel E Carpenter_
Signature

By:    Daniel E. Carpenter

Title:  Chairman of the Managing Member

Dated: August    11 , 2006

ADDRESS:

100 Grist Mill Road

Simsbury, CT 06070

WITNESS:

_Amanda R_
Amanda Rossi
Name

LENDER:

Grist Mill Trust

_Wayne H Bursey_
Signature

By:    Wayne H. Bursey

Title:  Trustee

Dated:  8 - 11 , 2006

ACKNOWLEDGMENT OF
PAYMENT IN FULL AND RECEIPT

Grist Mill Trust

_Donna Dawson_
Signature

5/12/09

Donna Dawson            Date

GMT-000147

# LOAN AGREEMENT AND PROMISSORY NOTE

THIS LOAN AGREEMENT AND PROMISSORY NOTE, is made this 1st day of October, 2007, by and among Grist Mill Capital, LLC of 100 Grist Mill Road (hereinafter, known as "BORROWER") and The Grist Mill Trust., a Trust organized under the laws of the State of Connecticut (hereinafter known as "LENDER"). BORROWER and LENDER shall collectively be known herein as "the Parties". In determining the rights and duties of the Parties under this Loan Agreement, the entire document must be read as a whole.

## PROMISSORY NOTE

FOR A LOAN OF $2,500,000 RECEIVED, BORROWER promises to pay to the order of LENDER, the sum of $2,500,000 dollars on demand, but no later than October 4, 2010 (hereinafter known as "LOAN"). Any amounts unpaid shall accrue at 1% interest per month or 8% per annum.

## ADDITIONAL LOAN TERMS

The BORROWER and LENDER, hereby further set forth their rights and obligations to one another under this Loan Agreement and Promissory Note and agree to be legally bound as follows:

A. LOAN REPAYMENT TERMS. BORROWER shall pay back the entire amount of the LOAN to LENDER no later than October 4, 2010 with interest computed at 1% per month or 8% per annum.

B. DEMAND BY LENDER. This is a "demand" Loan Agreement and Promissory Note under which BORROWER in the event of default is required to repay in full the entire outstanding Loan Amount within 15 days of receiving a written demand from LENDER for full repayment of the Loan Amount. Delivery of written notice by LENDER to BORROWER via U.S. Postal Service Certified Mail shall constitute prima facie evidence of delivery. For mailing of said notice, LENDER shall use BORROWER'S address as stated below.

C. METHOD OF LOAN PAYMENT. The BORROWER shall make all payments called for under this Loan Agreement by hand delivery or by sending a check, wire, or other negotiable instrument made payable to LENDER at the following address:

Grist Mill Trust

C/O Benefit Plan Advisors, LLC

Grist Mill Plaza

100 Grist Mill Road

Simsbury, CT 06070

860-408-7000

If LENDER gives written notice to BORROWER that a different address shall be used for making payments under this Loan Agreement, BORROWER shall use the new address so given by LENDER.

GMT-000134

D. DEFAULT. The occurrence of any of the following events shall constitute a Default by the BORROWER of the terms of this Loan Agreement and Promissory Note:

1. BORROWER's failure to pay any amount due as principal or interest on the date required under this Loan Agreement.

2. BORROWER seeks an order of relief under the Federal Bankruptcy laws.

3. A federal or state tax lien is filed against the assets of BORROWER.

4. A money judgment is entered by any court against BORROWER.

E. ADDITIONAL PROVISIONS REGARDING DEFAULT:

1. Commercial Loan. BORROWER fully recognizes that this is a Commercial Loan given in the course of a business venture and therefore BORROWER waives any and all rights to demand, presentment for payment, notice of non-payment, notice of dishonor, protest, and notice of non-payment of this Promissory Note.

2. Acceleration. If the BORROWER fails to cure any default on or before the expiration of the fifteen (15) day cure period that starts on the date BORROWER receives written notice from LENDER that an event of default has occurred under this Loan Agreement, the entire unpaid principal, accrued interest, and penalties under this Loan Agreement shall accelerate and become due and payable immediately.

3. Indemnification of Attorneys Fees and out-of-pocket costs. A default by BORROWER which is not cured within 15 days after receiving a written notice of default from LENDER constitutes a material breach of this Agreement by BORROWER, and will entitle the Lender to be indemnified by the BORROWER for any Attorneys' Fees, court costs, and out-of-pocket costs in the collection of the dept owed to the LENDER.

F. PLEDGE AND COLLATERAL. As security for the repayment in full of this loan, and in addition to any and all other rights and remedies under the law, BORROWER pledges to LENDER all shares of any business interest owned by the BORROWER as well as the assets of any real estate owned by BORROWER. BORROWER further agrees to protect such assets as collateral and help LENDER collect on those assets and shares in the event of BORROWER's default as listed above.

G. INTEGRATION. This Agreement, including any attachments mentioned in the body as incorporated by reference, sets forth the entire agreement between the Parties with regard to the subject matter hereof. All prior agreements, representations and warranties, express or implied, oral or written, with respect to the subject matter hereof, are hereby superseded by this agreement. This is an integrated Agreement.

GMT-000135

H. **SEVERABILITY.** In the event any provision of this Agreement is deemed to be void, invalid, or unenforceable, that provision shall be severed from the remainder of this Agreement so as not to cause the invalidity or unenforceability of the remainder of this Agreement. All remaining provisions of this Agreement shall then continue in full force and effect. If any provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope and breadth permitted by law.

I. **MODIFICATION.** Except as otherwise provided in this document, this Agreement may be modified, superseded, or voided only upon the written and signed agreement of the Parties. Further, the physical destruction or loss of this document shall not be construed as a modification or termination of the Agreement contained herein.

J. **EXCLUSIVE JURISDICTION FOR SUIT IN CASE OF BREACH.** The Parties, by entering into this Agreement, submit to jurisdiction in Hartford, Connecticut for adjudication of any disputes and/or claims between the parties under this Agreement. Furthermore, the parties hereby agree that the courts of Hartford, Connecticut shall have exclusive jurisdiction over any disputes between the parties relative to this Agreement, whether said disputes sound in contract, tort, or other areas of the law.

K. **STATE LAW.** This Agreement shall be interpreted under, and governed by, the laws of the State of Connecticut.

IN WITNESS WHEREOF and acknowledging acceptance and agreement of the foregoing, BORROWER and LENDER affix their signatures hereto.

BORROWER:                                    LENDER:

Grist Mill Capital, LLC                      Grist Mill Trust

_Signature_                                  _Signature_

By:   Daniel E. Carpenter                    By:   Wayne H. Bursey

Title:   Chairman of the Managing Member     Title:   Trustee

Dated: October 1, 2007                       Dated: 10-1, 2007

ADDRESS:                                      ACKNOWLEDGMENT OF
                                             PAYMENT IN FULL AND RECEIPT

100 Grist Mill Road                           Grist Mill Trust

Simsbury, CT 06070                            _Signature_

WITNESS:

_Signature_                                   Donna Dawson        Date

Amanda Rossi
Name

GMT-000136

# EXHIBIT 46

100 Grist Mill Road
Simsbury, CT 06070



# Memo

**To:**     Grist Mill Capital

**Cc:**     Daniel E. Carpenter & Amanda Rossi

**From:**   Grist Mill Trust

**Date:**   11/30/2009

**Re:**     Grist Mill Capital requested loan on behalf of REDACTED from GMT Trust

---

The Pay-off Amount for the above loan as of November 30, 2009 is $510,000.00

Please see breakdown below of Principal:

| | Principal | Interest | Total | Balance Due | Balance |
|---|---|---|---|---|---|
| Advance on July 23, 2009 | $500,000.00 | $10,000 | $510,000.00 | $510,000.00 | $0.00 |

**On July 23, 2009**
There was a request to loan Grist Mill Capital $500,000 on behalf of REDACTED The loan is calculated from July 23, 2009 to November 30, 2009 at 6% percent total owed $510,000.00. The loan was paid off 12/03/2009

1

GMT-000176

100 Grist Mill Road
Simsbury, CT 06070

**GRIST MILL TRUST**

# Memo

| | |
|---|---|
| **To:** | Grist Mill Capital |
| **Cc:** | Daniel E. Carpenter & Amanda Rossi |
| **From:** | Grist Mill Trust |
| **Date:** | 11/30/2009 |
| **Re:** | Grist Mill Capital requested Policy payment for ██REDACTED██ from the SADI Plan & Trust |

---

The Pay-off Amount for the above loan as of November 30, 2009 is $178,125.00

Please see breakdown below of Principal:

| | Principal | Interest | Total | Balance Due | Balance |
|---|---|---|---|---|---|
| Advance on February 13, 2008 | $178,125.00 | $0.00 | $178,125.00 | $178,125.00 | $0.00 |

<u>On February 13, 2008</u>
There was a request to pay $178,125.00 on ██REDACTED██ policy# ██REDACTED██ The Loan is from February 13, 2008 thru November 30, 2009. Paid off December 3, 2009

1

GMT-000187

# EXHIBIT 47

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CASE NO. 11-1590-LTS-HBP


   UNIVERSITAS EDUCATION, LLC

          Plaintiff,


         VS.


   NOVA GROUP, INC., as trustee,

   sponsor and fiduciary of the

   CHARTER OAK TRUST WELFARE

   BENEFIT PLAN,

         Defendant.


         April 17, 2013

         10:00 a.m.

         DEPOSITION OF DANIEL E. CARPENTER


REPORTED BY:

MARY G. VAN DINA, Certified Court Reporter,

Certified LiveNote Reporter.

1

2    April 17, 2013

3    10:00 a.m.

4

5            Deposition of DANIEL E. CARPENTER,

6    taken by Plaintiffs, pursuant to subpoena, at the

7    offices of LOEB & LOEB, LLP, 345 Park Avenue, New

8    York, New York, before MARY G. VAN DINA, a

9    Certified Shorthand Reporter and Notary Public

10   within and for the State of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2    A P P E A R A N C E S:

