UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

UNIVERSITAS EDUCATION, LLC,

               Petitioner,

     -v-                                     Nos.    11 Civ. 1590 (LTS) (HBP)
                                                    and
                                     11 Civ. 8726 (LTS) (HBP)

NOVA GROUP, INC., as trustee, sponsor and
fiduciary of THE CHARTER OAK TRUST
WELFARE BENEFIT PLAN,

               Respondent.

------------------------------------------------------x

<u>MEMORANDUM OPINION AND ORDER</u>

        Following the entry of judgment in its favor in the above captioned-actions,

Universitas Education, LLC ("Petitioner") petitioned this Court for an order to show cause as to

why United Services Automobile Association ("USAA") should not be required to turn over to

Petitioner the USAA insurance proceeds claimed in connection with any property owned at any

point in time by Moonstone Partners, LLC ("Moonstone"), Daniel E. Carpenter, or Molly

Carpenter (together with Moonstone, the "Moonstone Respondents"), or any nominee or related

party of any of them.  The Court issued the order to show cause, which included temporary

restraining orders, and scheduled a hearing on the turnover application.  USAA does not oppose

Petitioner's application, although its attorneys have made appearances (docket entry nos. 227and

228).  The Moonstone Respondents have entered appearances and oppose the petition for an

order to show cause.

The Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331, 1332(a)(1) and 1441, and under Federal Rule of Civil Procedure 69.

The Court held a bench trial on May 9, 2013.  The Court has considered carefully all of the submissions and arguments of the parties, the documentary evidence, including transcripts of deposition testimony, and the courtroom testimony.  In accordance with Federal Rule of Civil Procedure 52(a), this Opinion constitutes the Court's findings of fact and conclusions of law.  To the extent any finding of fact includes conclusions of law it is deemed a conclusion of law, and vice versa.  For the following reasons, the Petition is granted in part.

FINDINGS OF FACT

This case is part of a lengthy and ongoing dispute over the disposition of the $30 million in proceeds of two life insurance policies obtained by the late Sash A. Spencer, who was the Chief Executive Officer of Holding Capital Group, Inc.  Mr. Spencer placed the two life insurance policies into the Charter Oak Trust Welfare Benefit Plan ("Charter Oak Trust") which was "established to provide for the acquisition of and investment in various types of insurance policies to provide a welfare benefit fund or estate planning benefits," pursuant to a Funding Obligation Agreement and Power of Attorney.  (Ex. E at 1.)  Mr. Spencer named Petitioner the sole, irrevocable beneficiary of a Charter Oak Trust death benefit comprising the proceeds payable under two life insurance policies, whose face values totaled $30 million (the "Life Insurance Proceeds").  (Ex. 28 at ¶16.)  Mr. Spencer died in June 2008, and Petitioner made a valid and timely claim to the Life Insurance Proceeds.  (Ex. 18 at 3-4.)

Nova Group, Inc. ("Nova") and the Charter Oak Trust Welfare Benefit Plan ("Charter Oak Trust") are two of the hundreds of business entities organized and controlled, directly or indirectly, by respondent Mr. Carpenter.  Wayne H. Bursey was, at relevant times,

President of Nova and trustee of the Charter Oak Trust.  Ms. Carpenter is married to Mr.

Carpenter, and Mr. Bursey is Ms. Carpenter's brother-in-law.  (May 9 Tr. at 26:14-21 and 58:8-

13.)  Nova is the corporate trustee of the Charter Oak Trust.  (Ex. 31 at ¶5.)  After Petitioner made

its death beneficiary claim,  Mr. Bursey sought payment from the insurer, acknowledging in

writing that Nova had "a fiduciary responsibility and legal obligation to carry out Mr. Spencer's

wishes as he intended in a timely fashion to pay those death proceeds to a charity that he

established prior to his death."  (Ex. 18 at pg. 2.)  The insurer paid Charter Oak Trust $30.67

million in Life Insurance Proceeds, including interest, and Mr. Bursey signed for the deposit as

trustee.  (Ex. 1.)  In May 2009, after receiving payment of the Life Insurance Proceeds, Nova

denied Petitioner's death benefit claim.  Petitioner challenged the denial through a demand for

arbitration filed on June 17, 2010; a binding arbitration award against Nova, upon which judgment

has been entered by this Court, was issued on January 24, 2011 in the amount of $26,525,535.98.

(Ex. 18.)  The arbitration award explicitly reduced the benefit amount payable to Petitioner from

the $30 million in insurance proceeds to account for  fees and expenses of $4.02 million, that the

arbitrator found had been appropriately charged by Grist Mill Capital, LLC ("Grist Mill"), another

Carpenter affiliate, against the benefits payable to the Petitioner in connection with Grist Mill's

role in funding the policy premiums.  (Ex. 18 at pg. 9.)  To date, No payment has been made to

Petitioner to satisfy the arbitration award.

        Petitioner filed a complaint against Nova, as trustee, sponsor, and fiduciary of the

Charter Oak Trust, in the Supreme Court of the State of New York, County of New York, to

enforce the arbitration award.  Separately, Nova commenced an action in the United States District

Court for the District of Connecticut seeking to vacate the arbitration award.  Nova removed

Petitioner's state court action to this Court in March 2011, and the Connecticut action was

transferred to this Court and consolidated under this case caption in January 2012.  This Court

entered an Order confirming the arbitration award and dismissing Nova's action on June 5, 2012.

