1

        6IHUNIA
    1   UNITED STATES DISTRICT COURT
    1   SOUTHERN DISTRICT OF NEW YORK
    2   ------------------------------x
    2
    3   UNIVERSITAS EDUCATION, LLC,
    3
    4                   Plaintiff,
    4
    5             v.                          11 cv. 1590 (LTS)
    5
    6   NOVA GROUP, INC., et al.,
    6
    7                   Defendants.
    7
    8   ------------------------------x
    8                                        New York, N.Y.
    9                                        June 18, 2014
    9                                        2:45 p.m.
   10
   10   Before:
   11
   11                   HON. LAURA TAYLOR SWAIN,
   12
   12                                        District Judge
   13
   13                       APPEARANCES
   14
   14   LOEB & LOEB LLP
   15        Attorneys for Petitioner Universitas Education, LLC
   15   BY:  MICHAEL BARNETT
   16        PAULA K. COLBATH
   17   THE LAW OFFICE OF MICHAEL S. TAYLOR, LLC
   17        Attorney for Respondent Carpenter Financial, Phoenix
   18   Capital Management, Avon Capital, Hanover Trust
   18   BY:  MICHAEL S. TAYLOR
   19
   19   SIEGEL, O'CONNOR, O'DONNELL & BECK, P.C.
   20        Attorneys for Respondent Grist Mill Trust Welfare Benefit
   20   Plan
   21   BY:  GLENN A. DUHL
   21        ANGELICA M. WILSON
   22
   22   HALLORAN & SAGE LLP
   23        Attorney for Movant Molly Carpenter and Grist Mill
   23   Partners, LLC
   24   BY:  DAN E. LaBELLE
   24
   25

2

```
      6IHUNIA
 1    ANTHONY OSTLUND BAER & LOUWAGIE P.A
 1        Attorney for Interested Parties Minneapolis Trailer Sales,
 2    Inc., Keith Kornovich and Mark Kornovich
 2    BY:  KRISTIN B. ROWELL
 3
 3    MICHAEL H. BLOOM PC
 4        Attorney for Interested Party Gerald Williams
 4    BY:  MICHAEL H. BLOOM
 5
 6    ANTHONY J. SIANO
 6        Attorney for Movant Daniel Carpenter
 7
 7    BRIEF JUSTICE CARMEN & KLEIMAN, LLP
 8        Attorney for Respondent Nova Group,Inc.
 8    BY:  IRA KLEIMAN
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

6IHUNIA

```
 1              THE COURT:  Good afternoon.  Would everyone other than
 2    counsel at the tables please be seated.
 3              Good afternoon.  Can we have appearances, please,
 4    beginning with Universitas.
 5              MR. BARNETT:  Your Honor, Michael Barnett and my
 6    colleague, Paula Colbath.  We're from the firm of Loeb & Loeb
 7    here representing Universitas Education, LLC.
 8              THE COURT:  Good afternoon, Mr. Barnett, Ms. Colbath.
 9              MS. COBATH:  Good afternoon.
10              THE COURT:  And the rear table going from my right to
11    my left, please.
12              MR. TAYLOR:  Good afternoon, your Honor.  Michael
13    Taylor representing Carpenter Financial Group, Avon Capital,
14    Phoenix Capital Management, and Hanover Trust.
15              THE COURT:  Good afternoon, Mr. Taylor.
16              MR. DUHL:  Good afternoon, your Honor.  My name is
17    Glenn Duhl of Siegel, O'Connor representing the Grist Mill
18    Trust.  With me is Angelica Wilson who is not admitted to the
19    Bar here, but with your permission, I would ask she be able to
20    accompany on this matter.
21              THE COURT:  Certainly.  Good afternoon, Mr. Duhl.
22    Good afternoon, Ms. Wilson.
23              MR. LaBELLE:  Good afternoon, your Honor.  Dan
24    LaBelle representing Molly Carpenter and Grist Mill Partners,
25    LLC.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

6IHUNIA

```
 1              THE COURT:  Good afternoon, Mr. LaBelle.
 2              MS. ROWELL:  Good afternoon, your Honor.  My name is
 3    Kristin Rowell, and I represent interested parties, Minneapolis
 4    Trailer Sales, Inc., Keith Kornovich and Mark Kornovich.  In
 5    the briefing I have shortened that to the MTS parties for ease
 6    of the Court's reference.  Good afternoon.
 7              MR. BLOOM:  My name is Mike Bloom and I represented
 8    interested party Gerald Williams.
 9              THE COURT:  Good afternoon, Mr. Bloom.  Please be
10    seated.
11              And so in today's argument, I intend for you to focus
12    on the legal and factual authority for the nonfinancial relief
13    that's requested, the injunction, and the turnover or retitling
14    of particular insurance policies, and the determination of
15    rights of Universitas to proceeds that may or may not ensue
16    from certain pending litigation.
17              As I noted in the additional order that was faxed out
18    this morning, I will also expect to hear regarding the
19    necessity or not of establishing personal jurisdiction over the
20    third-party respondents and how service was accomplished by
21    Universitas in initiating this motion practice.
22              And so I do not intend to address specifically the
23    applications that have been made with respect to particular
24    insurance policies in this argument today.  Or with one
25    exception, address directly the financial relief in terms of
```

5

6IHUNIA

```
 1    money judgments that the petitioner seeks.  I will, however,
 2    need from petitioner an explanation of the reason for the
 3    differences in amounts sought as among Grist Mill Capital,
 4    Mr. Carpenter and Grist Mill Holdings.  And so that we're not
 5    all here until next week, I am going to provide time limits for
 6    remarks.  I will give Universitas 20 minutes.  Each person who
 7    wishes to speak in opposition for his or her party or groups of
 8    parties, I'm going to give you a presumptive five minutes.  To
 9    the extent you believe you need more, you'll explain that to me
10    and we'll work it out and then Universitas will have five
11    minutes for rebuttal.
12               And Mr. Halverson will be the official timekeeper for
13    this event.  He has signs that I hope you'll be able to read --
14    Why don't you try holding one up -- at ten minutes, five
15    minutes...
16               We have ten, five, three, one and timeout?
17               MR. HAVERSON:  Yes.
18               THE COURT:  And timeout.  So to help you pace
19    yourself, we don't get those fancy lights like they have in the
20    Court of Appeals so we have to make do with signs.
21               Greetings to everyone else that is here.
22               So counsel for Universitas.
23               And I think it would be helpful to the court reporter
24    if you do say your name when you speak.
25               MR. BARNETT:  Thank you, your Honor.  My name is
```

