6IHUNIA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNIVERSITAS EDUCATION, LLC,

4                 Plaintiff,

5            v.                          11 cv. 1590 (LTS)

6   NOVA GROUP, INC., et al.,

7                 Defendants.

8   ------------------------------x
                                       New York, N.Y.
9                                      June 18, 2014
                                       2:45 p.m.
10
    Before:
11
                    HON. LAURA TAYLOR SWAIN,
12
                                       District Judge
13
                         APPEARANCES
14
    LOEB & LOEB LLP
15       Attorneys for Petitioner Universitas Education, LLC
    BY:  MICHAEL BARNETT
16       PAULA K. COLBATH

17  THE LAW OFFICE OF MICHAEL S. TAYLOR, LLC
         Attorney for Respondent Carpenter Financial, Phoenix
18  Capital Management, Avon Capital, Hanover Trust
    BY:  MICHAEL S. TAYLOR
19
    SIEGEL, O'CONNOR, O'DONNELL & BECK, P.C.
20       Attorneys for Respondent Grist Mill Trust Welfare Benefit
    Plan
21  BY:  GLENN A. DUHL
         ANGELICA M. WILSON
22
    HALLORAN & SAGE LLP
23       Attorney for Movant Molly Carpenter and Grist Mill
    Partners, LLC
24  BY:  DAN E. LaBELLE

25

6IHUNIA

ANTHONY OSTLUND BAER & LOUWAGIE P.A
        Attorney for Interested Parties Minneapolis Trailer Sales,
Inc., Keith Kornovich and Mark Kornovich
BY:  KRISTIN B. ROWELL

MICHAEL H. BLOOM PC
        Attorney for Interested Party Gerald Williams
BY:  MICHAEL H. BLOOM


ANTHONY J. SIANO
        Attorney for Movant Daniel Carpenter

BRIEF JUSTICE CARMEN & KLEIMAN, LLP
        Attorney for Respondent Nova Group,Inc.
BY:  IRA KLEIMAN

6IHUNIA

1          THE COURT:  Good afternoon.  Would everyone other than

2     counsel at the tables please be seated.

3          Good afternoon.  Can we have appearances, please,

4     beginning with Universitas.

5          MR. BARNETT:  Your Honor, Michael Barnett and my

6     colleague, Paula Colbath.  We're from the firm of Loeb & Loeb

7     here representing Universitas Education, LLC.

8          THE COURT:  Good afternoon, Mr. Barnett, Ms. Colbath.

9          MS. COBATH:  Good afternoon.

10          THE COURT:  And the rear table going from my right to

11     my left, please.

12          MR. TAYLOR:  Good afternoon, your Honor.  Michael

13     Taylor representing Carpenter Financial Group, Avon Capital,

14     Phoenix Capital Management, and Hanover Trust.

15          THE COURT:  Good afternoon, Mr. Taylor.

16          MR. DUHL:  Good afternoon, your Honor.  My name is

17     Glenn Duhl of Siegel, O'Connor representing the Grist Mill

18     Trust.  With me is Angelica Wilson who is not admitted to the

19     Bar here, but with your permission, I would ask she be able to

20     accompany on this matter.

21          THE COURT:  Certainly.  Good afternoon, Mr. Duhl.

22     Good afternoon, Ms. Wilson.

23          MR. LaBELLE:  Good afternoon, your Honor.  Dan

24     LaBelle representing Molly Carpenter and Grist Mill Partners,

25     LLC.

6IHUNIA

1          THE COURT:  Good afternoon, Mr. LaBelle.

2          MS. ROWELL:  Good afternoon, your Honor.  My name is

3    Kristin Rowell, and I represent interested parties, Minneapolis

4    Trailer Sales, Inc., Keith Kornovich and Mark Kornovich.   In

5    the briefing I have shortened that to the MTS parties for ease

6    of the Court's reference.  Good afternoon.

7          MR. BLOOM:  My name is Mike Bloom and I represented

8    interested party Gerald Williams.

9          THE COURT:  Good afternoon, Mr. Bloom.  Please be

10   seated.

11          And so in today's argument, I intend for you to focus

12   on the legal and factual authority for the nonfinancial relief

13   that's requested, the injunction, and the turnover or retitling

14   of particular insurance policies, and the determination of

15   rights of Universitas to proceeds that may or may not ensue

16   from certain pending litigation.

17          As I noted in the additional order that was faxed out

18   this morning, I will also expect to hear regarding the

19   necessity or not of establishing personal jurisdiction over the

20   third-party respondents and how service was accomplished by

21   Universitas in initiating this motion practice.

22          And so I do not intend to address specifically the

23   applications that have been made with respect to particular

24   insurance policies in this argument today.  Or with one

25   exception, address directly the financial relief in terms of

money judgments that the petitioner seeks.  I will, however,

need from petitioner an explanation of the reason for the

differences in amounts sought as among Grist Mill Capital,

Mr. Carpenter and Grist Mill Holdings.  And so that we're not

all here until next week, I am going to provide time limits for

remarks.  I will give Universitas 20 minutes.  Each person who

wishes to speak in opposition for his or her party or groups of

parties, I'm going to give you a presumptive five minutes.  To

the extent you believe you need more, you'll explain that to me

and we'll work it out and then Universitas will have five

minutes for rebuttal.

        And Mr. Halverson will be the official timekeeper for

this event.  He has signs that I hope you'll be able to read --

Why don't you try holding one up -- at ten minutes, five

minutes...

        We have ten, five, three, one and timeout?

        MR. HAVERSON:  Yes.

        THE COURT:  And timeout.  So to help you pace

yourself, we don't get those fancy lights like they have in the

Court of Appeals so we have to make do with signs.

        Greetings to everyone else that is here.

        So counsel for Universitas.

        And I think it would be helpful to the court reporter

if you do say your name when you speak.

        MR. BARNETT:  Thank you, your Honor.  My name is

6IHUNIA

Michael Barnett with the law firm of Loeb & Loeb here

representing Universitas Education, LLC, your Honor.

        May it please the Court, your Honor already explained

why we're here.  I'll go right to it.  Subject matter

jurisdiction, your Honor.  We believe first that there is an

independent basis for subject matter jurisdiction in the form

of diversity jurisdiction over all parties.  Universitas, it's

undisputed that its domicile is in New York as an LLC; and it's

also undisputed that for each of the respondents, each of the

respondents are residents of Connecticut and Delaware and the

amount in controversy exceeds $75,000.00.

