FBANUNIC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNIVERSITAS EDUCATION, LLC,

4                   Judgment Creditor,

5           v.                          11 CV 1590 (LTS)

6   NOVA GROUP, INC.,

7                   Judgment Debtor.

8   ------------------------------x

9                                   New York, N.Y.
                                    November 10, 2015
10                                  2:00 p.m.

11  Before:

12                  HON. LAURA TAYLOR SWAIN,

13                                  District Judge

14                      APPEARANCES

15  LOEB & LOEB
         Attorneys for Universitas Education
16  BY:  PAULA K. COLBATH
         LEILY LASHKARI
17
18  HALLORAN & SAGE
         Attorneys for SADI 2005 Trust and Grist Mill Trust
19  BY:  DAN E. LaBELLE

20  DRINKER, BIDDLE & REATH
         Attorneys for Penn Mutual Life Insurance Co.
21  BY:  ROBERT MANCUSO, II

22  ROBINSON & COLE
         Attorneys for Curaleaf
23  BY:  JOSEPH L. CLASEN

24

25

FBANUNIC

1          (In open court)

2          THE COURT:  We are here on Universitas' orders to show

3     cause as to why certain restraining notices that were issued in

4     2014 ought not to be extended indefinitely.  Before I go into

5     the substance, counsel, would you please introduce yourselves

6     and state your appearances.

7          MS. COLBATH:  Good afternoon, your Honor.  Paula

8     Colbath from the firm of Loeb & Loeb LLP, representing

9     Universitas.  With me today is my colleague Leily Lashkari.

10         MS. LASHKARI:  Good afternoon, your Honor.

11         THE COURT:  Good afternoon, Ms. Colbath and

12    Ms. Lashkari.

13         MR. LaBELLE:  Dan LaBelle, Halloran & Sage,

14    representing the judgment debtor Grist Mill Trust, and also the

15    interested parties Benistar 419 Plan and Trust, GMT Living

16    Benefit Trust, Sickness Accident Disability Indemnities Trust,

17    2005, Nutmeg Trust, Life One Welfare Benefit Trust, and also

18    Grist Mill Partners.

19         THE COURT:  Good afternoon, Mr. LaBelle.

20         MR. MANCUSO:  Good afternoon, your Honor.

21         Bob Mancuso from Drinker Biddle & Reath, on behalf of

22    third-party garnishee, the Penn Mutual Life Insurance Company.

23         THE COURT:  Good afternoon, Mr. Mancuso.

24         MR. CLASEN:  Joe Clasen, from Robinson & Cole,

25    representing Curaleaf.

FBANUNIC

         THE COURT:  Good afternoon, Mr. Clasen.  I have

reviewed the written submissions, and it appears that the

application is objected to in two respects:

         One, by Penn Mutual and the interested parties

concerning the breadth of the restraint on Penn Mutual.

         Then the interested parties have also raised the

question of the propriety of restraint of Curaleaf.  I haven't

received any objections directed to the applications for

extension as to any other garnishees.

         For the sake of efficiency, I would like to direct the

speakers' attention to specific issues and let you know where

I'm inclined to go on the basis of the papers regarding these

particular objections.

         As to the restraint on Penn Mutual, it seems to me

that the point is well taken, that to put on the insurance

company the burden of divination as to connections with the

judgment debtors and their principals, while fulfilling its

obligations under contracts that may not name judgment debtors,

is an inappropriate burden in the context of a restraining

notice, which is a tool that is intended to be used with

respect to debts and property that can be identified to

judgment debtors.

         So my inclination would be as to Penn Mutual to modify

the restraining language in the order, and you might wish to

turn to the Penn Mutual order.

FBANUNIC

1          It is the please take notice paragraph on page 2.  I

2    am looking at file document 543.

3          The please take notice paragraph, which is in effect

4    the restraint paragraph, currently says, "Hereby forbidden to

5    make, permit, or suffer any sale, assignment, or transfer of or

6    any interference with any such property or pay over or

7    otherwise dispose of any of such debt."  The antecedents of

8    "such property" and "such debt" are the general references in

9    the whereas clause immediately preceding that language, and the

10   whereas clause says, "It appears that you owe a debt to one or

11   more of the judgment debtors or are in possession of property

12   in which one or more of the judgment debtors has an interest."

13   The "has an interest" language I think is at the root of the

14   indefiniteness problem.

15         So what I would propose to do -- and I will read this

16   slowly twice for conceptual purposes so that you can take notes

17   if you wish -- I would delete the language that begins, "Sale,

18   assignment or transfer" through the words "such debt" in the

19   please take notice paragraph.

20         MS. COLBATH:  Could you repeat that one more time,

21   your Honor.

22         THE COURT:  OK.

23         So right now it reads, "Permit or suffer any sale,

24   assignment or transfer."

25         MS. COLBATH:  Correct.

FBANUNIC

1            THE COURT:  So from the word "sale," I would cross out

2     the rest of that line, cross out the entire following line, and

3     then cross out the words, "such debt," leaving "except as

4     provided in 5222."

5            Are you with me so far?

6            MS. COLBATH:  Yes.

7            THE COURT:  I would substitute for that language,

8     after the word "payment," and I will read this and then I will

9     read it again slowly, "Transfers of or disbursements from

10    policies titled to any judgment debtor, Benistar, or any other

11    entity that has been found by a Court to be an alter ego of any

12    judgment debtor, and disbursements from any policies to any

13    judgment debtor, Benistar, or any other entity that has been

14    found by a Court to be an alter ego of any judgment debtor,

15    including any such disbursements made to an intermediary or

16    agent for the stated benefit any of judgment debtor."

17           Let know me when you're ready for me to read that

18    again more slowly.

19           MS. COLBATH:  I'm ready.

20           MR. MANCUSO:  Likewise, your Honor.

21           THE COURT:  Here we go.  Apologies for not having it

22    written it out for you.  The insert begins, "Transfers of or

23    disbursements from policies titled to any judgment debtor,

24    Benistar, or any other entity that has been found by a court to

25    be an alter ego of any judgment debtor, and disbursements from

FBANUNIC

1    any policies to any judgment debtor, Benistar, or any other

2    entity that has been found by a Court to be an alter ego of any

3    judgment debtor, including any such disbursements made to an

4    intermediary or agent for the stated benefit of any judgment

5    debtor, Benistar, or any other entity that has been found by a

6    Court," the same language regarding alter egos.

7            MR. LaBELLE:  Your Honor, may I?

8            THE COURT:  I am going to ask Mr. Mancuso when he's

9    ready whether that language would address Penn Mutual's

10   administrative concerns.  Then I will hear everybody else.

11           Mr. LaBelle, did you have a question?

12           MR. LaBELLE:  I was going to ask if I could confer

13   briefly with my client representative in the courtroom.

14           THE COURT:  Oh, sure.

15           MR. LaBELLE:  If Mr. Mancuso is ready, I will stop.  I

16   will be ready when he's ready.