 3

 4    LOEB & LOEB, LLP

 5    345 Park Avenue

 6    4 New York, New York 10154

 7    BY:  PAULA KAE COLBATH, ESQ.

 8         MICHAEL BARNETT, ESQ.

 9    Attorneys for the Plaintiff

10

11    ANTHONY J. SIANO, ESQUIRE, PLLC

12    333 Westchester Avenue, Suite 302

13    White Plains, New York 10604

14    BY:  ANTHONY SIANO, ESQ.

15    Attorneys for Daniel E. Carpenter

16

17    HALLORAN & SAGE, LLP

18    315 Post Road West

19    Westport, Connecticut 06880

20    BY:  DAN E. LABELLE, ESQ.

21    Attorneys for Molly Carpenter

22

23

24

25
```

1

2                    INDEX

3

4   WITNESS                                    PAGE

5

6   DANIEL E. CARPENTER

7   BY MS. COLBATH                              5

8

9              E X H I B I T S

10

11   NUMBER        DESCRIPTION              PAGE

12

13   Moonstone 1  Order to Show Cause with

14                Temporary Restraining     9

15                Order and Application for

16                Turnover of Insurance

17                Proceeds and Imposition

18                of Constructive Trust

19   Moonstone 2  Document, Bates Nos. TD   18

20                Universitas 0998 through

21                1002

22   Moonstone 3  Document bearing Bates    63

23                stamp number

24                TD-Universitas 0524

25   Moonstone 4  UCC Financing Statement   66

1

2      Moonstone 5    Open End Mortgage Deed        114

3                     and Security Agreement

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        Daniel Carpenter 4/17/13

2    D A N I E L  E.  C A R P E N T E R, 18 Pondside

3    Lane, West Simsbury, Connecticut 06092, having

4    been duly sworn by the Notary Public, testified

5    as follows:

6    EXAMINATION BY MS. COLBATH:

7        Q.   Good morning, Mr. Carpenter.  As you

8    know, my name is Paula Colbath, and I'm a lawyer

9    here at Loeb & Loeb.  We represent Universitas

10   Education, LLC in this proceeding.

11           You've been deposed before, sir.

12   Correct?

13       A.   Yes, ma'am.

14       Q.   And you understand that your answers

15   today need to be audible so the court reporter

16   can take down your answers?  She doesn't -- it's

17   difficult for her to take down nods.

18       A.   Yes, ma'am.

19       Q.   If you need a break today, please let

20   me know.  We'll take a break.

21           Is that agreeable?

22       A.   Yes.

23       Q.   And, sir, if I ask you a question

24   today that you don't understand, please let me

25   know.

1          Daniel Carpenter 4/17/13

2          Q.   Are you familiar with more than one

3     entity that has Moonstone in the name?

4          A.   No.

5          Q.   What is your relationship to Moonstone

6     Partners, LLC?

7          A.   I am the chairman of Caroline

8     Financial Group, Inc., which is the managing

9     member and tax matters partner of Moonstone

10    Partners, LLC.

11         Q.   Is Caroline Financial Group, Inc. a

12    member of Moonstone?

13         A.   Yes.

14         Q.   Are there any other members of

15    Moonstone currently?

16         A.   Yes.

17         Q.   Whom are the other members?

18         A.   Molly Carpenter.

19         Q.   At any point prior to today, have

20    there been any other members of Moonstone?

21         A.   No.

22         Q.   Is there -- strike that.

23              Does Moonstone have any understanding

24    currently with any individuals or entities to

25    make them members?

1          Daniel Carpenter 4/17/13

2    it to.

3          Q.    To whom have you rented the property?

4          A.    A number of employees of USB Group, as

5    well as Benistar.

6          Q.    Why was an LLC formed to take

7    ownership of the property?

8          A.    All of -- anything that I invested in

9    is either held in an LLC or it's held in a trust,

10   you know, for either estate planning purposes or

11   protection, you know, asset protection, you know,

12   type purposes, so that if something happens on

13   one property, people can only sue that property

14   and they cannot sue other properties that are

15   owned by different trusts or different LLCs.

16         Q.    Is part of your motivation also to

17   avoid being sued personally?

18         A.    I've been constantly sued since about

19   January 6th of 2001, so I've been under a

20   constant siege of lawsuits since early January of

21   2001.

22              MR. SIANO:  May I have a moment,

23      please?

24              MS. COLBATH:  Sure.

25              (Off-the-record discussion.)

1          Daniel Carpenter 4/17/13

2     BY MS. COLBATH:

3          Q.    What is the significance, if any, to

4     the January 26, 2001 date that you referenced in

5     your last answer?

6          A.    The company that I work for invested

7     money for Section 1031 tax-free exchanges, and I

8     lost a little over $8 million in the great stock

9     market fall of December of 2000, and shortly

10    thereafter, in January of 2001, there were a

11    number of lawsuits that started against the

12    company and me personally and that litigation is

13    still going on today in Boston.

14         Q.    Is that company you're referring to

15    Benistar Property Exchange?

16         A.    It's now called Boston Property

17    Exchange, but at that time it was Benistar

18    Property Exchange, but it's now Boston Property

19    Exchange, but at the time it was Benistar

20    Property Exchange Trust Company, but the name has

21    been changed to Boston Property Exchange.

22         Q.    Who were the shareholders of Caroline

23    Financial Group, Inc.?

24         A.    I don't know.

25         Q.    Who would know?

1          Daniel Carpenter 4/17/13

2          A.    If I don't know, I don't believe

3     there's anybody who would know.

4          Q.    Is Caroline Financial Group, Inc. a

5     company that's currently in good standing in a

6     jurisdiction?

7          A.    Yes, ma'am.

8          Q.    How do you know that?

9          A.    Because every year, we follow up with

10    the state of Delaware.

11               Most of the entities that I'm involved

12    with are incorporated in Delaware and we

13    routinely just -- you know, every March, we just

14    make sure that we're current with the franchise

15    tax and the annual reporting, so that I just

16    happen to know that Caroline Financial Group is

17    in good standing.

18          Q.    Who is the "we" that you referred to

19    in your last answer that makes sure that Caroline

20    Financial Group is current?

21          A.    I use the editorial "we" and the

22    empirical "we" a lot, but the person who follows

23    up to make sure that the company is in good

24    standing is Amanda Rossi.

25          Q.    Who are the officers and directors

1          Daniel Carpenter 4/17/13

2    currently of Caroline Financial Group, Inc.?

3          A.    It's just myself as chairman and

4    secretary.

5          Q.    Do you recall who -- putting aside who

6    the current shareholders of Caroline Financial

7    Group, Inc., do you know who any -- any

8    shareholders were at any point in time?

9          A.    No.

10          Q.    Who formed Caroline Financial Group,

11    Inc.?

12          A.    I did.

13          Q.    When was it formed?

14          A.    I think in 1995.

15          Q.    What's the business of Caroline

16    Financial Group, Inc.?

17          A.    It acts as the managing member and the

18    tax matters partner of a number of different

19    entities.

20          Q.    Can you identify any of those

21    entities?

22          A.    I could, but it's probably too

23    numerous to mention.

24          Q.    Okay.  Well, does Caroline Financial

25    Group, Inc. have any relationship to Grist Mill

1                    Daniel Carpenter 4/17/13

2    Capital, LLC?

3         A.    Yes, Caroline Financial Group is the

4    managing member and the tax matters partner of

5    Grist Mill Capital.

6         Q.    Does Caroline Financial Group have

7    any -- and when I refer to Caroline Financial

8    Group, I'm talking about Caroline Financial

9    Group, Inc. I'll just shorten it.

10              Is that agreeable?

11        A.    That's fine.

12        Q.    Does Caroline Financial Group have any

13   relationship to Grist Mill Holdings?

14        A.    Yes, it's the tax matters partner and

15   managing member.

16        Q.    And does Caroline Financial Group have

17   the same relationship to Grist Mill Partners,

18   LLC?

19        A.    Yes.

20        Q.    Are there multiple Grist Mill Capital,

21   LLCs?

22        A.    There's only two that I know.

23        Q.    And does Caroline Financial Group act

24   as the managing member and tax member for both of

25   Grist Mill Capital LLCs?

1           Daniel Carpenter 4/17/13

2    documents.

3              MR. SIANO:   Just a minute.

4              (Off-the-record discussion.)

5    BY MS. COLBATH:

6         Q.   And when you say you've signed over

7    200 documents like this, your reference is to

8    Moonstone 2.

9              Are you talking about over 200

10   documents like this at TD Banknorth?

11        A.   No, no, at various banks, at various

12   banks.

13        Q.   Do I understand you to be saying that

14   you've opened up over 200 bank accounts over the

15   last few years?

16        A.   Easily.

17        Q.   And other than opening bank accounts

18   at TD Banknorth, what other banks have you opened

19   bank accounts at?

20        A.   Well, what time period are you looking

21   at, from --

22        Q.   The time period that you referenced

23   when you said you had opened up over 200 bank

24   accounts.

25        A.   Okay.  Well, you know, there are at

1        Daniel Carpenter 4/17/13

2    BY MS. COLBATH:

3        Q.    Where do you currently maintain bank

4    accounts for the businesses that you are involved

5    in?

6        A.    I personally don't have any bank

7    accounts right now.

8        Q.    Where do the businesses that you're

9    involved in maintain accounts currently?

10        A.    I would say most of the business that

11    I am actively involved with -- and none of the

12    businesses that I'm involved with are sham

13    companies, so I would say that most of them are

14    at Peoples.

15        Q.    Have you ever been involved in setting

16    up a bank account outside the United States?

17        A.    In the past ten years?  What time

18    frame?

19        Q.    The past 20 years.

20        A.    The past 20 years.  Not in the past 20

21    years.

22        Q.    Have you asked anyone else on your

23    behalf to set up an account outside the United

24    States in the past 20 years?

25        A.    No.

1          Daniel Carpenter 4/17/13

2          Q.    Has any business with which you've

3    been affiliated in any capacity maintained a bank

4    account outside the United States?

5          A.    Not that I know of.

6          Q.    Does your wife maintain any bank