On June 7, 2012, judgment was entered in favor of Petitioner upon the arbitration award  in the

amount of $30,181,880.30 (the "Judgment"), comprising the $26,525,535.98 arbitration award and

prejudgment interest.  (Docket entry no. 41.)  On October 5, 2012, this Court granted Petitioner

$268,810.01 in attorneys' fees in addition to the Judgment.  (Docket entry no. 162.)  To date, the

Judgment has not been satisfied.  Petitioner has engaged in wide-ranging discovery efforts in aid of

execution of the Judgment, which have been met with vigorous opposition by Nova and its

affiliates.  In a Report and Recommendation issued in connection with these discovery and

execution efforts, Magistrate Judge Pitman noted that Nova "has resisted all efforts to enforce the

judgment and has failed to disclose the current location of the proceeds of the insurance policies."

(Docket entry no. 176.)[1]  The Court adopted the Report and Recommendation, imposing sanctions

on Nova and its former attorney, Jack E. Robinson.  (Docket entry no. 295.)

Mr. Carpenter's Retention of the Life Insurance Proceeds

---

[1]      Mr. Bursey has asserted his Fifth Amendment right against self-incrimination
regarding essentially all matters relevant to this case, including the operation of
Charter Oak Trust, the validity of any liens in favor of Grist Mill; the location or
transfers of the Life Insurance Proceeds; and his role in GM Trust, Grist Mill, or any
of the Carpenter related entities.

The Carpenters have each invoked the Fifth Amendment at various times during
discovery in this case.  In his October 2012 deposition, Mr. Carpenter asserted his
Fifth Amendment right against self-incrimination in response to all substantive
questions about the whereabouts of the Life Insurance Proceeds.  It was only later
that Mr. Carpenter agreed to testify regarding the location of the Life Insurance
Proceeds, in an apparent attempt to assert fabricated defenses to the paper trail that
Petitioner had uncovered.  Similarly, Ms. Carpenter also asserted the Fifth
Amendment at her first deposition, in November 2012, but did not assert the Fifth
Amendment at her April 2013 deposition in connection with the instant turnover
proceeding.  The Court finds both Carpenters' testimony to be wholly self-serving
and unreliable.

Respondent Daniel E. Carpenter has founded and controlled hundreds of companies out of his offices at 100 Grist Mill Road in Simsbury, Connecticut.  (<u>See</u> Tr. at 47:23-25, 48:1-5.) Some of these companies appear to have conducted a variety of businesses; among them was the management of welfare benefit and estate planning trusts, including the Charter Oak Trust; others are holding or shell entities.  Nova, a Delaware corporation, was the trustee of the Charter Oak Trust.  Mr. Carpenter was an officer of Nova; at times he signed official filings as "Chairman" or "Secretary."  These signed documents, including tax returns, demonstrate that he was an officer of Nova from at least 2008 through 2011.  (Exs. 7, 8, 9, and 10.)  Mr. Bursey, as President of Nova and trustee for the Charter Oak Trust, was the only signatory on the Charter Oak Trust accounts. (Ex. 1 at 0008).  In his testimony in connection with this matter, Mr. Carpenter nonetheless denied having any relationship with Nova (for example, he testified that he had signed tax returns and other documents indicating that he was "Chairman" and "Secretary" of Nova without reading them carefully).  (<u>See</u> May 9 Tr. at 45:3-5.)  The Court, heaving observed Mr. Carpenter's demeanor while testifying and having reviewed the evidence, finds this testimony incredible.

Mr. Carpenter also had control over the Charter Oak Trust, as demonstrated not only by his positions with Nova, but also by his actions on behalf of the trust itself.  In May 2009, Mr. Carpenter wrote e-mails to representatives of Bank of America which indicated, first, that he was attempting to open an account for Charter Oak Trust and, later, that "we have already opened new accounts for the Charter Oak Trust with two major banks."  (Ex. 12.)  Mr. Carpenter acknowledged that he had sent the e-mail, saying "it definitely looks like Dan Carpenter," but he denied having been involved in setting up accounts for Charter Oak Trust.  (May 9 Tr. at 56-57.) Again, the Court finds this testimony incredible, and finds that Mr. Carpenter directly controlled material aspects of the affairs of Nova and the Charter Oak Trust during the relevant period.

In order to retain the Life Insurance Proceeds for himself and/or his affiliated entities, Mr. Carpenter orchestrated a series of transfers of money through accounts of various entities that he controlled, withdrawing millions of dollars of the Life Insurance Proceeds from Charter Oak Trust and sending them to Grist Mill.  Mr. Carpenter is the only individual with an ownership interest, membership interest, or beneficial interest, direct or indirect, in Grist Mill.  (May 9 Tr. at 67:1-3.)  Mr. Carpenter held Grist Mill through its two members Caroline Financial Group, Inc. ("Caroline Financial") and Grist Mill Holdings, LLC ("GM Holdings"), each of which is wholly owned by Mr. Carpenter.  (May 9 Tr. at 25:2-4; Ex. 22 at 47:15-18 ("[GM Holdings] is my alter ego for collecting commissions.").)  Mr. Bursey, in addition to serving as trustee of the Charter Oak Trust and President of Nova, served as a "manager" at Grist Mill.  (Ex. 14.)  In testimony that again strained credulity, Mr. Carpenter proffered that Mr. Bursey was identified as a manager at Grist Mill in error.  (May 9 Tr. at 59.)  The Court finds that Mr. Bursey was a manager of Grist Mill.  Mr. Bursey transferred the Life Insurance Proceeds funds from a Charter Oak Trust account, newly opened at TD Bank and with no other assets, to a newly opened account in the name Grist Mill, eventually moving nearly all of the approximately $31 million of the Life Insurance Proceeds (including accrued interest) by October 2009.  Two of the transfers into a Grist Mill bank account, at issue in the instant petition, were made in May 2009, in the amounts of $8,677,276.75 and $2,186,566 (totaling approximately $10.8 million).  (Ex. 1 at 357.)