6

6IHUNIA

1   Michael Barnett with the law firm of Loeb & Loeb here
2   representing Universitas Education, LLC, your Honor.
3           May it please the Court, your Honor already explained
4   why we're here.  I'll go right to it.  Subject matter
5   jurisdiction, your Honor.  We believe first that there is an
6   independent basis for subject matter jurisdiction in the form
7   of diversity jurisdiction over all parties.  Universitas, it's
8   undisputed that its domicile is in New York as an LLC; and it's
9   also undisputed that for each of the respondents, each of the
10  respondents are residents of Connecticut and Delaware and the
11  amount in controversy exceeds $75,000.00.
12          THE COURT:  Now, for artificial entities such as LLCs,
13  citizenship is determined by reference to the citizenship of
14  the members rather than by principal place of business and
15  state of incorporation.  So are you prepared to make those
16  representations with respect to all noncorporate parties?
17          MR. BARNETT:  Yes, your Honor.
18          THE COURT:  And your representation is that there is
19  complete diversity?
20          MR. BARNETT:  Yes, your Honor.
21          And as support for this, aside from the Peacock line
22  of cases and the other cases, which I'm sure we'll go into,
23  this Court's decision in Cordius Trust versus Kummerfeld
24  citation 153 F.app. 761 in the Second Circuit noted in the
25  process of a proceeding for fraudulent conveyance and veil

6IHUNIA

```
 1    piercing that -- and this was a postjudgment proceeding -- that
 2    it had independent diversity jurisdiction and the Second
 3    Circuit affirmed on this basis.
 4             Your Honor asked us to address the Supreme Court's
 5    opinion in Peacock.  First, your Honor, while I will address it
 6    today as much as you'd like, I would also like to note that we
 7    also addressed this in our reply brief filed November 1st, 2013
 8    Docket Number 326 in the leading case.
 9             Peacock, a 1996 Supreme Court case, dealt not with
10    postjudgment proceedings, but a second cause of action in which
11    there was no independent jurisdiction.  So here we are in
12    postjudgment proceedings and there is an independent diversity
13    jurisdiction.  During the November 22nd, 2013 hearing when we
14    were talking about jurisdiction over Mr. Carpenter himself, I
15    believe that there was discussion along these lines about how
16    Peacock is distinguishable because here there is independent
17    jurisdiction and the same goes for today, your Honor.
18             Further, unlike in Peacock, the events relevant to our
19    motion today are the events underlying the arbitration.
20    Essentially, Mr. Carpenter, through various attorneys you see
21    here, one of the things he's arguing is that he's entitled to
22    the $30 million that the insurance carrier paid out.  That was
23    exactly the dispute in the arbitration.  So much so that I
24    believe your Honor found that Mr. Carpenter was estopped from
25    arguing some of these issues.
```

6IHUNIA

```
 1              Separately from the fact that Peacock is
 2    distinguishable on the grounds that there's independent
 3    jurisdiction, there's also the Second Circuit's decision in
 4    Epperson, which is 2001 and came after Peacock.  Epperson
 5    clarified Peacock Holding and said that even when there's not
 6    independent jurisdiction, there is ancillary jurisdiction in
 7    postjudgment proceedings over fraudulent conveyance actions.
 8    So that's an independent basis for jurisdiction here.
 9              Also, as established in the Cordius Trust case and
10    also in a Fourth Circuit decision called CF Trust 306 F3d 126,
11    alter ego claims can be heard in postjudgment proceedings where
12    independent basis for jurisdiction exists.
13              Your Honor asked us to address this Court's holding in
14    Ungar.  It's distinguishable on multiple grounds.  First, there
15    was no independent jurisdiction in that case.  Ungar only
16    addressed ancillary jurisdiction.  Ungar also noted that
17    Epperson was the seminal case dealing with ancillary
18    jurisdiction over fraudulent conveyance actions.  And Ungar
19    itself did not deal with fraudulent conveyances.  It was trying
20    to reach the assets held by a non-transferee.  And Ungar was
21    principally dealing with alter ego claims.  We do make alter
22    ego claims with respect to Mr.~Carpenter, but as far as all the
23    other respondents, they are the subject of fraudulent
24    conveyance actions, and so there's ancillary jurisdiction
25    there.  And then with respect to Mr. Carpenter there is
```

6IHUNIA
1   independent diversification jurisdiction over him
2           Furthermore, in Ungar, the events in that case were
3   not part of -- the events in the case that was decided that
4   your Honor asked us to address were not part of the action,
5   that first action that Ungar was talking about.
6           You Honor also asked us to address the issue of
7   whether, what effect, if any, is respondent's assertion that
8   they are no longer in possession of Universitas' assets.  First
9   of all, we believe this to be a conclusory assertion.  We're
10  not done yet in postjudgment discovery.  Given the course of
11  events in this proceeding and our dealings with Mr. Carpenter,
12  we're not prepared to accept any attorney arguments to the
13  effect of none of these entities has the money because there's
14  so many bank accounts and looking at all of them takes a lot of
15  time and there's just been no showing that they don't have the
16  money and we're going to assume otherwise until these
17  proceedings are over one way or another.
18          THE COURT:  You have not targeted particular bank
19  accounts in this proceeding.  You are looking for money
20  judgments rather than Writs of Execution as to particular
21  identified assets.  Am I correct?
22          MR. BARNETT:  Well, your Honor, we are looking for a
23  turnover order, one of moneys that they may have that may be
24  traceable to Universitas.  We're not -- because of the passage
25  of time, we can't be certain and we're not prepared to

6IHUNIA

```
 1   represent that certain monies are traceable to Universitas.
 2          THE COURT:  You haven't offered particular proof of
 3   traceability as to assets; and, again, this is not a garden
 4   variety turnover proceeding in which the petitioner says here
 5   is X, here is X bank account or X debt or here's something else
 6   that's specifically identifiable and what I'm looking for is a
 7   Court Order directing a judgment debtor to the judgment debtor
 8   or some other entity to turn that over to the judgment
 9   creditor.
10          MR. BARNETT:  Yes, your Honor.  We haven't identified
11   any bank accounts because the transfers in question were
12   several years ago and tracing them all, in the way that
13   Mr. Carpenter has arranged things, that's not what we're
14   seeking here.  We're seeking a Turnover Order of monies which
15   are fungible.
16          THE COURT:  So you're seeking a money judgment?
17          MR. BARNETT:  Yes, but only because of their
18   representation that they don't have the money and fraudulent
19   conveyance law provides for this.  If someone takes $100.00 of
20   mine and spends it and I go after that person who just spent my
21   money, fraudulent conveyance law in both New York and
22   Connecticut says you're entitled to a money judgment.  That's
23   an alternative ground, an alternative remedy because, one, a
24   victim of a fraudulent transfer shouldn't be prejudiced just
25   because the initial transferee spent money in some way that's
```