        THE COURT:  Now, for artificial entities such as LLCs,

citizenship is determined by reference to the citizenship of

the members rather than by principal place of business and

state of incorporation.  So are you prepared to make those

representations with respect to all noncorporate parties?

        MR. BARNETT:  Yes, your Honor.

        THE COURT:  And your representation is that there is

complete diversity?

        MR. BARNETT:  Yes, your Honor.

        And as support for this, aside from the Peacock line

of cases and the other cases, which I'm sure we'll go into,

this Court's decision in Cordius Trust versus Kummerfeld

citation 153 F.app. 761 in the Second Circuit noted in the

process of a proceeding for fraudulent conveyance and veil

6IHUNIA

1    piercing that -- and this was a postjudgment proceeding -- that

2    it had independent diversity jurisdiction and the Second

3    Circuit affirmed on this basis.

4           Your Honor asked us to address the Supreme Court's

5    opinion in Peacock.  First, your Honor, while I will address it

6    today as much as you'd like, I would also like to note that we

7    also addressed this in our reply brief filed November 1st, 2013

8    Docket Number 326 in the leading case.

9           Peacock, a 1996 Supreme Court case, dealt not with

10   postjudgment proceedings, but a second cause of action in which

11   there was no independent jurisdiction.  So here we are in

12   postjudgment proceedings and there is an independent diversity

13   jurisdiction.  During the November 22nd, 2013 hearing when we

14   were talking about jurisdiction over Mr. Carpenter himself, I

15   believe that there was discussion along these lines about how

16   Peacock is distinguishable because here there is independent

17   jurisdiction and the same goes for today, your Honor.

18          Further, unlike in Peacock, the events relevant to our

19   motion today are the events underlying the arbitration.

20   Essentially, Mr. Carpenter, through various attorneys you see

21   here, one of the things he's arguing is that he's entitled to

22   the $30 million that the insurance carrier paid out.  That was

23   exactly the dispute in the arbitration.  So much so that I

24   believe your Honor found that Mr. Carpenter was estopped from

25   arguing some of these issues.

6IHUNIA

1              Separately from the fact that Peacock is

2      distinguishable on the grounds that there's independent

3      jurisdiction, there's also the Second Circuit's decision in

4      Epperson, which is 2001 and came after Peacock.  Epperson

5      clarified Peacock Holding and said that even when there's not

6      independent jurisdiction, there is ancillary jurisdiction in

7      postjudgment proceedings over fraudulent conveyance actions.

8      So that's an independent basis for jurisdiction here.

9              Also, as established in the Cordius Trust case and

10     also in a Fourth Circuit decision called CF Trust 306 F3d 126,

11     alter ego claims can be heard in postjudgment proceedings where

12     independent basis for jurisdiction exists.

13             Your Honor asked us to address this Court's holding in

14     Ungar.  It's distinguishable on multiple grounds.  First, there

15     was no independent jurisdiction in that case.  Ungar only

16     addressed ancillary jurisdiction.  Ungar also noted that

17     Epperson was the seminal case dealing with ancillary

18     jurisdiction over fraudulent conveyance actions.  And Ungar

19     itself did not deal with fraudulent conveyances.  It was trying

20     to reach the assets held by a non-transferee.  And Ungar was

21     principally dealing with alter ego claims.  We do make alter

22     ego claims with respect to Mr.~Carpenter, but as far as all the

23     other respondents, they are the subject of fraudulent

24     conveyance actions, and so there's ancillary jurisdiction

25     there.  And then with respect to Mr. Carpenter there is

1    independent diversification jurisdiction over him

2              Furthermore, in Ungar, the events in that case were

3    not part of -- the events in the case that was decided that

4    your Honor asked us to address were not part of the action,

5    that first action that Ungar was talking about.

6              You Honor also asked us to address the issue of

7    whether, what effect, if any, is respondent's assertion that

8    they are no longer in possession of Universitas' assets.  First

9    of all, we believe this to be a conclusory assertion.  We're

10   not done yet in postjudgment discovery.  Given the course of

11   events in this proceeding and our dealings with Mr. Carpenter,

12   we're not prepared to accept any attorney arguments to the

13   effect of none of these entities has the money because there's

14   so many bank accounts and looking at all of them takes a lot of

15   time and there's just been no showing that they don't have the

16   money and we're going to assume otherwise until these

17   proceedings are over one way or another.

18             THE COURT:  You have not targeted particular bank

19   accounts in this proceeding.  You are looking for money

20   judgments rather than Writs of Execution as to particular

21   identified assets.  Am I correct?

22             MR. BARNETT:  Well, your Honor, we are looking for a

23   turnover order, one of moneys that they may have that may be

24   traceable to Universitas.  We're not -- because of the passage

25   of time, we can't be certain and we're not prepared to

6IHUNIA

1    represent that certain monies are traceable to Universitas.

2            THE COURT:  You haven't offered particular proof of

3    traceability as to assets; and, again, this is not a garden

4    variety turnover proceeding in which the petitioner says here

5    is X, here is X bank account or X debt or here's something else

6    that's specifically identifiable and what I'm looking for is a

7    Court Order directing a judgment debtor to the judgment debtor

8    or some other entity to turn that over to the judgment

9    creditor.

10            MR. BARNETT:  Yes, your Honor.  We haven't identified

11    any bank accounts because the transfers in question were

12    several years ago and tracing them all, in the way that

13    Mr. Carpenter has arranged things, that's not what we're

14    seeking here.  We're seeking a Turnover Order of monies which

15    are fungible.

16            THE COURT:  So you're seeking a money judgment?

17            MR. BARNETT:  Yes, but only because of their

18    representation that they don't have the money and fraudulent

19    conveyance law provides for this.  If someone takes $100.00 of

20    mine and spends it and I go after that person who just spent my

21    money, fraudulent conveyance law in both New York and

22    Connecticut says you're entitled to a money judgment.  That's

23    an alternative ground, an alternative remedy because, one, a

24    victim of a fraudulent transfer shouldn't be prejudiced just

25    because the initial transferee spent money in some way that's

6IHUNIA

 1   not traceable or has transferred it in a way that's difficult

 2   to trace.