17           THE COURT:  OK.

18           Mr. Mancuso.

19           MR. MANCUSO:  May I, your Honor?

20           THE COURT:  Yes.

21           MR. MANCUSO:  I think overall this works well.  The

22   concern I have, your Honor, is one that I think we sort of

23   continued to have over and over.  It is just that I guess the

24   specificity of the trust entities that own policies held by

25   Penn Mutual.

FBANUNIC

1          So, for example, the judgment debtor Grist Mill is the

2     Grist Mill Welfare Benefit Plan.  I just want to make sure that

3     we're clear on which Grist Mill trusts would fall into that

4     category, if any.

5          I am not aware, your Honor, of any of the trusts or

6     policies in play here that relate to Benistar, although I would

7     want to go back with the company to confirm that.  As far as

8     alter egos, the only alter ego entity that I am aware of that

9     has been adjudicated by a court to be an alter ego -- again,

10    that is related to what we have before us today -- is the Grist

11    Mill Trust.  But there are various Grist Mill trusts.

12         I just want to make sure before we leave today that it

13    is crystal clear as to which entities fall into these

14    subcategories and which ones do not.  I think so long as we

15    have that understanding, I appreciate what your Honor has done.

16         THE COURT:  My intention is to capture the specific

17    entities that are named in the judgment as judgment debtors,

18    and to the extent that any other entity is denominated

19    specifically on the relevant documents as X and such trust as

20    sponsor or for the benefit of an entity that is specifically

21    listed in the judgment, because the judgment speaks of, in the

22    case of Grist Mill, Grist Mill and sponsors and entities, to

23    the extent they hold property, the Grist Mill Trust.

24         So it would be the Grist Mill Trust entity that's

25    listed specifically in the judgment.  Is that the Grist Mill

FBANUNIC

Welfare Benefit Plan Trust, Ms. Colbath.

              MS. COLBATH:  It is, your Honor.  But the way that
it's operated, and we have a document that we will be
submitting to the Court today that I have submitted to counsel
before we got here, addresses that the Grist Mill Trust that is
the judgment debtor, the long name, was the umbrella for all of
these Grist Mill trusts.  You don't have the document in front
you.  It's Exhibit B to something that we would like to submit
today.

              I appreciate Mr. Mancuso's point.  What they did was
they have the Grist Mill Trust Welfare Benefit Plan, which is
what we have the judgment against, and that has subtrusts under
it.

              Some of those are GMT -- I haven't memorized all of
the names, but the Grist Mill Trust, as the document sets
forth, was the umbrella for a number of Grist Mill trusts.  So
we would ask that the -- I could recite for you the specific
names.  It is GMT Living Benefit Trust.  It should be included
as well.  It is one of the interested parties.

              THE COURT:  And I understand that you are making the
general sort of policy and practical argument that these are
entities that move assets around and among themselves, and it's
hard to keep up with transfers.  But, given the scope of the
restraining notice tool, if in fact these are set up as
separate entities, what is the legal basis within the

restraining notice judgment execution context?  Before you go

and get a veil-piercing determination or alter ego

determination or some court adjudication that they should all

factually be collapsed, what would be the basis of my extending

it?

          MS. COLBATH:  I am not asking you to collapse

different entities at this point, your Honor.  The documents

that the Grist Mill Trust has produced to us, so that the

entity that I have a judgment against, the trust is comprised

of multiple trusts.  That label was given to multiple trusts.

          Might I suggest --

          THE COURT:  Yes.

          MS. COLBATH:  -- a proposal here, your Honor.

          I do appreciate the position that Penn Mutual was in,

and I hope you recognize from the record that we submitted that

we did try to resolve some of this with the Grist Mill Trust

folks by preparing the declarations.

          I feel that Universitas is somewhat prejudiced at this

point because we had filed an application to take

Mr. Carpenter's deposition to resolve all of all of this; also,

Ms. Carpenter's deposition, and she hasn't presented herself.

It will take another application because we have to do

everything by motion.

          But we have had for quite a number of months an

application filed for Mr. Carpenter's deposition.  So I would

FBANUNIC

1    just ask that -- and he's pleaded the Fifth Amendment as to all

2    documents relating to the Grist Mill Trust and all of these

3    entities.  So you are entitled to make an adverse inference

4    from that.

5        I would ask you to look at our supplemental

6    submission, where they describe exactly what the entity is that

7    we have -- it's not an entity, it is a label that they use, the

8    Grist Mill Trust, for these subtrusts -- before making your

9    determination.

10        I'm happy to leave here today so that Mr. Mancuso has

11    some definition to accept the language that you have proposed

12    with the addition that the GMT Living Benefit Trust be included

13    for at least some period of time until we make posthearing

14    submissions to you, until 30 days after Magistrate Judge Pitman

15    renders a decision on our application to take Mr. Carpenter's

16    deposition.

17        The day that this restraint is lifted those assets are

18    going, and we are not going to be able to get them back.  I

19    have done everything in my power to clarify the issues that

20    Mr. Mancuso has raised.  I totally appreciate that with

21    Mr. Carpenter as a judgment debtor, I am entitled to restrain

22    anything he has an interest in.  He's taking the Fifth

23    Amendment, and people won't show up and they won't produce the

24    documents.

25        You are entitled to stay all of those trusts he has an

FBANUNIC

1    interest in.   My client shouldn't be prejudiced because

2    Mr. Carpenter has a corporate shell game, and so he wins the

3    corporate shell game when he pleads the Fifth and he refuses to

4    produce documents.

5            That's not the fair outcome.   This restraint should

6    continue until his deposition is taken, until we have expedited

7    discovery as we have sought so that those assets don't

8    disappear forever.

9            THE COURT:   Thank you.

10           Let me finish hearing from Mr. Mancuso.

11           MR. MANCUSO:   Your Honor, if I may, I just wanted to

12   point out that I'm not sure if your Honor has it in front of

13   you or not, but in our opposition papers, which are at document

14   567 page 3 of 10, I have listed out there the various entities

15   that are identified within Penn Mutual as owners of policies.

16   So if you look --

17           THE COURT:   This is the footnote?

18           MR. MANCUSO:   Yes.   The footnote, your Honor, contains

19   14 entities.   There is also, in addition to that, the Grist

20   Mill Trust dated 10/1/03, which is further up in the bottom of

21   the text as well as the SADI Trust 2005.

22           So, just for purposes of clarity, which is, your

23   Honor, why I'm here today, it would be my understanding that,

24   based on what your Honor's coming from and what I heard from

25   Ms. Colbath, that the two entities that would remain restrained

FBANUNIC

1    pursuant to your revised restraining notice would be the Grist

2    Mill Trust dated 10/1/03, and I understand Ms. Colbath to be

3    asking that GMT Living Benefits Trust dated 10/1/05, which is

4    listed in footnote 1 at sub 1, to be the two entities that

5    would remain restrained.  As I were to take that, there would

6    be no other entities at the moment that would fall under what

7    your Honor has indicated thus far.