7    accounts outside of the United States?

8          A.    No.

9          Q.    Does Moonstone currently have any

10   liabilities?

11         A.    It's got a mortgage payable to Hanover

12   Trust for $1.1 million.

13         Q.    Do you have any relationship with

14   Hanover Trust Company?

15         A.    Yes.

16         Q.    What's your relationship with Hanover

17   Trust Company?

18         A.    I'm the chief investment officer and,

19   you know, I handle various investments for

20   Hanover Trust.

21         Q.    When was Hanover Trust Company formed?

22         A.    I'm going to say -- it was either 2004

23   or 2005.

24         Q.    Who are the current owners of Hanover

25   Trust Company?

1          Daniel Carpenter 4/17/13

2    nothing whatsoever to do with me, I was

3    frightened that they would try to go after the

4    Moonstone property under the same idea that, you

5    know, because Molly Carpenter owned the property,

6    Dan Carpenter still controls it.  So that was the

7    reason for setting up the promissory note and the

8    mortgage, to make sure it would be secure.

9          Q.    What is the full name of the Phoenix

10   Capital entity you've referred to?

11         A.    It's Phoenix Capital Management, LLC.

12         Q.    Now, getting back to the cash that

13   Hanover Trust Company had, what cash did Hanover

14   Trust Company have in 2009?

15         A.    Before Phoenix Capital?

16         Q.    Before the Phoenix Capital transfer.

17         A.    They just had cash value and annuities

18   and life insurance policies.

19         Q.    And what is your relationship, if any,

20   to Phoenix Capital Management?

21         A.    I'm either the head trustee, chief

22   financial officer or chief investment officer, so

23   I'm the only person that signs for and directs

24   the investments of Hanover Trust.

25         Q.    Okay.  My question related to Phoenix

1                   Daniel Carpenter 4/17/13

2      Capital Management, and you ended with Hanover

3      Trust Company?

4           A.    I thought you asked me about Hanover

5      Trust.

6           Q.    No.  What is your relationship with

7      Phoenix Capital Management?

8           A.    I'm the only investment officer.

9      Phoenix Capital Management is the investment arm

10     of Carpenter Financial Group, so I'm the chairman

11     and secretary of Carpenter Financial Group, and

12     Phoenix Capital Management was established to be

13     the lending arm of Carpenter Financial Group.

14          Q.    Does Phoenix Capital Management have

15     any employees?

16          A.    Just me.  There's no payroll.  It's

17     just me.  I'm the only signature.

18          Q.    And what corporate form is the entity

19     known as Phoenix Capital Management?

20          A.    It's a Delaware LLC.

21          Q.    Whose its managing member?

22          A.    I believe that it's Caroline Financial

23     Group, and it's owned 99 percent by Carpenter

24     Financial and 1 percent by Caroline Financial

25     Group.

1              Daniel Carpenter 4/17/13

2    I correct that it's your position that the money

3    for the purchase of the Rhode Island property did

4    not originate with Grist Mill Capital?

5         A.    Yes, it did not originate with Grist

6    Mill Capital.

7              The money came from Phoenix Capital to

8    Grist Mill Holdings and then from Grist Mill

9    Holdings, it went to Hanover, and then from

10   Hanover over to Moonstone.

11        Q.    What is the business of Grist Mill

12   Capital, LLC?

13        A.    Grist Mill Capital is just in the

14   business of investing in life insurance policies.

15        Q.    What's the business of Grist Mill

16   Holdings, LLC?

17        A.    Grist Mill Holdings is my alter ego

18   for collecting commissions.

19        Q.    And what is the business, to the

20   extent you haven't already told me, of Hanover

21   Trust Company?

22        A.    Just to handle various assets.    That's

23   it.

24        Q.    Have you ever accessed the cash value

25   of any of the insurance policies held by Hanover

1             Daniel Carpenter 4/17/13

2      Capital Management and Grist Mill Holdings.

3             MR. SIANO:  I'll take that under

4      advisement.

5   BY MS. COLBATH:

6         Q.   Now, the transaction between Grist

7   Mill Holdings and Hanover Trust Company was in

8   the amount of $1.2 million.

9             Correct?

10        A.   Yes.

11        Q.   Okay.  Now, was that transaction a

12   loan?

13        A.   I don't believe so.  I believe it was

14   just an investment.

15        Q.   Is there any writing reflecting that

16   investment?

17        A.   I don't believe so.

18        Q.   Who on behalf of Grist Mill Holdings

19   made the decision to invest in Hanover Trust

20   Company?

21        A.   It would have been me.

22        Q.   Were there any negotiations between

23   anyone on behalf of Hannover Trust Company and

24   Grist Mill Holdings concerning the investment?

25        A.   It would have been a very small

1                    Daniel Carpenter 4/17/13

2     meeting.  As I control Grist Mill Holdings and I

3     control Hanover Trust, it would have been me

4     talking to myself.

5     BY MS. COLBATH:

6          Q.   Are there any loan agreements between

7     the Charter Oak Trust and Grist Mill Capital?

8               MR. SIANO:  Don't answer that

9          question.  Beyond the scope of the

10         deposition.

11              MS. COLBATH:  I mean, I really have to

12         differ with you, Mr. Siano, at this point.

13              You have our papers.  We have

14         documented money going from the Charter Oak

15         Trust to Grist Mill Capital and a number of

16         other entities, and we're entitled to know

17         whether that money was a loan, was an

18         investment, was authorized, was negotiated.

19         So it's at the heart of the deposition.

20              MR. SIANO:  No, this deposition is

21         about Moonstone.  This deposition is about

22         Moonstone.

23              MS. COLBATH:  This deposition, by

24         court order, is about --

25              MR. SIANO:  South Kingstown

1          Daniel Carpenter 4/17/13

2          A.   I don't remember.  I don't know if

3    anybody represented -- Nova Group, Inc. was the

4    shell corp. that acted as the sponsor of the

5    Charter Oak Trust.

6          Q.   And to the best you can recall, in

7    connection with the transaction set forth in

8    Moonstone 4, you're not aware of anyone

9    representing Nova Group, Inc.'s interest?

10         A.   I have no knowledge of who was

11   representing Nova Group, Inc., and I know that

12   Halloran & Sage was definitely representing Grist

13   Mill Capital, and I don't know if there would

14   have been a conflict, so I'm going to guess that

15   Halloran & Sage would not have represented Nova

16   Group, Inc., because there's an inherent conflict

17   between Grist Mill Capital being the creditor and

18   Nova Group representing the Charter Oak Trust as

19   the debtor.

20         Q.   Right.

21         A.   So I don't know who would have

22   represented Nova Group at all.

23         Q.   And if I asked the question a little

24   differently, would you answer me the same?

25              Was anyone representing Charter Oak

1                    Daniel Carpenter 4/17/13

2          Q.    You're aware, sir, that Lincoln Life

3     paid the Charter Oak Trust approximately $30.7

4     million in May 2009?

5          A.    Correct.

6          Q.    And you testified that Grist Mill

7     Capital received approximately 4.2 million of

8     those?

9          A.    In relation to those Sash Spencer

10    proceeds, correct.

11         Q.    So if you subtract the 4.2 from the

12    30.7, you're left with $26.5 million in the

13    Charter Oak Trust.  Correct?

14         A.    Correct.

15         Q.    Okay.  Do you have any idea where that

16    $26.5 million went?

17         A.    Yeah, I've got a very good idea.

18         Q.    Where?

19         A.    In other words, when TD Bank announced

20    that it was closing out the account, we basically

21    had somewhere around $40 million, maybe 45

22    million owed to Grist Mill Capital, and I believe

23    there was like $11 million left in the Charter

24    Oak Trust account, and we made a demand to have

25    that money paid to Grist Mill Capital.

1                    Daniel Carpenter 4/17/13

2              So any money that was in the Charter

3    Oak Trust account was effectively seized by Grist

4    Mill Capital.

5         Q.   And does Grist Mill Capital still have

6    this $26.5 million?

7         A.   No, Ridgewood foreclosed on us twice

8    and threatened to sue me personally, so Ridgewood

9    Capital took all of the policies that they had

10   something to do with, and they took policies that

11   Grist Mill Capital owned, and they took whatever

12   cash they could.

13             So there was absolutely no assets left

14   from the Charter Oak Trust or Grist Mill Capital

15   as of September of 2010.

16        Q.   The $26.5 million --

17             MR. SIANO:  Give me a minute.

18             (The witness confers with his

19        attorney.)

20             THE WITNESS:  Could you repeat the

21        question?  Maybe I didn't understand the

22        question.  So just repeat the question.

23             MR. SIANO:  The question he answered.

24             (The pertinent portion is read back by

25        the reporter.)

1          Daniel Carpenter 4/17/13

2          A.     If I didn't ask them to do it, I don't

3    think they would do it for me.  So I'd say, no,

4    I've never had anybody backdate a document for

5    me.  I've never asked anyone to do it, and I

6    don't believe anybody has ever backdated a

7    document for me.

8          Q.     At the time this document was signed

9    in October 2010 -- I think it's fair to say that

10   it was signed in October 2010.  Correct?

11         A.     Once again, I believe that -- I

12   believe that the reason we did this document at

13   the same time was that there was another

14   transaction involving one of our affiliates named

15   Richard Belding, and we basically said, hey,

16   we're doing this loan between Carpenter Financial

17   Group and Richard Belding, let's document the

18   loan between Hanover and Moonstone.

19              So I realized that the Moonstone

20   transaction was done in 2009, but the genesis of

21   this document was we were doing another mortgage

22   for Rich Belding and that's why I believe we

23   created this document, and Bob Cox created both

24   mortgages.

25         Q.     This gentleman, Mr. Belding, he has

1          Daniel Carpenter 4/17/13

2   nothing whatsoever to do with Moonstone Partners,

3   LLC.  Correct?

4          A.   Correct.

5          Q.   Why didn't Phoenix Capital Management