In its papers in support of the instant order to show cause, Petitioner demonstrates that a large portion of the Life Insurance Proceeds were transferred without consideration from the Charter Oak Trust through Grist Mill and to other entities that Mr. Carpenter controls, and that some of those proceeds were ultimately applied to purchase and insure a vacation property located at 392B Cards Pond Road in South Kingstown, Rhode Island (the "Property") for the benefit of Mr.

Carpenter and his wife.  The property and casualty insurance proceeds that Petitioner seeks to have

turned over in partial satisfaction of the Judgement are payable on account of storm damage to the

Property.

The Carpenter Entities that Received Relevant Portions of the Life Insurance Proceeds

Both Petitioner and the Moonstone Respondents agree that a portion of the Life

Insurance Proceeds traveled through the accounts of certain entities.  The Court finds that each of

these entities was controlled by Mr. Carpenter.  The parties agree that Mr. Carpenter controlled

each of the following entities: Grist Mill, GM Holdings, Phoenix Capital Management, LLC

("Phoenix"), Hanover Trust Co. ("Hanover"), and Moonstone.  Each of these had an account

opened on its behalf at TD Bank after Charter Oak Trust's receipt of the Life Insurance Proceeds.

Finally, each of these entities shared the office at 100 Grist Mill Road.

The Moonstone Respondents allege that certain of the Life Insurance Proceeds were

transferred to the Grist Mill Trust (the "GM Trust").  Mr. Carpenter testified, but proffered no

corroborative documentary evidence, that he was not in control of the GM Trust. His testimony is

not credible.  He acknowledged that he initiated a plan, relevant to the activities of the Charter Oak

Trust, for Grist Mill to enter into "split dollar arrangements" with GM Trust to fund insurance

policies.  (May 9 Tr. at 53:8-11.)[4]  Furthermore, Mr. Carpenter and Mr. Bursey have each been

identified as "trustees" of the GM Trust, and, Ms. Carpenter was identified as a "signer" on the

account.  (Ex. 6; Ex. 31 at pg. 8.)  GM Trust had an office at 100 Grist Mill Road, along with the

other entities Mr. Carpenter admitted to controlling.  (May 9 Tr. at 41:22-24.)  The Court finds that

Mr. Carpenter controlled the GM Trust during the relevant period.

---

[4]     So-called "Split Dollar Arrangements" are financing mechanisms for life insurance
policies that allow the costs of premiums to be split and the benefits of such a policy
to be shared with a third-party.  See Conemaugh Star Plan Welfare Benefit Plan &
Trust v. Fisher, 536 F. Supp. 2d 231, 233 (D. Conn. 2008); 26 C.F.R. § 1.61–22.

The Flow of Funds from Charter Oak Trust to Moonstone

        Petitioner alleges that the purchase money for the Property was transferred from the

Charter Oak Trust account, which at all relevant times held only the Life Insurance Proceeds, to the

Grist Mill account, to the GM Holdings Account, then the Hanover account, and finally, to the

Moonstone account.  None of the other accounts held more than $1000 before these transfers.

Thus, they argue, the purchase money must have been paid out of the Life Insurance Proceeds.

        The Moonstone Respondents offer an alternative account of the flow of money,

which still begins with Charter Oak Trust and ends with Moonstone's purchase of the Property.

Mr. Carpenter asserted in his testimony that money flowed out of Charter Oak Trust to Grist Mill

and then to the GM Trust as the result of alleged loan repayments in the amount of $3.79 million.

(See Ex. H at 359.)  Mr. Carpenter testified that he did not simply transfer money from the GM

Trust; rather, he requested a loan in the amount of $2.7 million on behalf of Phoenix Capital

Management, LLC ("Phoenix"), from a Ms. Donna Dawson, who apparently was authorized to

distribute funds as a loan from the GM Trust.  (See May 9 Tr. 21-23.)  Phoenix is another shell

company that Mr. Carpenter operates out of 100 Grist Mill Road; he is its sole owner and it has no

employees.  (Ex. 22 at 34:19-24.)  No evidence was presented to document that this transfer was in

fact a loan, what the repayment schedule was, or what interest rate was set.  Nor have the

Moonstone Respondents demonstrated that any repayments have been made against this alleged

loan.  From there, the money was sent back to Grist Mill, with no explanation for the transfer in the

amount of $2.5 million on July 13, 2009.  (Ex. 1 at pgs. 345, 361.)  $2.2 million of the money then

was transferred to GM Holdings on July 13, 2009, again with no explanation for the transfer.  (Ex.1

at pg. 1365, 1366.)  GM Holdings thereafter transferred $1.2 million to Hanover on July 15, 2009,

again without explanation.  (Ex. 1 at pg. 1365, 1366.)  Finally, in this flurry of unexplained

transfers, Hanover transferred $1.1 million to Moonstone on July 15, 2009, the day Moonstone

purchased the vacation property for $1.1 million.  (Ex. 1 at pgs. 1008, 1397.)