6IHUNIA

1   not traceable or has transferred it in a way that's difficult
2   to trace.
3            And, your Honor, just moving on to personal
4   jurisdiction, there's no dispute that all parties, all
5   respondents have been served.  All counsel accepted service by
6   email and in the course of doing that we also entered a
7   stipulation on the briefing schedule.  And the reason we served
8   by e-mail is because, one, it's easier; two, they are willing
9   to agree to it; and, three, it's cost effective and it saves us
10  the time of trying to serve some of these respondents who are
11  difficult to track down.
12           THE COURT:  Well, I have supplemental papers at least,
13  and I think other papers, taking the position on behalf of at
14  least some of the respondents that service consistent with Rule
15  4 with procedures for service of a Summons and Complaint is
16  necessary in connection with this proceeding and that the
17  informal service was not sufficient to gain personal
18  jurisdiction over the objecting people.
19           So are you telling me that you have a stipulation
20  waiving rule for service?
21           MR. BARNETT:  No, your Honor.  We do have e-mails that
22  I've shown to opposing counsel that we could give to your Honor
23  showing each opposing counsel agreeing to service by e-mail.
24           THE COURT:  Will you be a little bit more specific
25  with me about the language?

6IHUNIA

1      So essentially you're telling me that it's a waiver of
2  other service.  Can you be any more specific for me?  This is
3  the first I've heard of this.
4      MR. BARNETT:  Oh, your Honor, so we filed the motion.
5  We approached each respondent.  As an initial matter we said,
6  we filed this motion, and we asked will you consent to e-mail
7  service otherwise we'll have to serve it in the usual way.  And
8  "the usual way" being personal service.  And I think each of
9  them or at least I think Grist Mill Trust counsel responded to
10  the effect we'll accept service by e-mail as long as you agree
11  to a certain briefing schedule; and we amicably all agreed to
12  this and so that is how service was effected.
13      THE COURT:  I am now giving you permission to
14  supplement your filing with a Certificate of Service explaining
15  what you contend was the agreed form of service and what was
16  accomplished.
17      MR. BARNETT:  Thank you, your Honor.
18      Further, on personal jurisdiction, we do agree that
19  personal jurisdiction must be established over each respondent
20  and we think personal jurisdiction is established here as each
21  respondent subject to jurisdiction under NY CPLR 30283, that is
22  the commission of tortious conduct outside the state with
23  injurious effects inside the state.  Some of the respondents
24  have suggested that we are simply arguing that because
25  Universitas is located here, that that's enough for

6IHUNIA

1    jurisdiction.  That is not what we're arguing, your Honor.
2    We're not arguing that Universitas' fortuitous location here
3    establishes jurisdiction.  What we're arguing is that the
4    respondents, each of them acting through Mr. Carpenter and
5    Mr. Bursey, aimed their conduct with the intent and effect of
6    harming Universitas.  So while their conduct may have occurred
7    in Connecticut, they were fully aware that it had substantial
8    effects in New York.  They knew Universitas was in New York at
9    all relevant times.  Not only that, but under the Charter Of
10   Trust Instrument arbitration was required in New York.  And we
11   were first dealing with Mr. Carpenter and Mr.~Bursey -- or,
12   actually, I think it was mostly Mr.~Bursey.  We were told you
13   have to file for arbitration in New York at the same time as
14   we've demonstrated money was going this way and that and
15   certainly wasn't being held in trust for Universitas.
16        And each respondent in this case acted through
17   Mr. Carpenter and Mr.~Bursey.  And on this, your Honor, the
18   Second Circuit's opinion in Hargrave versus Oki Nursery
19   636 F.2d 897 I think best encapsulates our argument.  The
20   exercise of jurisdiction over each of the respondents is also
21   reasonable and doesn't offend any due process concerns.
22   Respondents don't claim any specific burden relating to
23   litigating in New York as opposed to next door in Connecticut.
24   And, as you can see, from the lawyers here today, they're
25   perfectly capable of litigating here.

14

6IHUNIA

```
 1              Furthermore, your Honor, while this is not an
 2    arbitration, and while it's not before the Court, Grist Mill
 3    Trust's own trust instrument requires its own beneficiaries to
 4    submit to binding arbitration in New York under the AAA.  So
 5    the Grist Mill Trust, when it gets beneficiaries, it shows that
 6    it prefers actually to be here not in Connecticut.
 7              Your Honor, at least one of the respondents has raised
 8    this issue as to whether a new action had to be commenced; and,
 9    obviously, we're not in a new action, we're in postjudgment
10    proceedings.  This Court has already entered a Turnover Order
11    in a postjudgment context; and also, the way we're proceeding
12    here today has been sanctioned not only by the Second Circuit
13    in the Cordius Trust case, but also by the majority of district
14    courts in this jurisdiction.
15              One of the respondents cites a case called Runaway at
16    396 F. Supp 2d 471.  The facts in Runaway are far afield from
17    the facts in this case.  In that case it was the judgment
18    creditor got a judgment in 1993 for circumstances that we don't
19    need to discuss here, unless your Honor wants to.  The judgment
20    creditor was actually barred from bringing new actions in this
21    court.  It was an injunction against frivolous litigation and
22    so the creditor, to try to get around this injunction, tried to
23    go back to the 1993 case and file something in a postjudgment
24    context. The Court said, you know, you can't do this 12 years
25    later.  And to the extent that Runaway somehow casts doubt on
```

6IHUNIA

1  the procedure here, Judge Rakoff in Northern Mariana Islands
2  845 F. Supp 2d 581 noted that Runaway is at odds with nearly
3  every court in the circuit.
4          Again, another case that they cite is a Wasserman case
5  from 2012.  That case also cites no law for its conclusion;
6  and, again, it conflicts with not only Second Circuit
7  precedent, but the practice in this Court.
8          Your Honor, just moving to the necessity for permanent
9  injunction, first of all, in effect we're not asking the Court
10 to enforce a Restraining Order against each respondent, but in
11 effect what we're seeking to accomplish here is a Court Ordered
12 Restraining Order; and the reason we need a Court Order is we
13 need something with teeth.  We could issue perhaps a
14 Restraining Order if we were a judgment creditor of all these
15 entities, but our experience in this case, as we documented, is
16 that these restraining notices just go ignored.  And this case
17 falls within in a class of cases where courts, in order to
18 secure a judgment or a Turnover Order, enter a permanent
19 injunction at the end of a proceeding.  And these cases include
20 the Republic of Argentina litigation, a case involving Yukos.
21 And we have cited all these in our supplemental brief.
22         And I think if these cases establishing anything, it's
23 that unfortunately the monetary judgment cannot adequately
24 compensate Universitas where Mr. Carpenter has sought to
25 undermine the judgment at every turn.