 3            And, your Honor, just moving on to personal

 4   jurisdiction, there's no dispute that all parties, all

 5   respondents have been served.  All counsel accepted service by

 6   email and in the course of doing that we also entered a

 7   stipulation on the briefing schedule.  And the reason we served

 8   by e-mail is because, one, it's easier; two, they are willing

 9   to agree to it; and, three, it's cost effective and it saves us

10   the time of trying to serve some of these respondents who are

11   difficult to track down.

12            THE COURT:  Well, I have supplemental papers at least,

13   and I think other papers, taking the position on behalf of at

14   least some of the respondents that service consistent with Rule

15   4 with procedures for service of a Summons and Complaint is

16   necessary in connection with this proceeding and that the

17   informal service was not sufficient to gain personal

18   jurisdiction over the objecting people.

19            So are you telling me that you have a stipulation

20   waiving rule for service?

21            MR. BARNETT:  No, your Honor.  We do have e-mails that

22   I've shown to opposing counsel that we could give to your Honor

23   showing each opposing counsel agreeing to service by e-mail.

24            THE COURT:  Will you be a little bit more specific

25   with me about the language?

6IHUNIA

1          So essentially you're telling me that it's a waiver of

2     other service.  Can you be any more specific for me?  This is

3     the first I've heard of this.

4          MR. BARNETT:  Oh, your Honor, so we filed the motion.

5     We approached each respondent.  As an initial matter we said,

6     we filed this motion, and we asked will you consent to e-mail

7     service otherwise we'll have to serve it in the usual way.  And

8     "the usual way" being personal service.  And I think each of

9     them or at least I think Grist Mill Trust counsel responded to

10    the effect we'll accept service by e-mail as long as you agree

11    to a certain briefing schedule; and we amicably all agreed to

12    this and so that is how service was effected.

13         THE COURT:  I am now giving you permission to

14    supplement your filing with a Certificate of Service explaining

15    what you contend was the agreed form of service and what was

16    accomplished.

17         MR. BARNETT:  Thank you, your Honor.

18         Further, on personal jurisdiction, we do agree that

19    personal jurisdiction must be established over each respondent

20    and we think personal jurisdiction is established here as each

21    respondent subject to jurisdiction under NY CPLR 30283, that is

22    the commission of tortious conduct outside the state with

23    injurious effects inside the state.  Some of the respondents

24    have suggested that we are simply arguing that because

25    Universitas is located here, that that's enough for

6IHUNIA

1  jurisdiction.  That is not what we're arguing, your Honor.

2  We're not arguing that Universitas' fortuitous location here

3  establishes jurisdiction.  What we're arguing is that the

4  respondents, each of them acting through Mr. Carpenter and

5  Mr. Bursey, aimed their conduct with the intent and effect of

6  harming Universitas.  So while their conduct may have occurred

7  in Connecticut, they were fully aware that it had substantial

8  effects in New York.  They knew Universitas was in New York at

9  all relevant times.  Not only that, but under the Charter Of

10 Trust Instrument arbitration was required in New York.  And we

11 were first dealing with Mr. Carpenter and Mr.~Bursey -- or,

12 actually, I think it was mostly Mr.~Bursey.  We were told you

13 have to file for arbitration in New York at the same time as

14 we've demonstrated money was going this way and that and

15 certainly wasn't being held in trust for Universitas.

16     And each respondent in this case acted through

17 Mr. Carpenter and Mr.~Bursey.  And on this, your Honor, the

18 Second Circuit's opinion in Hargrave versus Oki Nursery

19 636 F.2d 897 I think best encapsulates our argument.  The

20 exercise of jurisdiction over each of the respondents is also

21 reasonable and doesn't offend any due process concerns.

22 Respondents don't claim any specific burden relating to

23 litigating in New York as opposed to next door in Connecticut.

24 And, as you can see, from the lawyers here today, they're

25 perfectly capable of litigating here.

6IHUNIA

1          Furthermore, your Honor, while this is not an

2     arbitration, and while it's not before the Court, Grist Mill

3     Trust's own trust instrument requires its own beneficiaries to

4     submit to binding arbitration in New York under the AAA.  So

5     the Grist Mill Trust, when it gets beneficiaries, it shows that

6     it prefers actually to be here not in Connecticut.

7          Your Honor, at least one of the respondents has raised

8     this issue as to whether a new action had to be commenced; and,

9     obviously, we're not in a new action, we're in postjudgment

10    proceedings.  This Court has already entered a Turnover Order

11    in a postjudgment context; and also, the way we're proceeding

12    here today has been sanctioned not only by the Second Circuit

13    in the Cordius Trust case, but also by the majority of district

14    courts in this jurisdiction.

15         One of the respondents cites a case called Runaway at

16    396 F. Supp 2d 471.  The facts in Runaway are far afield from

17    the facts in this case.  In that case it was the judgment

18    creditor got a judgment in 1993 for circumstances that we don't

19    need to discuss here, unless your Honor wants to.  The judgment

20    creditor was actually barred from bringing new actions in this

21    court.  It was an injunction against frivolous litigation and

22    so the creditor, to try to get around this injunction, tried to

23    go back to the 1993 case and file something in a postjudgment

24    context. The Court said, you know, you can't do this 12 years

25    later.  And to the extent that Runaway somehow casts doubt on

6IHUNIA

1    the procedure here, Judge Rakoff in Northern Mariana Islands

2    845 F. Supp 2d 581 noted that Runaway is at odds with nearly

3    every court in the circuit.

4            Again, another case that they cite is a Wasserman case

5    from 2012.  That case also cites no law for its conclusion;

6    and, again, it conflicts with not only Second Circuit

7    precedent, but the practice in this Court.

8            Your Honor, just moving to the necessity for permanent

9    injunction, first of all, in effect we're not asking the Court

10   to enforce a Restraining Order against each respondent, but in

11   effect what we're seeking to accomplish here is a Court Ordered

12   Restraining Order; and the reason we need a Court Order is we

13   need something with teeth.  We could issue perhaps a

14   Restraining Order if we were a judgment creditor of all these

15   entities, but our experience in this case, as we documented, is

16   that these restraining notices just go ignored.  And this case

17   falls within in a class of cases where courts, in order to

18   secure a judgment or a Turnover Order, enter a permanent

19   injunction at the end of a proceeding.  And these cases include

20   the Republic of Argentina litigation, a case involving Yukos.

21   And we have cited all these in our supplemental brief.

22           And I think if these cases establishing anything, it's

23   that unfortunately the monetary judgment cannot adequately

24   compensate Universitas where Mr. Carpenter has sought to

25   undermine the judgment at every turn.