8              THE COURT:  When you say no other entities, you mean

9    no other entities that you recognize as having been listed

10   anywhere as judgment debtor that you understand are policy

11   owners with Penn Mutual?

12             MR. MANCUSO:  That's correct.

13             THE COURT:  And it would also restrain Penn Mutual

14   from complying with a direction to make a transfer out of a

15   trust owned by some other entity to a listed judgment debtor?

16             MR. MANCUSO:  And/or Benistar.

17             THE COURT:  And/or Benistar, one of the adjudicated

18   alter egos.

19             MR. MANCUSO:  Correct.

20             THE COURT:  I'm sure there is a specific Benistar

21   entity name that's in the alter ego adjudication, and you would

22   serve, give copies to Mr. Mancuso of the judicial decisions

23   that were cited in Universitas' papers finding other entities

24   to be alter egos?  Correct, Ms. Colbath?

25             MS. COLBATH:  I am happy to furnish him with those

FBANUNIC

1    decisions.  I think that there are three of them, but we have

2    them in our papers and I'm happy to furnish those.

3            I just want to be clear on footnote 1.  At this point,

4    the parties are agreeable that GMT Living Benefit Trust, the

5    Grist Mill Survivor Trust, Benistar 419 Plan and Trust that are

6    listed there would continue to remain subject to the

7    restraining notices, correct?

8            THE COURT:  Well, that isn't what I had proposed.

9            MS. COLBATH:  OK.

10           THE COURT:  So why don't you speak to that.

11           MS. COLBATH:  Well, again, your Honor -- and I

12   appreciate there is a need to clarify for Penn Mutual.  Again,

13   we have undertaken to do that.

14           The affidavits that were submitted, Ms. Carpenter's

15   affidavit and Ms. Kehoe's affidavit could have very easily,

16   succinctly, in one line, said Daniel Carpenter has no interest

17   in these trusts, the trusts that are set forth there.  They

18   never said that.  And we have a judgment against Mr. Carpenter,

19   who we know has a corporate shell game going.  He's taken the

20   Fifth.

21           He refuses to produce one piece of paper relating to

22   any of these trusts, and that should not be used against

23   Universitas.  Universitas gets a benefit from that.  I mean, my

24   thinking is, based on the record before you, there's no reason

25   that the trusts set forth in footnote 1, all of them, shouldn't

FBANUNIC

1    be restrained.

2            There has been opportunity for Mr. Carpenter to say I

3    don't have any interest in any of that.  Ms. Kehoe has access

4    to all of the records, paper and electronic.  She's the trustee

5    now.  We presented her with an affidavit.  She submitted an

6    affidavit.  Nowhere does she say Mr. Carpenter doesn't have an

7    interest.  So I am entitled to execute on assets that he has an

8    interest in.

9            Again, I would ask, at least until Magistrate Judge

10   Pitman affords us the opportunity to take Mr. Carpenter's

11   deposition, I have acted with all diligent speed once you gave

12   me the judgments last August.  We issued the restraining

13   notices, and I understand Penn mutual is looking for guidance.

14   I think they deserve guidance.  I'm trying to give them

15   guidance.

16           But I will tell you that whenever Penn Mutual has

17   called to tell me that there is an individual who has an issue

18   with a transfer of a policy Universitas has acted on that and

19   vis-a-vis Penn Mutual I am not aware of any outstanding issue

20   with an insured.

21           When I received Mr. LaBelle's papers they listed, you

22   know, you've got NB and you've got STV and you've got these

23   individuals that they claim have issues.

24           I asked Mr. LaBelle, tell me who they are.  I will get

25   on the phone and we'll resolve this.  He hasn't furnished the

FBANUNIC

1    information to me.

2           But I don't think that there's any reason that we need

3    to act before Universitas has had its opportunity for

4    appropriate discovery.  I have dealt on a case-by-case basis

5    with every issue, and I would ask Mr. Mancuso to confirm it for

6    me.  We have resolved all outstanding issues.

7           THE COURT:  You and Mr. Mancuso have resolved specific

8    issues that have come up about disbursements to third parties?

9    Is that what you mean?

10          MS. COLBATH:  Correct.

11          If someone went to Penn Mutual, an insured or a

12   participant or individual, and said, look, I want to transfer

13   my policy and Penn Mutual says, well, hold it, we've got this

14   issue with the restraining notice, he furnishes them my

15   telephone, and I am going to hazard a guess, I think it is

16   under six.  It's been like three or four individuals.  We have

17   arranged for the transfer.  There has been a small payment

18   transfer payment made, a few thousand dollars on these.

19          There's no outstanding individual, to my knowledge,

20   except for whatever is set forth in Mr. LaBelle's, which I

21   learned for the first time when Ms. Kehoe submitted her

22   declaration.  We have dealt with every person who wanted relief

23   from the restraining order.

24          THE COURT:  Mr. Mancuso?

25          MR. MANCUSO:  To my knowledge, your Honor, there were

FBANUNIC

 1   two.  And, to be clear, if anybody contacts Penn Mutual asking

 2   Penn Mutual why can't something be processed, they are advised

 3   that there is a restraining notice in place, and Penn Mutual's

 4   understanding is that it precludes Penn Mutual from doing

 5   whatever the specific request is.

 6        My understanding is that, in turn, that Penn Mutual --

 7   yes the information is provided that indicates who the

 8   attorneys are in the case and that they can speak with them

 9   about status.

10        I am aware of two of them that have been resolved.

11   There may be more, but I'm aware of two.  So in two instances

12   out of -- I don't quite know how many -- I am sure Mr. LaBelle

13   will speak to that -- have come up or have gotten resolved or

14   not resolved, I'm not certain about that.  But that's my

15   understanding of it, your Honor.

16        THE COURT:  So you are not aware of any active

17   unresolved controversies?

18        MR. MANCUSO:  Not personally.  I wouldn't suggest to

19   this Court that Penn Mutual is aware of zero, but none have

20   been brought to my attention at this time.

21        THE COURT:  Thank you.

22        Ms. Colbath, for clarity, what you are asking me to do

23   with respect to a modification on Penn Mutual today is to

24   restrain not only judgment debtors and adjudicated alter egos,

25   but also, pending the resolution of the discovery issues as to

FBANUNIC

```
 1     the Carpenter entities and Mr. Carpenter in particular and

 2     supplemental submissions as necessary, any transfers or

 3     disbursements regarding all of the entities.  I think there's

 4     14 listed in the footnote to page 3 of Penn Mutual's papers.

 5              MS. COLBATH:  Correct.  And, your Honor, on the

 6     policies, I believe that there may have been a couple of

 7     policies that came to my attention from Lincoln Life, who

 8     doesn't oppose the extension of the restraining notice, that I

 9     included in the six.  If there were two from Penn Mutual, that

10     sounds right, but there was another carrier who brought a

11     couple of instances to my attention and they were promptly

12     resolved.

13              So the prejudice to my client would be tremendous if

14     the restraint is lifted without us having the opportunity for

15     the appropriate discovery, which we have sought diligently.

16              The prejudice is very low to the plans at issue

17     because we have been addressing them on a case-by-case basis.

18              Aside from the details that are in Ms. Kehoe's, which

19     I was prepared to act on -- but I can't with initials, I need

20     additional information -- those two can be addressed on a

21     prompt basis.

22              THE COURT:  Thank you.

23              Mr. Mancuso?

24              MR. MANCUSO:  Your Honor, if I may, my concern with

25     that is just the timing with which it may or may not happen.  I
```

FBANUNIC

appeared here last year when there was Mr. LaBelle's motion for

a protective order pending, and the year has gone by with a

restraining notice and we're still sort of in the same

position.