6   loan the money directly to Moonstone?

7          A.   Phoenix Capital Management put the

8   money into Grist Mill Holdings, but certainly --

9   certainly, we could have lent money directly

10  to -- Phoenix Capital Management could have

11  directly lent money to Moonstone, but we didn't

12  do it that way, so...

13         Q.   Why not?

14         A.   I don't know.  You know, in other

15  words, I could have borrowed money out of my

16  insurance policies and financed the purchase of

17  Moonstone, but we didn't do it that way either.

18         Q.   That would require you to go to the

19  insurance carriers to tap into your cash value.

20  Correct?

21         A.   Correct, but I've done that before to

22  buy other businesses.  In other words, why we

23  decided to do one transaction rather than

24  another, but the reason for using Hanover Trust

25  is to make sure that someone wouldn't be coming

1          Daniel Carpenter 4/17/13

2    after the Moonstone property.

3               So Phoenix Capital Management had

4    cash.  Hanover didn't have any cash.  So when you

5    ask the question of why didn't you just have

6    Phoenix Capital lend money directly to Moonstone,

7    I would say it was my fear that someone would

8    say, you know, it's all Dan Carpenter, and the

9    reason for doing this transaction in the first

10   place was to make sure that the Boston exchangers

11   wouldn't go after the Moonstone property because

12   under the theory that Dan Carpenter owns and

13   controls everything.

14              So there's no question that Phoenix

15   Capital Management is owned and controlled by

16   Carpenter Financial Group, and if they're going

17   after independent entities that have absolutely

18   nothing to do with Daniel Carpenter, then clearly

19   they would go after a transaction where it's

20   Carpenter Financial Group that owns 99 percent of

21   Phoenix.

22              So the whole reason behind the

23   security agreement and the whole reason behind

24   Hanover Trust is to protect Moonstone from the

25   Boston exchangers.

# EXHIBIT 48

CHASE

**Business Signature Card**

ACCOUNT TITLE

GRIST MILL TRUST

| | |
|---|---|
| ACCOUNT NUMBER | 708119662 |
| ACCOUNT TYPE | Chase Business Classic |
| | New Account |
| TAX PAYER ID NUMBER | 06-6526773 |
| DATE OPENED | 03/12/2007 |
| FORM OF BUSINESS | Trust Company |
| ISSUED BY | JPMorgan Chase Bank, N A ( 802 )<br>SBB RM Northern CT<br>ZAIBEL ROBLES<br>(203)392-5328 |
| EXPIRATION<br>DATE | 3/12/2007 |

BUSINESS ADDRESS
BENISTAR LTD
100 GRIST MILL LN
SIMSBURY, CT 06070-2464

| | | | |
|---|---|---|---|
| PRIMARY IDENTIFICATION | ID NUMBER | ISSUER | ISSUANCE<br>DATE |
| Articles of Incorporation | | Delaware | |

SIGNER(S) TO BE ADDED LATER

ACKNOWLEDGEMENT – By signing this Signature Card, either individually, jointly, or through your duly authorized representative(s) you apply to open a deposit account at Chase You represent and warrant that (i) the signatures appearing below are genuine or facsimile signatures of the person(s) authorized to transact business on your account and (ii) all necessary action or formalities where necessary have been taken to authorize the named person(s) to so act. The Bank is entitled to rely on the authority of the named person(s) until written revocation of such authority is received by the Bank. You certify that the information provided to the Bank by you is true to the best of your knowledge and authorize the Bank, at its discretion, to obtain credit reports on you. You acknowledge receipt of the Bank's deposit account agreement which includes all provisions that apply to this deposit account, and other agreements and service terms for account analysis and other treasury management services if applicable, and agree to be bound by the agreements and terms contained therein

CERTIFICATION –I certify under penalty of perjury that (1) the Taxpayer Identification Number given is correct and (2) I am not subject to backup withholding because (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and (3) I am a U S person (including a U S resident alien)

☐ If the IRS has notified you that you are subject to backup withholding due to underreporting interest or dividends on your tax return, and you have not been notified that the backup withholding is terminated, check here and cross out item 2 above

This Bank does not require your consent to any provision of this document other than the certifications required to avoid backup withholding

| PRINTED NAME | TAX PAYER ID # | TITLE | SIGNATURE | DATE |
|---|---|---|---|---|
| WAYNE H BURSEY | 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 | Trustee | *Wayne H Bursey* | 3-12-17 |
| MOLLY D CARPENTER | 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 | Signer | *Molly Carpenter* | 3-22-07 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

# EXHIBIT 49

| | |
|---|---|
| INSURED | ROBERT LEVINTHAL |
| POLICY NUMBER | 020095030 |
| ISSUE AGE,SEX | 58, MALE |
| CLASS | NON-TOBACCO |
| SPECIFIED FACE AMOUNT | $7,000,000.00 |
| MINIMUM SPECIFIED FACE AMOUNT | $100,000 |
| DEATH BENEFIT COMPLIANCE TEST | GUIDELINE PREMIUM |
| DEATH BENEFIT OPTION | OPTION A :SPECIFIED FACE AMOUNT |
| INITIAL PREMIUM | $1,041,623.52 DUE ON DECEMBER 05, 2003 (INCLUDES THE FIRST PLANNED PERIODIC PREMIUM) |
| PLANNED PERIODIC PREMIUM | $25,000.00 |
| BILLING PERIOD | ANNUALLY |
| ISSUE DATE | JULY 22, 2004 |
| POLICY DATE (UNLESS CHANGED BY AGREEMENT) | DECEMBER 05, 2003 |
| CURRENCY | UNITED STATES DOLLARS |
| OWNER | GRIST MILL TRUST DTD 10/1/03 |
| BENEFICIARY | AS STATED IN THE APPLICATION UNLESS SUBSEQUENTLY CHANGED |
| GUARANTEED INTEREST RATE (ANNUAL) | 3.00% |
| INTEREST ENHANCEMENT FACTOR | 0.25 |
| INTEREST ENHANCEMENT PERIOD | POLICY YEARS 10 AND AFTER |
| MAXIMUM INTEREST ENHANCEMENT (ANNUAL) | 0.50% |
| POLICY LOAN INTEREST RATE (ANNUAL) | 5.00% DURING POLICY YEARS 1 - 42 |

*PAYMENT OF PREMIUMS DOES NOT NECESSARILY GUARANTEE COVERAGE TO AGE 100 AND COVERGAE MAY TERMINATE IF THE CASH VALUE BECOMES INSUFFICIENT TO CONTINUE COVERAGE TO THAT DATE.

ULN-2002

This policy is a counterpart of the original policy issued with the same number which is deemed to have been lost or destroyed. The original policy and this counterpart thereof shall constitute but one and the same instrument.
(Dated) _7/14/10_
58a-516

## 1. POLICY SPECIFICATIONS

(POLICY NUMBER 020095030 )

EXPENSE CHARGE APPLIED
TO PREMIUM

6.00%

MONTHLY EXPENSE CHARGE

$10.00 IN ALL POLICY YEARS
PLUS $0.46 PER $1000 OF SPECIFIED
FACE AMOUNT DURING POLICY YEARS 1 - 10

MAXIMUM PARTIAL WITHDRAWAL

20% OF CASH SURRENDER VALUE DURING POLICY YEARS 1-10
100% OF CASH SURRENDER VALUE IN POLICY YEARS 11
AND AFTER

PARTIAL WITHDRAWL FEE

$25.00

ULN-2002

1. POLICY SPECIFICATIONS
(020095030 )

SUPPLEMENTAL BENEFIT RIDER(S)

ACCELERATED BENEFIT RIDER

ULN-2002

## 1. POLICY SPECIFICATIONS
### (POLICY NUMBER 020095030 )

**SURRENDER CHARGE ON THE SPECIFIED FACE AMOUNT AT THE POLICY DATE**

| POLICY YEAR | SURRENDER CHARGE |
|---|---|
| 1 | $154,420.00 |
| 2 | $143,360.00 |
| 3 | $132,370.00 |
| 4 | $121,310.00 |
| 5 | $110,320.00 |
| 6 | $99,260.00 |
| 7 | $88,270.00 |
| 8 | $77,210.00 |
| 9 | $66,150.00 |
| 10 | $55,160.00 |
| 11 | $44,100.00 |
| 12 | $33,110.00 |
| 13 | $22,050.00 |
| 14 | $11,060.00 |

ULN-2002

22:911359. 005:07. 15. 2010:17:21

## 2A. TABLE OF ACCOUNT VALUE PERCENTAGES

### POLICY NUMBER 020095030

| POLICY YEAR | PERCENTAGE | POLICY YEAR | PERCENTAGE |
|---|---|---|---|
| 1 | 138.00 | 2 | 134.00 |
| 3 | 130.00 | 4 | 128.00 |
| 5 | 126.00 | 6 | 124.00 |
| 7 | 122.00 | 8 | 120.00 |
| 9 | 119.00 | 10 | 118.00 |
| 11 | 117.00 | 12 | 116.00 |
| 13 | 115.00 | 14 | 113.00 |
| 15 | 111.00 | 16 | 109.00 |
| 17 | 107.00 | 18 | 105.00 |
| 19 | 105.00 | 20 | 105.00 |
| 21 | 105.00 | 22 | 105.00 |
| 23 | 105.00 | 24 | 105.00 |
| 25 | 105.00 | 26 | 105.00 |
| 27 | 105.00 | 28 | 105.00 |
| 29 | 105.00 | 30 | 105.00 |
| 31 | 105.00 | 32 | 105.00 |
| 33 | 105.00 | 34 | 104.00 |
| 35 | 103.00 | 36 | 102.00 |
| 37 | 101.00 | 38 | 100.00 |
| 39 | 100.00 | 40 | 100.00 |
| 41 | 100.00 | 42 | 100.00 |

ULN-2002

## 2B. TABLE OF GUARANTEED MAXIMUM COST OF INSURANCE RATES
### PER $1,000 OF NET AMOUNT AT RISK
### POLICY NUMBER 020095030

| POLICY YEAR | MONTHLY RATES | POLICY YEAR | MONTHLY RATES | POLICY YEAR | MONTHLY RATES |
|---|---|---|---|---|---|
| 1 | 0.86833 | 2 | 0.95583 | 3 | 1.05333 |
| 4 | 1.16167 | 5 | 1.28500 | 6 | 1.42583 |
| 7 | 1.58500 | 8 | 1.76083 | 9 | 1.95000 |
| 10 | 2.15500 | 11 | 2.37500 | 12 | 2.61500 |
| 13 | 2.88583 | 14 | 3.24250 | 15 | 3.54667 |
| 16 | 3.95333 | 17 | 4.41000 | 18 | 4.90000 |
| 19 | 5.42167 | 20 | 5.97000 | 21 | 6.33917 |
| 22 | 7.14333 | 23 | 7.80583 | 24 | 8.54333 |
| 25 | 9.37667 | 26 | 10.31583 | 27 | 11.34250 |
| 28 | 12.43333 | 29 | 13.56667 | 30 | 14.73250 |
| 31 | 15.90750 | 32 | 17.10750 | 33 | 18.34917 |
| 34 | 19.65333 | 35 | 21.06250 | 36 | 22.63583 |
| 37 | 24.63750 | 38 | 27.49667 | 39 | 32.04583 |
| 40 | 40.01667 | 41 | 54.83167 | 42 | 83.33333 |

BASIS OF VALUES:   COMMISSIONERS' 1980 STANDARD ORDINARY SMOKER AND NONSMOKER, MALE AND FEMALE MORTALITY TABLES.

NOTE: THE MORTALITY BASIS OF A TOBACCO USER IS THAT OF A SMOKER.  THE MORTALITY BASIS OF A TOBACCO NON-USER IS THAT OF A NONSMOKER.

ULN-2002

SEP-03-2004 09:21  PRELLE FINANCIAL  713 659 5981  P.19/19
P.04

# REQUEST FOR ALTERATION
# OF APPLICATION


**Sun Life Financial℠**

Policy Number _ 020095030 on the life of __Robert Levinthal__

The Sun Life Assurance Company of Canada, a member of the Sun Life Financial group of companies, is hereby requested to accept the following answers in lieu of the answers to the corresponding questions on the application by the undersigned for the numbered policy.

Question 11 – Trustee(s) Name: Daniel B. Carpenter

Question 12 – Beneficiary: Grist Mill Trust dated 10-1-03, Daniel E. Carpenter, Trustee

Question 13A – Base plan applied for: Sun Universal Protector Plus

      Base Face Amount: $7,000,000

Question 15 – Death Benefit Option: A (Level)

Question 16 – Planned Periodic Premium: $25,000

Question 20 – Payment Mode: Annual

It is hereby agreed by the undersigned that the above answers shall form part of the said application and that a copy of this Alteration of Application, the signed original of which is to be recorded at the Head Office of the Company, shall be attached to and shall apply to any policy issued thereon.

Signed at _Houston Tx._  Signature _____
                                       Daniel E. Carpenter - Trustee

On _August 31_ 20 04  Signature _____
     Date

In presence of _Jenny Valedas_  Signature _____
            Witness

New Business, July 22, 2004

SLFC 1954  One Sun Life Executive Park, Wellesley Hills, Massachusetts 02481  Tel: (781) 237-6050

TOTAL P.04
TOTAL P.19

MAR-25-2004 16:46
MAR-17-2004 18:48 ...LE FINANCIAL P.02

## Sun Life Assurance Company of Canada
## Part I of Application for Life Insurance

**Sun Life Financial™**

### Proposed Insured(s) Information

"Life Two" responses are for survivorship policies only.

| | Proposed Insured: Life One | | Proposed Insured: Life Two |
|---|---|---|---|