        No credible, legitimate rationale for any of these transfers has been offered.  In his

deposition, Mr. Carpenter asserted that there was a promissory note documenting a loan obligation

from Moonstone to Hanover.  The note was, however,  created more than three months after the

closing date.  (Ex. 22 at 32:17-20.)  In fact, Mr. Carpenter admitted in his deposition that, three

months after the purchase of the Property, because of "aggressive" litigation in Boston, he thought

"the best thing to do was to establish a direct loan with [Hanover], so that in the case that

somebody was going after [him] tangentially, the property basically would be safe."  (Ex. 22 at

33:6-13.)  Ms. Carpenter, who purportedly owned 99% of Moonstone, testified at her deposition

that the Property was not purchased with a loan of any kind.  (Ex. 23 at 19:16-23.)  In October

2010, Mr. Carpenter testified, that a year after the promissory note was written, he created a

mortgage against the Property in favor of Hanover.  (May 9 Tr. at 79:14-19.)  The date of the later

mortgage filing was contemporaneous with the ongoing arbitration proceeding in this case, which

began in June 2010 and terminated with the arbitration award in January 2011, and the purpose of

this mortgage appears to have been to further protect the Property from collection by certain other

creditors, rather than to secure any loan that Mr. Carpenter had actually arranged between his two

shell companies, Hanover and Moonstone.  (See May 9 Tr. at 80:7-24.)

        The Court finds that both Petitioner's and Moonstone Respondents' theories of the

flow of the Life Insurance Proceeds among the various entities demonstrate that Mr. Carpenter

caused the Life Insurance Proceeds that ended up at Moonstone to be transferred through a series

of entities that he controlled without any contemporaneous or genuine consideration.

The Purchase of the Property

   Mr. Carpenter, through his corporate shell Caroline Financial, and his wife, Ms. Carpenter, formed Moonstone Partners, LLC on April 20, 2009.  (Ex. 3.)  Ms. Carpenter purportedly holds 99% of the ownership interest of Moonstone, however, all documentary evidence and the testimony suggest that Mr. Carpenter acted on the company's behalf in connection with the receipt of funds and the purchase of the Property.  At the time of the bench trial, and at all relevant times beforehand, Moonstone had no employees or operations.  Its sole purpose appears to have been the purchase of the Property.  (See May 9 Tr. At 26:17-21.)

   Shortly after Moonstone was created, it purchased the Property.  (Ex. 23 at 6:20-24.)  Mr. Carpenter had made a $1.2 million offer for the Property, on April 8, 2009, on Grist Mill letterhead, purporting to be acting on behalf of Moonstone.[5]  Mr. Carpenter testified that the offer was later reduced to $1.1 million due to problems with the Property.  (May 9 Tr. at 89-90.)

The Closing on the Property and Subsequent Insurance Claims

   On July 15, 2009, Moonstone closed the deal for the Property, paying $1.1 million that was transferred from the Hanover account on the same day.  Moonstone obtained insurance policies covering the Property through USAA.  Moonstone paid the insurance premium with a check in the amount of $3,469.37 drawn on the same Moonstone account at TD Bank that it drew on to purchase the Property.  During the last few days of October 2012, Hurricane Sandy struck the Atlantic Coast of the United States and reportedly inflicted significant damage on the Property. The Carpenters filed several damage claims with USAA.  (Reyhani Decl. Ex. 3.)  On February 25, 2013, after a series of discussions with Petitioner's counsel, USAA informed Petitioner that it would pay the claims imminently unless it received a court order to the contrary.  (Reyhani Decl.

---

   [5] Mr. Carpenter also sought, and was denied, a loan from Washington Trust, a Rhode Island Bank, on behalf of Moonstone.  (May 9 Tr. at 60:20-25, 61:1-10).

Ex. 1.)  Petitioner subsequently filed the instant petition for an order to show cause on March 4, 2013. (Docket entry no. 219.)

The Moonstone Respondents' Defenses

The Moonstone Respondents argue that, at the time the Life Insurance Proceeds were transferred to the GM Trust, the GM Trust had at least $1.2 million in its account that was "from sources unconnected in any way to the funds GM Trust received from Grist Mill on June 9, 2009." (Docket entry no. 272 at ¶ 25.)  They have offered no evidence to demonstrate the source of this money, only a description of the funds held in the GM Trust's account before the transfers from Grist Mill.  (Ex. R.)  They assert that the purchase money for the Property should be deemed to have been drawn from these funds rather than money removed from Charter Oak Trust.  Secondarily, they argue, even if the Property purchase money did come from the Life Insurance Proceeds, the portion transferred should be attributed to the $4.02 million found by the arbitrator to be payable to Grist Mill rather than to the $26 million plus interest that remains due to Petitioner.