6IHUNIA

```
 1              THE COURT:  Now, in Yukos, and I believe the other
 2    case that you cited, the party enjoined was the judgment debtor
 3    and the injunction wasn't effectively a receivership, which
 4    seems to be what you're looking for here.  You're looking to
 5    have yourselves appointed as gatekeeper for all activities and
 6    asset dispositions by all of these entities in perpetuity until
 7    you get paid.  Yukos was a ban on shareholder dividends, I
 8    believe, and shareholder distributions.  The Argentina case, I
 9    believe, was restraints on specific identified accounts.  There
10    is another case that was a restraint on making distributions
11    inconsistent with levels of priority of different types of
12    debt.
13              I have not yet seen anything of the rents that you're
14    requesting here and it does seem to me that this is a
15    receivership without a receivership proceeding and the
16    attendant proof and structures that would be involved in a
17    receivership.
18              MR. BARNETT:  Well, your Honor, first, as respect to
19    the Grist Mill Trust, which I think has most directly raised
20    this issue, one, we have concerns that as demonstrated by the
21    motions in this Court, that the Grist Mill Trust is not
22    securing its own assets, namely the cash value in each of these
23    insurance policies.  That cash value is an asset of the trust,
24    not of the people who are the insureds.  And if Grist Mill
25    Trust is just going to give that away without consideration,
```

6IHUNIA

1    that prejudices Universitas as a potential creditor.  And
2    that's one reason that we need an injunction because this is
3    the way they're proposing to proceed.
4              With that being said, we, if the Court is inclined to
5    grant a permanent injunction, would be happy to confer with,
6    for instance, counsel for the Grist Mill Trust on more specific
7    limitations.  I believe counsel for the Grist Mill Trust
8    submitted something that Judge Patterson entered.  Now that we
9    know a little bit more about the Grist Mill Trust's operations,
10   we could tailor.  And if the parties don't agree, we could
11   submit competing proposed orders that your Honor could consider
12   in view of the facts and the submissions here.
13             So, one, I do think the injunction that we're seeking
14   is justified because right before the Court's eyes the Grist
15   Mill Trust is --
16             THE COURT:  You can finish your thought and then
17   quickly explain the numbers to me and then you can sit down.
18             MR. BARNETT:  Thank you, your Honor.
19             One, we do think the injunction is warranted under the
20   circumstances, which includes the Grist Mill Trust not properly
21   valuing its own assets, and also prejudicing its creditors at
22   the expense of insureds who really don't have the rights that
23   they say they do.
24             And then, again, we're happy to tailor an injunction
25   if the Court finds that a more limited one is warranted.  It's
                     SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

6IHUNIA

1   not in our mind an all-or-nothing request.
2        And then also, your Honor, as to the amounts sought,
3   the amounts are different.  So the amounts are a function of
4   how much each entity received that we can trace from
5   Universitas' money.  So Grist Mill Capital received more than
6   Grist Mill Holdings and then Daniel E. Carpenter, whom we
7   assert is an alter ego for most of these identities.  He should
8   be found liable for all the money that's passed through.
9        THE COURT:  So more specifically, on your notice of
10  motion, you asked for 31 million and change from Grist Mill
11  Capital, but only 26.7 from Carpenter.  And I thought it was
12  your contention, and perhaps even Carpenter's admission, that
13  Carpenter and Grist Mill Capital are alter egos.  So I don't
14  understand that disparity.
15       MR. BARNETT:  I believe that for Mr. Carpenter we did
16  not include the monies that passed through the Grist Mill Trust
17  because our intention is that while Mr. Carpenter controls the
18  Grist Mill Trust, we're not going to represent, we're not going
19  to argue that the Grist Mill Trust is his alter ego.  We do
20  assert that he is the alter ego of all the other respondent
21  entities and that he controls the Grist Mill Trust to this day.
22       THE COURT:  So that money didn't pass first through
23  Grist Mill Capital?
24       MR. BARNETT:  I have to go back and look at the chart.
25  And I apologize to your Honor for not knowing this because I

6IHUNIA

```
 1   should because it's in my declaration, but we could also
 2   supplement on the numbers, your Honor, if that's okay with you.
 3           THE COURT:  Yes, right away, promptly before the end
 4   of the week.
 5           MR. BARNETT:  Absolutely, your Honor.
 6           THE COURT:  Thank you for your time.
 7           Just one moment.
 8           (Pause)
 9           THE COURT:  Mr. Taylor.
10           MR. TAYLOR:  Thank you, your Honor.  As I mentioned, I
11   represent Carpenter Financial Group, Michael Taylor, Carpenter
12   Financial Group, Avon Capital, Phoenix Capital Management and
13   Hanover Trust.  And I will try to stick to my five minutes,
14   your Honor.
15           First, I think that the law is clear, your Honor, that
16   the key to the reach of the Turnover Order is personal
17   jurisdiction.  I think that's what the New York Appellate Court
18   says in Koehler versus Bank of Bermuda.  And I don't think that
19   there's any real question about that.
20           I did receive today a packet of e-mails suggesting
21   that service of the original motion was made on counsel at the
22   time.  As I review that e-mail, and if I'm wrong, counsel will
23   correct me, of my clients, it seems only that Avon was
24   represented at that time.  So even if service of the motion had
25   been adequate, it was only served on Avon as far as I can see.
```