6IHUNIA

1              THE COURT:  Now, in Yukos, and I believe the other

2    case that you cited, the party enjoined was the judgment debtor

3    and the injunction wasn't effectively a receivership, which

4    seems to be what you're looking for here.  You're looking to

5    have yourselves appointed as gatekeeper for all activities and

6    asset dispositions by all of these entities in perpetuity until

7    you get paid.  Yukos was a ban on shareholder dividends, I

8    believe, and shareholder distributions.  The Argentina case, I

9    believe, was restraints on specific identified accounts.  There

10   is another case that was a restraint on making distributions

11   inconsistent with levels of priority of different types of

12   debt.

13              I have not yet seen anything of the rents that you're

14   requesting here and it does seem to me that this is a

15   receivership without a receivership proceeding and the

16   attendant proof and structures that would be involved in a

17   receivership.

18              MR. BARNETT:  Well, your Honor, first, as respect to

19   the Grist Mill Trust, which I think has most directly raised

20   this issue, one, we have concerns that as demonstrated by the

21   motions in this Court, that the Grist Mill Trust is not

22   securing its own assets, namely the cash value in each of these

23   insurance policies.  That cash value is an asset of the trust,

24   not of the people who are the insureds.  And if Grist Mill

25   Trust is just going to give that away without consideration,

6IHUNIA

1    that prejudices Universitas as a potential creditor.  And

2    that's one reason that we need an injunction because this is

3    the way they're proposing to proceed.

4           With that being said, we, if the Court is inclined to

5    grant a permanent injunction, would be happy to confer with,

6    for instance, counsel for the Grist Mill Trust on more specific

7    limitations.  I believe counsel for the Grist Mill Trust

8    submitted something that Judge Patterson entered.  Now that we

9    know a little bit more about the Grist Mill Trust's operations,

10   we could tailor.  And if the parties don't agree, we could

11   submit competing proposed orders that your Honor could consider

12   in view of the facts and the submissions here.

13          So, one, I do think the injunction that we're seeking

14   is justified because right before the Court's eyes the Grist

15   Mill Trust is --

16          THE COURT:  You can finish your thought and then

17   quickly explain the numbers to me and then you can sit down.

18          MR. BARNETT:  Thank you, your Honor.

19          One, we do think the injunction is warranted under the

20   circumstances, which includes the Grist Mill Trust not properly

21   valuing its own assets, and also prejudicing its creditors at

22   the expense of insureds who really don't have the rights that

23   they say they do.

24          And then, again, we're happy to tailor an injunction

25   if the Court finds that a more limited one is warranted.  It's

6IHUNIA

1    not in our mind an all-or-nothing request.

2            And then also, your Honor, as to the amounts sought,

3    the amounts are different.  So the amounts are a function of

4    how much each entity received that we can trace from

5    Universitas' money.  So Grist Mill Capital received more than

6    Grist Mill Holdings and then Daniel E. Carpenter, whom we

7    assert is an alter ego for most of these identities.  He should

8    be found liable for all the money that's passed through.

9            THE COURT:  So more specifically, on your notice of

10    motion, you asked for 31 million and change from Grist Mill

11    Capital, but only 26.7 from Carpenter.  And I thought it was

12    your contention, and perhaps even Carpenter's admission, that

13    Carpenter and Grist Mill Capital are alter egos.  So I don't

14    understand that disparity.

15            MR. BARNETT:  I believe that for Mr. Carpenter we did

16    not include the monies that passed through the Grist Mill Trust

17    because our intention is that while Mr. Carpenter controls the

18    Grist Mill Trust, we're not going to represent, we're not going

19    to argue that the Grist Mill Trust is his alter ego.  We do

20    assert that he is the alter ego of all the other respondent

21    entities and that he controls the Grist Mill Trust to this day.

22            THE COURT:  So that money didn't pass first through

23    Grist Mill Capital?

24            MR. BARNETT:  I have to go back and look at the chart.

25    And I apologize to your Honor for not knowing this because I

6IHUNIA

1   should because it's in my declaration, but we could also

2   supplement on the numbers, your Honor, if that's okay with you.

3        THE COURT:  Yes, right away, promptly before the end

4   of the week.

5        MR. BARNETT:  Absolutely, your Honor.

6        THE COURT:  Thank you for your time.

7        Just one moment.

8        (Pause)

9        THE COURT:  Mr. Taylor.

10        MR. TAYLOR:  Thank you, your Honor.  As I mentioned, I

11   represent Carpenter Financial Group, Michael Taylor, Carpenter

12   Financial Group, Avon Capital, Phoenix Capital Management and

13   Hanover Trust.  And I will try to stick to my five minutes,

14   your Honor.

15        First, I think that the law is clear, your Honor, that

16   the key to the reach of the Turnover Order is personal

17   jurisdiction.  I think that's what the New York Appellate Court

18   says in Koehler versus Bank of Bermuda.  And I don't think that

19   there's any real question about that.

20        I did receive today a packet of e-mails suggesting

21   that service of the original motion was made on counsel at the

22   time.  As I review that e-mail, and if I'm wrong, counsel will

23   correct me, of my clients, it seems only that Avon was

24   represented at that time.  So even if service of the motion had

25   been adequate, it was only served on Avon as far as I can see.

6IHUNIA

1    Second, service with motion is not adequate.  You need to

2    commence an action here.  And I think that's what we've cited

3    the Wasserman case for in our papers.  These parties, as

4    nonparties, who are not subject to the judgment, in order to be

5    bound by the Court's judgment in this turnover proceeding, need

6    to be brought in within the Court's jurisdiction and that needs

7    to happen through Service of Process, commencement of a new

8    action.

9            THE COURT:  I think what I'm hearing is that they're

10   not asking for a declaration that the entities are jointly and

11   severally liable on the judgment that has been entered as

12   against Nova, but rather they're seeking an order and judgment

13   holding the entities liable for funds that they receive or

14   passed through them as proceeds of fraudulent conveyances, so

15   limited by the amount of money that was received by or passed

16   through the entity and premised on the fraudulent conveyance as

17   opposed to being premised on some other theory of underlying

18   liability, except insofar as alter ego liability is concerned.