     I appreciate that out of today's hearing I hope there

will be an order really one way or the other, and I think

that's the most important thing with respect to Penn Mutual,

that there is some clarity that Penn Mutual will be ordered to

be restrained in connection with.  If it's all of these

entities, so be it.  But if not, know which specific entities

we are restrained with respect to, because I think that's the

most important piece here that Penn Mutual does have some

guidance.

     That being said, I appreciate where Mr. Colbath's

coming from, I really do.  I don't know that there is a

mechanism to get the information, get an adjudication on that.

     I just fear that we are going to be back here a year

later in the same position.  I think part of this is covered

by -- I know Mr. LaBelle hasn't had his chance to speak yet.

     THE COURT:  He will.

     MR. MANCUSO:  But part of it I think is, you know, his

entities that he's representing are also restrained, at least

in some part.  I think there is sort of a double layer of

protection, notwithstanding the arguments that Ms. Colbath has

made, contrary to that.  I just think that to enter an order

FBANUNIC

```
1   restraining all these entities, if that's where the Court is
2   going, I would appreciate that, but I do think that we don't
3   need to go that far.  I don't think that that's really where we
4   should go.
5        My hope is that we can continue to work within the
6   framework you have announced to start this hearing, with some
7   specific parameters on which of the entities will fall into
8   those categories today, understanding that, of course, an
9   adjudication down the line could expand on that at any time.
10        THE COURT:  Before I hear from Mr. LaBelle, what I
11   believe I am hearing Ms. Colbath ask for here is -- well, when
12   we leave today, because I am not going to type it up on the
13   bench will be a continuation of the current TRO until I put the
14   new order in.
15        Then the order that Universitas is asking for today is
16   one that extends until the judgment is paid the restraining
17   notice against Penn Mutual as to the judgment debtors and
18   adjudicated alter egos, as I laid it out in my initial
19   proposal, and then also extends as to the other 14 listed in
20   footnote 1 the restraint in that same construct of titled
21   policies and disbursements as to these other 14, pending
22   further order of the Court, which would be pending the
23   resolution of the outstanding discovery issues as to
24   Mr. Carpenter, and the principals of his affiliates or the
25   representatives of his affiliates.
```

FBANUNIC

```
1             Is that what you are asking me for, Ms. Colbath?
2             MS. COLBATH:  Yes, your Honor.  Though on the
3   indefinite for an institution like Penn Mutual, we recognize
4   that this was really very much a very long short wish list.  So
5   I don't expect that we are going to get something indefinite.
6             I think something along the lines of 30 or 45 days
7   after the completion of Mr. Carpenter's deposition or an order,
8   you know, compelling it by a date certain, something where it's
9   tied to his deposition in some reasonable time to come back to
10  the Court with whatever information we garner from that is what
11  is fair.
12            THE COURT:  This is as to the other 14 entities or as
13  to everything?
14            MS. COLBATH:  Those restraining notices where no one
15  objected, those could be extended until the judgments are
16  satisfied in full.  I thought the focus here was on the Penn
17  Mutual.
18            THE COURT:  What are you asking me for as to Penn
19  Mutual, because we haven't talked about duration?
20            MS. COLBATH:  Penn Mutual, I would say 45 days; that
21  the restraining notices remain in full force and effect until
22  45 days after the conclusion of Mr. Carpenter's deposition or
23  denial.
24            THE COURT:  As to judgment debtors as well as the
25  other 14?
```

FBANUNIC

1          MS. COLBATH:  As to all 14.

2          THE COURT:  Well, the list of 14 in the footnote

3    doesn't include the named judgment debtors as I understand it.

4          MS. COLBATH:  Correct.  So it would be, your Honor,

5    your recitation that said -- let me just find my notes.  You

6    had listed the judgment debtors, Benistar, any alter ego, and

7    we would just be adding those entities listed in footnote 1 on

8    page 3 of Penn Mutual's memorandum on the motion.

9          THE COURT:  What I'm asking you is that are you asking

10   or willing to agree to -- however you want to put it -- a limit

11   on the duration of the restraining notice as to the judgment

12   debtors, Benistar, and the alter egos to that 45 days after the

13   conclusion of Carpenter's deposition time frame, or are you

14   asking for a different durational provision as to the judgment

15   debtors Benistar?

16         MS. COLBATH:  I now appreciate your Honor's question.

17         As to those entities listed in footnote 1, I think

18   that that has to be a shorter period of time.  That would be a

19   45-day period after the completion of Mr. Carpenter's

20   deposition.  As to the others --

21         THE COURT:  You would file an affidavit upon the

22   completion of --

23         MS. COLBATH:  Correct.  It would automatically expire

24   if I don't do anything, and to get it extended I have to come

25   into court with a showing.

FBANUNIC

1          THE COURT:  Well, none of us is going to know when

2     Carpenter's deposition is concluded unless you file something.

3     It can't be automatic because I am not going to know,

4     Mr. Mancuso isn't going to know.  We will need some mechanism.

5          MS. COLBATH:  OK.  We'll accept some notice I have to

6     file with the Court upon completion.  However, the Court would

7     like to set a definitive date on that.  I'm obviously --

8          THE COURT:  We will create a mechanism.

9          MS. COLBATH:  Correct.  As to the others, I think that

10    what is typically done I see in cases is that they are extended

11    for another year.  So I would ask that they remain in force for

12    an additional year.

13         THE COURT:  All right.

14         MS. COLBATH:  Thank you.

15         THE COURT:  Thank you.

16         Mr. Mancuso?

17         MR. LaBELLE:  May I make one clarification.

18         The footnote, your Honor, just so it's clear, there's

19    14, but there's two in the bottom of the text as well.  So

20    there's really a total of 16 entities.  Just so we are all

21    talking about the same thing.

22         THE COURT:  All right.  So let's be clear.

23         So in the first paragraph, the carryover paragraph,

24    there's Grist Mill Trust dated 10/1/03.

25         MR. MANCUSO:  Correct.

FBANUNIC

1           THE COURT:  That's one of the additional ones.  And

2     the Sickness Accident and Disability Indemnity Trust 2005

3     listed up in the text, and then the 14 in the footnote?