| 1Z. | Mr. ☒ Mrs. ☐ Ms. ☐ Dr. ☒ | 1Z. | Mr. ☐ Mrs. ☐ Ms. ☐ Dr. ☐ |
| | Name Levinthal Robert | | Name |
| 2A. | Home Address | 2B. | Home Address |
| | 4 Eaton Square | | |
| | Houston TX 77027 | | |
| | Years at Address 3½ | | Years at Address |
| 3A. | Mailing Address (if other than above) | 3B. | Mailing Address (if other than above) |
| 4A. | Home Phone (713) 960 - 1238 | 4B. | Home Phone ( ) |
| | Business Phone (713) 520 - 7444 | | Business Phone ( ) |
| 5A. | Birth Date 6 7 45 | 5B. | Birth Date |
| | Birth Place Houston Tx | | Birth Place |
| 6A. | Social Security No. 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 | 6B. | Social Security No. |
| 7A. | Driver's License No. 10731733 | 7B. | Driver's License No. |
| | State of Issue TX | | State of Issue |
| 8A. | Sex M ☒ F ☐ | 8B. | Sex M ☐ F ☐ |
| 9A. | Occupation Neurosurgeon | 9B. | Occupation |
| | Name of Employer Houston Neurosurgery | | Name of Employer |
| | Address of Employer | | Address of Employer |
| | 1200 Binz #1130 | | |
| | Houston TX 77004 | | |

10. This policy will be used primarily for: (please check only one)
☒ Income Replacement ☐ Supplemental Retirement Income ☐ Estate Plan ☐ Charitable Gift
☐ Split Dollar ☐ Bonus Plan ☐ Key Person ☐ Business Continuity ☐ Deferred Compensation Plan
☐ Other

Special Instructions:

Corrections and Amendments (For Sun Life use only):

### Owner/Applicant Information

11. Owner or Trust Name GRIST MILL TRUST          Date of Birth 10-1-03
Relationship to Insured TRUST
Trustee(s) Name(s) Daniel E. Carpenter

Address 100 Grist Mill Rd. Simsbury, CT 06070    Permanent U.S. Resident? ☒ Yes ☐ No
Social Security or Tax Identification No. 01-6524775          U.S. Citizen? ☒ Yes ☐ No

UND 14/250    SLPC 2264          No.

MAR-25-2004 16:46

MAR-17-2004 18:40     PRELLE FINANCIAL        713 659 3981    P.03   P.66/11

If owner is a trust, date of trust   10-1-03    State trust was established in   Connecticut

Contingent Owner (if any) _____    Date of Birth _____

Relationship to Insured(s)   TRUST

Address _____    Permanent U.S. Resident? ☐ Yes ☐ No

Social Security or Tax Identification No. _____    U.S. Citizen? ☐ Yes ☐ No

## Beneficiary Information

12.   Primary:   GRIST MILL TRUST     Relationship:   TRUST

     Primary: _____    Relationship: _____

     Primary: _____    Relationship: _____

     Contingent: _____    Relationship: _____

     Contingent: _____    Relationship: _____

NOTE: Unless otherwise specified: (a) The surviving beneficiaries within a class (primary or contingent) will share equally. (b) If no beneficiary is living when the proceeds become due, the proceeds will be paid to the insured's/owner's estate.

## Plan Information

13a.   Base plan applied for (select only one):

| Whole Life Insurance | Universal Life Insurance | Term Insurance |
|---|---|---|
| ☐ Sun Anniversary Life-Advantage | ☐ SUL | ☐ Ultra ART |
| ☐ Sun Modified Life | ☐ SUL-NQ | ☐ Ultra 10 |
| ☐ Spectrum Gold | ☐ Spectrum Gold UL | ☐ Other _____ |
| ☐ Other _____ | ☐ Other _____ | |
| Base Face Amount $ _____ | Base Face Amount $ _____ | Base Face Amount $ _____ |

13b.   ELB Face Amount $ _____    ADB Face Amount $ _____

    TLR II Face Amount $ _____

14.   Level Plus Premium $ _____

    Single Plus Premium $ _____

14.   Supplemental Benefits

    ADB Face Amount $ _____    ADB Face Amount $ _____    ADB Face Amount $ _____

    Waiver Premium Yes ☐ No ☐    Waiver Disability Premium    Waiver Premium Yes ☐ No ☐

       to age 65 ☐ to age 95 ☐

       Amount $ _____

       Waiver Deductions

       Life 1 ☐ Life 2 ☐ Both ☐

    Other(s) _____    Other(s) _____    Other(s) _____

## Policy Information

For universal life policies, please complete questions 15 and 16.

15.   Death Benefit Option    ☐ A (Level) ☐ B (Increasing) ☐ 1 (Return of Premium) ☐ 2 (___% Increase)

       ☐ 3 (Return of Premium plus ___% Increase) ☐ Other _____

16.   Planned Periodic Premium    $ _____

For whole life policies, please complete questions 17 and 18.

17.   Dividend Option    ☐ PUA ☐ Cash ☐ Reduction ☐ Deposit ☐ TDO ☐ Other _____

18.   Is Automatic Premium Loan requested, if available?   Yes ☐ No ☐

19.   Due Date of First Premium _____

20.   Payments Made    ☐ Annual ☐ Semi-annual ☐ PAC (Draft date _____ )

       ☐ List, Bill (billing arrangement _____ )

21.   Amount Paid With Application    $ _____    (refer to Temporary Life Agreement)

UKB 14290                                   No.

APR-05-2004 13:53  LE FINANCIAL     713 659 5981     P.04/86

## Other Insurance/Replacement Information

22. Details of insurance in force and pending with Sun Life and other companies.    ☐ None

| Proposed/Insured name | Company | Business/Personal | Issue year/Pending | Total Amount |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

|  |  | Life One | Life Two |
|---|---|---|---|
| 23. | Has any application for insurance on your life been declined or offered on a basis other than applied for? If "yes," provide detail. | ☐ Yes ☐ No | ☐ Yes ☐ No |
| 24. | Will any existing life insurance or annuity with this or any other company be replaced, changed or used as a source of premium payment for the insurance applied for? If "yes," provide details and necessary forms. | ☐ Yes ☐ No | ☐ Yes ☐ No |
| 25. | If a replacement is involved, is it intended as an IRC Section 1035 exchange? | ☐ Yes ☐ No | ☐ Yes ☐ No |

## Lifestyle Information

|  |  | Life One | Life Two |
|---|---|---|---|
| 26. | (a) Have you used tobacco (cigarettes, cigars, chewing tobacco, etc.) or nicotine-containing products (nicorette gum, nicotine patch, etc.) within the past twelve months? If "yes," provide details. | ☐ Yes ☒ No | ☐ Yes ☐ No |
| | (b) Did you previously use tobacco or nicotine products but have now stopped? If "yes," give date you stopped. CIGARETTES - 10yrs | ☒ Yes ☐ No | ☐ Yes ☐ No |
| 27. | Do you plan to travel or reside outside of the U.S. in the next two years? If "yes," provide details. | ☐ Yes ☒ No | ☐ Yes ☐ No |
| 28. | Have you within the past two years: | | |
| | (a) Flown as a pilot or co-pilot in any type of aircraft? (If "yes," an Aviation Questionnaire is required on both lives.) | ☐ Yes ☒ No | ☐ Yes ☐ No |
| | (b) Participated in scuba diving, parachuting, hang gliding, motorized racing or any other hazardous sport? (If "yes," appropriate questionnaire is required.) | ☐ Yes ☒ No | ☐ Yes ☐ No |
| 29. | Have you in the last three years while operating a motor vehicle, boat or aircraft: | | |
| | (a) Been charged with any moving violations? | ☒ Yes ☐ No | ☐ Yes ☐ No |
| | (b) Had your operator's license restricted, suspended or revoked? | ☐ Yes ☒ No | ☐ Yes ☐ No |
| | (c) Been charged with operating while under the influence of alcohol and/or drugs? | ☐ Yes ☒ No | ☐ Yes ☐ No |

If "yes," provide details.

Speeding ticket 2002

## Statement of Health

*Complete for non-medical application on all persons to be covered as shown in 1A and 1B.*

30. Family History

| Life One | Age(s) If Living | Age(s) at Death | State of Health or Cause of Death | Life Two | Age(s) If Living | Age(s) at Death | State of Health or Cause of Death |
|---|---|---|---|---|---|---|---|
| Father | | 60 | Colon Cancer | Father | | | |
| Mother | 87 | | COPD - Cancer Age 76 | Mother | | | |
| Brother(s) | | None | | Brother(s) | | | |
| Sister(s) | | | | Sister(s) | | | |

UND 14/250          No.

APR-25-2004 13:54 ⬤ LE FINANCIAL ⬤ 713 659 5981 P.85/86

For "yes" responses to questions 31, 33 and 34, please provide details on the next page.

|  | | Life One | Life Two |
|---|---|---|---|
| 31. | Have any of your parents, brothers or sisters had diabetes, heart disease or high blood pressure? | ☐ Yes, ☑ No | ☐ Yes ☐ No |
| 32. | Life One: Height _5'10_ Weight _195_ Life Two: Height _____ Weight _____ | | |
| 33. | Have you had a change of weight of more than 10 pounds within the past 12 months? If "yes," how much and for what reason? | ☐ Yes ☑ No | ☐ Yes ☐ No |
| 34. | Are you being treated by diet, drugs or other means? | ☐ Yes ☑ No | ☐ Yes ☐ No |
| 35. | Name(s) and address(es) of personal physician(s): | | |

Life One _____ NONE _____

Life Two _____

_____

_____

Date last seen and reason for visit:

_____

_____

For all "yes" responses to questions 36-39, please include diagnoses, dates, durations, names and addresses of attending physicians and medical facilities on the next page.

| | | Life One | Life Two |
|---|---|---|---|
| 36. | Have you ever had, been told you have or been treated by a physician for: | | |
| | (a) High blood pressure, chest discomfort, stroke, circulatory or heart disorder? | ☐ Yes ☑ No | ☐ Yes ☐ No |
| | (b) Diabetes, sugar in the urine, thyroid, or other glandular (endocrine) disorder? | ☐ Yes ☑ No | ☐ Yes ☐ No |
| | (c) Kidney, bladder, urinary, reproductive organ or prostate disorder? | ☐ Yes ☑ No | ☐ Yes ☐ No |
| | (d) Protein (albumin), blood or pus in the urine, sexually transmitted disease or venereal disease? | ☐ Yes ☑ No | ☐ Yes ☐ No |
| | (e) Cancer, tumor, polyp, or disorder of the skin or breast? | ☑ Yes ☐ No | ☐ Yes ☐ No |
| | (f) Asthma, pneumonia, emphysema, or any other respiratory or lung disorder? | ☐ Yes ☑ No | ☐ Yes ☐ No |
| | (g) Seizure, convulsion, fainting, loss of consciousness, tremor, paralysis, or other disorder of the nervous system? | ☐ Yes ☑ No | ☐ Yes ☐ No |
| | (h) Anxiety, depression, stress or any psychological or emotional condition or disorder? | ☐ Yes ☑ No | ☐ Yes ☐ No |
| | (i) Colitis, hepatitis, ulcers, or other disorders of the stomach, liver or digestive system? | ☐ Yes ☑ No | ☐ Yes ☐ No |
| | (j) Arthritis, gout, back or joint pain, bone fracture, or muscle disorder? | ☑ Yes ☐ No | ☐ Yes ☐ No |
| | (k) Anemia, bleeding, or blood disorder? | ☐ Yes ☑ No | ☐ Yes ☐ No |
| | (l) Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC)? | ☐ Yes ☑ No | ☐ Yes ☐ No |
| | (m) A positive blood test for antibodies to the AIDS (HIV) virus? | ☐ Yes ☑ No | ☐ Yes ☐ No |
| 37. | Have you: | | |
| | (a) Regularly used amphetamines, marijuana, cocaine, hallucinogens, heroin or other drugs except as prescribed by a physician? | ☐ Yes ☑ No | ☐ Yes ☐ No |
| | (b) Been treated or counseled for alcoholism or drug abuse? | ☐ Yes ☑ No | ☐ Yes ☐ No |
| | (c) Been advised to reduce your consumption of alcohol? | ☐ Yes ☑ No | ☐ Yes ☐ No |
| 38. | Do you have any health symptoms for which a physician has not been consulted or treatment received? For example, persistent fever, unexplained weight loss, loss of appetite, pain or swelling? | ☐ Yes ☑ No | ☐ Yes ☐ No |
| 39. | Other than previously stated, have you within the past five years: | | |
| | (a) Had a checkup, consultation, illness, surgery or been hospitalized? | ☐ Yes ☑ No | ☐ Yes ☐ No |
| | (b) Had an electrocardiogram, stress or exercise test, x-ray, blood test or other diagnostic test? | ☑ Yes ☐ No | ☐ Yes ☐ No |
| | (c) Been advised to have, or scheduled, any diagnostic test, hospitalization or surgery which was not completed? | ☐ Yes ☑ No | ☐ Yes ☐ No |

No.

SEP-03-2004 09:15  FRELLE FINANCIAL  713 659 5901  P.04/19
AUG-26-2004 THU 11:44 AM COLLEGE STN NEUROSURGERY  FAX NO. 9786982911  P. 02/02

FRELLE FINANCIAL  713 659 5901  P.02/02

Life One Details:  Life Two Details:

398" 366° 24th EPIDERMAL BIOPSY OF