Finally, the Moonstone Respondents offer two February 2007 UCC-1 financing statements filed with the Delaware Department of State.  One purportedly documents a security interest in all of the assets of Nova, as trustee for the Charter Oak Trust, in favor of Grist Mill, and the second that purportedly documents a security interest in all assets of the Charter Oak Trust in favor of Grist Mill. (Ex. C.)  Mr. Carpenter testified that Grist Mill had previously loaned the Charter Oak Trust approximately $60 Million to finance life insurance policies, yet offered no documentary evidence to support the allegation. (See May 9 Tr. at 96-101.)  Mr. Carpenter admitted that the only documentation even arguably related to such a loan was a promissory note purportedly documenting an obligation of Grist Mill to an entity called Ridgewood Finance, Inc. ("Ridgewood").  Mr. Carpenter relies solely on his testimony that, as part of the loan proceeds

under this promissory note with Ridgewood, Charter Oak Trust borrowed well in excess of $10,863,842.75 from Grist Mill.  In fact, Mr. Carpenter could point to no promissory note, default notice, or other documentation that there was ever an obligation or promise by Charter Oak Trust to pay Grist Mill anything, other than the $4.02 million payable under the arbitration award.  Mr. Carpenter's testimony confirmed that neither Nova nor the Charter Oak Trust had any payment obligation directly to Ridgewood.  (See May 9 Tr. at 97:24-25, 98:1-5; see also Ex. A.)

In the arbitration proceeding, Nova had proffered five reasons for the denial of Petitioner's claim to the Life Insurance proceeds.  Not one of those reasons had anything to do with a purported loan repayment obligation to Grist Mill.  Nova's spurious defenses to payment ranged from Petitioner's supposed waiver of the right to $30 million based on failure to fill out the proper claim form to alleged secret agreements among the parties that Mr. Spencer would transfer the rights to the Life Insurance Proceeds to Grist Mill. (Ex. 18.)  The arbitrator rejected Nova's defenses.  (Ex. 18 at 4-5.)  The arbitrator found that Nova had breached its fiduciary duties to the Petitioners by denying its claims to the Life Insurance Proceeds held in trust by the Charter Oak Trust, and by Nova as trustee.  (Ex. 18 at 2-3.)

Investigation by an Independent Agent

Amid the heated discovery dispute regarding the whereabouts of the Life Insurance Proceeds, Grist Mill appointed Peter A. Goldman, Esq. as its agent to review documents and testify on its behalf.  Mr. Goldman testified at the May 9 bench trial that he also represented Charter Oak Trust and Nova as their agents.  Mr. Goldman also testified that he was originally contacted by Mr. Carpenter's attorney to undertake the representation of Grist Mill, and that he was contacted by the attorneys for Nova and the Charter Oak Trust to represent those entities, all in an attempt to "determine what happened to $30 million."  (May 9 Tr. at 120:20-22.)  Mr. Goldman testified that

he had reviewed certain records of Grist Mill, and that he confirmed that there had been transfers totaling about $31 million from the Charter Oak Trust.  (May 9 Tr. at 115:14-24.)  He reported that he could not explain why the Charter Oak Trust had made any of the three transfers to Grist Mill, including the two transfers in May 2009 which totaled over $10.8 million.  (May 9 Tr. at 114:5-25, 115:21-25, 116:1-17.)  As to $19.8 million that was transferred from Charter Oak Trust to Grist Mill in October 2009, Mr. Goldman reported that it was recorded in the Grist Mill's general ledger as an "unknown deposit."  (May 9 Tr. at 118:19-20.)

The Court finds that Mr. Carpenter caused Nova, the Charter Oak Trust, and other affiliated entities, directly or indirectly, to transfer the Life Insurance Proceeds to which Petitioner is entitled.  Mr. Carpenter caused the Life Insurance Proceeds to be transferred to and through entities that he controlled, either directly or indirectly, including Moonstone, for the personal benefit of Mr. Carpenter and his affiliates.

CONCLUSIONS OF LAW

Federal Rule of Civil Procedure 69 requires that a money judgment be enforced by a writ of execution and provides that "the procedure on execution . . . must accord with the procedure of the state where the court is located."  Under New York law, a judgment creditor may move by way of a special proceeding against property not in possession of the judgment debtor, in which the judgment debtor has an interest, where:

> [I]t is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee . . . .

N.Y. C.P.L.R. 5225(b) (McKinney 1997).  "[T]he rule provides for a two-step analysis in determining whether property belonging to a judgment debtor—but in the possession of a third party—should be turned over to a judgment creditor.  First, it must be shown that the judgment

debtor has an interest in the property the creditor seeks to reach.  Where this first step is satisfied,

the trial court must, second, then make one of two findings: it must find either that the judgment

debtor is entitled to the possession of such property, or it must find that the judgment creditor's

rights to the property are superior to those of the party in whose possession it is.  Only after both

steps of the analysis are demonstrated may the trial court order the transferee to turn over the

property to the judgment creditor . . . ."  Beauvais v. Allegiance Sec., Inc., 942 F.2d 838, 840-41

(2d Cir. 1991) (internal quotation marks omitted).

       "A judgment creditor may use Section 5225(b) 'as the means to set aside a transfer

made by a judgment debtor to defraud his creditors.'"  Leser v. U.S. Bank Nat. Ass'n, 09 Civ.