6IHUNIA

1  Second, service with motion is not adequate.  You need to
2  commence an action here.  And I think that's what we've cited
3  the Wasserman case for in our papers.  These parties, as
4  nonparties, who are not subject to the judgment, in order to be
5  bound by the Court's judgment in this turnover proceeding, need
6  to be brought in within the Court's jurisdiction and that needs
7  to happen through Service of Process, commencement of a new
8  action.
9            THE COURT:  I think what I'm hearing is that they're
10  not asking for a declaration that the entities are jointly and
11  severally liable on the judgment that has been entered as
12  against Nova, but rather they're seeking an order and judgment
13  holding the entities liable for funds that they receive or
14  passed through them as proceeds of fraudulent conveyances, so
15  limited by the amount of money that was received by or passed
16  through the entity and premised on the fraudulent conveyance as
17  opposed to being premised on some other theory of underlying
18  liability, except insofar as alter ego liability is concerned.
19            MR. TAYLOR:  That brings me to my understanding of the
20  Peacock and Epperson decisions, but before I get there, your
21  Honor, I think the answer is no.  I think the difference
22  between 5225(a) and 5225(b) is that in the one case you have
23  property that may be subject to the Court's jurisdiction, and
24  in the other, you have property that is in the possession of
25  third parties, and unless the Court has jurisdiction over them,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6IHUNIA
1    the Court can't issue a binding order against them.  And the
2    only reason -- if we were wrong in this, the language that is
3    different between 5225(a) and 5225(b) would be meaningless.
4    Where 5225(b) says you have to institute a special proceeding,
5    I think that it means that you have to start an action against
6    these parties in order to reach that property.
7             And it's related, but a slightly separate point.  On
8    the issue of Peacock and Epperson, I think the part of Peacock
9    that is important, your Honor, is Part B.  And as I read Part B
10   of Peacock, what the Court is trying to do there is to
11   distinguish between an effort to reach funds, which may be in
12   the possession of a third party, and an effort to make the
13   third party actually responsible for the judgment going
14   forward.  And what the Court says is you may be able to reach
15   funds that are in the possession of the third party, but you
16   can't make the third party responsible for the judgment going
17   forward.  But a permanent injunction here is precisely that.  A
18   permanent injunction here would allow the plaintiffs to make
19   these third parties who are not subject to the judgment liable
20   for the judgment going forward.
21            And that I think is what you can't do.  Moving back,
22   that comports with my understanding of 5225(b).  The plaintiffs
23   can identify funds that they think meet 5225(b)'s criteria and
24   that rightfully ought to be used to pay a judgment.  And if
25   those funds are in the possession of the third party, and the

22

6IHUNIA
1  Court has personal jurisdiction over that third party, the
2  plaintiffs can reach those funds.  The plaintiffs cannot use
3  that statute -- there's nothing in that statute to suggest that
4  they can make those third parties, my clients for instance,
5  responsible for the judgment going forward.
6         I have one more point, but my time is up.
7         THE COURT:  You can make one more.
8         MR. TAYLOR:  Thank you, your Honor.  The last point
9  was on jurisdiction as a result of the commission of a tort.
10 Very briefly, with respect to my clients, I don't see that
11 there has been any presentation of evidence that my clients
12 have committed any tort.  The suggestion is that all of their
13 conduct was controlled by either Mr.~Bursey or Mr. Carpenter,
14 but I haven't seen that evidence either.
15        There's other evidence with respect to Nova, or with
16 respect to Charter Oak Trust, and that may be debatable.  But
17 with respect to my clients, you can't simply say, well,
18 Mr. Carpenter is a bad guy so every company he ever had any
19 contact with is liable to pay his debts.  That's just not the
20 way the statute works.
21        Thank you, your Honor.
22        THE COURT:  Thank you, Mr. Taylor.
23        MR. LaBELLE:  Good afternoon, your Honor.  Dan LaBelle
24 on behalf of Grist Mill Partners.  Your Honor, Grist Mill
25 Partners is not a respondent to the turnover motions, but I
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

6IHUNIA

1    didn't want to let this hearing go by without revisiting its
2    position in this matter because there is a preliminary
3    injunction extant against Grist Mill Partners and your Honor's
4    order asking the parties to address issues having to do
5    essentially with the Court's jurisdiction or the reach of its
6    power in these kinds of situations, I didn't want that to go by
7    without speaking to the situation with Grist Mill Partners.
8             Your Honor will recall that Grist Mill Partners is the
9    owner of the building in Simsbury where these entities -- many
10   of these entities did business.  And there was a lease option
11   to purchase transaction which was -- the contract had been
12   signed before your Honor issued the preliminary injunction in
13   January.  But they were building up to the closing and then
14   your Honor issued the injunction.  Because of the breadth of
15   the language in the injunction, the tenant option purchaser
16   obviously didn't want to pursue it without some clarification
17   for the Court.  So we came here essentially on a stipulation
18   because it was good for everybody to get clarification from the
19   Court, get the deal done.  But I came in on behalf of Grist
20   Mill Partners and reserved all our rights at that time
21            This situation is a good illustration, I think, of the
22   limits of what the Court can do in this situation.  There's no
23   evidence at all that Grist Mill Partners received any of the
24   funds from the $30 million Sash Spencer death proceeds.
25            Following up on what Mr. Taylor just said, the law is

24

6IHUNIA

1    not that everything Mr. Carpenter touches is automatically
2    liable for whatever judgment might enter against Mr. Carpenter.
3    That's not the law.  The law still recognizes that there may be
4    corporate structures or LLC structures that exist; and unless
5    and until there's evidence presented beyond, you know, just
6    service of a turnover motion, or evidence that there's been
7    some independent tortious conduct, a standalone LLC shouldn't
8    presumptively be responsible, and certainly not presumptively
9    subject to the personal jurisdiction of this court.
10            Since the time of the entry of the preliminary
11   injunction, part of the requirement there was that monthly
12   statements showing the financial transactions of the business
13   would be given to the plaintiffs and I've been responsible for
14   providing those.  I did not have any knowledge of Grist Mill
15   Partners prior to the injunction.  I hadn't represented them
16   previously.  But I did learn that the building was acquired
17   long ago, long before Sash Spencer died, and there's no
18   evidence that any of the funds that are subject to the
19   arbitration award went there.
20            THE COURT:  You can slow down so that we can get an
21   accurate transcript; and if I need to let you go past the five
22   minutes we can do that.
23            MR. LaBELLE:  I speed up, it's like at the end of the
24   Rangers game, it gets kind of fanatic at the end.
25            THE COURT:  It's not sudden death here.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

6IHUNIA

1           MR. LaBELLE:  So just in reviewing what I have seen of
2    the financial statements, it appears that this LLC is a
3    single-asset LLC.  It collects rents and pays building-related
4    debts, maintenance and electrical and the heat and all that
5    stuff.  That's all it does.  And absent some showing, a plenary
6    action, that that LLC ought to be liable for a judgment that
7    might enter against Mr. Carpenter, I don't, respectfully -- and
8    I stipulated to the injunction that your Honor issued because
9    of the circumstances at the time -- respectfully, I don't think
10   that this Court absent a plenary action can just reach out and
11   enjoin a standalone LLC in Connecticut that just owns a piece
12   of real estate.
13           THE COURT:  Thank you.
14           MR. DUHL:  Good afternoon, your Honor.  Glenn Duhl
15   representing the Grist Mill Trust.  I consider myself a little
16   bit down on the food chain in this proceeding for the reason
17   that the proceeding deals with a judgment creditor adverse to a
18   judgment debtor and Grist Mill Trust is neither.  Grist Mill
19   Trust is a separate business.  The record by now is full of
20   evidence that we've put into your Honor for your Honor's
21   consideration.  It's a multi-employer plan that entities, such
22   as the two interested parties today, have a interest in.
23           The core issue that I'd like to address today is that
24   the Grist Mill Trust suggests that the Court has no evidence of
25   Universitas meeting the four points needed for a permanent