19           MR. TAYLOR:  That brings me to my understanding of the

20   Peacock and Epperson decisions, but before I get there, your

21   Honor, I think the answer is no.  I think the difference

22   between 5225(a) and 5225(b) is that in the one case you have

23   property that may be subject to the Court's jurisdiction, and

24   in the other, you have property that is in the possession of

25   third parties, and unless the Court has jurisdiction over them,

6IHUNIA

1    the Court can't issue a binding order against them.  And the

2    only reason -- if we were wrong in this, the language that is

3    different between 5225(a) and 5225(b) would be meaningless.

4    Where 5225(b) says you have to institute a special proceeding,

5    I think that it means that you have to start an action against

6    these parties in order to reach that property.

7              And it's related, but a slightly separate point.  On

8    the issue of Peacock and Epperson, I think the part of Peacock

9    that is important, your Honor, is Part B.  And as I read Part B

10   of Peacock, what the Court is trying to do there is to

11   distinguish between an effort to reach funds, which may be in

12   the possession of a third party, and an effort to make the

13   third party actually responsible for the judgment going

14   forward.  And what the Court says is you may be able to reach

15   funds that are in the possession of the third party, but you

16   can't make the third party responsible for the judgment going

17   forward.  But a permanent injunction here is precisely that.  A

18   permanent injunction here would allow the plaintiffs to make

19   these third parties who are not subject to the judgment liable

20   for the judgment going forward.

21             And that I think is what you can't do.  Moving back,

22   that comports with my understanding of 5225(b).  The plaintiffs

23   can identify funds that they think meet 5225(b)'s criteria and

24   that rightfully ought to be used to pay a judgment.  And if

25   those funds are in the possession of the third party, and the

6IHUNIA

1  Court has personal jurisdiction over that third party, the

2  plaintiffs can reach those funds.  The plaintiffs cannot use

3  that statute -- there's nothing in that statute to suggest that

4  they can make those third parties, my clients for instance,

5  responsible for the judgment going forward.

6          I have one more point, but my time is up.

7          THE COURT:  You can make one more.

8          MR. TAYLOR:  Thank you, your Honor.  The last point

9  was on jurisdiction as a result of the commission of a tort.

10  Very briefly, with respect to my clients, I don't see that

11  there has been any presentation of evidence that my clients

12  have committed any tort.  The suggestion is that all of their

13  conduct was controlled by either Mr.~Bursey or Mr. Carpenter,

14  but I haven't seen that evidence either.

15          There's other evidence with respect to Nova, or with

16  respect to Charter Oak Trust, and that may be debatable.  But

17  with respect to my clients, you can't simply say, well,

18  Mr. Carpenter is a bad guy so every company he ever had any

19  contact with is liable to pay his debts.  That's just not the

20  way the statute works.

21          Thank you, your Honor.

22          THE COURT:  Thank you, Mr. Taylor.

23          MR. LaBELLE:  Good afternoon, your Honor.  Dan LaBelle

24  on behalf of Grist Mill Partners.  Your Honor, Grist Mill

25  Partners is not a respondent to the turnover motions, but I

6IHUNIA

1     didn't want to let this hearing go by without revisiting its

2     position in this matter because there is a preliminary

3     injunction extant against Grist Mill Partners and your Honor's

4     order asking the parties to address issues having to do

5     essentially with the Court's jurisdiction or the reach of its

6     power in these kinds of situations, I didn't want that to go by

7     without speaking to the situation with Grist Mill Partners.

8              Your Honor will recall that Grist Mill Partners is the

9     owner of the building in Simsbury where these entities -- many

10    of these entities did business.  And there was a lease option

11    to purchase transaction which was -- the contract had been

12    signed before your Honor issued the preliminary injunction in

13    January.  But they were building up to the closing and then

14    your Honor issued the injunction.  Because of the breadth of

15    the language in the injunction, the tenant option purchaser

16    obviously didn't want to pursue it without some clarification

17    for the Court.  So we came here essentially on a stipulation

18    because it was good for everybody to get clarification from the

19    Court, get the deal done.  But I came in on behalf of Grist

20    Mill Partners and reserved all our rights at that time

21             This situation is a good illustration, I think, of the

22    limits of what the Court can do in this situation.  There's no

23    evidence at all that Grist Mill Partners received any of the

24    funds from the $30 million Sash Spencer death proceeds.

25             Following up on what Mr. Taylor just said, the law is

6IHUNIA

1    not that everything Mr. Carpenter touches is automatically

2    liable for whatever judgment might enter against Mr. Carpenter.

3    That's not the law.  The law still recognizes that there may be

4    corporate structures or LLC structures that exist; and unless

5    and until there's evidence presented beyond, you know, just

6    service of a turnover motion, or evidence that there's been

7    some independent tortious conduct, a standalone LLC shouldn't

8    presumptively be responsible, and certainly not presumptively

9    subject to the personal jurisdiction of this court.

10          Since the time of the entry of the preliminary

11   injunction, part of the requirement there was that monthly

12   statements showing the financial transactions of the business

13   would be given to the plaintiffs and I've been responsible for

14   providing those.  I did not have any knowledge of Grist Mill

15   Partners prior to the injunction.  I hadn't represented them

16   previously.  But I did learn that the building was acquired

17   long ago, long before Sash Spencer died, and there's no

18   evidence that any of the funds that are subject to the

19   arbitration award went there.

20          THE COURT:  You can slow down so that we can get an

21   accurate transcript; and if I need to let you go past the five

22   minutes we can do that.

23          MR. LaBELLE:  I speed up, it's like at the end of the

24   Rangers game, it gets kind of fanatic at the end.

25          THE COURT:  It's not sudden death here.

6IHUNIA

```
1          MR. LaBELLE:  So just in reviewing what I have seen of
2     the financial statements, it appears that this LLC is a
3     single-asset LLC.  It collects rents and pays building-related
4     debts, maintenance and electrical and the heat and all that
5     stuff.  That's all it does.  And absent some showing, a plenary
6     action, that that LLC ought to be liable for a judgment that
7     might enter against Mr. Carpenter, I don't, respectfully -- and
8     I stipulated to the injunction that your Honor issued because
9     of the circumstances at the time -- respectfully, I don't think
10    that this Court absent a plenary action can just reach out and
11    enjoin a standalone LLC in Connecticut that just owns a piece
12    of real estate.
13          THE COURT:  Thank you.
14          MR. DUHL:  Good afternoon, your Honor.  Glenn Duhl
15    representing the Grist Mill Trust.  I consider myself a little
16    bit down on the food chain in this proceeding for the reason
17    that the proceeding deals with a judgment creditor adverse to a
18    judgment debtor and Grist Mill Trust is neither.  Grist Mill
19    Trust is a separate business.  The record by now is full of
20    evidence that we've put into your Honor for your Honor's
21    consideration.  It's a multi-employer plan that entities, such
22    as the two interested parties today, have a interest in.
23          The core issue that I'd like to address today is that
24    the Grist Mill Trust suggests that the Court has no evidence of
25    Universitas meeting the four points needed for a permanent
```

6IHUNIA

injunction and they certainly have not met the standard as

stated in eBay, in Entergy and its progeny.