4           MR. MANCUSO:  Correct.

5           THE COURT:  Ms. Colbath, that's the universe that you

6     are asking be added to judgment debtors?

7           MS. COLBATH:  Correct.

8           MR. MANCUSO:  Your Honor, I would ask, to the extent

9     that we're deviating from where you initially stated, that if

10    there's going to be a deposition of Mr. Carpenter that it be

11    set within a specific time frame.

12          I do fear by the time we get to that point, if it's 45

13    days thereafter, that deposition takes place in ten months,

14    that is essentially a year that -- you know, we basically have

15    gotten nowhere then in 12 months.

16          I think to the extent that that has to happen, I

17    object to that.  But if it has to happen, I think we have to

18    try to set it for a certain date so we can move this forward.

19    Again, otherwise my fear is that we are going to be back before

20    you in another year having the same conversation.

21          THE COURT:  It seems that the issues relating to

22    Mr. Carpenter's deposition taking place are twofold.  One is my

23    colleague making a determination as to whether he will order

24    the deposition, and the other is Mr. Carpenter complying with

25    the order to take the deposition.

FBANUNIC

1              Ms. Colbath doesn't have control over either of those,

2      and frankly I don't either because my colleague is taking care

3      of the application.

4              I think, yes, there is a possibility that, if the

5      order is granted but Mr. Carpenter is not compliant that this

6      second group could end up extending out for another year, which

7      would give you a defined universe of entities, but the

8      practical issue of having to negotiate carveouts to the extent

9      that disbursements are disputed.

10             What I'm thinking of as a mechanism is to require

11     every 30 days for Universitas to file and copy to Penn Mutual a

12     statement as to the status of the application for Carpenter's

13     deposition and the conduct of any depositions.  So that if the

14     deposition is actually taken and concluded, then certainly

15     within 30 days of that date and no more than 45 days of that

16     date we have the -- and I guess I would have you put in a

17     notice upon the conclusion of the deposition if it doesn't

18     coincide with the 30-day reporting period so that there would

19     be some objective indicator if it's going to expire earlier.

20             So let me hear from Mr. LaBelle.

21             MR. LaBELLE:  Thank you, your Honor.

22             I have to respond to some of the things that

23     Ms. Colbath said.

24             First of all, these declarations that she's talking

25     about, what they did was they drafted five declarations, one

FBANUNIC

1    for Mr. Percy, one for Mr. Carpenter, one for Ms. Carpenter,

2    one for Ms. Kehoe, and one for an individual named Matthew

3    Westcott.  They were 35 or 40 pages long and had all kinds of

4    stuff in them.

5            At the same time they said, We want to depose anybody

6    anyway.

7            So I said, OK, tell me what you want.  You can take a

8    deposition.

9            We have talked about taking the depositions.  I don't

10   represent Mr. Carpenter.  Mr. Percy is deceased.  As recently

11   as last week, I spoke with Ms. Colbath about the scheduling of

12   Mrs. Carpenter's deposition.

13           The representation that Mrs. Carpenter has been

14   dodging her deposition is simply incorrect.  It is not

15   accurate.  She's willing to testify.  They subpoenaed her here.

16   She's willing to testify today if your Honor needs it.  I don't

17   think you do.

18           She mentioned this umbrella, Grist Mill Trust umbrella

19   document.  That document is a marketing document.  Some of

20   these trusts were being marketed at the same time, back in the

21   early 2000s.  The Grist Mill Trust was a large trust and had

22   become known in the world of brokers, and there was a marketed

23   being document that referred to under the Grist Mill Trust

24   umbrella.  OK.  That is all that is.

25           Earlier this year -- and Ms. Colbath neglected to tell

FBANUNIC

1    you this –– we furnished over a thousand pages of documents to

2    Loeb & Loeb giving them copies of all the individual trust

3    documents on each of these trusts.

4         We gave them documentation from the IRS indicating

5    that each of them has separate employer identification numbers.

6    We gave them information on all of the bank accounts maintained

7    by these trusts, both in the past and presently, indicating

8    that they all maintained separate bank accounts.

9         To the point that there's been no declaration filed

10   there has been a declaration filed by Kathy Kehoe as part of

11   this motion.  She explains the setup of these trusts, including

12   the interested parties that are objecting.  They all exist

13   separately.

14        I can't believe that what she is looking for is some

15   declaration from somebody that Mr. Carpenter does not have an

16   interest in these trusts.

17        I have called Ms. Kehoe today to testify to that.

18   There is absolutely no –– you know, there just isn't any

19   question about that.

20        Your Honor made a finding with respect to Grist Mill

21   Trust because of financial transactions that occurred, and I

22   understand that finding.

23        To my knowledge, and I can't represent that I have

24   looked at all the trusts, I am not intimately familiar with all

25   of the trusts.  But Universitas counsel subpoenaed all of

FBANUNIC

1   Mr. Carpenter's bank records, and the reason that your Honor

2   was able to have evidence presented with respect to the Grist

3   Mill Trust is because they traced all the money and they saw

4   those transactions.  There weren't any other transactions that

5   they brought to light.  If they had claims against these other

6   trusts, they should have brought them.

7          The idea that they need more discovery, well, maybe

8   they need a little more discovery because they have some new

9   ideas, but it's not like they haven't had a tremendous amount

10  of discovery.  They have literally subpoenaed every bank

11  account where Mr. Carpenter had signature authority, and the

12  only evidence they found was as to Grist Mill Trust.  The

13  evidence was there, and your Honor made findings with respect

14  to Grist Mill Trust.

15         In the other litigation that has been involved where

16  entities have been found to be alter egos -- and that is the

17  matter that I was conferring with the client representatives

18  about -- no other trusts has ever been found to be an alter ego

19  of Mr. Carpenter other than the Grist Mill Trust.  The reasons

20  for that were because of the financial transactions that your

21  Honor found that went back and forth.  The alter ego findings

22  have been with respect to LLCs and corporations.

23         So, if you want to use as an example, the Grist Mill

24  Living Benefit Trust, the issue currently pending there is that

25  provides medical reimbursement benefits.  Each of those

FBANUNIC

1   trusts -- again, I don't know every one of these trusts, but

2   the ones that I have seen that I have become familiar with

3   because of the litigation, they are all set up differently, and

4   they provide different benefits.

5          They share common characteristics in that typically

6   employers make contributions to the trusts in order to derive

7   benefits for employees of those employers.  They share that

8   common characteristic, and they do have common trustees.  But

9   they are all set up differently.  There's different

10  participants, there's different bank accounts, there's

11  different taxpayer ID numbers, and they operate separately.

12         If they are able to prove otherwise, then prove

13  otherwise and then obtain a judgment.  That is what they did

14  with Grist Mill Trust, and they got a judgment.