SKIN BENIGN ROSEN_ JDEN
DR. MELANOMA - DR MERRICK
ROSS - HOUSTON Tx
DERMATOLOGY SKY #3 - JON STEEN
HOUSTON Tx 77024
33-7991 LUMBAR DRAINAGE CORPT
DR. WOLE

## Request for Taxpayer Identification Number and Certification (To be Completed by Owner/Taxpayer)

CERTIFICATION - UNDER PENALTY OF PERJURY I CERTIFY THAT:

(1) The number shown in Part I here 2A or 3B (or Item 1) if the owner is not a prepaid / insured) of this form is my correct taxpayer Identification number, AND

(2) I am not subject to backup withholding because (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding.

(X) _Daniel E Carpenter_  _8-31-04_
Signature of Owner/Taxpayer  Date

### Signature Section

I/We understand and agree that:

1. The Information provided in this application Part I and Part II Medical, if required is the basis for and becomes part of the insurance issued. I is...

2. No insurance agent or medical examiner has the authority to make or modify any contract of Sun Life...

3. In accepting a policy, I/we also accept any corrections and amendments made by Sun Life...

4. Except as provided in a Temporary Insurance Agreement having the same number and date as the application...

5. Sales transactions are used to assist in understanding how the policy would perform over time...

I/We declare that the statements and answers in this application are complete and true...

I/We authorize any physician, hospital or other medically related facility, health insurance company...

#2 Signed at _____ TX _____ 8 - 31 _____ 20 04

(X) _____  X _____
Signature of proposed Insured Life 1 (also required if under 15)  Signature of Proposed Insured Life 2

(X) _Daniel E Carpenter_  X _____
Signature of applicant/owner if other than proposed insured Life 1  Signature of Business

_____  _____
Signature of non-assignee  Agents License Number
Obtained residence where required

UND 14/25d  N/a

(Page 96 of 148)

DEC-01-2003 11:01    PRELLE FINANCIAL    713 659 5981    P.06/09

## Sun Life of Canada®
*Shining over America since 1895*

### Part II of Application for Life Insurance

1. Name of proposed insured   Robert Lewinthal   MD    Application Number: _____

|  | Yes | No |
|---|---|---|
| 2. Are you being treated by diet, drugs or other means? | ☐ | ☑ |
| 3. Have you ever had, been told you have or been treated by a physician for: |  |  |
| (a) High blood pressure, chest discomfort, stroke, circulatory or heart disorder? | ☐ | ☑ |
| (b) Diabetes, sugar in the urine, thyroid, or other glandular (endocrine) disorder? | ☐ | ☑ |
| (c) Kidney, bladder, urinary, reproductive organ or prostate disorder? | ☐ | ☑ |
| (d) Protein (albumin), blood or pus in the urine, sexually transmitted disease or venereal disease? | ☐ | ☑ |
| (e) Cancer, tumor, polyp, or disorder of the skin or breast? | ☑ | ☐ |
| (f) Asthma, pneumonia, emphysema, or any other respiratory or lung disorder? | ☐ | ☑ |
| (g) Seizure, convulsion, fainting, loss of consciousness, tremor, paralysis, or other disorder of the nervous system? | ☐ | ☑ |
| (h) Anxiety, depression, stress or any psychological or emotional condition or disorder? | ☐ | ☑ |
| (i) Colitis, hepatitis, ulcers, or other disorders of the stomach, liver or digestive system? | ☐ | ☑ |
| (j) Arthritis, gout, back or joint pain, bone fracture, or muscle disorder? | ☑ | ☐ |
| (k) Anemia, bleeding, or blood disorder? | ☐ | ☑ |
| (l) Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC)? | ☐ | ☑ |
| (m) A positive blood test for antibodies to the AIDS (HIV) virus? | ☐ | ☑ |
| 4. Have you: |  |  |
| (a) Regularly used amphetamines, marijuana, cocaine, hallucinogens, heroin or other drugs except as prescribed by a physician? | ☐ | ☑ |
| (b) Been treated or counseled for alcoholism or drug abuse? | ☐ | ☑ |
| (c) Been advised to reduce your consumption of alcohol? | ☐ | ☑ |
| 5. Do you have any health symptoms for which a physician has not been consulted or treatment received? For example, persistent fever, unexplained weight loss, loss of appetite, pain or swelling? | ☐ | ☑ |
| 6. Other than previously stated, have you within the past five years: |  |  |
| (a) Consulted a physician or any other practitioner, had a checkup, illness, surgery or been hospitalized? | ☐ | ☑ |
| (b) Had an electrocardiogram, stress or exercise test, x-ray, blood test or other diagnostic test? | ☐ | ☑ |
| (c) Been advised to have, or scheduled, any diagnostic test, hospitalization or surgery which was not completed? | ☐ | ☑ |
| 7. Have any of your parents, brothers or sisters had diabetes, heart disease or high blood pressure? | ☑ | ☐ |

* Please provide full details for all "Yes" answers in the space below. (Include the dates, the results and the names and address of all attending physicians and medical facilities.)

30 2000 Excisional Biopsy of
Steinberg @ Gr. + USGK
Deslanoma — Melanomas
Merick Ross, MD Anderson
1515 Holcombe Blvd 2705
Houston TX 77050  713 794 1414
Dermathology; Jon Stern
1200 Hermann Dr 2250
Houston TX 77074  713 800 0418
48 Reawrences —
30 1991 Lumbar Laminectomy—
Dr. Stuart Weil (neurosurgeon)
6624 Fannin St. 2140
Houston TX 77050  713 789 0400

8. Family History

| | Age(s) if Living | Age(s) at Death | State of Health or Cause of Death |
|---|---|---|---|
| Father |  | 60 | Colon Cancer— Pulmonary Embolus |
| Mother | 87 |  | Chronic Obstructive Pulmonary Disease - Colon Ca |
| Brother(s) | None |  |  |
| Sister(s) |  |  |  |

I declare that I have made no statement to the medical examiner, agent, or any other person connected with the Company which in any way qualifies or modifies the above answers which I have read and confirm to be full and true to the best of my knowledge and belief.

Signed at  Houston, Texas   this  25th  day of  November  19 2003

Signature _____
(Person proposed for insurance)

In presence of _____   Carlos Nogueira MD
(Medical or paramedical examiner will please sign here)

SLPC 2396

# EXHIBIT 50

D59FUNIH                    Hearing

1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2  UNIVERSITAS EDUCATION, LLC,
3
3              Plaintiff,
4
4         v.                            11 CV 1590 (LTS)
5
5  NOVA GROUP, INC. et al,
6
6              Defendants.
7  ------------------------------x
7                                 New York, N.Y.
8                                 May 9, 2013
8                                 9:30 a.m.
9
9  Before:
10                 HON. LAURA TAYLOR SWAIN,
10
11                                   District Judge
11
12                        APPEARANCES
12
13  LOEB & LOEB LLP
13       Attorneys for Plaintiff
14  PAULA K. COLBATH, ESQ.
14
15  BRYAN I. REYHANI, ESQ.
15       Attorney for Plaintiff
16
16  ANTHONY J. SIANO, ESQ.
17       Attorney for Defendant D. Carpenter and Moonstone Partners
17  LLP
18
18  HALLORAN & SAGE LLP
19       Attorneys for Defendant M. Carpenter
19  DAN E. LaBELLE, ESQ.
20
20  BRIEF CARMEN & KLEIMAN, LLP
21       Attorneys for Defendant Nova Group
21  IRA KLEIMAN, ESQ.
22
22  CAROLE R. BERNSTEIN, ESQ.
23       Attorney for Defendant Grist Mill Capital
23
24  ABRAMS, GORELICK, FRIEDMAN & JACOBSON, LLP
24       Attorneys for Defendant USAA
25  ALEXANDRA E. RIGNEY, ESQ.
25

1  A.  Honestly, till today, I don't even remember ever seeing
2  this document.
3  Q.  Okay, well, turn to the next page that has Bates number
4  1372 on the bottom.  Do you recognize that document?
5  A.  No.  Just looks like a bank statement for Hanover Trust
6  Company.
7  Q.  Right, and it again indicates that you're the trustee of
8  Hanover Trust Company, correct?
9  A.  It says that in the upper left-hand corner.
10  Q.  Looking at this document, does that refresh your
11  recollection that you told TD Bank that you were a trustee of
12  this entity?
13  A.  Actually, no.
14  Q.  What is your relationship with Grist Mill Trust?
15  A.  I don't have a relationship with Grist Mill Trust.
16  Q.  You don't control Grist Mill Trust?
17  A.  No, not at all.  I'm not a signatory, never been a trustee
18  of it and I'm not a signatory of Grist Mill Trust.
19  Q.  Do you have any decision-making authority for the Grist
20  Mill Trust?
21  A.  None whatsoever.
22  Q.  Have you had decision-making authority for the Grist Mill
23  Trust at any point in time?
24  A.  Never.
25  Q.  Is the Grist Mill Trust an employee welfare benefit plan

D59FUNIH                    Carpenter - direct
1   like the Charter Oak Trust?
2   A.  It's a totally different welfare benefit plan.  Grist Mill
3   Trust has other benefits and it's totally a different structure
4   than the Charter Oak Trust.
5   Q.  It's a different structure, but it is an employee welfare
6   benefit plan, correct?
7   A.  Correct.
8   Q.  Do you have any personal knowledge with regard to the
9   business affairs of the Grist Mill Trust?
10  A.  What do you mean by the business affairs?
11  Q.  Well, do you consult with anyone on behalf of the Grist
12  Mill Trust?
13  A.  Normally if they've got a tax question, if one of the
14  participating employers is being audited I'm usually consulted
15  by the people at the Grist Mill Trust to see if I could help
16  that person through their audit.
17  Q.  Have you ever received any payments from the Grist Mill
18  Trust?
19  A.  Never.
20  Q.  Are you a signatory on any of the bank accounts for the
21  Grist Mill Trust?
22  A.  No, ma'am.
23  Q.  Have you or any of the entities that you control made loans
24  to the Grist Mill Trust?
25  A.  Made loans to the Grist Mill Trust?
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

D59FUNIH                    Carpenter - direct

1    Q.   Mm-hmm.
2    A.   No.  We've paid back loans but I don't believe we've made
3    any loans.
4    Q.   Have you or any company that you control received a loan
5    from the Grist Mill Trust?
6    A.   I believe several companies that I'm affiliated with have
7    received loans from the Grist Mill Trust.
8    Q.   Which companies that you're affiliated with have received
9    loans from the Grist Mill Trust?
10   A.   I know that Phoenix Capital Management definitely received
11   a loan and I believe that Avon Capital received loans from the
12   Grist Mill Trust.
13   Q.   When did Phoenix Capital Management receive a loan from the
14   Grist Mill Trust?
15   A.   I believe they received several loans going back to
16   2005-2006.
17   Q.   Are those loans evidenced by written promissory notes?
18   A.   I believe they are, yes.
19   Q.   When was the last loan made by the Grist Mill Trust to
20   Phoenix Capital Management?
21   A.   I don't recall.
22   Q.   Who on behalf of the Grist Mill Trust authorized the loan
23   to Phoenix Capital Management?
24   A.   I believe Wayne Bursey and Nova Benefits Plans LLC is the
25   trustee, so Mr. Bursey would have to sign off on any loans that

D59FUN1H                    Carpenter - direct
1    were made.
2    Q.  Did you have any discussion with Mr. Bursey concerning the
3    loan from Grist Mill Trust to Phoenix Capital Management?
4    A.  I believe I talked to two other people in his office about
5    the loan.
6    Q.  And who are those two people?
7    A.  Cathy Keogh, I believe Cathy Keogh and Donna Dawson.
8    Q.  Did you submit a loan application to the Grist Mill Trust?
9    A.  No.