2362, 2013 WL 3788877, at *8 (E.D.N.Y. July 18, 2013) (quoting Gelbard v. Esses, 96 A.D.2d

573, 465 N.Y.S.2d 264, 267 (N.Y. App. Div. 2d 1983)).[6]

      Under the New York Debtor and Creditor Law, a conveyance may be avoided as

actually fraudulent or constructively fraudulent.  See N.Y. Debt. & Cred. Law §§ 273, 275

(McKinney 2012).

---

[6]    The Funding Obligation Agreement and Power of Attorney for the Charter Oak
Trust, the agreement under which Grist Mill and Nova agreed to fund the trust,
provides that it will be governed by New York law.  (Ex. E at 1.)  Furthermore, both
of Mr. Spencer's Election of Participation & Beneficiary Designation Forms with
respect to the two life insurance policies at issue in this case state that each
agreement "shall be governed by the laws of the State of New York."  (Ex. D.)  On
the other hand, the arbitrator found that Connecticut law applied to the Charter Oak
Trust Welfare Benefit Plan. (Ex. 18.)  Petitioner cites New York fraudulent
conveyance law in its submissions, and the Moonstone Respondents do not object to
its application or argue that application of another forum's law would .  Consequently,
the Court applies New York law.

Collapsing the Phases of a Fraudulent Conveyance

      "[I]t is well-established that if any component of a transfer is deemed fraudulent, the entire transfer must be voided in its entirety."  Leser, 2013 WL 3788877, at *8 (citing HBE Leasing Corp. v. Frank, 48 F.3d 623, 635 (2d Cir.1995)).  The court may "collapse" a series of related transactions and treat them as "phases" of the same transaction.  HBE Leasing, 48 F.3d at 639.  "In equity, substance will not give way to form, and technical considerations will not prevent substantial justice from being done.  Thus, an allegedly fraudulent conveyance must be evaluated in context . . . . "  Orr v. Kinderhill Corp., 991 F.2d 31, 35 (2d Cir. 1993) (quotation marks and internal citation omitted).

      Here, although there was a series of transfers through a variety of entities, the evidence demonstrates that each entity that received Life Insurance Proceeds was controlled by Mr. Carpenter.  The transactions directly at issue here were structured with a single purpose, to remove a portion of the Life Insurance Proceeds from the Charter Oak Trust and to purchase a property for the Carpenter's personal use, insulated from the reach of Mr. Carpenter's creditors (and, of course, from Petitioner's claim).  The fact that Mr. Carpenter moved assets through a series of his shell companies, while relevant to the Court's analysis of fraudulent intent, had no impact on the equities of the transaction.  Thus, if the original transfer away from the control of the judgment debtor, Nova, as trustee for the Charter Oak Trust, was a fraudulent conveyance, the entire transaction was fraudulent and void.

Actual Fraud under Section 273

      A debtor's conveyance made with the "actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."  N.Y. Debt. & Cred. Law § 276 (McKinney 2012).  Under

section 276, "[t]he existence of actual intent to defraud is never presumed, and intent to defraud cannot be found 'based merely on suspicion, conjecture, or doubtful inference.'"  Lippe v. Bairnco Corp., 249 F. Supp. 2d 357, 375 (S.D.N.Y. 2003), aff'd, 99 F. App'x 274 (2d Cir. 2004). Therefore, "[a]ctual fraudulent intent must be proven by clear and convincing evidence, but it may be inferred from the circumstances surrounding the transaction, including the relationship among the parties and the secrecy, haste, or unusualness of the transaction."  HBE Leasing, 48 F.3d at 639.

    Under section 276 of the Debtor and Creditor Law, courts have applied "an analysis of 'badges of fraud' associated with the transaction, which are 'circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent,' to hinder, delay, or defraud a present or future creditor."  See Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp., No 04 Civ. 4971, 2013 WL 417352, at *11 (E.D.N.Y. Jan.29, 2013) (internal quotation and citation omitted).  These "badges of fraud" include: 1) inside transactions among related entities, 2) hasty transfers made outside the ordinary course of business, 3) inadequate or lack of consideration, 4) secret transfers, 5) retention of control by the transferor, and 6) creation of a shield of property from creditors.  See Lippe, 249 F. Supp. 2d at 375; Lesser, 2013 WL 3788877, at *8.  Alternatively, absence of these indicators -- "evidence that fair consideration was paid, the parties dealt at arm's-length, the transferor was solvent, the transfer was not questionable or suspicious, the transfer was made openly, or the transferor did not retain control" -- suggests that no fraudulent intent was present.  Lesser, 2013 WL 3788877, at *8.

    Here the badges of fraud are manifold.

    First, this was an inside transaction involving closely related entities.  The evidence demonstrates that Mr. Carpenter not only controlled Grist Mill, but also Nova, the Charter Oak Trust, the GM Trust, Phoenix, GM Holdings, and Moonstone, all out of his office at 100 Grist Mill

Road.  The Court finds that Mr. Carpenter controlled all of the relevant entities that received money from the Charter Oak Trust account.  It is highly probative that each of these entities shared the office at 100 Grist Mill Road, from which Mr. Carpenter admits to having established and controlled hundreds of entities, including each of those involved in this transaction.  It is also indicative of the close relationship between the entities that Mr. Goldman, retained by Mr. Carpenter's attorney to act as agent of Grist Mill, was also retained to act as an agent of the Charter Oak Trust and Nova.  Moreover, time and again, Mr. Carpenter's name appears on the filings of the various entities in capacities indicating positions of responsibility.  Despite his self-serving denials, the Court finds that these transactions, including the initial transactions removing $10.8 million of the Life Insurance Proceeds from the Charter Oak Trust to the Grist Mill account, were phases of a transaction among related entities, each of which Mr. Carpenter controlled.