26

6IHUNIA

1  injunction and they certainly have not met the standard as
2  stated in eBay, in Entergy and its progeny.
3        Certainly there has been no effort by Grist Mill Trust
4  to frustrate any Universitas collection efforts.  As a matter
5  of fact, as your Honor will see from the emails saying, yes, we
6  will gladly accept the papers, there has been voluntary
7  cooperation to basically say:  Here are our cards face up on
8  the table.  This is what we have and if you have any questions,
9  we will answer it.  We have provided bank records and all other
10  documentation of the notes that had existed prior to the facts
11  that came into issue here.
12        Grist Mill Trust had made numerous loans well back
13  before 2009, and at the time that the notes were repaid in
14  2009, there was no judgment and there was no judgment debtor
15  and there was no fraudulent transfer.  There could not have
16  been a fraudulent transfer at that time and there was not.
17  There are no assets that are shown to have been retained by
18  Grist Mill Trust that in a turnover motion typically would be
19  turned over.  Grist Mill Trust is ongoing, running a business
20  and the efforts of Universitas have -- and I was going to say
21  for the first time, but your Honor beat me to it -- Universitas
22  is trying to be a receiver of the Grist Mill Trust.  And
23  there's absolutely no justification for that.  My client's
24  business has been hampered and hindered.  Mr. Carpenter is not
25  a part of the entity.  There's no showing that he has been a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6IHUNIA

1    part of the entity for many, many years.  We are now talking
2    about a payment that was made to the Grist Mill Trust more than
3    five years ago.  Nothing is retained now by the Grist Mill
4    Trust to turn over, and I would, given the short time that I
5    have with your Honor, we've briefed exhaustively the issues
6    that were raised today in your Honor's e-mail, were in the
7    document number 234 that we had filed, which was our Memorandum
8    of Law in Opposition to Universitas' motion for turnover and
9    protective permanent injunction as well as the supplemental
10   memorandum, we filed document 459 which does, in fact, address
11   the lack of Universitas meeting the fundamental necessary
12   elements for the preliminary -- for the permanent injunction.
13         And what my brother counsel had said is essentially
14   what -- and what I understand is, in a postjudgment remedy
15   scenario, you serve an entity to say what do you have that is
16   due and owing to a judgment debtor.
17         We responded and we've shown the bank accounts.  We've
18   shown bank accounts preceding and subsequent to the material
19   date.  Just not there.  And what we also have is you have a
20   fundamental dispute as to the trust having insurance, insurance
21   policies that are for its employer representatives and there
22   may be a belief that money or assets held in a trust for a
23   third person is belonging to the Grist Mill Trust.  I suggest
24   to you that the law suggests that it is not.
25         I've run out of time.  Thank you, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6IHUNIA

```
 1              THE COURT:  Thank you, Mr. Duhl.
 2              MS. ROWELL:  Thank you, your Honor.  May it please the
 3   Court, counsel, my name is Kristen Rowell, and I represent the
 4   interested parties Minneapolis Trailer Sales, Keith Kornovich
 5   and Mark Kornovich.
 6              The Court stated at the outset of this hearing what it
 7   wants to hear about is the legal and factual basis for the
 8   nonmonetary relief that's requested and we're one of the
 9   interested parties that have requested nonmonetary relief,
10   though I also heard the Court say --
11              THE COURT:  I meant Universitas' request for
12   nonmonetary relief.
13              MS. ROWELL:  I understand that, your Honor, because I
14   also heard the Court say it was not going to issue any rulings
15   with respect to the insurance policies, but we are mindful of
16   the fact that we're given five minutes.
17              THE COURT:  I didn't want to hear argument on the
18   insurance policies.  That's what I meant to say if I wasn't
19   clear enough about that.
20              MS. ROWELL:  So can I make a couple of points with
21   respect to the Court's order of this morning?
22              THE COURT:  Yes.
23              MS. ROWELL:  Or do you not want to hear from the
24   interested parties at all?
25              THE COURT:  I don't want to hear the details of the
                      SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

6IHUNIA

1    dispute with respect to particular insurance policies.  I did
2    want to hear about the bases or the propriety of Universitas'
3    request for restraints on the policies, and it's taking me
4    longer to try to explain this than to let you speak.  So speak.
5              MS. ROWELL:  Thank you, your Honor.  I apologize if I
6    got off track there for a moment.
7              Let me do it this way.  Essentially what we are
8    seeking is clarification from the Court about its earlier
9    order, and if the Court is inclined to issue any subsequent
10   order enjoining anyone, clarification about the scope and the
11   reach of that, and that it cannot get to policyholders like my
12   clients because they are equitable owners in these policies
13   that are held in trust by the Grist Mill Trust.  And I realize
14   if I go down this argument too far, it's probably going to be
15   getting into the issue of the policy that it sounds like the
16   Court doesn't want to hear about.
17             THE COURT:  But let me ask you this.  Are you arguing
18   in essence that any restraint on the disposition of the policy
19   would reach interests that are not the property of the trust
20   holding entity, Grist Mill Trust?
21             MS. ROWELL:  That's right, your Honor.  And it's a
22   simple matter of black letter trust law.  And if I could just
23   quickly point the Court to the restatement sections that are
24   applicable here because I think the argument for my client's
25   perspective is so straightforward, the law is so

6IHUNIA

```
 1    straightforward and Universitas has provided no legal authority
 2    to refute this.
 3            The first is Section 2 of the Restatement Second of
 4    Trust and it talks about the fact that a trust is a fiduciary
 5    relationship with respect to property, and there are equitable
 6    duties to deal with the property for the benefit of another
 7    person.
 8            And I think what's important in the comments of
 9    restatement is this sentence:  And we analogize the scenario
10    here to the case of funds in a client's trust account at a law
11    firm.  If someone was to get a judgment against my law firm,
12    they can't dip in my other clients' trust funds to collect on
13    their judgment.  That's crazy.  And what the comments to the
14    Restatement Section 2 say is fiduciary relations include not
15    only relation of trustee and beneficiaries, such as we have
16    here, the Grist Mill Trust and the beneficiaries, but also
17    among others, the attorney and client.  It's an analogous
18    relationship and Section 308 of the second restatement says,
19    your Honor, with respect to judgment creditors -- and as
20    counsel pointed out, Universitas does not even have a judgment
21    against Grist Mill Trust at this point.  And what 308 says is
22    that although by statute or otherwise, a creditor who obtains
23    judgment is entitled to a lien upon land or other property of
24    the judgment debtor, the judgment creditor is not a bona fide
25    purchaser and he cannot enforce a lien upon property which the
```

6IHUNIA