        Certainly there has been no effort by Grist Mill Trust

to frustrate any Universitas collection efforts.  As a matter

of fact, as your Honor will see from the emails saying, yes, we

will gladly accept the papers, there has been voluntary

cooperation to basically say:  Here are our cards face up on

the table.  This is what we have and if you have any questions,

we will answer it.  We have provided bank records and all other

documentation of the notes that had existed prior to the facts

that came into issue here.

        Grist Mill Trust had made numerous loans well back

before 2009, and at the time that the notes were repaid in

2009, there was no judgment and there was no judgment debtor

and there was no fraudulent transfer.  There could not have

been a fraudulent transfer at that time and there was not.

There are no assets that are shown to have been retained by

Grist Mill Trust that in a turnover motion typically would be

turned over.  Grist Mill Trust is ongoing, running a business

and the efforts of Universitas have -- and I was going to say

for the first time, but your Honor beat me to it -- Universitas

is trying to be a receiver of the Grist Mill Trust.  And

there's absolutely no justification for that.  My client's

business has been hampered and hindered.  Mr. Carpenter is not

a part of the entity.  There's no showing that he has been a

6IHUNIA

1    part of the entity for many, many years.  We are now talking

2    about a payment that was made to the Grist Mill Trust more than

3    five years ago.  Nothing is retained now by the Grist Mill

4    Trust to turn over, and I would, given the short time that I

5    have with your Honor, we've briefed exhaustively the issues

6    that were raised today in your Honor's e-mail, were in the

7    document number 234 that we had filed, which was our Memorandum

8    of Law in Opposition to Universitas' motion for turnover and

9    protective permanent injunction as well as the supplemental

10   memorandum, we filed document 459 which does, in fact, address

11   the lack of Universitas meeting the fundamental necessary

12   elements for the preliminary -- for the permanent injunction.

13           And what my brother counsel had said is essentially

14   what -- and what I understand is, in a postjudgment remedy

15   scenario, you serve an entity to say what do you have that is

16   due and owing to a judgment debtor.

17           We responded and we've shown the bank accounts.  We've

18   shown bank accounts preceding and subsequent to the material

19   date.  Just not there.  And what we also have is you have a

20   fundamental dispute as to the trust having insurance, insurance

21   policies that are for its employer representatives and there

22   may be a belief that money or assets held in a trust for a

23   third person is belonging to the Grist Mill Trust.  I suggest

24   to you that the law suggests that it is not.

25           I've run out of time.  Thank you, your Honor.

6IHUNIA

```
 1              THE COURT:  Thank you, Mr. Duhl.

 2              MS. ROWELL:  Thank you, your Honor.  May it please the

 3    Court, counsel, my name is Kristen Rowell, and I represent the

 4    interested parties Minneapolis Trailer Sales, Keith Kornovich

 5    and Mark Kornovich.

 6              The Court stated at the outset of this hearing what it

 7    wants to hear about is the legal and factual basis for the

 8    nonmonetary relief that's requested and we're one of the

 9    interested parties that have requested nonmonetary relief,

10    though I also heard the Court say --

11              THE COURT:  I meant Universitas' request for

12    nonmonetary relief.

13              MS. ROWELL:  I understand that, your Honor, because I

14    also heard the Court say it was not going to issue any rulings

15    with respect to the insurance policies, but we are mindful of

16    the fact that we're given five minutes.

17              THE COURT:  I didn't want to hear argument on the

18    insurance policies.  That's what I meant to say if I wasn't

19    clear enough about that.

20              MS. ROWELL:  So can I make a couple of points with

21    respect to the Court's order of this morning?

22              THE COURT:  Yes.

23              MS. ROWELL:  Or do you not want to hear from the

24    interested parties at all?

25              THE COURT:  I don't want to hear the details of the
```

6IHUNIA

1    dispute with respect to particular insurance policies.  I did

2    want to hear about the bases or the propriety of Universitas'

3    request for restraints on the policies, and it's taking me

4    longer to try to explain this than to let you speak.  So speak.

5            MS. ROWELL:  Thank you, your Honor.  I apologize if I

6    got off track there for a moment.

7            Let me do it this way.  Essentially what we are

8    seeking is clarification from the Court about its earlier

9    order, and if the Court is inclined to issue any subsequent

10   order enjoining anyone, clarification about the scope and the

11   reach of that, and that it cannot get to policyholders like my

12   clients because they are equitable owners in these policies

13   that are held in trust by the Grist Mill Trust.  And I realize

14   if I go down this argument too far, it's probably going to be

15   getting into the issue of the policy that it sounds like the

16   Court doesn't want to hear about.

17           THE COURT:  But let me ask you this.  Are you arguing

18   in essence that any restraint on the disposition of the policy

19   would reach interests that are not the property of the trust

20   holding entity, Grist Mill Trust?

21           MS. ROWELL:  That's right, your Honor.  And it's a

22   simple matter of black letter trust law.  And if I could just

23   quickly point the Court to the restatement sections that are

24   applicable here because I think the argument for my client's

25   perspective is so straightforward, the law is so

6IHUNIA

1    straightforward and Universitas has provided no legal authority

2    to refute this.

3          The first is Section 2 of the Restatement Second of

4    Trust and it talks about the fact that a trust is a fiduciary

5    relationship with respect to property, and there are equitable

6    duties to deal with the property for the benefit of another

7    person.