15         It's simply unfair, and it's impacting people who are

16  innocent.  I will use this example.  There is a fellow in the

17  Grist Mill Living Benefit Trust who has brain cancer, and he's

18  incurred a lot of medical expenses.  He can't get reimbursement

19  because Penn Mutual is being overly conservative in my view in

20  the way they are interpreting the restraining notice.

21         The restraining notice ought to operate against

22  judgment debtors.  It ought not to operate against entities

23  that are not judgment debtors.  It's incumbent upon Universitas

24  to prove that they have a claim against these entities before

25  they start restraining them and impairing the rights of people

FBANUNIC

1    who have nothing to do with Universitas.

2              THE COURT:  Has --

3              MR. LaBELLE:  May I say one other thing, your Honor?

4              THE COURT:  Yes.

5              MR. LaBELLE:  The two transactions that Mr. Mancuso

6    mentioned, those involve SADI Trust.  The SADI Trust is not a

7    judgment debtor.  There were two individuals who wanted to

8    terminate out of the SADI Trust and have their life insurance

9    policies transferred to them.  So it was going to be an

10   ownership change in the SADI Trust out to the individuals.  I

11   don't know the details, but I have reason to believe that the

12   only reason those two were approved was because Universitas

13   insisted that they be paid, even though they had no judgment

14   against SADI, and they had no right to impede those people's

15   insurance, life insurance rights.

16            And we are not talking about a couple of thousand

17   dollars, your Honor.  I have reason to believe it was in the

18   range of $50,000.  I have reason to believe that because the

19   broker contacted me.

20            Your Honor is also familiar with the Fisher death

21   claim that's pending.  The broker there told me that

22   Ms. Colbath's office has contacted him, even though, again,

23   that is a SADI policy.  There is one Grist Mill Trust policy,

24   and I agree that Grist Mill Trust is restrained.  But as to the

25   SADI policy, the conversation has been, well, pay us money and

FBANUNIC

1    we'll let your death benefit go through.

2             That's what's going on with these restraining notices,

3    your Honor, and it's not right.  I have given them

4    documentation which its face shows that these trusts are

5    separate.

6             They had an opportunity to prove transactions that

7    might have been involved with Mr. Carpenter, and they proved

8    them as to Grist Mill Trust and Grist Trust Mill only.

9             I apologize.  I'm getting animated about this.  I

10   believe we are in area where this getting abusive.  It is an

11   abuse of process when you serve a restraining notice and you

12   refuse to say to insurers like Penn Mutual, I agree it only

13   applies to the judgment debtors.  That's the only thing it can

14   apply to, your Honor, under the CPLR.  It restrains the assets

15   of judgment debtors.  It doesn't restrain the assets of people

16   who you think you might have a claim against down the road,

17   particularly when it is impacting individuals like people who

18   have brain cancer who also have a death in their family.  It is

19   just not right.

20            If they have a claim get, let them pursue it and make

21   it.  They had the opportunity, and the only claim they made was

22   against Grist Mill Trust.  Your Honor found that for reasons

23   that are in the record and understood.

24            I apologize for being animated about this, your Honor,

25   but it is wrong.  They say why don't we give them the names of

FBANUNIC

other people.  Why?  So they can shake down more money out of

other people that are innocent?  It's not right.

THE COURT:  Before you stand, Ms. Colbath,

Mr. LaBelle, does your interest group object to the judgment

debtor oriented modification of the Penn Mutual restraining

notice that I outlined?

MR. LaBELLE:  I'm sorry.  Was that directed to me?

I agree in principle with your initial reaction, your

Honor, not with the extensions to these other trusts that have

been discussed.  Your Honor's initial reaction was correct in

my humble opinion.  I apologize again for being than animated.

THE COURT:  Thank you, Mr. LaBelle.

Ms. Colbath?

MS. COLBATH:  Mr. LaBelle talked about bank statements

and thousands of pages of documents that these trusts have

produced.  He must have produced those documents honestly to

someone else.

I've never seen bank statements, loan transactions,

Mr. Carpenter's involvement at all with any of these.  He did

produce pieces of paper that show this they applied for tax ID

numbers.  But that is not what is at issue here.  The

restraining notice is issued against a judgment debtor's

interest, contingent, direct, indirect, in property.

Again, Ms. Kehoe could have said that none of the

judgment debtors have any interest in this trust, and they

FBANUNIC

didn't do that.  He did produce a disk about a week ago when we

were preparing for the hearing which I haven't looked at.  But

I believe it had about 75 pages on it.  We did subpoena bank

statements.  That didn't come from Mr. LaBelle and his clients.

We went to TD Bank.  We fought.  We finally got documents.

Then, when TD bank closed the accounts, we don't know where the

$30 million is.

          Mr. LaBelle's clients haven't paid one penny

voluntarily on these $30 million judgments.  So he can get

animated and get upset, but it's my client that is owed the $30

million, and they have refused and continue to refuse to reveal

where it is, where they have parked it, what they have invested

it in.

          So, yes, we have to use the mechanism that the CPLR

allows us, and that is these restraining notices.

          If he would furnish me with the name of the individual

with brain cancer, we will look into that, and they can show me

their enrollment documents and we will act on that right away.

          Again, we have asked him for it.  They don't want to

reveal the name, but every month they do send to us a short

affidavit telling us that they have paid the premium on John

Smith with the policy number.

          In one breath here he will give me every detail on a

transaction, but when it comes to something serious that he is

hyping up, this brain cancer person, he won't tell me the

FBANUNIC

policy, he won't tell me the insured's name.  If he wants to

resolve this, we could do it and get it down now or outside the

court when we finish here today.

I remain ready, willing, and able on any emergent case

like this to do the reasonable thing.  They want a total

lifting so that they can begin to transfer assets, and that's

what we object to.

Thank you.

One other thing, your Honor.  As to the SADI Trust,

there is currently pending before Judge Nathan -- he says that

we're shaking down SADI.  No.  SADI money was paid into the

court in an interpleader action for Grist Mill and SADI.

That's combined litigation, two life insurance companies,

currently pending before Judge Nathan.

We have asserted a cross-claim for an alter ego

finding against SADI.  That is currently being litigated.  We

are in the middle of discovery.  She recently issued a

scheduling order.  We are waiting in that case for Mr. LaBelle

to comply with discovery.  He hasn't served any.  We have, and

we are waiting for his responses.

THE COURT:  Thank you.

I will take these modification requests under

advisement.  By the end of this week I will issue a modified

order.

Mr. LaBelle?

1        MR. LaBELLE:  Yes, your Honor.

2        There is one other with respect to your Honor's

3    initial proposal.

4        You referred to Benistar.  I am not sure what you mean

5    by Benistar.  Benistar is a name that is used by a lot of these

6    companies.  There is a Benistar 419 Plan and Trust.

7        THE COURT:  Benistar was meant to be shorthand for the

8    Benistar entity or entities against which there have been alter

9    ego adjudications, and this is referenced in the supplemental

10    memorandum of --

11        MR. LaBELLE:  That is clear.  I can live with that,

12    your Honor.