10   Q.  How did it -- just tell me, how did it come to be that
11   Phoenix Capital Management got a loan from Grist Mill Trust
12   that's an employee welfare benefit plan?
13          MR. SIANO:  Judge, I don't mean to intrude, but I
14   believe there was testimony that there was more than one loan.
15   I'm having a little trouble with the use of the word "the," but
16   that's my objection to the form of the question.
17   Q.  The last loan that was made.  Well, let me withdraw that.
18   What was the principal amount of the last loan that was made?
19   A.  The last loan that I remember was for -- there's two loans.
20   There was one for two and a half -- there's three loans that I
21   remember.  So there was one for about 2-1/2 million, there was
22   one for 900-something thousand and there was another one that
23   was done to Phoenix Capital Management for 2.7 million.
24   Q.  And Mr. Bursey approved all three of these loans?
25   A.  He would have to sign off.  Money could not move without
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

1   Mr. Bursey's signature.
2   Q.  What are the repayment terms for the $2.5 million loan
3   between the Grist Mill Trust and Phoenix Capital Management?
4   A.  On the 2.5 million, we paid back over 2.8 million, so I
5   believe it was about 6 percent interest.
6   Q.  Was that loan repaid prior to May 2009?
7   A.  I don't recall when that was paid.
8   Q.  If you look at, under Exhibit 1, page 467?
9   A.  Yes, ma'am, I have it.
10  Q.  Is that your signature there on the middle of the page?
11  A.  Yes, ma'am.
12  Q.  And can you tell me what this document that we're looking
13  at is?
14  A.  It appears to be another banking resolution form for
15  Phoenix Capital Management LLC.
16  Q.  And was this document a document that you signed and
17  furnished to TD Bank in connection with opening up a bank
18  account at TD Bank for Phoenix Capital Management?
19  A.  Yes, ma'am.
20  Q.  And when did you open up that bank account on behalf of
21  Phoenix Capital Management at TD Bank?
22  A.  I don't exactly recall.  The dates seem to be May 20 and
23  May 21.
24  Q.  Does that comport with your general recollection that you
25  opened up this account in the May 20, 2009 time frame?

1  A.  Yes.
2  Q.  And is that your signature that appears on the second page
3  of the document bearing number 468?
4  A.  Yes, ma'am.
5  Q.  And prior to opening up the bank account at TD Bank for
6  Phoenix Capital Management, did Phoenix Capital Management
7  maintain bank accounts at any other institutions?
8  A.  Yes, ma'am.
9  Q.  Where?
10  A.  I know that there was a large account at Bank of America
11  and I think that there were accounts before at Fleet and
12  perhaps Simsbury Bank and Trust.
13  Q.  If you flip in your notebook to Exhibit 15, and tell me
14  what is document 15?
15  A.  These are accounts, a young man in our office, Eric
16  Schneider, kept all these bank accounts, these are Bank of
17  America bank accounts and usually every day or every other day
18  he would put together a listing of the various bank accounts
19  that we had at Bank of America and he would just routinely do
20  this.
21  Q.  Did he do it under your direction?
22  A.  I actually think he did it under Amanda Rossi's direction.
23  Q.  And Ms. Rossi is your assistant, she works for you?
24  A.  Yes, she does work for me.
25  Q.  Exhibit 15 doesn't list any bank account at Bank of America

D59FUNIH                    Carpenter - direct
1   for Phoenix Capital Management, does it?
2   A.  I don't see it listed on this, I don't see it listed on
3   this sheet.
4   Q.  Okay, and then down in the lower right the document says
5   "last modified 5/15/2009," correct?
6   A.  That's what it says, yes.
7   Q.  And flip to Exhibit 16 and it's a similar sheet, correct?
8   A.  Yes.
9   Q.  And Exhibit 16 bears the date last modified July 7, 2009,
10  right?
11  A.  That's what it says, yes.
12  Q.  And you'll agree with me that there's no Phoenix Capital
13  Management listed as an account at Bank of America?
14  A.  Phoenix Capital is not on this list, but that doesn't mean
15  there wasn't a Bank of America account.
16  Q.  Did you ever receive bank statements from Bank of America
17  for a Phoenix Capital Management account?
18  A.  I don't recall.
19  Q.  Do you still bank with Bank of America?
20  A.  No.  Not at all.
21  Q.  Why not?
22  A.  We had a falling out pretty much around that time frame.
23  One of our companies that had done $20 million in transactions
24  with them, they restricted the wiring and the reason, we're
25  wiring large amounts all the time and they restricted our

D59FUNIH                    Carpenter - direct
1  wiring ability and that was unacceptable to us.
2  Q.  Was it a falling out or -- at your deposition you said you
3  were kicked out.  Is that accurate?
4  A.  Well, you know, it's kind of like a mutual divorce.  There
5  was no question that we felt that somebody -- we were
6  definitely kicked out of TD Bank, but as far as Bank of America
7  goes, I think we went back and forth with some of the top
8  executives there that we didn't think we were being treated
9  fairly and I believed that somebody had sent a nasty letter to
10 the president of Bank of America and I think what they
11 insinuated is that you should get rid of all of the accounts at
12 Bank of America that Dan Carpenter is associated with.  But
13 nobody ever confirmed that at Bank of America.
14 Q.  Now, in your answer I think you may have misspoke at the
15 beginning and you said that you were kicked out of TD Bank.  We
16 could have it read back if you want.  Were you also kicked out
17 of TD Bank?
18 A.  Yes, ma'am.  In June.
19         THE COURT:  I beg your pardon, what year?
20         THE WITNESS:  I'm sorry, June of 2010, your Honor.
21         THE COURT:  Thank you.
22 Q.  Does the Grist Mill Trust operate out of 100 Grist Mill
23 Road in Simsbury, Connecticut?
24 A.  I believe it does.
25 Q.  And you created the Grist Mill Trust, is that correct?
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

D59FUNIH                    Carpenter - direct
1   A.  No, that's not true.
2   Q.  Why did Phoenix Capital -- I want to go back a couple of
3   questions on the Grist Mill Trust.  I apologize.  Why did
4   Phoenix Capital Management need a loan?
5           MR. SIANO:  Objection as to form.  Which loan?
6           THE COURT:  Do you want to rephrase?
7   Q.  Why did Phoenix Capital Management need any of the three
8   loans that you identified?
9   A.  Phoenix Capital Management is the lending arm or financial
10  arm of Carpenter Financial Group and Phoenix Capital.  I had
11  made substantial loans to Benistar Admin Services Inc. and
12  because of my personal problems legally several people had made
13  the suggestion that we should not have Carpenter Financial
14  Group appearing on the Benistar Admin Services financial
15  statements because Benistar Admin Services had to file
16  financial statements and even though I had nothing to do with
17  BASI our accountants and our attorneys felt it would be a
18  better idea to restructure the loan, create a new entity which
19  would be Phoenix Capital.  So the first deal that Phoenix
20  Capital did was lending money to Benistar Admin Services which
21  was used to pay back Carpenter Financial Group so Carpenter
22  Financial group would no longer appear on BASI's audited
23  financial statements.
24  Q.  Why didn't Grist Mill Trust just make the loan directly to
25  BASI?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

D59FUNIH                    Carpenter - direct

1   A.  Nobody ever talked to me about Grist Mill Trust.  I was the
2   only one who approached Grist Mill Trust because in the old
3   days we might be able to get three or four percent interest
4   from JPMorgan, but all during the 2000's the interest rates
5   were all under 1 percent and literally dropped to ten basis
6   points.  So it was my idea to come up with the idea with the
7   excess cash that the Grist Mill Trust had to lend it to groups
8   like Grist Mill Capital and to Phoenix Capital so we could
9   invest in insurance policies and pay back 6 or 8 percent to the
10  Grist Mill Trust.  So it wasn't a question of need, it was a
11  question of opportunity.
12  Q.  Well, sir, if you had nothing to do with the Grist Mill
13  Trust, how would you know that they had excess cash that could
14  be put to work?
15  A.  Because I knew for a fact that hundreds of millions of
16  dollars were coming in to the Grist Mill Trust every year.
17  Q.  Now, all of the entities that we talked about; Carpenter
18  Financial Group, Caroline Financial Group, Grist Mill Holdings,
19  Grist Mill Capital Delaware, Grist Mill Capital Connecticut,
20  Phoenix Capital Management, all of them operate out of 100
21  Grist Mill Road in Simsbury, Connecticut, correct?
22  A.  Yes, ma'am.
23  Q.  Now, you're aware that a judgment was entered in this
24  action against an entity known as Nova Group Inc., correct?
25  A.  Yes, ma'am.

D59FUNIH                    Carpenter - direct
1   Q. Do you have any relationship with Nova Group Inc.?
2   A. Which Nova Group Inc. are you referring to?
3   Q. Okay. I wasn't aware that there were more than one, but
4   how many Nova Group Inc.'s are there?
5   A. There's two. There's a Nova Group Inc. that was formed in
6   Delaware in August of 2002, and then there's a Nova Group Inc.
7   that was formed in Connecticut in January of 2007 and that's a
8   Connecticut corporation.
9   Q. Were you involved in forming both of those Nova Group
10  entities?
11  A. I wasn't involved in either one of them.
12  Q. Did you authorize the forming of either one of those
13  entities?
14  A. No, I did not.
15  Q. Have you at any point in time been an officer or director
16  of Nova Group Inc.?
17  A. When Paul Doucet who established Nova Group Inc. Delaware
18  left, he left in 2004, I took over the doing of tax returns and
19  the filing of various paperwork, but that Nova Group Inc
20  Delaware had nothing whatsoever to do with the Nova Group Inc
21  Connecticut that was formed to be the sponsor of the Charter
22  Oak Trust.
23  Q. So do I understand your testimony, you -- strike that.
24          Do you have any understanding as to how much is
25  currently due under the judgment against Nova Group Inc?
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

# EXHIBIT 51

<u>Exhibit A</u>

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| The Penn Mutual Life Insurance Company, | |
| Plaintiff, | Case No. 10-cv-01520-RNC |
| v. | |
| Wayne H. Bursey, as trustee of the Charter Oak Trust; the Charter Oak Trust; J. Edward Waesche; and John Does 1-10, | ~~May~~ June 9, 2011 |
| Defendants. | |

## <u>STIPULATION OF DISMISSAL WITH PREJUDICE</u>

Pursuant to Federal Rule of Civil Procedure 41(a), Plaintiff, The Penn Mutual Life Insurance Company, and Defendants, Wayne H. Bursey, as President of Nova Group, Inc., trustee of the Charter Oak Trust, the Charter Oak Trust, and J. Edward Waesche (the parties that have appeared in this action), hereby stipulate to the dismissal with prejudice of the above-styled action. Penn Mutual further voluntarily dismisses its action against Defendants John Does 1-10 pursuant to Rule 41(a). Pursuant to this Stipulation, each party is to bear its own costs and attorney's fees.