Second, the evidence demonstrates that the transfers were hasty and not in the ordinary court of business.  Many of the transfers were done in the two-day period before Moonstone purchased the Property.  Most telling of all is the alleged loan between Charter Oak Trust and Grist Mill, which was allegedly made for millions of dollars, but for which Mr. Carpenter can show no promissory note and no record of repayment or default notice.  The Court also finds fraudulent the promissory note and mortgage in favor of Hanover that were made months after the transaction, and admittedly only for purposes of shielding the Property from certain of Mr. Carpenter's creditors.  Moreover, the Moonstone Respondents fail to offer any explanation at all for many of the money transfers, a strong indication that they were not in the ordinary course of business, but rather were undertaken for the purpose of shielding the money from creditors.

Third, the conveyances were without consideration.  Grist Mill received $10.8 million in funds from the Charter Oak Trust in June 2009 alone, with no consideration given aside

from the prior payment of insurance premiums for which the arbitrator held that Grist Mill was

entitled to only $4.02 million.  Mr. Goldman testified, after reviewing the transfers in his role as

agent for Grist Mill, that he could find no explanation for the payments from Charter Oak Trust.

Moreover, although the Moonstone Respondents allege that Grist Mill loaned Charter Oak Trust

$60 million, they offered no evidence of the existence of the loan other than the testimony of Mr.

Carpenter, which was not at all credible.  Furthermore, each of the subsequent transactions between

the entities is similarly lacking consideration.  Mr. Carpenter's suggestion that Grist Mill owed the

GM Trust millions of dollars has no corroborating basis in the documentary record.  Moreover, Mr.

Carpenter's testimony regarding loans from the GM Trust to Phoenix Capital Management, and

from Hanover to Moonstone, is entirely incredible and unsubstantiated by documentary evidence.

Thus, the transfers clearly lacked consideration.

Fourth, the transfers were done in secret.  Neither Nova, nor any other of Mr.

Carpenter's other entities, informed Petitioner that it was removing the Life Insurance Proceeds

from the Charter Oak Trust.  Despite the fact that Mr. Bursey had earlier acknowledged a fiduciary

duty to pay Petitioner the trust funds, he proceeded to transfer the entire amount of the Life

Insurance Proceeds to Grist Mill over a period of six months while wrongly denying Petitioner's

claims.  Petitioner was forced to engage in extensive, fiercely resisted, discovery to uncover the

transfers.

Fifth, the transactions were for the sole purpose of retaining the benefit of the Life

Insurance Proceeds for the Carpenters.  As discussed above, Mr. Carpenter controlled each of the

entities that received the Life Insurance Proceeds.  Indeed, Mr. Carpenter admitted to orchestrating

the creation of the promissory note and mortgage related to the purchase of the Property as an

attempt to protect "his" property from his creditors.  Through these transactions, Mr. Carpenter

retained control of the Life Insurance Proceeds for himself and avoided paying Petitioner, a

creditor of Nova and the Charter Oak Trust, the Life Insurance Proceeds to which it is entitled.

Sixth, the transactions were orchestrated as a complex method of secreting property

away from a variety of creditors of Mr. Carpenter and of his entities.  The two purported loans,

made by the GM Trust to Phoenix and Hanover to Moonstone, each with no documentation of

intent to lend money and no repayments demonstrated, are among the indicia of a scheme to move

money away from Nova's creditors.  See Leser, 2013 WL 3788877, at *10 (holding that a

purported loan that had no repayments was a fraudulent mechanism to shield money from

creditors).  Mr. Carpenter was able to hide the Carpenters' taking of the Life Insurance Proceeds

for years because of the complexity of the bank transfers, Mr. Carpenter's creation of a new entity

to hold title to the Property, and Nova's resistance to efforts to locate the Life Insurance Proceeds

through discovery litigation.

Constructive Fraud under Section 275

Under New York Debtor and Creditor Law, a transfer that is without fair

consideration and occurs at a time when the debtor "believes that he will incur debts beyond his

ability to pay as they mature, is fraudulent as to both present and future creditors."  N.Y. Debt. &

Cred. Law § 275 (McKinney 2012).  This "constructive fraud" under section 275 does not require

the debtor to have an actual intent to defraud, rather a creditor must demonstrate that the debtor's

subjective belief or intent was that it would become incapable of paying its creditors after the

conveyance.  MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co., 910 F.

Supp. 913, 943 (S.D.N.Y. 1995).  "Circumstances [indicative] of [an] actual intent to incur debts

beyond the ability [of a debtor] to pay may include: (1) the lack or inadequacy of consideration; (2)

the family, friendship or close associate relationship between the parties; (3) the retention of

possession, benefit or use of the property in question; (4) the financial condition of the party sought
to be charged both before and after the transaction in question; (5) the existence or cumulative
effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of
financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of
the events and transactions under inquiry." SungChang Interfashion Co., Ltd. v. Stone Mountain
Accessories, Inc., 12 Civ. 7280, 2013 WL 5366373, at *10 (S.D.N.Y. Sept. 25, 2013).