```
 1    judgment debtor holds in trust.  The point is that they can't
 2    reach it.  And so we are in a scenario right now with the Grist
 3    Mill Trust in which those policies are frozen as a result of
 4    the Court's order because the Grist Mill Trust doesn't want to
 5    take any actions that would be inconsistent with the order
 6    understandably.  So what we are seeking is for an order
 7    specifically allowing the Grist Mill Trust to be able to
 8    transfer those policies to my clients.
 9             One other issue that I'd like to raise just because of
10    the Court's order of this morning is with respect to --
11             THE COURT:  Very briefly.
12             MS. ROWELL:  Yes.  With respect to the issue of
13    personal jurisdiction, your Honor.  The reason that that issue
14    is important with respect to my clients is this:  There are
15    beneficiaries to my clients' insurance policies.  If one of my
16    clients was to die tomorrow, the beneficiaries of those
17    policies should be getting that money.  Those individuals
18    haven't received any notice of this proceeding.  They weren't
19    even aware.  I stumbled upon the fact that this hearing was
20    even going to happen and appeared to assert my clients' rights.
21    That's important because there are necessary and indispensable
22    parties here that haven't received notice and so orders should
23    not be issued that could impinge upon their rights.
24             And unless the Court has any questions, I will sit
25    down.
```

6IHUNIA

```
 1              THE COURT:  Thank you very much.
 2              MR. BLOOM:  Good afternoon.  My name is Mike Bloom,
 3   and I represent interested parties Gerald Williams.  We came
 4   out here from Oregon so we could be heard on this matter.  I
 5   understand that you want us to limit the specifics of the
 6   argument away from the specifics about policy.
 7              THE COURT:  Yes.
 8              MR. BLOOM:  So I'll talk a little about the big
 9   picture.  The Grist Mill Trust contains a policy of my clients
10   and the funds from that policy without doubt were traced to my
11   client.  There's no tracing to anything else.  What Mr. Barnett
12   has said is that we are not seeking any alter ego theory
13   against the Grist Mill Trust.  That leaves solely the claim for
14   fraudulent conveyance.  Now, right here before you today is a
15   matter of permanent injunction.  The difference between a
16   permanent injunction and a temporary injunction is Universitas
17   has to prove -- has to establish its claim and it has to
18   establish the elements for fraudulent conveyance.  They have
19   not done that.  And for that reason alone, with regard to the
20   Grist Mill Trust, it should not be granted.
21              With regard to Mr. Barnett's argument that, well, New
22   York recognizes that if you can trace funds to an entity, and
23   then you go to the entity and the entity does not have the
24   funds, then you can obtain a personal money judgment, that did
25   not happen here.  There is no tracing of assets to my clients
```

6IHUNIA

1   or any of these insurance policies.  The sole theory for
2   obtaining relief against these policies is a provision in the
3   trust that the trust owned these policies.  So, in other words,
4   what they're saying is we have a judgment against the trust and
5   the trust owns the policy.  Well, that's an alter ego theory of
6   liability, which the cases that you presented us with today,
7   that you asked us to discuss, clearly state that you need to
8   bring a separate claim for piercing the veil, alter ego theory
9   or any of these personal liability claims.  Following the
10  property is one thing, but claiming the trust, the Grist Mill
11  Trust, is liable for Mr. Carpenter's wrongdoing without being
12  named as a party is exactly what Thomas says you cannot do.
13          So, in closing, I would second Ms. Rowell's request.
14  We have a family that has an insurance policy and the funds are
15  traceable back to that family.  Without dispute.  Without
16  dispute.  There's nothing to indicate those funds came from
17  anywhere else.  We ask that at least you tailor whatever order
18  you do, if you do grant a permanent injunction, to allow these
19  families to obtain their property so they can go on with their
20  lives in this small part of this large litigation.  And we are
21  comfortable litigating here.  Even though we do come from
22  Oregon, we have enjoyed our stay.  Thank you.
23          THE COURT:  Thank you and welcome.
24          Mr. Barnett.
25          MR. BARNETT:  Thank you, your Honor.  Just a few quick

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6IHUNIA

 1   points.  One on the issue of service and the points that
 2   Mr. Taylor raised, we will be supplementing our filing at the
 3   Court's invitation.  But just a few points about whether
 4   service was achieved and whether Mr. Taylor has had sufficient
 5   notice of this hearing.
 6           First of all, he's here.  He argued.  Second of all,
 7   Mr. Siano, who's sitting here today, represented all these
 8   entities at one time and he accepted service on behalf of all
 9   these entities.  And those were the only points I wanted to
10   make there.
11           There's been some discussion, your Honor, about
12   damages versus turnover of specific assets.  Essentially, the
13   respondents are arguing that because we don't have your money,
14   even though we had it at one time, you lose, Universitas.  And
15   that's just not the law and it makes sense because if someone
16   has both fraudulently received your assets and conveyed them
17   somewhere else, they should be answerable on a fraudulent
18   conveyance turnover motion both in the form of a turnover order
19   and a money judgment.
20           In terms of Mr. Taylor's contention that no facts have
21   been asserted regarding the tortious conduct of his client,
22   we've established these in declarations and documents and we
23   had a hearing in November 2013 at which Mr. Taylor -- I think
24   it predates his representation of his clients -- at which
25   Mr. Carpenter sat on the witness stand and explained how he's

6IHUNIA

```
 1   all these entities and he transferred from one entity to
 2   another and he also did that in the May 2013 hearing.  So there
 3   are ample facts in the record to show wrongdoing on behalf of
 4   all these entities which are just other names for Daniel
 5   E. Carpenter.  And that's not just any company.  It's not as
 6   though, your Honor, that we've filed for turnover and money
 7   judgments against Mr. Carpenter's hundreds of companies.  And
 8   there are hundreds.  We've named as respondents perhaps ten,
 9   maybe even fewer entities, and those respondents are the
10   entities that received Universitas' money as established in
11   declarations submitted on this motion.
12         THE COURT:  For permanent injunctive relief, are you
13   not seeking something of the same rents that you asked for in
14   the preliminary injunction against Carpenter, something that in
15   effect does reach every entity touched by Carpenter?
16         MR. BARNETT:  Well, that is dependent on whether he
17   controls certain entities.  So before the Court today -- well,
18   the answer, the short answer to your question, your Honor, is
19   yes.  But as to Mr. Taylor's clients, we have showed wrongdoing
20   on their part.  As far as the entities that Mr. Carpenter
21   controls, it's our contention that if he controls or owns an
22   entity, that that entity, that LLC is just another name for
23   Mr. Carpenter.  So there's no distance between these entities
24   and Mr. Carpenter, and that's the way Mr. Carpenter runs his
25   business.
```

6IHUNIA