8          And I think what's important in the comments of

9    restatement is this sentence:  And we analogize the scenario

10   here to the case of funds in a client's trust account at a law

11   firm.  If someone was to get a judgment against my law firm,

12   they can't dip in my other clients' trust funds to collect on

13   their judgment.  That's crazy.  And what the comments to the

14   Restatement Section 2 say is fiduciary relations include not

15   only relation of trustee and beneficiaries, such as we have

16   here, the Grist Mill Trust and the beneficiaries, but also

17   among others, the attorney and client.  It's an analogous

18   relationship and Section 308 of the second restatement says,

19   your Honor, with respect to judgment creditors -- and as

20   counsel pointed out, Universitas does not even have a judgment

21   against Grist Mill Trust at this point.  And what 308 says is

22   that although by statute or otherwise, a creditor who obtains

23   judgment is entitled to a lien upon land or other property of

24   the judgment debtor, the judgment creditor is not a bona fide

25   purchaser and he cannot enforce a lien upon property which the

6IHUNIA

1    judgment debtor holds in trust.  The point is that they can't

2    reach it.  And so we are in a scenario right now with the Grist

3    Mill Trust in which those policies are frozen as a result of

4    the Court's order because the Grist Mill Trust doesn't want to

5    take any actions that would be inconsistent with the order

6    understandably.  So what we are seeking is for an order

7    specifically allowing the Grist Mill Trust to be able to

8    transfer those policies to my clients.

9            One other issue that I'd like to raise just because of

10    the Court's order of this morning is with respect to --

11            THE COURT:  Very briefly.

12            MS. ROWELL:  Yes.  With respect to the issue of

13    personal jurisdiction, your Honor.  The reason that that issue

14    is important with respect to my clients is this:  There are

15    beneficiaries to my clients' insurance policies.  If one of my

16    clients was to die tomorrow, the beneficiaries of those

17    policies should be getting that money.  Those individuals

18    haven't received any notice of this proceeding.  They weren't

19    even aware.  I stumbled upon the fact that this hearing was

20    even going to happen and appeared to assert my clients' rights.

21    That's important because there are necessary and indispensable

22    parties here that haven't received notice and so orders should

23    not be issued that could impinge upon their rights.

24            And unless the Court has any questions, I will sit

25    down.

6IHUNIA

1          THE COURT:  Thank you very much.

2          MR. BLOOM:  Good afternoon.  My name is Mike Bloom,

3     and I represent interested parties Gerald Williams.  We came

4     out here from Oregon so we could be heard on this matter.  I

5     understand that you want us to limit the specifics of the

6     argument away from the specifics about policy.

7          THE COURT:  Yes.

8          MR. BLOOM:  So I'll talk a little about the big

9     picture.  The Grist Mill Trust contains a policy of my clients

10    and the funds from that policy without doubt were traced to my

11    client.  There's no tracing to anything else.  What Mr. Barnett

12    has said is that we are not seeking any alter ego theory

13    against the Grist Mill Trust.  That leaves solely the claim for

14    fraudulent conveyance.  Now, right here before you today is a

15    matter of permanent injunction.  The difference between a

16    permanent injunction and a temporary injunction is Universitas

17    has to prove -- has to establish its claim and it has to

18    establish the elements for fraudulent conveyance.  They have

19    not done that.  And for that reason alone, with regard to the

20    Grist Mill Trust, it should not be granted.

21          With regard to Mr. Barnett's argument that, well, New

22    York recognizes that if you can trace funds to an entity, and

23    then you go to the entity and the entity does not have the

24    funds, then you can obtain a personal money judgment, that did

25    not happen here.  There is no tracing of assets to my clients

6IHUNIA

or any of these insurance policies.  The sole theory for

obtaining relief against these policies is a provision in the

trust that the trust owned these policies.  So, in other words,

what they're saying is we have a judgment against the trust and

the trust owns the policy.  Well, that's an alter ego theory of

liability, which the cases that you presented us with today,

that you asked us to discuss, clearly state that you need to

bring a separate claim for piercing the veil, alter ego theory

or any of these personal liability claims.  Following the

property is one thing, but claiming the trust, the Grist Mill

Trust, is liable for Mr. Carpenter's wrongdoing without being

named as a party is exactly what Thomas says you cannot do.

So, in closing, I would second Ms. Rowell's request.

We have a family that has an insurance policy and the funds are

traceable back to that family.  Without dispute.  Without

dispute.  There's nothing to indicate those funds came from

anywhere else.  We ask that at least you tailor whatever order

you do, if you do grant a permanent injunction, to allow these

families to obtain their property so they can go on with their

lives in this small part of this large litigation.  And we are

comfortable litigating here.  Even though we do come from

Oregon, we have enjoyed our stay.  Thank you.

THE COURT:  Thank you and welcome.

Mr. Barnett.

MR. BARNETT:  Thank you, your Honor.  Just a few quick

6IHUNIA

points.  One on the issue of service and the points that

Mr. Taylor raised, we will be supplementing our filing at the

Court's invitation.  But just a few points about whether

service was achieved and whether Mr. Taylor has had sufficient

notice of this hearing.

First of all, he's here.  He argued.  Second of all,

Mr. Siano, who's sitting here today, represented all these

entities at one time and he accepted service on behalf of all

these entities.  And those were the only points I wanted to

make there.

There's been some discussion, your Honor, about

damages versus turnover of specific assets.  Essentially, the

respondents are arguing that because we don't have your money,

even though we had it at one time, you lose, Universitas.  And

that's just not the law and it makes sense because if someone

has both fraudulently received your assets and conveyed them

somewhere else, they should be answerable on a fraudulent

conveyance turnover motion both in the form of a turnover order

and a money judgment.

In terms of Mr. Taylor's contention that no facts have

been asserted regarding the tortious conduct of his client,

we've established these in declarations and documents and we

had a hearing in November 2013 at which Mr. Taylor -- I think

it predates his representation of his clients -- at which

Mr. Carpenter sat on the witness stand and explained how he's

6IHUNIA

1    all these entities and he transferred from one entity to

2    another and he also did that in the May 2013 hearing.  So there

3    are ample facts in the record to show wrongdoing on behalf of

4    all these entities which are just other names for Daniel

5    E. Carpenter.  And that's not just any company.  It's not as

6    though, your Honor, that we've filed for turnover and money

7    judgments against Mr. Carpenter's hundreds of companies.  And

8    there are hundreds.  We've named as respondents perhaps ten,

9    maybe even fewer entities, and those respondents are the

10   entities that received Universitas' money as established in

11   declarations submitted on this motion.

12          THE COURT:  For permanent injunctive relief, are you

13   not seeking something of the same rents that you asked for in

14   the preliminary injunction against Carpenter, something that in

15   effect does reach every entity touched by Carpenter?