13        Again, my understanding -- incidentally, Ms. Colbath

14    always associates me with Mr. Carpenter.  I don't represent

15    Mr. Carpenter, nor do I represent those other companies.  I'm

16    here on behalf of the Grist Mill Trust and the trusts, and so I

17    don't represent those other entities or Mr. Carpenter.

18        My understanding is none of the trusts other than

19    Grist Mill Trust have been found to be alter egos in any of

20    those litigations, and I am familiar with those.

21        THE COURT:  But you are familiar also with the

22    adjudications relating to, as you put it, LLCs and

23    corporations?

24        MR. LaBELLE:  The Cahaly litigation and the Iantosca

25    litigation that is referenced in Universitas' papers.

FBANUNIC

1           THE COURT:  I just found the document now.

2           This is the supplemental memorandum of Universitas.  I

3    don't have the docket entry number on this printed.  It's dated

4    September 24, 2015, and at the bottom of page 1 it says that in

5    *Cahaly v. Benistar Property Exchange Trust Company, Inc.*, that

6    Benistar Administrative Services Inc., Benistar Ltd., Benistar

7    Employer Services Trust Corporation, judgment debtor Carpenter

8    Financial Group, LLC, U.S. Property Exchange, and Benistar

9    Property Exchange Trust Company Incorporated were held to be

10   Carpenter alter egos.  And then it also refers to a verdict in

11   a case called an *Iantosca v. Benistar Administrative Services*.

12   The representation is that Step Plan Services Inc. and Benistar

13   419 Plan Services Inc. are Carpenter alter egos.

14           Then there's also a reference to a recitation in the

15   First Circuit opinion in *Iantosca* indicating that the state

16   court had found that five additional corporate entities had the

17   veil pierced, and that lists Benistar Administrative Services,

18   Benistar Employers Services Trust Corp., Benistar Ltd.,

19   Carpenter Financial Group LLC and U.S. Property Exchange.

20           So that was what the Benistar shorthand was meant to

21   be.  I think the way I will phrase it is entities found to have

22   been alter egos.

23           MR. LaBELLE:  I can live with that, your Honor.  Those

24   are all accurate, by the way.  But those don't involve any of

25   these trusts.

FBANUNIC

```
 1              THE COURT:  Thank you.

 2              Now may we go on to Curaleaf?

 3              MS. COLBATH:  Sure.

 4              THE COURT:  As to Curaleaf, my understanding is that

 5   Curaleaf is the tenant of and has an option to purchase

 6   property from Grist Mill Partners LLC, which is not itself a

 7   judgment debtor, but as to which the district court in

 8   Connecticut has issued a charging order.

 9              My understanding of the function of the charging order

10   or the effect of the charging order is that it requires that

11   any disbursements that would have been made by the LLC to

12   Mr. Carpenter instead be made to Universitas, and that no loans

13   could be made to Mr. Carpenter, but that it doesn't constitute

14   a transfer of the equity interest in that LLC to Universitas

15   and doesn't give Universitas the status of a member of that

16   LLC.

17              Am I correct so far, Ms. Colbath?

18              MS. COLBATH:  You are very good, yes.

19              It also required production of some documents which

20   haven't been made.  But you have summarized the substantive

21   order.  Thank you.

22              THE COURT:  Thank you.  I have been trying.  There's a

23   lot to study in this case.  So it seems to me that the Curaleaf

24   debt is to a nonjudgment debtor and an entity that hasn't been

25   found to be an alter ego.
```

FBANUNIC

1              So, since the Curaleaf receivable is not a debt to a

2     judgment debtor or alter ego, it seems to me inappropriate to

3     continue the restraining order because of the lack of that

4     relationship.  So my inclination is to vacate the Curaleaf

5     restraining order.

6              So, Ms. Colbath, if you wanted to be heard.

7              MS. COLBATH:  Sure, your Honor.  The argument is

8     essentially the same as with Penn Mutual.  That is, we have

9     not -- I believe that Dan Carpenter has an interest in Grist

10    Mill Partners.  This is just another one of his show companies

11    that he formed.

12             They have never produced any -- I sought financial

13    records.  This order required them to give me certain things

14    last week which haven't been produced.  That is a list of other

15    LLCs that Carpenter Financial Group has an interest in.  But it

16    also requires next week --

17             THE COURT:  Slow down just a little bit.

18             MS. COLBATH:  Yes.  It also requires them to give me

19    copies of profit and loss statements, tax returns, balance

20    sheets, bank statements.  So at this point, based on the

21    declaration that Ms. Carpenter submitted on the application,

22    she doesn't say that her husband doesn't have an interest in

23    Grist Mill Partners.  And I have a judgment against

24    Mr. Carpenter.  And it only operates, he has testified --

25             THE COURT:  Even if he is has an interest in that

FBANUNIC

1  LLC --

2              MS. COLBATH:  Correct.

3              THE COURT:  -- that might mean that you can go and, if

4  Connecticut law permits this, execute on his interest in the

5  LLC and get the transfer of that membership interest.  But that

6  in and of itself would not, unless you dissolve that LLC, make

7  the assets of the LLC his assets or make that LLC his alter

8  ego.

9              MS. COLBATH:  If Mr. Carpenter, as we believe is the

10  case, has an interest in Grist Mill Partners LLC, OK -- I mean,

11  Mr. Carpenter himself testified that he never puts any assets

12  into is own name.  He uses these LLCs in order to shield

13  creditors like Universitas.  He's acknowledged that under oath.

14         Based on all the facts as we currently understand

15  them, we believe Mr. Carpenter has an interest in Grist Mill

16  Partners LLC.  That's the entity that Curaleaf is engaged in

17  the transaction with.

18         I sought to have Mr. Carpenter, I asked him please

19  produce to me documents relating to your relationship with

20  Grist Mill Partners LLC, and he said, I am taking the Fifth

21  Amendment.  I am not producing anything.  I am not going to

22  incriminate myself.

23         Based on that, a reasonable inference is that he has

24  an interest that he's concealing in Grist Mill Partners LLC.

25  If that is the case, and Curaleaf owes money to Grist Mill

FBANUNIC

1   Partners, I am entitled to issue a restraining notice to

2   Curaleaf.

3            They are within my Rule 45 100 miles.  Magistrate

4   Judge Pitman has already ruled on this issue on the

5   effectiveness of a restraining order on a party in Connecticut.

6   He ruled on it in this case with regard to Mr. LaBelle's firm

7   and found that we were authorized so long as the party was

8   within the 100 miles.

9            So, at this point, you are entitled to -- and until we

10  take Mr. Carpenter's deposition and get the discovery, we are

11  entitled to that we've sought relating to Grist Mill Partners,

12  we are entitled to issue a restraining notice to Curaleaf to

13  say, Hold it.  If you owe money on Grist Mill Partners, you

14  can't transfer that without us knowing and giving us an

15  opportunity to make a turnover motion that that money be

16  transferred to us.