\*     \*     \*

**DRINKER BIDDLE & REATH LLP**

E.J. Robbin Greenspan (CT14788)
ROGIN NASSAU LLC     6/9/11
185 Asylum Street
Hartford, CT  06103-3460
Tel:  (860) 278-7480
Fax:  (860) 278-2179

James Hoffman
DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103
Tel:  (215) 988-2700
Fax:  (215) 988-2757

*Attorneys for The Penn Mutual Life
Insurance Company*

**FOX ROTHSCHILD LLP**

Joseph M. Pastore, III (CT11431)
FOX ROTHSCHILD LLP
One Landmark Square, 21st Floor
Stamford, CT 06901
Tel:  (203) 425-9500
Fax:  (203) 425-9595

*Attorneys for Wayne H. Bursey, as
President of Nova Group, Inc., trustee of
the Charter Oak Trust, the Charter Oak
Trust, and J. Edward Waesche*

## CERTIFICATION

This is to certify that a copy of the foregoing was filed electronically this 9th day of June, 2011 and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic filing.  Parties may access this filing through the Court's CM/ECF system.

Joseph M. Pastore, III
Fox Rothschild LLP
One Landmark Square, 21st Floor
Stamford, CT 06901-2601
*Phone:  203-425-9500*
*Fax:  203-425-9595*

James A. Hoffman II, Esq.
John M. Bloor, Esq.
Drinker Biddle & Reath LLP
One Logan Square #2000
Philadelphia, PA 19103
*Phone:  215-988-2700*
*Fax:  215-988-2757*

E. J. Robbin Greenspan

# EXHIBIT 52

# People's United Bank

**Commercial Deposit**

Date 6/13/11

Name Grist Mill Capital, LLC

**Please be sure that all items are properly endorsed**

Checks and other items are received for deposit subject to the provisions of the Uniform Commercial Code or any applicable agreement. Deposit may not be available for immediate withdrawal.

Total Items ▶ 1

| Cash | Coin | Checks | | | | | | | | | | | | | | | | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 600,000.00 | | | | | | | | | | | | | | | | 600,000.00 |

Deposit to Account Number

6500023292

Amount of Deposit

Net Deposit $   600,000.00

⑆51360600⑆

Pocket:19 Pattern:3003 Account:6500023292 Serial:0 Amount:$600,000.00 Sequence:2700591685 TR:51360600 BOFD TR:-
TranCode:0 CUID:1615 Date:06/13/2011 PostAcct:6500023292

$600,000.00
6500023292 CK Deposit
4136006
TR:85  175-17506 06/13/11  12:04 PM
06/13/2011  2700591685
M0511-7018-6...  P.B. DPT. CT
P8T

COT_PEOPLES0000092

A PennMutual Company

THE PENN MUTUAL LIFE INSURANCE COMPANY
INDEPENDENCE SQUARE, PHILADELPHIA, PA 19172

DATE
JUN 07, 2011

60-162
433

CHECK NUMBER
1038855

08E11     ATH     46DS     H411000123

EXACTLY   *Six hundred thousand and 00/100 Dollars*

PAY
TO:
GRIST MILL CAPITAL, LLC
100 GRIST MILL ROAD
SIMSBURY, CT 06070

VOID
6 MONTHS AFTER
DATE OF ISSUE

*****$600,000.00

PNC BANK, NA
JEANNETTE, PA

*Patricia M. Chiarlanza*
ASSISTANT TREASURER

⑾1038855⑾ ⑆043301627⑆ 1004690744⑾

Pocket:5 Pattern:3003 Account:1004690744 Serial:1038855 Amount:$600,000.00 Sequence:2700591690 TR:43301627 BOFD TR:-
TranCode:0 CUID:1615 Date:06/13/2011 PostAcct:0

ENDORSE CHECK HERE

X *for deposit only*

DO NOT WRITE, SIGN, OR STAMP BELOW THIS LINE
FOR BANK ENDORSEMENT

# EXHIBIT 53

## BRIEF CARMEN & KLEIMAN, LLP
### ATTORNEYS AT LAW
### 805 THIRD AVENUE
### NEW YORK, NEW YORK 10022

MATTHEW J. BRIEF
RICHARD E. CARMEN
IRA KLEIMAN*

www.briefjustice.com

* ALSO ADMITTED IN THE DISTRICT OF COLUMBIA

TELEPHONE
(212) 758-6160
(212) 832-5570

FACSIMILE
(212) 832-1747
(212) 832-7221

October 4, 2013

The Honorable Laura Taylor Swain
United States District Judge
United States District Court
500 Pearl Street
New York, NY 10007

Re:    **Universitas Education, LLC v. Nova Group, Inc.**
        **(S.D.N.Y. 11-CV-1590-LTS-HBP)**

Dear Judge Swain:

We write as counsel for Nova Group, Inc. ("Nova"), in regard to that part of the Court's Order, dated September 30, 2013, (Docket Number 295) which ordered Nova to deposit the judgment amount of $30,181,880.30 with the Clerk of the Court by October 4, 2013.

Mindful of the financial magnitude of the Order of the Court, we consulted with counsel for Grist Mill Capital, Avon Capital, Grist Mill Trust and for Daniel Carpenter, as well as Daniel Carpenter himself, in an effort to obtain compliance. However, we have been advised by Mr. Carpenter that neither the Charter Oak Trust, nor Charter Oak Trust 2009, nor Nova possess the funds or assets to comply with the Court's Order. We have been further advised by Mr. Carpenter that recoupment of monies from the entities to which the proceeds of the Sash Spencer Insurance policies were transferred in 2009 (well before the entry of judgment in this matter), cannot be had, because: a) those entities themselves no longer have the funds transferred in 2009; or b) the monies transferred were paid in satisfaction of pre-existing debts, and Mr. Carpenter is not in control of at least one of those entities.

Specifically, the Court's Order to Nova to deposit the judgment amount is directed to an entity that, since at least 2010, has been dormant. A successor entity of the same name incorporated in Connecticut, has also been dormant since 2010. Mr. Carpenter advises that there are presently no active bank accounts in the name of either of the Nova Group entities.

The Court's order refers generally to "transferee entities". As has been disclosed in both documents and in the testimony of the agent for Grist Mill Capital, LLC, ("GMC") GMC received cash and assets from Nova and the Charter Oak Trust as valid debt repayments. In turn, GMC used the cash and assets it received to satisfy its valid liabilities and obligations to actual

BRIEF CARMEN & KLEIMAN, LLP
ATTORNEYS AT LAW

October 4, 2013
Page 2

creditors. Such cash and assets are no longer under the control of the judgment debtor or of the transferee entities. None of the transferee entities is a judgment debtor.

The proceeds of the Sash Spencer insurance policies were transferred from Nova to Grist Mill Capital, LLC, in May and in October, 2009. That money is no longer in the Grist Mill Capital LLC Account. As of September 30, 2013, the amount of money in the Grist Mill Capital Bank Account was $10.00 (copy of bank statement dated September 30, 2013 is annexed hereto as Exhibit A).

From the Grist Mill Capital account, the monies were transferred (in 2009) at various times to a number of entities including Grist Mill Holdings, Avon Capital, Carpenter Financial Group, Phoenix Capital, and the Grist Mill Trust.

Except for the Grist Mill Trust (which will be discussed separately), none of the foregoing entities possess any meaningful sums in their bank accounts. The short time provided by the Court for compliance with the Order and the page limits imposed by the Court's Rules preclude us from attaching copies of bank statements to reflect these facts at this time, Mr. Carpenter is prepared to provide the Court and counsel for Universitas with disclosure of financial information necessary to demonstrate that none of these entities possesses the monies or assets to comply with the Court's order.[1]

In regard to the insurance policies previously owned by Nova, as previously described to the Court, all insurance policies which were at one time owned by the original Charter Oak Trust or Charter Oak Trust 2009, (no policies were owned by Nova Group, Inc.) were assigned pursuant to Collateral Assignment Agreements to Grist Mill Capital, LLC and/or Ridgewood Financial II, LLC. Any policies which were covered by such an agreement with Ridgewood were resolved when Ridgewood accepted the transfer of ownership of certain of the policies to Ridgewood, in satisfaction of the debt Charter Oak, Nova Group, Inc. or Grist Mill Capital, LLC owed to them. All other policies had been or were assigned to Grist Mill Capital, LLC, which was owed in excess of $60,000,000.00 as a result of policy financing arrangements extant at the time the Sash Spencer proceeds were paid in 2009.

At the present time, the remaining policies still owned by the Charter Oak Trust are the subject of litigation and cannot be transferred. To Mr. Carpenter's knowledge, all other policies have either been terminated or lapsed. In one instance, our client understands that a policy was transferred after the acquiring entity actually made a payment to Universitas.

---

[1]   No current counsel ever has been paid by Nova or the Charter Oak Trust, and no counsel has been paid by any of what at this time we understand to be transferee entities since the end of 2012.

## BRIEF CARMEN & KLEIMAN, LLP
### ATTORNEYS AT LAW

October 4, 2013
Page 3

One of the transferee entities is the Grist Mill Trust. Grist Mill Trust is a multiple employer trust providing death benefits for covered employees of employers who adopt into the plan. It currently serves 343 employers and 632 participants. Funds are paid to the Trust by employers and the Trust in turn pays various life insurance companies premiums due for the various policies insuring the lives of the covered employees. When a participant dies, the life insurance company pays the death benefit to the Trust, which in turn secures the appropriate documentation and pays the benefit to the beneficiary(ies). In this regard, from time to time, there may be significant dollars in the Trust's bank accounts, but such funds are (a) held in trust for the beneficiary(ies); (b) premiums to be paid to maintain the life insurance policies; and (c) cash due to forfeitures and buyouts as well as fees and costs payable to the administrator and sponsor for their work. As to the latter, as of this date, the Trust has less than $50,000 belonging to it.

On September 18, 2013, and again on September 24, 2013, the Trust provided documentation of the foregoing financial details to counsel for Universitas in response to their request for same. Beyond this, as to counsel's inquiry as to the reasons for payments made to the Trust in 2009, the Trust provided counsel for Universitas with documents which show the propriety of various documented loans having been repaid: We are advised by Mr. Carpenter and counsel for the Grist Mill Trust, that Mr. Carpenter is not a principal of the Grist Mill Trust, was never its trustee, and has no control over its cash assets.

Thus, Nova and the Charter Oak Trust find that they are not capable of complying with the order of the Court at this time. Thus, we ask that the Court allow us additional time to provide the Court and counsel for Universitas with such documentation and/or testimony, as well as to continue to attempt to locate whatever assets, if any, that may be placed with the Court pursuant to its' Order. Counsel for Universitas, with whom I have consulted by e-mail by telephone, has declined to consent to this request.

Thank you for your attention to this matter.

Respectfully submitted,

Ira Kleiman

cc: All counsel (via e-mail)

BRIEF CARMEN & KLEIMAN, LLP
ATTORNEYS AT LAW

October 4, 2013
Page 4

Reviewed and
Agreed Upon:

_____
Anthony J. Siano, Esq.
Attorney for Daniel Carpenter

_____
Carole Bernstein, Esq.
Attorney for Grist Mill Capital LLC
and Avon Capital LLC

_____
Glenn A. Duhl, Esq.
Siegel, O'Connor, O'Donnell & Beck, P.C.
Attorney for Grist Mill Trust