        As explained above, there was no fair consideration paid for the $10.8 million
transferred from Charter Oak Trust to Grist Mill in May 2009.  Mr. Bursey, on behalf of Nova,
acknowledged Nova's legal and fiduciary duty to pay to Petitioner the Life Insurance Proceeds
prior to the arbitration.  Furthermore, Petitioner had made claim to the funds in June 2008, well
before they were transferred out of the Charter Oak Trust account, which indicates that Nova knew
of the possibility of a law suit to collect the Life Insurance Proceeds.  Nova must therefore have
believed that it be unable to pay the benefit plan obligation to Petitioner when it drained its bank
account by transferring the Life Insurance Proceeds to Grist Mill.  As discussed above, there was
clearly a close association between the entities involved in this transfer, with Mr. Bursey moving
the funds to an entity controlled by his brother-in-law, Mr. Carpenter.  Finally, the chronology of
events, as discussed above in detail, clearly indicates an intent to shield the Life Insurance
Proceeds from creditors for the benefit of the Moonstone Respondents, which is also indicative of
the belief that Nova would be unable to pay all of its debts.  Under these circumstances, the Court
finds that Nova had the actual intent or belief that it would incur debts beyond its ability to repay
them and that the Property was purchased as part of a constructive fraudulent conveyance.

Defenses to Fraudulent Conveyance

        The Moonstone Respondents' defenses to the fraudulent conveyance claim are unavailing.  First, they offer no evidence to support the alleged $60 million loan from Grist Mill to Charter Oak Trust.  The Court finds that Mr. Carpenter's testimony is completely incredible in this regard.  Even assuming, <u>arguendo</u>, that this loan was made, the Moonstone Respondents have offered no explanation as to how such an obligation would entitle Grist Mill to repayment of funds held in trust by an entity that Mr. Carpenter controlled, which funds Nova, through Mr. Bursey, had admitted it had a fiduciary and legal duty to pay to Petitioner.

        Second, the Moonstone Respondents argue that the Property is not traceable to the Charter Oak Trust because GM Trust, one of the entities through which the financial transfers passed, also allegedly held at least $1.2 million in funds unrelated to the Charter Oak Trust.  Again, even assuming that the $1.2 million in the GM Trust account was unrelated to Charter Oak Trust, this argument is still unavailing.  It is a basic principle of equity that "the mere commingling of [other] property with the proceeds of property fraudulently transferred by the Debtor is not sufficient to defeat tracing."  <u>See</u> <u>In re Bernard L. Madoff Inv. Sec. LLC</u>, 08-01789, 2012 WL 892514, at *2 (Bankr. S.D.N.Y. Mar. 14, 2012).  Because the initial transfer of funds out of the Charter Oak Trust was clearly made with fraudulent intent, subsequent transfers for no consideration cannot "clean" the money for the Moonstone Respondents' benefit.

        Finally, the Moonstone Respondents argue that, because $4.02 million was payable to Grist Mill under the arbitration award, and because Moonstone was provided with only $1.1 million to purchase the Property, the Court must trace the Property to the $4.02 million rather than to the remainder of the $10.8 million that was transferred out of Charter Oak Trust in June 2009.  This argument is illogical.  The court declines to presume that fraudulently conveyed funds, mixed

with potentially legitimate funds, are traceable first to the legitimate funds, as this would lead to the inequitable result of permitting Mr. Carpenter and his affiliates to perpetuate their evasion of the legal obligation to pay the Life Insurance Proceeds to Petitioner through manipulation of money transfers.  See, e.g., United States v. Henshaw, 388 F.3d 738, 741 (10th Cir. 2004) ("[C]ourts exercise case-specific judgment to select the [tracing] method best suited to achieve a fair and equitable result on the facts before them.").

        The Court finds that Petitioner has proven by clear and convincing evidence that the Property was purchased and insured through fraudulent conveyances of Life Insurance Proceeds funds held in trust by Charter Oak Trust.  The Court also finds that the mortgage, and underlying promissory note, held by Hanover against Moonstone and the Property are invalid for lack of consideration and are fraudulent conveyances.  See Dolphin v. Marocik, 635 N.Y.S.2d 84 (1995) (holding a mortgage invalid for lack of consideration).  Mr. Carpenter testified that he caused the promissory note and mortgage to be created, months after the purchase of the property and the purported loan from Hanover to Moonstone, in an effort to frustrate the efforts of creditors to seize his assets.  This demonstrates the fraudulent purpose of the mortgage and the lack of any consideration paid for it.

        Therefore, the judgment debtor, Nova as trustee for Charter Oak Trust, has an interest in the Property and in any insurance proceeds arising from damage to the Property.  Petitioner's interest in the Property and any insurance proceeds is superior to those of the insurance company, USAA, and those of all of the Moonstone Respondents.  Accordingly, Petitioner, as judgment creditor, is entitled to the proceeds of any USAA insurance policies covering the Property.

C<small>ONCLUSION</small>

For the foregoing reasons, the turnover Petition is granted.  USAA is directed to pay to Petitioner, within fourteen days from the date hereof, the proceeds all policies held by any of the Moonstone Respondents and covering the Property.

The Order resolves docket entry no. 219.

SO ORDERED.


Dated: New York, New York
      November 20, 2013

                              ____/S_____
                              LAURA TAYLOR SWAIN
                              United States District Judge