```
 1              If we were dealing with a normal person, you know,
 2    maybe he'd have one or two companies.  He happens to have
 3    hundreds and there's no efficient way for us to name them all.
 4    So that is why the preliminary injunction was worded the way it
 5    was, your Honor, and that's also why we're seeking the same on
 6    permanent injunction.
 7              Regarding Grist Mill Partners -- well, first of all,
 8    Mr. LaBelle stipulated to the modification of the injunction
 9    that was entered.  I don't see how he has cause to complain for
10    that.  Mr. LaBelle at the hearing, I think it was in March or
11    February.  He represented to the Court that Mr. Carpenter
12    controlled the Grist Mill Partners.  He's never identified
13    anyone else who controls it.  And so, again,  I'm not sure
14    exactly what Mr. LaBelle is trying to achieve.
15              As far as the Grist Mill Trust, first of all, as to
16    Mr. Bloom's point, we have traced assets into the Grist Mill
17    Trust.  Universitas' money was shown and documented to be sent
18    through the Grist Mill Trust and commingled with all the other
19    funds.  So we have traced assets into and out of and back into
20    the Grist Mill Trust.  This was done by Mr. Carpenter, who at
21    all relevant times and to this day, controls the Grist Mill
22    Trust.
23              Your Honor has heard a lot about concerns about
24    receivership and permanent injunctions and the like and we take
25    those issues very seriously.  One, we're not suggesting a
```

6IHUNIA

 1   receivership for the Grist Mill Trust.  We are fine with them
 2   transferring policies out of the trust so long as the trust
 3   document is followed, because if they don't follow their own
 4   trust document, then they're prejudicing potential and real
 5   creditors in favor of insureds who are getting something that
 6   they didn't bargain for when they signed up for the trust.
 7         THE COURT:  Unless you're the receiver or otherwise
 8   recognized or appointed as a party in control of Grist Mill
 9   Trust's affairs and with an interest in Grist Mill Trust's
10   affairs, how do you have standing to assert prejudice to the
11   rights of all of the insurance policyholders as you've just
12   posited?
13         MR. BARNETT:  Well, your Honor, under both New York
14   and Connecticut fraudulent conveyance law, we are creditors in
15   the sense that we have a contingent or possible claim not yet
16   reduced to judgment.  So that's our standing.
17         Furthermore, your Honor, we didn't make motions to
18   stop the people who spoke to you today from transferring their
19   policies.  They made motions in this court to get out from
20   under the injunction because they recognized that Mr. Carpenter
21   controls the Grist Mill Trust and that they needed relief from
22   your Honor's order.  We never made a motion to stop them.  In
23   fact, we didn't hear of them until they came to us.  So we're
24   not the ones bringing the motion.
25         THE COURT:  You're not the ones bringing the motion,

6IHUNIA

```
 1    but you are the ones who got the preliminary injunction that
 2    says on its face that Grist Mill Trust can't do certain things.
 3    So at this point you're set up as someone who needs to be dealt
 4    with.  The question for me is whether that continues in the
 5    future.
 6              MR. BARNETT:  I agree, your Honor.
 7              THE COURT:  So I don't know what I'm supposed to get
 8    out of "I didn't jump on them, they came to me, jumped on them
 9    in the first place," and they said, "Okay, can you get up."
10              So tell me the legal significance of the argument that
11    you just made.
12              MR. BARNETT:  It was more of an equitable point, your
13    Honor.  They were essentially accusing, and I think there was a
14    paper filed today by the MTS parties that says Universitas is
15    victimizing these beneficiaries and these insureds.  That's
16    just overcharged rhetoric designed to distract from the merits
17    of Universitas' motion.  I was just making the factual and
18    equitable point that actually we had never heard of them until
19    they came to us.
20              THE COURT:  And so another way you could look at that
21    is that you didn't understand the breadth of what you were
22    asking for until people started to say, hey, wait a minute, I'm
23    caught in this net too.
24              MR. BARNETT:  Well, we understood; but, for instance,
25    we didn't anticipate -- well, I can't speak to what I thought a
```

6IHUNIA
```
 1    few months ago, but they, the Grist Mill Trust, it's not a
 2    foregone conclusion that they were going to have insureds
 3    trying to get out from under the trust.  It so happens that
 4    they are because this complicated tax avoidance scheme that
 5    they engaged in kind of collapsed and they want their policy.
 6    And our position isn't that no, you can't get your policy, no,
 7    you can't send insurance proceeds to your family in the event
 8    of death.  That's not our position at all and it's been
 9    mischaracterized.  Our position as a contingent possible
10    creditor of the Grist Mill Trust is follow your own trust
11    instrument because if you don't, you're prejudicing Universitas
12    as a potential creditor in favor of insureds who agreed to a
13    certain deal that should be now respected.
14              THE COURT:  And is it your contention that there is
15    independent diversity jurisdiction and sufficient amount
16    currently in controversy as to each of these policies that are
17    in the Grist Mill Trust?
18              MR. BARNETT:  Yes, your Honor.  And counsel can
19    correct me if I'm wrong, the combined cash value of the MTS
20    party's policies is a million dollars.  And as far as
21    Mr. Bloom's client, I believe it's around $150,000.00.
22              THE COURT:  Thank you for that clarification.
23              MR. BARNETT:  I think my time is up.
24              THE COURT:  Thank you.
25              MR. BARNETT:  Thank you for your time.
```

40

6IHUNIA

```
 1              THE COURT:  Thank you all.  This was very helpful to
 2   the Court.  I will need those supplemental submissions filed by
 3   Friday and Universitas is to arrange with the court reporter to
 4   get me a copy of the transcript of this argument by Monday.
 5              And it is my hope and expectation that I will resolve
 6   the turnover motion soon.  I can't promise you whether that's
 7   two weeks or three weeks, but I do understand that there are
 8   pressing issues involved.
 9              As I'm sure everyone must recognize, no outcome is
10   entirely certain including there's no certainty that I would
11   continue injunctive relief.  I will decide the motion and let
12   you know what I've decided
13              All right.  Thank you.
14              (Adjourned)
15
16
17
18
19
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300