16          MR. BARNETT:  Well, that is dependent on whether he

17   controls certain entities.  So before the Court today -- well,

18   the answer, the short answer to your question, your Honor, is

19   yes.  But as to Mr. Taylor's clients, we have showed wrongdoing

20   on their part.  As far as the entities that Mr. Carpenter

21   controls, it's our contention that if he controls or owns an

22   entity, that that entity, that LLC is just another name for

23   Mr. Carpenter.  So there's no distance between these entities

24   and Mr. Carpenter, and that's the way Mr. Carpenter runs his

25   business.

6IHUNIA

1          If we were dealing with a normal person, you know,

2     maybe he'd have one or two companies.  He happens to have

3     hundreds and there's no efficient way for us to name them all.

4     So that is why the preliminary injunction was worded the way it

5     was, your Honor, and that's also why we're seeking the same on

6     permanent injunction.

7          Regarding Grist Mill Partners -- well, first of all,

8     Mr. LaBelle stipulated to the modification of the injunction

9     that was entered.  I don't see how he has cause to complain for

10    that.  Mr. LaBelle at the hearing, I think it was in March or

11    February.  He represented to the Court that Mr. Carpenter

12    controlled the Grist Mill Partners.  He's never identified

13    anyone else who controls it.  And so, again,  I'm not sure

14    exactly what Mr. LaBelle is trying to achieve.

15         As far as the Grist Mill Trust, first of all, as to

16    Mr. Bloom's point, we have traced assets into the Grist Mill

17    Trust.  Universitas' money was shown and documented to be sent

18    through the Grist Mill Trust and commingled with all the other

19    funds.  So we have traced assets into and out of and back into

20    the Grist Mill Trust.  This was done by Mr. Carpenter, who at

21    all relevant times and to this day, controls the Grist Mill

22    Trust.

23         Your Honor has heard a lot about concerns about

24    receivership and permanent injunctions and the like and we take

25    those issues very seriously.  One, we're not suggesting a

6IHUNIA

1    receivership for the Grist Mill Trust.  We are fine with them

2    transferring policies out of the trust so long as the trust

3    document is followed, because if they don't follow their own

4    trust document, then they're prejudicing potential and real

5    creditors in favor of insureds who are getting something that

6    they didn't bargain for when they signed up for the trust.

7            THE COURT:  Unless you're the receiver or otherwise

8    recognized or appointed as a party in control of Grist Mill

9    Trust's affairs and with an interest in Grist Mill Trust's

10   affairs, how do you have standing to assert prejudice to the

11   rights of all of the insurance policyholders as you've just

12   posited?

13           MR. BARNETT:  Well, your Honor, under both New York

14   and Connecticut fraudulent conveyance law, we are creditors in

15   the sense that we have a contingent or possible claim not yet

16   reduced to judgment.  So that's our standing.

17           Furthermore, your Honor, we didn't make motions to

18   stop the people who spoke to you today from transferring their

19   policies.  They made motions in this court to get out from

20   under the injunction because they recognized that Mr. Carpenter

21   controls the Grist Mill Trust and that they needed relief from

22   your Honor's order.  We never made a motion to stop them.  In

23   fact, we didn't hear of them until they came to us.  So we're

24   not the ones bringing the motion.

25           THE COURT:  You're not the ones bringing the motion,

6IHUNIA

but you are the ones who got the preliminary injunction that
says on its face that Grist Mill Trust can't do certain things.
So at this point you're set up as someone who needs to be dealt
with.  The question for me is whether that continues in the
future.

       MR. BARNETT:  I agree, your Honor.

       THE COURT:  So I don't know what I'm supposed to get
out of "I didn't jump on them, they came to me, jumped on them
in the first place," and they said, "Okay, can you get up."

       So tell me the legal significance of the argument that
you just made.

       MR. BARNETT:  It was more of an equitable point, your
Honor.  They were essentially accusing, and I think there was a
paper filed today by the MTS parties that says Universitas is
victimizing these beneficiaries and these insureds.  That's
just overcharged rhetoric designed to distract from the merits
of Universitas' motion.  I was just making the factual and
equitable point that actually we had never heard of them until
they came to us.

       THE COURT:  And so another way you could look at that
is that you didn't understand the breadth of what you were
asking for until people started to say, hey, wait a minute, I'm
caught in this net too.

       MR. BARNETT:  Well, we understood; but, for instance,
we didn't anticipate -- well, I can't speak to what I thought a

6IHUNIA

few months ago, but they, the Grist Mill Trust, it's not a
foregone conclusion that they were going to have insureds
trying to get out from under the trust.  It so happens that
they are because this complicated tax avoidance scheme that
they engaged in kind of collapsed and they want their policy.
And our position isn't that no, you can't get your policy, no,
you can't send insurance proceeds to your family in the event
of death.  That's not our position at all and it's been
mischaracterized.  Our position as a contingent possible
creditor of the Grist Mill Trust is follow your own trust
instrument because if you don't, you're prejudicing Universitas
as a potential creditor in favor of insureds who agreed to a
certain deal that should be now respected.

          THE COURT:  And is it your contention that there is
independent diversity jurisdiction and sufficient amount
currently in controversy as to each of these policies that are
in the Grist Mill Trust?

          MR. BARNETT:  Yes, your Honor.  And counsel can
correct me if I'm wrong, the combined cash value of the MTS
party's policies is a million dollars.  And as far as
Mr. Bloom's client, I believe it's around $150,000.00.

          THE COURT:  Thank you for that clarification.

          MR. BARNETT:  I think my time is up.

          THE COURT:  Thank you.

          MR. BARNETT:  Thank you for your time.

6IHUNIA

1          THE COURT:  Thank you all.  This was very helpful to

2     the Court.  I will need those supplemental submissions filed by

3     Friday and Universitas is to arrange with the court reporter to

4     get me a copy of the transcript of this argument by Monday.

5          And it is my hope and expectation that I will resolve

6     the turnover motion soon.  I can't promise you whether that's

7     two weeks or three weeks, but I do understand that there are

8     pressing issues involved.

9          As I'm sure everyone must recognize, no outcome is

10     entirely certain including there's no certainty that I would

11     continue injunctive relief.  I will decide the motion and let

12     you know what I've decided

13          All right.  Thank you.

14          (Adjourned)

15

16

17

18

19

20

21

22

23

24

25