17           That's all the restraining notice does.  It doesn't

18  direct them that they have to pay it to me.  They just can't

19  pay it to Mr. Carpenter, and it gives me an opportunity --

20  frankly, these restraining notices are the only way we've ever

21  learned about any assets and transactions.  The judgment

22  debtors have never disclosed anything.  They have never made

23  any effort to satisfy any of these judgments.

24           So when Curaleaf decides it's going to make a payment,

25  I can go into court and make a turnover motion and say that

FBANUNIC

 1    belongs to Universitas, because this is another entity that

 2    Mr. Carpenter has an interest in.  And I am entitled to collect

 3    on the judgment we have against him with anything that he has

 4    an interest in.

 5            I do think that the restraining notice is -- their

 6    argument, Mr. LaBelle's argument that it is not effective in

 7    Connecticut has been addressed by Magistrate Judge Pitman, and

 8    we have a reasonable basis to believe that Mr. Carpenter has an

 9    interest in Grist Mill Partners and it should be extended along

10    the same lines, the same timetable as we have discussed with

11    Penn Mutual to afford Universitas the discovery that it is

12    entitled to.

13            Thank you.

14            THE COURT:  Thank you.

15            Mr. Clasen.

16            MR. CLASEN:  Yes, your Honor, I appreciate it.

17            We would like some clarity if we possibly could get

18    it.

19            First of all, we were served with a restraining order

20    restraining Curaleaf from paying Grist Mill Partners LLC.  We

21    took some discovery.  According to the discovery we got, it was

22    that 99 percent of Grist Mill Partners LLC is owned by one of

23    the judgment debtors, Carpenter Financial Group.

24            So in accordance with the restraining order we were

25    served upon, we complied.  We have not paid Grist Mill Partners

FBANUNIC

1    LLC anything.

2         In response Grist Mill Partners LLC has commenced an

3    eviction proceeding, claiming that the tenancy has been

4    terminated because we haven't paid them anything.

5         So if your Honor decides to continue the restraining

6    order or not to continue the restraining order, what we would

7    appreciate is at least some sort of statement that the

8    restraining order, if you decide to terminate it, is permanent

9    as of today, but we were right in complying with it.

10         If we were paying Grist Mill Partners, we would have

11    to pay her client.  We did what we should have done.  We

12    complied with the order.  You have extended it twice, your

13    Honor.  We have complied the order.

14         We have we are in a catch-22, your Honor, because by

15    complying with the order we have a eviction proceeding against

16    us up in Connecticut.  We have other defenses in that eviction

17    proceeding.  For example, the roof of the building has not been

18    repaired.

19         What we are looking for is just clarity if you are

20    going to continue it with a clear order that we are currently

21    restrained.  If you are not going to continue it, say the

22    restraint is lifted as of today, but prior to this we were

23    correct in complying with the restraining order they served as

24    well as the two orders you issued continuing the restraining

25    order.

FBANUNIC

1          So we appreciate it, your Honor.

2          THE COURT:  Mr. LaBelle, did you wish to be heard?

3          MR. LaBELLE:  Yes, your Honor.

4          Again, I think your Honor's initial instincts were

5    correct, that Grist Mill Partners is not a judgment debtor.

6    The obligation that Curaleaf owes, the rent obligation is owed

7    to Grist Mill partners.  It's really as simple as that.  So the

8    restraining notice shouldn't have any effect on Curaleaf's

9    obligation relating to Grist Mill Partners.

10         Your Honor, in point of fact, Mr. Clasen, they stopped

11   paying rent before the restraining notice was served.

12         What's happened now is they are using the restraining

13   notice as an excuse to continue to not pay rent.  That is just

14   the kind of mischief with the refusal of Universitas to clarify

15   the real import of the restraining notices.

16         But I think your Honor's initial assessment was

17   exactly right.  The whole setup of the LLC is the membership

18   interest is separate from the LLC interest, and the obligation

19   of Curaleaf is to the LLC.  It is not to Carpenter Financial.

20         The LLC is restrained.  It cannot pay any money to the

21   member debtor, which is Carpenter Financial Group.  There won't

22   be any distribution out.

23         If there is, it is a violation of the restraining

24   notice.  Actually, I shouldn't say that, because that is not --

25   that was an incorrect statement.  As long as the restraining

FBANUNIC

1    notice was in place, Grist Mill Partners couldn't pay anything

2    out.  It is a third party, so it would expire after the

3    one-year period.

4              THE COURT:  Unless I extend it.  Is the Grist Mill

5    Partners restraining notice one of the listed restraining

6    notices as to which no timely objection was interposed?

7              MS. COLBATH:  Yes.

8              THE COURT:  I am hearing yes.

9              MR. LaBELLE:  I mean, Grist Mill Partners doesn't

10   really have an objection to not paying Carpenter Financial, so

11   I don't really care.  What we do have an objection to is the

12   notion that the -- that was stated.  That was Grist Mill

13   Partners' objection.  The notion that the restraining notice

14   somehow prevents Curaleaf from paying Grist Mill Partners.  It

15   is a sole tenant in the building, your Honor, and the tenant is

16   refusing to pay based on this restraining notice in part.

17             THE COURT:  Thank you.

18             MR. CLASEN:  Your Honor, if I could just clarify

19   something?

20             THE COURT:  Yes.

21             MR. CLASEN:  Curaleaf stopped paying rent in January

22   because the roof was leaking and the landlord didn't come in

23   and fix it.  We were served with the restraining order in

24   February, and we then told them there was another reason why we

25   can no longer pay them right now, and we have been restrained

FBANUNIC

1    since February from paying them the rent.

2         To make some argument that this is an excuse for

3    something is totally incorrect.  We told them we were faced

4    with the restraining order that was issued that you twice

5    extended, your Honor.

6         I don't think there is any doubt that we have been

7    complying with the restraining order.  I would just appreciate

8    it, because in Connecticut they are taking the position that we

9    are not restrained.  And our tenancy has been terminated

10   because we have been complying with the order.  That is why we

11   have been put in this catch-22 position.

12        THE COURT:  Thank you.

13        I do need briefly to take all of this under

14   advisement, and I am undertaking by the end of the week to

15   issue modified orders or an order explaining my determination.

16        Ms Colbath.

17        MS. COLBATH:  Yes, your Honor.  Could we file on ECF

18   today the supplemental papers which we furnished to counsel

19   earlier today?

20        THE COURT:  Yes.

21        Do you have a courtesy copy for me?

22        MS. COLBATH:  Yes.  Also, would your Honor entertain a

23   two-page memorandum relating to adverse inferences with regard

24   to this application?

25        THE COURT:  If it is filed by the end of the day

FBANUNIC

1    tomorrow on ECF.  Even though it is a court holiday, ECF is

2    open.

3              MS. COLBATH:  Thank you.

4              THE COURT:  All right.  Thank you, all.

5              MS. COLBATH:  Thank you, your Honor.

6              THE COURT:  We are adjourned.

7              (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25